# EXHIBIT C

Exhibit C-1 (Setlak)

**Exhibit C-1**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 5,841,888 ("Setlak")**

U.S. PATENT NO. 5,841,888 to Setlak ("Setlak") entitled "Method for fingerprint indexing and searching" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Setlak |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Setlak discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "An apparatus according to the present invention may be implemented on one or more processors or computers operating under stored program control. The apparatus is for indexing and searching a plurality of reference fingerprints to determine if a sample fingerprint matches one of the reference fingerprints. In one embodiment, the apparatus |

1

Exhibit C-1 (Setlak)

| | |
|---|---|
| | preferably comprises indexing means for determining respective index values for the reference fingerprints and the sample fingerprint based upon at least one predetermined fingerprint characteristic and with the index values being generally evenly distributed over a relatively large population of individuals. The apparatus also preferably includes selecting means for selecting a first subset of the reference fingerprints having index values within a first range relative to the index value of the sample fingerprint, and comparing means for comparing the sample fingerprint to each fingerprint of the first subset of reference fingerprints to thereby determine if there is a match between the sample fingerprint and one of the reference fingerprints and without initially requiring comparing of the sample fingerprint to all of the reference fingerprints." Setlak at 4:61-5:14 <br><br> "As would be readily understood by those skilled in the art, the output may be used to identify the individual, such as to grant access or permit the person to perform some further function. The match or no match output may also be desirable when determining whether the individual has previously enrolled in the database, such as, for example, to prevent an individual from acquiring multiple driver's licenses under different names. Those of skill in the art will appreciate a wide range of additional applications for the present invention." Setlak at 6:44-53 |
| 1[a]. a memory comprising a database of biometric signatures; | Setlak discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-1 (Setlak)



FIG. 1

Setlak at Fig. 1

"In view of the foregoing background, it is therefore an object of the present invention to provide a method and apparatus for permitting efficient searching of a relatively large database of reference fingerprints."
Setlak at 3:34-37

"The fingerprint image is processed by the illustrated minutiae extractor 23 and curliness indexor 24 as will be explained in greater detail below. A plurality of reference fingerprints are indexed and stored in the illustrated database 25. The indexed minutiae data from the database 25 may be selectively searched by the illustrated minutiae comparor 27. The illustrated confidence level selector 26 provides the appropriate index range over which to initiate the search. The minutiae comparor 27 may provide a match or no match output as illustrated."
Setlak at 6:34-43

3

Exhibit C-1 (Setlak)

| 1[b]. a transmitter sub-system comprising: | Setlak discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>FIG. 1<br>Setlak at Fig. 1<br><br>"The fingerprint image is processed by the illustrated minutiae extractor 23 and curliness indexor 24 as will be explained in greater detail below. A plurality of reference fingerprints are indexed and stored in the illustrated database 25. The indexed minutiae data from the database 25 may be selectively searched by the illustrated minutiae comparor 27. The illustrated confidence level selector 26 provides the appropriate index range over which to initiate the search. The minutiae comparor 27 may provide a match or no match output as illustrated.<br>As would be readily understood by those skilled in the art, the output may be used to identify the individual, such as to grant access or permit the person to perform some further function. The match or no match output may also be desirable when determining whether |

4

Exhibit C-1 (Setlak)

| | |
|---|---|
| | the individual has previously enrolled in the database, such as, for example, to prevent an individual from acquiring multiple driver's licenses under different names. Those of skill in the art will appreciate a wide range of additional applications for the present invention." Setlak at 6:34-53 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Setlak discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>FIG. 1<br><br>Setlak at Fig. 1<br><br>"Referring now first to FIGS. 1 and 2, the invention is first described. The apparatus 20 of FIG. 1 includes a fingerprint scanner or sensor 22 for inputting an image of a fingerprint. A suitable fingerprint sensor 22 of an electric field measuring type is described in a copending patent application entitled "Electric Field Fingerprint Sensor and Related Methods" having |

5

Exhibit C-1 (Setlak)

| | |
|---|---|
| | attorney work docket number 16871, Ser. No. 08/592,469, assigned to the assignee of the present invention and the entire disclosure of which is incorporated herein by reference in its entirety. Optical, ultrasonic and other type fingerprint sensors may also be used as would be readily understood by those skilled in the art. In addition, the fingerprint image may be input from a paper copy or transparency of a fingerprint as would also be readily understood by those skilled in the art." Setlak at 6:19-33 |
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Setlak discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: *FIG. 1* Setlak at Fig. 1 |

6

Exhibit C-1 (Setlak)



FIG. 3

Setlak at Fig. 3

"An apparatus according to the present invention may be implemented on one or more processors or computers operating under stored program control. The apparatus is for indexing and searching a plurality of reference fingerprints to determine if a sample fingerprint matches one of the reference fingerprints. In one embodiment, the apparatus

7

Exhibit C-1 (Setlak)

| | preferably comprises indexing means for determining respective index values for the reference fingerprints and the sample fingerprint based upon at least one predetermined fingerprint characteristic and with the index values being generally evenly distributed over a relatively large population of individuals. The apparatus also preferably includes selecting means for selecting a first subset of the reference fingerprints having index values within a first range relative to the index value of the sample fingerprint, and comparing means for comparing the sample fingerprint to each fingerprint of the first subset of reference fingerprints to thereby determine if there is a match between the sample fingerprint and one of the reference fingerprints and without initially requiring comparing of the sample fingerprint to all of the reference fingerprints." <br> Setlak at 4:61-5:14 <br><br> "The fingerprint image is processed by the illustrated minutiae extractor 23 and curliness indexor 24 as will be explained in greater detail below. A plurality of reference fingerprints are indexed and stored in the illustrated database 25. The indexed minutiae data from the database 25 may be selectively searched by the illustrated minutiae comparor 27. The illustrated confidence level selector 26 provides the appropriate index range over which to initiate the search. The minutiae comparor 27 may provide a match or no match output as illustrated. <br> As would be readily understood by those skilled in the art, the output may be used to identify the individual, such as to grant access or permit the person to perform some further function. The match or no match output may also be desirable when determining whether the individual has previously enrolled in the database, such as, for example, to prevent an individual from acquiring multiple driver's licenses under different names. Those of skill in the art will appreciate a wide range of additional applications for the present invention." <br> Setlak at 6:34-53 <br><br> "If a match is determined at Block 62, a match may be indicated at Block 66 and the process repeated for another search. If no match is found at Block 62, a second subset including a wider range of index values may be selected for further searching as indicated at Block 64. Because of the desirable characteristics of the index in accordance with the present invention, adjacent indexes are more likely to produce a match than are remote indexes." |
|---|---|

Exhibit C-1 (Setlak)

| | Setlak at 7:34-41 |
|---|---|
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Setlak discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[e]<br>See, e.g., Wuidart at Claim 1[e]<br>See, e.g., Hamid at Claim 1[e]<br>See, e.g., Mathiassen at Claim 1[e]<br>See, e.g., Steiner at Claim 1[e] |
| 1[f]. a receiver sub-system comprising: | Setlak discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[f]<br>See, e.g., Wuidart at Claim 1[f]<br>See, e.g., Hamid at Claim 1[f]<br>See, e.g., Ikegami at Claim 1[f] |

Exhibit C-1 (Setlak)

| | |
|---|---|
| | See, e.g., Sands at Claim 1[f]<br>See, e.g., Howell at Claim 1[f]<br>See, e.g., Hoyos at Claim 1[f]<br>See, e.g., Mathiassen at Claim 1[f]<br>See, e.g., iPAQ 5400 series at Claim 1[f] |
| 1[g]. a receiver sub-system controller configured to: | Setlak discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[g]<br>See, e.g., Hamid at Claim 1[g]<br>See, e.g., Sands at Claim 1[g]<br>See, e.g., Howell at Claim 1[g]<br>See, e.g., Hoyos at Claim 1[g]<br>See, e.g., Mathiassen at Claim 1[g]<br>See, e.g., iPAQ 5400 series at Claim 1[g] |
| 1[h]. receive the transmitted secure access signal; and | Setlak discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in |

Exhibit C-1 (Setlak)

| | |
|---|---|
| | Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[h]<br>See, e.g., Wuidart at Claim 1[h]<br>See, e.g., Hamid at Claim 1[h]<br>See, e.g., Ikegami at Claim 1[h]<br>See, e.g., Sands at Claim 1[h]<br>See, e.g., Howell at Claim 1[h]<br>See, e.g., Hoyos at Claim 1[h]<br>See, e.g., Mathiassen at Claim 1[h] |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Setlak discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[i]<br>See, e.g., Hamid at Claim 1[i]<br>See, e.g., Sands at Claim 1[i]<br>See, e.g., Howell at Claim 1[i]<br>See, e.g., Hoyos at Claim 1[i]<br>See, e.g., Mathiassen at Claim 1[i]<br>See, e.g., Steiner at Claim 1[i] |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Setlak discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-1 (Setlak)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Setlak discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The first database is of live-scan fingerprints from an ultrasonic fingerprint scanner. This database contained data for 103 fingers, with two representative images of each finger illustrated by the squares and diamonds defining the plot 91 of FIG. 10 shown in sorted order based upon an average of the curliness values for each finger. The curliness algorithm was used without ridge flow smoothing and all of the prints have about 5-15% of the ridge flow cells indeterminate. For this first database the performance analysis indicates:<br>1. 15 to 1 average performance improvement over global search when the search print has a match in the database.<br>2. 5 to 1 performance improvement over global search for 99% confidence that no match exists.<br>The second database is of live scan fingerprints from 81 fingers with 5 sample images for each. This data is sorted and illustrated by the plot 92 of FIG. 11 with the index values for the five images of each finger represented by respective geometric figures along respective vertical lines. The performance analysis for this database indicates:<br>1. 10 to 1 average performance improvement over global search when the search print has a match in the database.<br>2. 3 to 1 performance improvement over global search for 95% confidence that no match exists."<br>Setlak at 9:49-10:8<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other |

Exhibit C-1 (Setlak)

|  | prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Ikegami at Claim 1[k]<br>See, e.g., Howell at Claim 1[k]<br>See, e.g., Steiner at Claim 1[k]<br>See, e.g., iPAQ 5400 series at Claim 1[k] |
|---|---|
| 1[l]. map said series into an instruction; and | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-1 (Setlak)



FIG. 3

Setlak at Fig. 3

"The overall operation of the invention is additionally understood with particular reference to the flow charts of FIGS. 3 and 4. From the start (Block 50) the fingerprint minutiae is extracted, the curliness index is calculated for each of the reference fingerprints in the database, and the results are stored at Block 52. Alternately, or in addition thereto, a digitized image of each of the reference fingerprints may also be stored for later searching;

14

Exhibit C-1 (Setlak)

| | however, the images are desirably stored with the associated curliness index or other searching index as described in greater detail herein." <br> Setlak at 7:1-11 |
|---|---|
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

15

Exhibit C-1 (Setlak)



FIG. 3

Setlak at Fig. 3

"As would be readily understood by those skilled in the art, the output may be used to identify the individual, such as to grant access or permit the person to perform some further function. The match or no match output may also be desirable when determining whether the individual has previously enrolled in the database, such as, for example, to prevent an

16

Exhibit C-1 (Setlak)

| | individual from acquiring multiple driver's licenses under different names. Those of skill in the art will appreciate a wide range of additional applications for the present invention."<br>Setlak at 6:44-53<br><br>"The overall operation of the invention is additionally understood with particular reference to the flow charts of FIGS. 3 and 4. From the start (Block 50) the fingerprint minutiae is extracted, the curliness index is calculated for each of the reference fingerprints in the database, and the results are stored at Block 52. Alternately, or in addition thereto, a digitized image of each of the reference fingerprints may also be stored for later searching; however, the images are desirably stored with the associated curliness index or other searching index as described in greater detail herein."<br>Setlak at 7:1-11 |
|---|---|
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Setlak discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Setlak discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |

Exhibit C-1 (Setlak)

| | |
|---|---|
| | See, e.g., Schmitt at Claim 2[a]<br>See, e.g., Hamid at Claim 2[a]<br>See, e.g., Ikegami at Claim 2[a]<br>See, e.g., Sands at Claim 2[a]<br>See, e.g., Howell at Claim 2[a]<br>See, e.g., Hoyos at Claim 2[a]<br>See, e.g., Steiner at Claim 2[a]<br>See, e.g., iPAQ 5400 series at Claim 2[a] |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Setlak discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 2[b]<br>See, e.g., Wuidart at Claim 2[b]<br>See, e.g., Hamid at Claim 2[b]<br>See, e.g., Sands at Claim 2[b]<br>See, e.g., Howell at Claim 2[b]<br>See, e.g., Hoyos at Claim 2[b]<br>See, e.g., Mathiassen at Claim 2[b]<br>See, e.g., Steiner at Claim 2[b] |
| 2[c]. construct an audit trail of biometric signals provided to the | Setlak discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

18

Exhibit C-1 (Setlak)

| biometric sensor in order to access the controlled item. | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
|---|---|
| **Claim 4** | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Setlak discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

19

Exhibit C-1 (Setlak)



*FIG. 1*

Setlak at Fig. 1

"In view of the foregoing background, it is therefore an object of the present invention to provide a method and apparatus for permitting efficient searching of a relatively large database of reference fingerprints."
Setlak at 3:34-37

"FIG. 1 is a schematic block diagram of an embodiment of the apparatus in accordance with the invention."
Setlak at 5:49-50

"The fingerprint image is processed by the illustrated minutiae extractor 23 and curliness indexor 24 as will be explained in greater detail below. A plurality of reference fingerprints are indexed and stored in the illustrated database 25. The indexed minutiae data from the database 25 may be selectively searched by the illustrated minutiae comparor 27. The illustrated confidence level selector 26 provides the appropriate index range over which to

Exhibit C-1 (Setlak)

| | |
|---|---|
| | initiate the search. The minutiae comparor 27 may provide a match or no match output as illustrated."<br>Setlak at 6:34-43<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Wuidart at Claim 4<br>See, e.g., Hamid at Claim 4<br>See, e.g., Ikegami at Claim 4<br>See, e.g., Sands at Claim 4<br>See, e.g., Hoyos at Claim 4<br>See, e.g., Mathiassen at Claim 4 |
| **Claim 6** | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Setlak discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Setlak discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-1 (Setlak)

| | |
|---|---|
| | To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[a]<br>See, e.g., Wuidart at Claim 6[a]<br>See, e.g., Hamid at Claim 6[a]<br>See, e.g., Howell at Claim 6[a]<br>See, e.g., Mathiassen at Claim 6[a]<br>See, e.g., Steiner at Claim 6[a]<br>See, e.g., iPAQ 5400 series at Claim 6[a] |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Setlak discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[b]<br>See, e.g., Hoyos at Claim 6[b]<br>See, e.g., Mathiassen at Claim 6[b]<br>See, e.g., Steiner at Claim 6[b] |
| Claim 9 | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Setlak discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-1 (Setlak)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Setlak discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 9[a]<br>See, e.g., Sands at Claim 9[a]<br>See, e.g., Howell at Claim 9[a]<br>See, e.g., Hoyos at Claim 9[a]<br>See, e.g., Steiner at Claim 9[a]<br>See, e.g., iPAQ 5400 series at Claim 9[a] |
| Claim 10 | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Setlak discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-1 (Setlak)

| | |
|---|---|
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Setlak discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Setlak discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Setlak discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Setlak discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |

Exhibit C-1 (Setlak)

| | |
|---|---|
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Setlak discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter | To the extent the preamble is limiting, Setlak discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access |

Exhibit C-1 (Setlak)

| | |
|---|---|
| configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Setlak discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Setlak discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Setlak discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-1 (Setlak)

| | |
|---|---|
| 11[d]. mapping said series into an instruction; and | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Setlak discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Setlak discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Setlak discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Setlak discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

27

Exhibit C-1 (Setlak)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Setlak discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Setlak discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

28

Exhibit C-1 (Setlak)

| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Setlak discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Setlak does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Setlak discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"An apparatus according to the present invention may be implemented on one or more processors or computers operating under stored program control. The apparatus is for indexing and searching a plurality of reference fingerprints to determine if a sample fingerprint matches one of the reference fingerprints. In one embodiment, the apparatus preferably comprises indexing means for determining respective index values for the reference fingerprints and the sample fingerprint based upon at least one predetermined fingerprint characteristic and with the index values being generally evenly distributed over a relatively large population of individuals. The apparatus also preferably includes selecting means for selecting a first subset of the reference fingerprints having index values within a first range relative to the index value of the sample fingerprint, and comparing means for comparing the sample fingerprint to each fingerprint of the first subset of reference |

Exhibit C-1 (Setlak)

| | |
|---|---|
| | fingerprints to thereby determine if there is a match between the sample fingerprint and one of the reference fingerprints and without initially requiring comparing of the sample fingerprint to all of the reference fingerprints." <br> Setlak at 4:61-5:14 |
| 14[a]. receive a series of entries of a biometric signal; | Setlak discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Setlak discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Setlak discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

30

Exhibit C-1 (Setlak)

| | See Disclosure at Claim 1[m] |
|---|---|
| 14[e]. receive the biometric signal; | Setlak discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Setlak discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Setlak discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-1 (Setlak)

| | See Disclosure at Claim 1[i] and Claim 1[m] |
|---|---|
| **Claim 15** | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Setlak discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Setlak discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Setlak discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Setlak discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |

32

Exhibit C-1 (Setlak)

| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Setlak discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Setlak discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Setlak discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Setlak discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |

33

Exhibit C-1 (Setlak)

| | |
|---|---|
| 15[h]. receiving the transmitted secure access signal; and | Setlak discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Setlak discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Setlak discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Setlak discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-1 (Setlak)

| 15[l]. mapping said series into an instruction; and | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Setlak discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Setlak discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

35

Exhibit C-1 (Setlak)

| | See Disclosure at Claim 1[c] |
|---|---|
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Setlak discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Setlak discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Setlak discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Setlak discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-1 (Setlak)

| | See Disclosure at Claim 1[k] |
|---|---|
| 16[f]. mapping said series into an instruction; and | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing | To the extent the preamble is limiting, Setlak discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |

Exhibit C-1 (Setlak)

| conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | |
|---|---|
| 17[a]. populating the database of biometric signatures by: | Setlak discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Setlak discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Setlak discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Setlak discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-1 (Setlak)

| | See Disclosure at Claim 1[l] |
|---|---|
| 17[e]. populating the database according to the instruction; | Setlak discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Setlak discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Setlak discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Setlak discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-1 (Setlak)

| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Setlak discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-2 (Schmitt)

**Exhibit C-2**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 6,088,585 ("Schmitt")**

U.S. PATENT NO. 6,088,585 to Schmitt ("Schmitt") entitled "Portable telecommunication device including a fingerprint sensor and related methods" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendants' Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Schmitt |
| --- | --- |
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Schmitt discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A portable telecommunication device includes a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and an authorizing feature for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing may be performed locally or based upon a |

1

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | remote authorization signal. The portable telecommunication device may be cellular telephone. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is desired to prevent reception or transmission on designated bands by unauthorized users. The device may also include a user identification feature for transmitting a user identification signal to a remote device based upon a sensed fingerprint. The portable telecommunication device may operate with one or both of audio and data signals. The portable telecommunication device is preferably based upon a lightweight and reliable integrated circuit fingerprint sensor. This integrated circuit may include a substrate, and at least one electrically conductive layer adjacent the substrate and comprising portions defining an array of electric field sensing electrodes. The at least one electrically conductive layer may further comprise portions defining a respective shield electrode for each electric field sensing electrode." <br> Schmitt at Abstract |
| 1[a]. a memory comprising a database of biometric signatures; | Schmitt discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "Fingerprint sensing and matching is a reliable and widely used technique for personal identification or verification. In particular, a common approach to fingerprint identification involves scanning a sample fingerprint or an image thereof and storing the image and/or unique characteristics of the fingerprint image. The characteristics of a sample fingerprint may be compared to information for reference fingerprints already in a database to determine proper identification of a person, such as for verification purposes. <br> A typical electronic fingerprint sensor is based upon illuminating the finger surface using visible light, infrared light, or ultrasonic radiation. The reflected energy is captured with some form of camera, for example, and the resulting image is framed, digitized and stored as a static digital image. U.S. Pat. No. 4,525,859 to Bowles similarly discloses a video camera for capturing a fingerprint image and uses the minutiae of the fingerprints, that is, |

Exhibit C-2 (Schmitt)

<table>
<tr>
<td></td>
<td>the branches and endings of the fingerprint ridges, to determine a match with a database of reference fingerprints."<br>Schmitt at 1:12-30<br><br>"This and other objects, features, and advantages in accordance with the invention are provided by a portable telecommunication device comprising a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and matching means for determining matching of a sensed fingerprint with stored data. The transmitter or receiver portion, or both, of the device may be prevented from operating unless the fingerprint matches an enrolled or authorized stored fingerprint."<br>Schmitt at 3:17-31</td>
</tr>
<tr>
<td>1[b]. a transmitter sub-system comprising:</td>
<td>Schmitt discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>FIG. 15.</td>
</tr>
</table>

3

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | Schmitt at Fig. 15<br><br>"Referring additionally to the block diagram of FIG. 15, the cellular telephone 190 is further explained. The telephone includes a radio transceiver 202 within a portable housing, a fingerprint sensor carried by the housing 191, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor 30 sensing a fingerprint of an authorized user. The transceiver 202 includes both a transmitter 204 and a receiver 205 as would be readily understood by those skilled in the art."<br>Schmitt at 12:13-21 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Schmitt discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>FIG. 1.<br><br>Schmitt at Fig. 1 |

4

Exhibit C-2 (Schmitt)



FIG. 2.

EXCITATION DRIVE

Schmitt at Fig. 2

FIG. 4.

Schmitt at Fig. 4

5

Exhibit C-2 (Schmitt)



Schmitt at Fig. 15

Schmitt at Fig. 16

6

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | "FIG. 1 is a top plan view of a fingerprint sensor in accordance with the present invention. FIG. 2 is a schematic view of a circuit portion of the fingerprint sensor as shown in FIG. 1."<br>Schmitt at 4:25-28<br><br>"Referring to FIGS. 1-3, the fingerprint sensor 30 in accordance with the invention is initially described. The illustrated sensor 30 includes a housing or package 51, a dielectric layer 52 exposed on an upper surface of the package which provides a placement surface for the finger, and a plurality of output pins, not shown. A first conductive strip or external electrode 54 around the periphery of the dielectric layer 52, and a second external electrode 53 provide contact electrodes for the finger 79 as described in greater detail below. The sensor 30 may provide output signals in a range of sophistication levels depending on the level of processing incorporated in the package as would be readily understood by those skilled in the art."<br>Schmitt at 5:11-23<br><br>"Turning now additionally to FIG. 4, another aspect of the sensor 30 of the invention is described. The sensor may include power control means for controlling operation of active circuit portions 100 based upon sensing finger contact with the first external electrode 54 as determined by the illustrated finger sense block or circuit 101. For example, the finger sense circuit 101 may operate based upon a change in impedance to an oscillator to thereby determine finger contact. Of course, other approaches for sensing contact with the finger are also contemplated by the invention. The power control means may include wake-up means for only powering active circuit portions upon sensing finger contact with the first external electrode to thereby conserve power. Alternately or additionally, the power control means may further comprise protection means for grounding active circuit portions upon not sensing finger contact with the first external electrode. In the illustrated embodiment, a combination of wake-up and protection controller circuits 101 are illustrated."<br>Schmitt at 6:46-64<br><br>"In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet |

7

Exhibit C-2 (Schmitt)

|  | another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art." Schmitt at 12:22-37<br><br>"As shown in the similar block diagram of a cellular telephone 190' of FIG. 16, the authorizing means may be based upon a remote authorization from a remote station 212. The remote station 212 may be in direct radio communication, or more likely for a cellular telephone network, a base station communicates with the radio transceiver 202, and the base station is connected to a remote station via a landline as would be readily understood by those skilled in the art.<br>The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention." Schmitt at 13:12-33<br><br>"One method aspect of the present invention is for enhancing security of a portable telecommunication device of a type comprising a radio transceiver 202 within a portable housing 191 and a fingerprint sensor 30 carried by the housing. The method preferably further comprises the steps of sensing a fingerprint using the fingerprint sensor, and permitting use of the radio transceiver based upon the fingerprint sensor 30 sensing a fingerprint of an authorized user. Another method aspect of the invention is for identifying a user of the portable telecommunication device 190 and comprises the steps of sensing a fingerprint using the fingerprint sensor 30, and transmitting a user identification signal to a |

8

Exhibit C-2 (Schmitt)

| | remote device using the radio transceiver and based upon the fingerprint sensor sensing a fingerprint."<br>Schmitt at 13:63-14:9 |
|---|---|
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Schmitt discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>FIG. 15.<br><br>Schmitt at Fig. 15<br><br>"Fingerprint sensing and matching is a reliable and widely used technique for personal identification or verification. In particular, a common approach to fingerprint identification involves scanning a sample fingerprint or an image thereof and storing the image and/or unique characteristics of the fingerprint image. The characteristics of a sample fingerprint may be compared to information for reference fingerprints already in a database to determine proper identification of a person, such as for verification purposes." |

9

Exhibit C-2 (Schmitt)

| | Schmitt at 1:12-20<br><br>"This and other objects, features, and advantages in accordance with the invention are provided by a portable telecommunication device comprising a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and matching means for determining matching of a sensed fingerprint with stored data. The transmitter or receiver portion, or both, of the device may be prevented from operating unless the fingerprint matches an enrolled or authorized stored fingerprint."<br>Schmitt at 3:17-31<br><br>"Yet another aspect of the device is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. For a cellular telephone, the called party would then know the identity of the caller, for example."<br>Schmitt at 3:47-51<br><br>"In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art."<br>Schmitt at 12:22-37 |

10

Exhibit C-2 (Schmitt)

| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Schmitt discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>Schmitt at Fig. 16<br><br>"A portable telecommunication device includes a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and an authorizing feature for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing may be performed locally or based upon a remote authorization signal. The portable telecommunication device may be cellular telephone. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is |

Exhibit C-2 (Schmitt)

<table>
<tr>
<td></td>
<td>

desired to prevent reception or transmission on designated bands by unauthorized users. The device may also include a user identification feature for transmitting a user identification signal to a remote device based upon a sensed fingerprint. The portable telecommunication device may operate with one or both of audio and data signals. The portable telecommunication device is preferably based upon a lightweight and reliable integrated circuit fingerprint sensor. This integrated circuit may include a substrate, and at least one electrically conductive layer adjacent the substrate and comprising portions defining an array of electric field sensing electrodes. The at least one electrically conductive layer may further comprise portions defining a respective shield electrode for each electric field sensing electrode."

Schmitt at Abstract

"Yet another aspect of the device is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. For a cellular telephone, the called party would then know the identity of the caller, for example."

Schmitt at 3:47-51

"Other features of the invention may include a rechargeable battery carried by the housing. In addition, the device may include cryptography means for transmitting and receiving encrypted signals."

Schmitt at 3:61-65

"In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art."

</td>
</tr>
</table>

Exhibit C-2 (Schmitt)

| | Schmitt at 12:22-37 |
|---|---|
| | "As shown in the similar block diagram of a cellular telephone 190' of FIG. 16, the authorizing means may be based upon a remote authorization from a remote station 212. The remote station 212 may be in direct radio communication, or more likely for a cellular telephone network, a base station communicates with the radio transceiver 202, and the base station is connected to a remote station via a landline as would be readily understood by those skilled in the art.<br>The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention.<br>As shown in the illustrated embodiment of FIGS. 14-16, the portable telecommunication device may be a cellular telephone 190, 190'. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is desired to prevent reception or transmission on designated bands by unauthorized users. The illustrated processor 207 may also implement any of various cryptography schemes for certain high security applications as would be understood by those skilled in the art."<br>Schmitt at 13:12-45<br><br>"One method aspect of the present invention is for enhancing security of a portable telecommunication device of a type comprising a radio transceiver 202 within a portable housing 191 and a fingerprint sensor 30 carried by the housing. The method preferably further comprises the steps of sensing a fingerprint using the fingerprint sensor, and permitting use of the radio transceiver based upon the fingerprint sensor 30 sensing a fingerprint of an authorized user. Another method aspect of the invention is for identifying a user of the portable telecommunication device 190 and comprises the steps of sensing a |

13

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | fingerprint using the fingerprint sensor 30, and transmitting a user identification signal to a remote device using the radio transceiver and based upon the fingerprint sensor sensing a fingerprint." <br> Schmitt at 13:63-14:9 |
| 1[f]. a receiver sub-system comprising: | Schmitt discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> <br> FIG. 15. <br> Schmitt at Fig. 15 |

Exhibit C-2 (Schmitt)



Schmitt at Fig. 16

"This and other objects, features, and advantages in accordance with the invention are provided by a portable telecommunication device comprising a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and matching means for determining matching of a sensed fingerprint with stored data. The transmitter or receiver portion, or both, of the device may be prevented from operating unless the fingerprint matches an enrolled or authorized stored fingerprint."
Schmitt at 3:17-31

"Referring additionally to the block diagram of FIG. 15, the cellular telephone 190 is further explained. The telephone includes a radio transceiver 202 within a portable housing, a fingerprint sensor carried by the housing 191, and authorizing means for permitting use of

15

Exhibit C-2 (Schmitt)

| | the radio transceiver based upon the fingerprint sensor 30 sensing a fingerprint of an authorized user. The transceiver 202 includes both a transmitter 204 and a receiver 205 as would be readily understood by those skilled in the art."<br>Schmitt at 12:13-21<br><br>"As shown in the similar block diagram of a cellular telephone 190' of FIG. 16, the authorizing means may be based upon a remote authorization from a remote station 212. The remote station 212 may be in direct radio communication, or more likely for a cellular telephone network, a base station communicates with the radio transceiver 202, and the base station is connected to a remote station via a landline as would be readily understood by those skilled in the art.<br>The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention."<br>Schmitt at 13:12-33 |
|---|---|
| 1[g]. a receiver sub-system controller configured to: | Schmitt discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f].<br><br>"Alternately, the authorizing means may be based upon a remote authorization. In other words, the authorizing means may include remote authorization request means for transmitting a request for authorization signal to a remote device and for permitting use of the radio transceiver based upon a received authorization signal from the remote device. Of |

16

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | course the security of use of the telecommunications device is greatly increased according to this aspect of the invention."<br>Schmitt at 3:32-38<br><br>"Other features of the invention may include a rechargeable battery carried by the housing. In addition, the device may include cryptography means for transmitting and receiving encrypted signals."<br>Schmitt at 3:61-65<br><br>"The illustrated processor 207 controls the operation of the other components as would be readily understood by those skilled in the art. The transmitter 204 or receiver 205, or both, of the telephone 190 may be prevented from operating by the processor 207 unless the fingerprint matches an enrolled or authorized stored fingerprint. The use the full resolution of the A/D converters 180."<br>Schmitt at 12:38-44 |
| 1[h]. receive the transmitted secure access signal; and | Schmitt discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f].<br><br>"Alternately, the authorizing means may be based upon a remote authorization. In other words, the authorizing means may include remote authorization request means for transmitting a request for authorization signal to a remote device and for permitting use of the radio transceiver based upon a received authorization signal from the remote device. Of course the security of use of the telecommunications device is greatly increased according to this aspect of the invention."<br>Schmitt at 3:32-38 |

17

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | "Other features of the invention may include a rechargeable battery carried by the housing. In addition, the device may include cryptography means for transmitting and receiving encrypted signals."<br>Schmitt at 3:61-65 |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Schmitt discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"U.S. Pat. No. 5,546,471 to Merjanian discloses an optical or pressure sensitive fingerprint sensor packaged in an ergonomic housing. The sensor may communicate with another device in a wireless fashion. Additional means may be provided for extracting data from a credit card or food stamp, and matching means may be provided for matching any acquired print to the extracted data, and perhaps verifying the acquired print and the extracted data match. The device may be used for remote control, such as in combination with a set-top box for use with a television set for multiple operators and which includes an adjustable service level and preference setting based upon the sensed fingerprint."<br>Schmitt at 2:33-45 |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Schmitt discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least | Schmitt discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

18

Exhibit C-2 (Schmitt)

| one of the number of said entries and a duration of each said entry; | For example, see the following passages and/or figures, as well as all related disclosures: |
|---|---|
| | See Disclosure at Claim 1[c]. |
| | "This and other objects, features, and advantages in accordance with the invention are provided by a portable telecommunication device comprising a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and matching means for determining matching of a sensed fingerprint with stored data. The transmitter or receiver portion, or both, of the device may be prevented from operating unless the fingerprint matches an enrolled or authorized stored fingerprint." Schmitt at 3:17-31 |
| | "Moreover, the fingerprint sensor 30 may further comprise finger charge bleed means for bleeding a charge from a finger or other object upon contact therewith. The finger charge bleed means may be provided by the second external electrode 53 carried by the package 51 for contact by a finger, and a charge bleed resistor 104 connected between the second external electrode and an earth ground. As schematically illustrated in the upper right hand portion of FIG. 4, the second electrode may alternately be provided by a movable electrically conductive cover 53' slidably connected to the package 51 for covering the opening to the exposed upper dielectric layer 52. A pivotally connected cover is also contemplated by the present invention. Accordingly, under normal conditions, the charge would be bled from the finger as the cover 53' is moved to expose the sensing portion of the sensor 30. In addition, the finger charge bleed means and power control means may be such that the active portions remain grounded until the charge bleed means can remove the charge on the finger before powering the active circuit portions, such as by providing a brief delay during wake-up sufficient to permit the charge to be discharged through the resistor 104 as would be readily understood by those skilled in the art. Accordingly, power may be conserved in |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | the sensor 30 and ESD protection provided by the sensor so that the sensor is relatively inexpensive, yet robust and conserves power." Schmitt at 6:65-7:24

"In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art." Schmitt at 12:22-37

To the extent that Plaintiff contends Schmitt does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:

See, e.g., Ikegami at Claim 1[k]
See, e.g., Howell at Claim 1[k]
See, e.g., Steiner at Claim 1[k]
See, e.g., iPAQ 5400 series at Claim 1[k] |
| 1[l]. map said series into an instruction; and | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures: |

20

Exhibit C-2 (Schmitt)

| | "Turning now additionally to FIGS. 14-16 another aspect of the present invention is now described. In view of the ruggedness, small size, and low power consumption of the fingerprint sensor 30, the sensor may be combined with a portable telecommunication device, such as the illustrated cellular telephone 190. As would be readily understood by those skilled in the art, the illustrated cellular telephone 190 includes a compact housing 191, rechargeable battery 192 removably connected to the rear of the housing, a speaker 194 behind the grill 193, a keypad 195, an antenna 196, and a microphone matching and storage functions may be alternately be performed by circuitry and software in either of the fingerprint sensor 30 or the processor 207, as would be readily understood by those skilled in the art."<br>Schmitt at 12:65-13:11<br><br>To the extent that Plaintiff contends Schmitt does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Setlak at Claim 1[l]<br>See, e.g., Hamid at Claim 1[l]<br>See, e.g., Ikegami at Claim 1[l]<br>See, e.g., Sands at Claim 1[l]<br>See, e.g., Howell at Claim 1[l]<br>See, e.g., Hoyos at Claim 1[l]<br>See, e.g., Mathiassen at Claim 1[l]<br>See, e.g., Steiner at Claim 1[l]<br>See, e.g., iPAQ 5400 series at Claim 1[l] |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Schmitt discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | "Fingerprint sensing and matching is a reliable and widely used technique for personal identification or verification. In particular, a common approach to fingerprint identification involves scanning a sample fingerprint or an image thereof and storing the image and/or unique characteristics of the fingerprint image. The characteristics of a sample fingerprint may be compared to information for reference fingerprints already in a database to determine proper identification of a person, such as for verification purposes. A typical electronic fingerprint sensor is based upon illuminating the finger surface using visible light, infrared light, or ultrasonic radiation. The reflected energy is captured with some form of camera, for example, and the resulting image is framed, digitized and stored as a static digital image. U.S. Pat. No. 4,525,859 to Bowles similarly discloses a video camera for capturing a fingerprint image and uses the minutiae of the fingerprints, that is, the branches and endings of the fingerprint ridges, to determine a match with a database of reference fingerprints." Schmitt at 1:12-30 <br><br> "As mentioned briefly above, fingerprint sensing may have many applications. For example, U.S. Pat. No. 5,623,552 to Lane discloses a self-authenticating card including a live fingerprint sensor and which confirms the identity of the person upon matching of the sensed live fingerprint with a stored fingerprint. U.S. Pat. No. 4,993,068 to Piosenka et al. discloses a personal identification system also matching credentials stored on a portable memory devices, such as a card, to a physical characteristic, such as a live fingerprint. Matching may determine access to a remote site, for example." Schmitt at 1:60-2:3 <br><br> "U.S. Pat. No. 5,603,179 to Adams discloses a safety trigger for a firearm wherein optical scanners on the trigger sense the user's fingerprint, and the safety is released only if the sensed fingerprint matches a stored print. Unfortunately, a firearm may generate a relatively shock when fired which may damage or shorten the life of the optical fingerprint sensor. Also relating to gun security, U.S. Pat. No. 4,768,021 to Ferraro discloses a safe for a hand gun including a fingerprint sensor for allowing access only when the sensed fingerprint matches as authorized user. |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | U.S. Pat. No. 5,245,329 to Gokcebay discloses an access control system, such as for the doors of secured areas, wherein a mechanical key includes encoded data stored thereon, such as fingerprint information. A fingerprint sensor is positioned at the access point and access is granted if the live fingerprint matches the encoded fingerprint data from the key." Schmitt at 2:15-32<br><br>"This and other objects, features, and advantages in accordance with the invention are provided by a portable telecommunication device comprising a radio transceiver within a portable housing, a fingerprint sensor carried by the housing, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor sensing a fingerprint of an authorized user. The authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and matching means for determining matching of a sensed fingerprint with stored data. The transmitter or receiver portion, or both, of the device may be prevented from operating unless the fingerprint matches an enrolled or authorized stored fingerprint." Schmitt at 3:17-31<br><br>"In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art." The illustrated processor 207 controls the operation of the other components as would be readily understood by those skilled in the art. The transmitter 204 or receiver 205, or both, of the telephone 190 may be prevented from operating by the processor 207 unless the fingerprint matches an enrolled or authorized stored fingerprint. The use the full resolution of the A/D converters 180." Schmitt at 12:22-44 |

Exhibit C-2 (Schmitt)

| Claim 2 | |
|---|---|
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Schmitt discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Schmitt discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The sensor 30 may include core location determining means 146 cooperating with the ridge flow determining means 145 for determining a core location of the fingerprint image. The position of the core is helpful, for example, in extracting and processing minutiae from the fingerprint image as would also be readily understood by those skilled in the art."<br>Schmitt at 9:29-35 |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Schmitt discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Yet another aspect of the device is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. For a cellular telephone, the called party would then know the identity of the caller, for example."<br>Schmitt at 3:47-51 |

24

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | "In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art." Schmitt at 12:22-37 <br><br> "One method aspect of the present invention is for enhancing security of a portable telecommunication device of a type comprising a radio transceiver 202 within a portable housing 191 and a fingerprint sensor 30 carried by the housing. The method preferably further comprises the steps of sensing a fingerprint using the fingerprint sensor, and permitting use of the radio transceiver based upon the fingerprint sensor 30 sensing a fingerprint of an authorized user. Another method aspect of the invention is for identifying a user of the portable telecommunication device 190 and comprises the steps of sensing a fingerprint using the fingerprint sensor 30, and transmitting a user identification signal to a remote device using the radio transceiver and based upon the fingerprint sensor sensing a fingerprint." Schmitt at 13:63-14:9 |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Schmitt discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> To the extent that Plaintiff contends Schmitt does not disclose or render obvious this |

Exhibit C-2 (Schmitt)

| | claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
|---|---|
| Claim 4 | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Schmitt discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Schmitt does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Wuidart at Claim 4<br>See, e.g., Hamid at Claim 4<br>See, e.g., Ikegami at Claim 4<br>See, e.g., Sands at Claim 4<br>See, e.g., Hoyos at Claim 4<br>See, e.g., Mathiassen at Claim 4 |
| Claim 6 | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor | To the extent the preamble is limiting, Schmitt discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| is further configured to authenticate the identity of a user; | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Schmitt discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>FIG. 14.<br><br>Schmitt at Fig. 14 |

27

Exhibit C-2 (Schmitt)



Schmitt at Fig. 15

Schmitt at Fig. 16

28

Exhibit C-2 (Schmitt)

|  | "Yet another aspect of the device is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. For a cellular telephone, the called party would then know the identity of the caller, for example."<br>Schmitt at 3:47-51<br><br>"Other features of the invention may include a rechargeable battery carried by the housing. In addition, the device may include cryptography means for transmitting and receiving encrypted signals."<br>Schmitt at 3:61-65<br><br>"The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention.<br>As shown in the illustrated embodiment of FIGS. 14-16, the portable telecommunication device may be a cellular telephone 190, 190'. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is desired to prevent reception or transmission on designated bands by unauthorized users. The illustrated processor 207 may also implement any of various cryptography schemes for certain high security applications as would be understood by those skilled in the art."<br>Schmitt at 13:21-45 |
| 6[b]. the system further comprising a control panel configured to receive | Schmitt discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

29

Exhibit C-2 (Schmitt)

| the information and provide the secure access requested. | For example, see the following passages and/or figures, as well as all related disclosures:  Schmitt at Fig. 14 |
|---|---|

Exhibit C-2 (Schmitt)



Schmitt at Fig. 15

Schmitt at Fig. 16

31

Exhibit C-2 (Schmitt)

|  |  |
|---|---|
|  | "In this illustrated embodiment, the authorizing means may be local and comprise storing means for storing data related to at least one fingerprint for at least one authorized user, and a matcher 206 for determining matching of a sensed fingerprint with stored data. Yet another aspect of the invention is that it may further include user identification means for transmitting a user identification signal to a remote device based upon a sensed fingerprint. Accordingly, FIG. 15 illustrates a combination fingerprint storage and ID storage block 208 as would be readily understood by those skilled in the art. For a cellular telephone, the called party would then know the identity of the caller, for example, based upon the fingerprint sensor 30. This ID feature could be used without or in addition to the user authorization features as would be readily appreciated by those skilled in the art." Schmitt at 12:22-37

"The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention. As shown in the illustrated embodiment of FIGS. 14-16, the portable telecommunication device may be a cellular telephone 190, 190'. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is desired to prevent reception or transmission on designated bands by unauthorized users. The illustrated processor 207 may also implement any of various cryptography schemes for certain high security applications as would be understood by those skilled in the art." Schmitt at 13:21-45 |
| Claim 9 |  |

Exhibit C-2 (Schmitt)

| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Schmitt discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
|---|---|
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Schmitt discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)



FIG. 14.

Schmitt at Fig. 14

34

Exhibit C-2 (Schmitt)



Schmitt at Fig. 15

Schmitt at Fig. 16

35

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | "Referring additionally to the block diagram of FIG. 15, the cellular telephone 190 is further explained. The telephone includes a radio transceiver 202 within a portable housing, a fingerprint sensor carried by the housing 191, and authorizing means for permitting use of the radio transceiver based upon the fingerprint sensor 30 sensing a fingerprint of an authorized user. The transceiver 202 includes both a transmitter 204 and a receiver 205 as would be readily understood by those skilled in the art." <br> Schmitt at 12:13-21 <br><br> "The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention. <br> As shown in the illustrated embodiment of FIGS. 14-16, the portable telecommunication device may be a cellular telephone 190, 190'. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is desired to prevent reception or transmission on designated bands by unauthorized users. The illustrated processor 207 may also implement any of various cryptography schemes for certain high security applications as would be understood by those skilled in the art." <br> Schmitt at 13:21-45 |
| **Claim 10** | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Schmitt discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

36

Exhibit C-2 (Schmitt)

| | For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |
|---|---|
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Schmitt discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Schmitt discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Schmitt discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Schmitt discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)

| | See Disclosure for Claim 10[b] |
|---|---|
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Schmitt discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Schmitt discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of | To the extent the preamble is limiting, Schmitt discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric |

38

Exhibit C-2 (Schmitt)

| | |
|---|---|
| biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Schmitt discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Schmitt discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Schmitt discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-2 (Schmitt)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
|---|---|
| 11[d]. mapping said series into an instruction; and | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Schmitt discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Schmitt discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Schmitt discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-2 (Schmitt)

| | For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[d] |
|---|---|
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Schmitt discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Schmitt discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Schmitt discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[m] |

41

Exhibit C-2 (Schmitt)

| 12[a]. receiving a biometric signal; and | Schmitt discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Schmitt discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Schmitt does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Schmitt discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Turning now additionally to FIGS. 14-16 another aspect of the present invention is now described. In view of the ruggedness, small size, and low power consumption of the fingerprint sensor 30, the sensor may be combined with a portable telecommunication device, such as the illustrated cellular telephone 190. As would be readily understood by |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | those skilled in the art, the illustrated cellular telephone 190 includes a compact housing 191, rechargeable battery 192 removably connected to the rear of the housing, a speaker 194 behind the grill 193, a keypad 195, an antenna 196, and a microphone matching and storage functions may be alternately be performed by circuitry and software in either of the fingerprint sensor 30 or the processor 207, as would be readily understood by those skilled in the art." Schmitt at 12:65-13:11<br><br>"The authorizing means may include remote authorization request means 211 for transmitting a request for authorization signal to the remote station 212 and for permitting further use of the radio transceiver based upon a received authorization signal from the remote station. The remote request means may be provided in a standalone device, or perhaps more preferably in the processor 207 or processing circuitry associated with the integrated fingerprint sensor 30 as would be readily understood by those skilled in the art. The security of use of the cellular telephone 190' is greatly increased according to the authorization features of the invention.<br>As shown in the illustrated embodiment of FIGS. 14-16, the portable telecommunication device may be a cellular telephone 190, 190'. Accordingly, unauthorized users may not be permitted to use the cellular telephone and accumulate charges without the owner's consent. The invention may also be used with law enforcement or other telecommunications devices, for example, where it is desired to prevent reception or transmission on designated bands by unauthorized users. The illustrated processor 207 may also implement any of various cryptography schemes for certain high security applications as would be understood by those skilled in the art."<br>Schmitt at 13:21-45 |
| 14[a]. receive a series of entries of a biometric signal; | Schmitt discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Schmitt discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Schmitt discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Schmitt discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of | Schmitt discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a |

44

Exhibit C-2 (Schmitt)

| | |
|---|---|
| biometric signatures to thereby output an accessibility attribute; | matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Schmitt discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Schmitt discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Schmitt discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| 15[a]. a memory comprising a database of biometric signatures; | Schmitt discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Schmitt discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Schmitt discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Schmitt discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Schmitt discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Schmitt discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Schmitt discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Schmitt discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Schmitt discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-2 (Schmitt)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
|---|---|
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Schmitt discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Schmitt discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a | Schmitt discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Schmitt discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Schmitt discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Schmitt discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)

| | See Disclosure at Claim 1[d] |
|---|---|
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Schmitt discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Schmitt discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Schmitt discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Schmitt discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Schmitt discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | Schmitt discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)

| | See Disclosure at Claim 1[c] |
|---|---|
| 17[b]. receiving a series of entries of the biometric signal; | Schmitt discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Schmitt discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Schmitt discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[l] |
| 17[e]. populating the database according to the instruction; | Schmitt discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)

| | See Disclosure at Claim 1[m] |
|---|---|
| 17[f]. receiving the biometric signal; | Schmitt discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Schmitt discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Schmitt discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Schmitt discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-2 (Schmitt)

| | |
|---|---|
| | See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-3 (Wuidart)

**Exhibit C-3**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 6,164,403 ("Wuidart")**

U.S. PATENT NO. 6,164,403 to Wuidart ("Wuidart") entitled "Security System" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Wuidart |
| --- | --- |
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Wuidart discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A security system of the type having a fixed terminal and a portable unit such as a remote control. The portable unit produces an activation signal based on active intervention by a user and a measurement signal based on the measurement of a biometrical signature of the user. A control signal is generated when the activation and measurement signals are both |

1

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | generated within a specified temporal window and the measured biometrical signature corresponds to that of an authorized user. Thus, there is a reduced chance of both the security system being disarmed by an ill-intentioned third party and of untimely or inadvertently disarming the system."<br>Wuidart at Abstract<br><br>"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified."<br>Wuidart at 2:8-33 |
| 1[a]. a memory comprising a database of biometric signatures; | Wuidart discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

2

Exhibit C-3 (Wuidart)



Wuidart at Fig. 3

"The control circuit 20 also includes a microcontroller M1 that has a memory DB2 in which biometrical signatures of one or more authorized users are stored (e.g., the fingerprint of the thumb, index finger, or any other finger). Preferably, each biometrical signature is stored as a matrix of binary data and the biometrical signatures of each authorized user are stored in distinct areas of the memory DB2 that are referenced by a user number. For example, five distinct areas could be reserved for storing the biometrical signatures of five different authorized users (e.g., the members of a family), with each user being fictitiously associated with a user number (e.g., 1, 2, 3, 4 or 5). It is also preferable to have the fingerprint sensor

3

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | CED deliver the measurement signal SM2 as a digital signal so that the data supplied to the second input E2 of the control unit 20 can be directly exploited by the microcontroller M1. Otherwise, it is necessary to provide an analog-to-digital converter for the measurement signal."<br><br>Wuidart at 4:37-53 |
| 1[b]. a transmitter sub-system comprising: | Wuidart discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>Wuidart at Fig. 2<br><br>"FIG. 2 shows a more detailed view of a portable unit in the form of a key in accordance with an embodiment of the present invention. The key 103 has a conventional metal portion |

4

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | 12 that forms a key insert and an upper portion 11 that forms the head or grasping portion of the key. The upper portion 11 fulfills a remote control function of the system. For this purpose, the upper or remote control portion in the illustrated embodiment is a plastic portion containing an electronic circuit that transmits the lock/unlock signal SD. The remote control portion includes detection means for detecting the active intervention of the user in a known manner. For example, the detection means can include one or more keys of a keyboard, or more simply a switch SW (e.g., a push-button type switch) that is positioned under a first region 13 of the remote control portion 11. The first region 13 of the remote control portion can be folded by pressure exerted by the user's thumb 15 (e.g., because of a smaller thickness or the presence of adjacent ribs) to activate the switch SW within the remote control portion 11.

Additionally, the remote control portion 11 includes measurement means for measuring a biometrical signature of the authorized user of the vehicle. In one embodiment, the measurement means includes a microphone and a voice-recognition device that identify the user's voice. However, in preferred embodiments such as the one shown in FIG. 2, the measurement means includes a fingerprint sensor CED that is located within the remote control portion 11 of the portable unit 103. The active surface of the sensor CED is flush with an outer surface of the plastic portion 11 of the key."
Wuidart at 3:9-37 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Wuidart discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

"FIG. 2 shows a more detailed view of a portable unit in the form of a key in accordance with an embodiment of the present invention. The key 103 has a conventional metal portion 12 that forms a key insert and an upper portion 11 that forms the head or grasping portion of the key. The upper portion 11 fulfills a remote control function of the system. For this purpose, the upper or remote control portion in the illustrated embodiment is a plastic portion containing an electronic circuit that transmits the lock/unlock signal SD. The remote |

Exhibit C-3 (Wuidart)

| | control portion includes detection means for detecting the active intervention of the user in a known manner. For example, the detection means can include one or more keys of a keyboard, or more simply a switch SW (e.g., a push-button type switch) that is positioned under a first region 13 of the remote control portion 11. The first region 13 of the remote control portion can be folded by pressure exerted by the user's thumb 15 (e.g., because of a smaller thickness or the presence of adjacent ribs) to activate the switch SW within the remote control portion 11.<br><br>Additionally, the remote control portion 11 includes measurement means for measuring a biometrical signature of the authorized user of the vehicle. In one embodiment, the measurement means includes a microphone and a voice-recognition device that identify the user's voice. However, in preferred embodiments such as the one shown in FIG. 2, the measurement means includes a fingerprint sensor CED that is located within the remote control portion 11 of the portable unit 103. The active surface of the sensor CED is flush with an outer surface of the plastic portion 11 of the key."<br>Wuidart at 3:9-37 |
|---|---|
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Wuidart discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-3 (Wuidart)



Wuidart at Fig. 3

"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified." Wuidart at 2:8-33

"Additionally, the remote control portion 11 includes measurement means for measuring a biometrical signature of the authorized user of the vehicle. In one embodiment, the measurement means includes a microphone and a voice-recognition device that identify the user's voice. However, in preferred embodiments such as the one shown in FIG. 2, the measurement means includes a fingerprint sensor CED that is located within the remote control portion 11 of the portable unit 103. The active surface of the sensor CED is flush with an outer surface of the plastic portion 11 of the key." Wuidart at 3:27-37

"Additionally, the portable unit includes measurement means CED, preferably in the form of a fingerprint sensor, for measuring a biometrical signature of the user and delivering a measurement signal SM2. The portable unit also includes generation means for generating the unlock signal SD when the activation signal SA1 and the measurement signal SM2 are produced within a specified temporal window and the measured biometrical signature corresponds to an authorized user. The generation means is in the form of a control circuit 20 having a first input E1 that receives the activation signal SA1 and a second input E2 that receives the measurement signal SM2 from the sensor CED. The control circuit 20 also includes a microcontroller M1 that has a memory DB2 in which biometrical signatures of one or more authorized users are stored (e.g., the fingerprint of the thumb, index finger, or any other finger). Preferably, each biometrical signature is stored as a matrix of binary data and the biometrical signatures of each authorized user are stored in distinct areas of the memory DB2 that are referenced by a user number. For example, five |

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | distinct areas could be reserved for storing the biometrical signatures of five different authorized users (e.g., the members of a family), with each user being fictitiously associated with a user number (e.g., 1, 2, 3, 4 or 5). It is also preferable to have the fingerprint sensor CED deliver the measurement signal SM2 as a digital signal so that the data supplied to the second input E2 of the control unit 20 can be directly exploited by the microcontroller M1. Otherwise, it is necessary to provide an analog-to-digital converter for the measurement signal.<br><br>The microcontroller M1 is driven by a control program. When the data elements of the measurement signal SM2 correspond to the data elements stored in one of the areas of the memory DB2, the microcontroller M1 delivers an output signal OUT. The output signal OUT is then supplied to a transmission circuit ER2 to prompt the transmission of the unlock signal SD, for example through an antenna, infrared diode, or electrical connection. In order to provide a clear illustration of the logical combination of the activation signal SA1 and the measurement signal SM2 within the control unit 20, FIG. 3 shows an AND gate PL2 that receives the activation signal SA1 at one input and the measurement signal SM2 at another input. The output of the AND gate PL2 is supplied to an input i1 of the microcontroller M1."<br><br>Wuidart at 4:25-67 |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Wuidart discloses ]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

9

Exhibit C-3 (Wuidart)



Wuidart at Fig. 2

"FIG. 2 shows a more detailed view of a portable unit in the form of a key in accordance with an embodiment of the present invention. The key 103 has a conventional metal portion 12 that forms a key insert and an upper portion 11 that forms the head or grasping portion of the key. The upper portion 11 fulfills a remote control function of the system. For this purpose, the upper or remote control portion in the illustrated embodiment is a plastic portion containing an electronic circuit that transmits the lock/unlock signal SD. The remote control portion includes detection means for detecting the active intervention of the user in a known manner. For example, the detection means can include one or more keys of a keyboard, or more simply a switch SW (e.g., a push-button type switch) that is positioned under a first region 13 of the remote control portion 11. The first region 13 of the remote control portion can be folded by pressure exerted by the user's thumb 15 (e.g., because of a smaller thickness or the presence of adjacent ribs) to activate the switch SW within the remote control portion 11.

Exhibit C-3 (Wuidart)

Additionally, the remote control portion 11 includes measurement means for measuring a biometrical signature of the authorized user of the vehicle. In one embodiment, the measurement means includes a microphone and a voice-recognition device that identify the user's voice. However, in preferred embodiments such as the one shown in FIG. 2, the measurement means includes a fingerprint sensor CED that is located within the remote control portion 11 of the portable unit 103. The active surface of the sensor CED is flush with an outer surface of the plastic portion 11 of the key."
Wuidart at 3:9-37

"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified."
Wuidart at 2:8-33

"Additionally, the portable unit includes measurement means CED, preferably in the form of a fingerprint sensor, for measuring a biometrical signature of the user and delivering a measurement signal SM2. The portable unit also includes generation means for generating the unlock signal SD when the activation signal SA1 and the measurement signal SM2 are produced within a specified temporal window and the measured biometrical signature

11

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | corresponds to an authorized user. The generation means is in the form of a control circuit 20 having a first input E1 that receives the activation signal SA1 and a second input E2 that receives the measurement signal SM2 from the sensor CED."<br>Wuidart at 4:25-36<br><br>"The exact structure, features, and operation of the fixed terminal (e.g., a centralized door locking and unlocking unit) are not critical to the present invention and can conform to conventional fixed systems. At the least, the selection and design of the fixed terminal are within the scope of one of ordinary skill in the art so the fixed terminal will not be described in greater detail. Furthermore, the lock/unlock signal can also include a standard type of open-ended code (i.e., a code whose value changes with each transmission). Such a code can be used to hinder fraudulent attempts at picking up and recording (with appropriate electronics) the lock/unlock signal when it is normally transmitted by an authorized user and then subsequently and fraudulently reproducing the signal to unlock the vehicle."<br>Wuidart at 6:13-27 |
| 1[f]. a receiver sub-system comprising: | Wuidart discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

12

Exhibit C-3 (Wuidart)



Wuidart at Fig. 1

"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified." Wuidart at 2:8-33<br><br>"The portable unit is designed to be carried and operated by an authorized user 104 (e.g., the owner of the vehicle), and other authorized users can use the same portable unit 103 or another unit of the same kind that is assigned to them for the same function. Under certain conditions, the portable unit 103 delivers a lock/unlock signal SD to the fixed terminal 102 by means of a carrier wave such as an electromagnetic or infrared wave. In preferred embodiments, the lock/unlock signal SD is an amplitude-modulated or phase-modulated radio frequency signal that is generated by the portable unit." Wuidart at 2:66-3:8 |
| 1[g]. a receiver sub-system controller configured to: | Wuidart discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

14

Exhibit C-3 (Wuidart)



Wuidart at Fig. 1

"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock

Exhibit C-3 (Wuidart)

| | signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified." Wuidart at 2:8-33<br><br>"FIG. 1 is a simplified illustration of a security system for an exemplary functional unit in the form of an automobile. The automobile 101 is fitted with an onboard fixed terminal such as a centralized locking and unlocking unit 102. The security system also includes a portable unit 103 such as a "remote" control that is usually associated with a key for the vehicle. (In the following description, the portable unit is identified with the remote control or the key for the vehicle and these three expressions are used without distinction.)<br>The portable unit is designed to be carried and operated by an authorized user 104 (e.g., the owner of the vehicle), and other authorized users can use the same portable unit 103 or another unit of the same kind that is assigned to them for the same function. Under certain conditions, the portable unit 103 delivers a lock/unlock signal SD to the fixed terminal 102 by means of a carrier wave such as an electromagnetic or infrared wave. In preferred embodiments, the lock/unlock signal SD is an amplitude-modulated or phase-modulated radio frequency signal that is generated by the portable unit." Wuidart at 2:57-3:8 |
|---|---|
| 1[h]. receive the transmitted secure access signal; and | Wuidart discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The portable unit is designed to be carried and operated by an authorized user 104 (e.g., the owner of the vehicle), and other authorized users can use the same portable unit 103 or another unit of the same kind that is assigned to them for the same function. Under certain conditions, the portable unit 103 delivers a lock/unlock signal SD to the fixed terminal 102 by means of a carrier wave such as an electromagnetic or infrared wave. In preferred |

Exhibit C-3 (Wuidart)

| | embodiments, the lock/unlock signal SD is an amplitude-modulated or phase-modulated radio frequency signal that is generated by the portable unit." Wuidart at 2:66-3:8 |
|---|---|
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Wuidart discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[i]<br>See, e.g., Hamid at Claim 1[i]<br>See, e.g., Sands at Claim 1[i]<br>See, e.g., Howell at Claim 1[i]<br>See, e.g., Hoyos at Claim 1[i]<br>See, e.g., Mathiassen at Claim 1[i]<br>See, e.g., Steiner at Claim 1[i] |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Wuidart discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being | Wuidart discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each |

Exhibit C-3 (Wuidart)

| characterised according to at least one of the number of said entries and a duration of each said entry; | said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified."<br>Wuidart at 2:8-33<br><br>"Additionally, the portable unit includes measurement means CED, preferably in the form of a fingerprint sensor, for measuring a biometrical signature of the user and delivering a measurement signal SM2. The portable unit also includes generation means for generating the unlock signal SD when the activation signal SA1 and the measurement signal SM2 are produced within a specified temporal window and the measured biometrical signature corresponds to an authorized user. The generation means is in the form of a control circuit 20 having a first input E1 that receives the activation signal SA1 and a second input E2 that receives the measurement signal SM2 from the sensor CED."<br>Wuidart at 4:25-36 |

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Ikegami at Claim 1[k]<br>See, e.g., Howell at Claim 1[k]<br>See, e.g., Steiner at Claim 1[k]<br>See, e.g., iPAQ 5400 series at Claim 1[k] |
| 1[l]. map said series into an instruction; and | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Setlak at Claim 1[l]<br>See, e.g., Hamid at Claim 1[l]<br>See, e.g., Ikegami at Claim 1[l]<br>See, e.g., Sands at Claim 1[l]<br>See, e.g., Howell at Claim 1[l]<br>See, e.g., Hoyos at Claim 1[l]<br>See, e.g., Mathiassen at Claim 1[l]<br>See, e.g., Steiner at Claim 1[l]<br>See, e.g., iPAQ 5400 series at Claim 1[l] |

Exhibit C-3 (Wuidart)

| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified." Wuidart at 2:8-33<br><br>"The portable unit is designed to be carried and operated by an authorized user 104 (e.g., the owner of the vehicle), and other authorized users can use the same portable unit 103 or another unit of the same kind that is assigned to them for the same function. Under certain conditions, the portable unit 103 delivers a lock/unlock signal SD to the fixed terminal 102 by means of a carrier wave such as an electromagnetic or infrared wave. In preferred embodiments, the lock/unlock signal SD is an amplitude-modulated or phase-modulated radio frequency signal that is generated by the portable unit." |

20

Exhibit C-3 (Wuidart)

| | Wuidart at 2:66-3:8 |
|---|---|
| | To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Setlak at Claim 1[m]<br>See, e.g., Schmitt at Claim 1[m]<br>See, e.g., Hamid at Claim 1[m]<br>See, e.g., Ikegami at Claim 1[m]<br>See, e.g., Sands at Claim 1[m]<br>See, e.g., Howell at Claim 1[m]<br>See, e.g., Hoyos at Claim 1[m]<br>See, e.g., Mathiassen at Claim 1[m]<br>See, e.g., Steiner at Claim 1[m]<br>See, e.g., iPAQ 5400 series at Claim 1[m] |
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Wuidart discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Wuidart discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

21

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | "FIG. 2 shows a more detailed view of a portable unit in the form of a key in accordance with an embodiment of the present invention. The key 103 has a conventional metal portion 12 that forms a key insert and an upper portion 11 that forms the head or grasping portion of the key. The upper portion 11 fulfills a remote control function of the system. For this purpose, the upper or remote control portion in the illustrated embodiment is a plastic portion containing an electronic circuit that transmits the lock/unlock signal SD. The remote control portion includes detection means for detecting the active intervention of the user in a known manner. For example, the detection means can include one or more keys of a keyboard, or more simply a switch SW (e.g., a push-button type switch) that is positioned under a first region 13 of the remote control portion 11. The first region 13 of the remote control portion can be folded by pressure exerted by the user's thumb 15 (e.g., because of a smaller thickness or the presence of adjacent ribs) to activate the switch SW within the remote control portion 11. |
| | Additionally, the remote control portion 11 includes measurement means for measuring a biometrical signature of the authorized user of the vehicle. In one embodiment, the measurement means includes a microphone and a voice-recognition device that identify the user's voice. However, in preferred embodiments such as the one shown in FIG. 2, the measurement means includes a fingerprint sensor CED that is located within the remote control portion 11 of the portable unit 103. The active surface of the sensor CED is flush with an outer surface of the plastic portion 11 of the key." |
| | Wuidart at 3:9-37 |
| | To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |
| | See, e.g., Schmitt at Claim 2[a] |
| | See, e.g., Hamid at Claim 2[a] |
| | See, e.g., Ikegami at Claim 2[a] |
| | See, e.g., Sands at Claim 2[a] |
| | See, e.g., Howell at Claim 2[a] |

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | See, e.g., Hoyos at Claim 2[a]<br>See, e.g., Steiner at Claim 2[a]<br>See, e.g., iPAQ 5400 series at Claim 2[a] |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Wuidart discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The control circuit 20 also includes a microcontroller M1 that has a memory DB2 in which biometrical signatures of one or more authorized users are stored (e.g., the fingerprint of the thumb, index finger, or any other finger). Preferably, each biometrical signature is stored as a matrix of binary data and the biometrical signatures of each authorized user are stored in distinct areas of the memory DB2 that are referenced by a user number. For example, five distinct areas could be reserved for storing the biometrical signatures of five different authorized users (e.g., the members of a family), with each user being fictitiously associated with a user number (e.g., 1, 2, 3, 4 or 5). It is also preferable to have the fingerprint sensor CED deliver the measurement signal SM2 as a digital signal so that the data supplied to the second input E2 of the control unit 20 can be directly exploited by the microcontroller M1. Otherwise, it is necessary to provide an analog-to-digital converter for the measurement signal."<br>Wuidart at 4:37-53<br><br>"In one embodiment of the present invention, the unlock signal SD includes an impersonal code to identify the authorized user whose biometrical signature has been measured and recognized to be valid. The impersonal code can simply be the corresponding user number (e.g., 1, 2, 3, 4, or 5 as described above). By transmitting the impersonal code, selected convenience functions in the vehicle can be activated when the unblock signal SD is received. For example, such functions could include the adjusting of the positions of the seats and the positions of the rearview mirrors, the setting of a selected temperature of the |

23

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | onboard thermostat, the tuning of the radio to a particular station, and so on according to predefined values corresponding to the preferences of one of the users.<br><br>In such embodiments, the portable unit transmits an impersonal number such as 1, 2, 3, 4, or 5 that merely identifies one of the authorized users from among the set of authorized users, and not information relating to the user's biometrical signature (hence the expression "impersonal code"). Thus, the data elements pertaining to the authorized user's biometrical signature cannot fall into the hands of an ill-intentioned third party that intercepts the unlock signal SD. Preferably, the unlock signal SD also includes a code for identifying the vehicle associated with the portable unit so that a specified portable unit can be associated with a single vehicle."<br>Wuidart at 5:54-6:26 |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Wuidart discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
| Claim 4 | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and | Wuidart discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system explicitly, |

Exhibit C-3 (Wuidart)

| palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"To overcome this problem, a security system can be associated with its authorized user (or users) so that only an authorized user can unlock the doors of the vehicle. For example, the system can include means for measuring a biometrical signature of an authorized user. With such a means, the security system can use a biometrical signature such as a fingerprint, the iris of the eye, or an audiometrical spectrum of the authorized user's voice to identify or authenticate a physical person. To this end, it has been proposed to use a voice recognition module in the fixed terminal of a security system to control the locking or unlocking of the vehicle upon the sound of the authorized user's voice. In such a system, the portable unit becomes superfluous and can be eliminated to produce a "hands-free" access system."<br>Wuidart at 1:49-63<br><br>"Additionally, the remote control portion 11 includes measurement means for measuring a biometrical signature of the authorized user of the vehicle. In one embodiment, the measurement means includes a microphone and a voice-recognition device that identify the user's voice. However, in preferred embodiments such as the one shown in FIG. 2, the measurement means includes a fingerprint sensor CED that is located within the remote control portion 11 of the portable unit 103. The active surface of the sensor CED is flush with an outer surface of the plastic portion 11 of the key."<br>Wuidart at 3:27-37 |
| **Claim 6** | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Wuidart discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |

25

Exhibit C-3 (Wuidart)

| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Wuidart discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>Wuidart at Fig. 1<br><br>"In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a |

26

Exhibit C-3 (Wuidart)

|  | vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified." Wuidart at 2:8-33

"FIG. 1 is a simplified illustration of a security system for an exemplary functional unit in the form of an automobile. The automobile 101 is fitted with an onboard fixed terminal such as a centralized locking and unlocking unit 102. The security system also includes a portable unit 103 such as a "remote" control that is usually associated with a key for the vehicle. (In the following description, the portable unit is identified with the remote control or the key for the vehicle and these three expressions are used without distinction.) The portable unit is designed to be carried and operated by an authorized user 104 (e.g., the owner of the vehicle), and other authorized users can use the same portable unit 103 or another unit of the same kind that is assigned to them for the same function. Under certain conditions, the portable unit 103 delivers a lock/unlock signal SD to the fixed terminal 102 by means of a carrier wave such as an electromagnetic or infrared wave. In preferred embodiments, the lock/unlock signal SD is an amplitude-modulated or phase-modulated radio frequency signal that is generated by the portable unit." Wuidart at 2:57-3:8

"The exact structure, features, and operation of the fixed terminal (e.g., a centralized door locking and unlocking unit) are not critical to the present invention and can conform to conventional fixed systems. At the least, the selection and design of the fixed terminal are within the scope of one of ordinary skill in the art so the fixed terminal will not be described |

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | in greater detail. Furthermore, the lock/unlock signal can also include a standard type of open-ended code (i.e., a code whose value changes with each transmission). Such a code can be used to hinder fraudulent attempts at picking up and recording (with appropriate electronics) the lock/unlock signal when it is normally transmitted by an authorized user and then subsequently and fraudulently reproducing the signal to unlock the vehicle." Wuidart at 6:13-26 |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Wuidart discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>FIG_1<br><br><br><br>Wuidart at Fig. 1 |

28

Exhibit C-3 (Wuidart)

|  | "In view of these drawbacks, it is an object of the present invention to remove the above-mentioned drawbacks and to provide a security system of the type associated with an authorized user (or users) that has a reduced chance of an inadvertent or untimely unlocking of the vehicle. The security system includes a fixed terminal and a portable unit that provides the fixed terminal with a signal for locking and unlocking a functional unit (e.g., a vehicle). The portable unit includes a detector, a measurement device, and a signal generator. The detector generates an activation signal when active intervention by a user is detected, and the measurement device measures a biometrical signature of the user. When the activation signal and a measurement signal are produced within a specified temporal window, the signal generator generates the lock/unlock signal if the measured biometrical signature corresponds to that of an authorized user. Because the measurement of a valid biometrical signal is necessary to prompt the portable unit to transmit the lock/unlock signal, an ill-intentioned third party possessing the portable unit cannot use it to unlock the vehicle. Further, because an active intervention by the user is still necessary to transmit the lock/unlock signal, the chance of untimely or inadvertently unlocking the vehicle is significantly reduced or eliminated. The present invention also preserves the function of a remote unit so that the users' current habits do not have to be significantly modified." Wuidart at 2:8-33 |
|  | "FIG. 1 is a simplified illustration of a security system for an exemplary functional unit in the form of an automobile. The automobile 101 is fitted with an onboard fixed terminal such as a centralized locking and unlocking unit 102. The security system also includes a portable unit 103 such as a "remote" control that is usually associated with a key for the vehicle. (In the following description, the portable unit is identified with the remote control or the key for the vehicle and these three expressions are used without distinction.) The portable unit is designed to be carried and operated by an authorized user 104 (e.g., the owner of the vehicle), and other authorized users can use the same portable unit 103 or another unit of the same kind that is assigned to them for the same function. Under certain conditions, the portable unit 103 delivers a lock/unlock signal SD to the fixed terminal 102 by means of a carrier wave such as an electromagnetic or infrared wave. In preferred embodiments, the lock/unlock signal SD is an amplitude-modulated or phase-modulated radio frequency signal that is generated by the portable unit." Wuidart at 2:57-3:8 |

Exhibit C-3 (Wuidart)

| Claim 9 | |
|---|---|
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Wuidart discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Wuidart discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 9[a]<br>See, e.g., Sands at Claim 9[a]<br>See, e.g., Howell at Claim 9[a]<br>See, e.g., Hoyos at Claim 9[a]<br>See, e.g., Steiner at Claim 9[a]<br>See, e.g., iPAQ 5400 series at Claim 9[a] |
| Claim 10 | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Wuidart discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-3 (Wuidart)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Wuidart discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Wuidart discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Wuidart discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Wuidart discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

31

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Wuidart discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of | To the extent the preamble is limiting, Wuidart discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric |

Exhibit C-3 (Wuidart)

| | |
|---|---|
| biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Wuidart discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Wuidart discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Wuidart discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-3 (Wuidart)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
|---|---|
| 11[d]. mapping said series into an instruction; and | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Wuidart discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Wuidart discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Wuidart discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

34

Exhibit C-3 (Wuidart)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Wuidart discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Wuidart discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |

Exhibit C-3 (Wuidart)

| 12[a]. receiving a biometric signal; and | Wuidart discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Wuidart discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Wuidart does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Wuidart discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The microcontroller M1 is driven by a control program. When the data elements of the measurement signal SM2 correspond to the data elements stored in one of the areas of the memory DB2, the microcontroller M1 delivers an output signal OUT. The output signal OUT is then supplied to a transmission circuit ER2 to prompt the transmission of the unlock |

Exhibit C-3 (Wuidart)

| | signal SD, for example through an antenna, infrared diode, or electrical connection. In order to provide a clear illustration of the logical combination of the activation signal SA1 and the measurement signal SM2 within the control unit 20, FIG. 3 shows an AND gate PL2 that receives the activation signal SA1 at one input and the measurement signal SM2 at another input. The output of the AND gate PL2 is supplied to an input i1 of the microcontroller M1."<br>Wuidart at 4:54-67 |
|---|---|
| 14[a]. receive a series of entries of a biometric signal; | Wuidart discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Wuidart discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

37

Exhibit C-3 (Wuidart)

| | |
|---|---|
| 14[d]. populate a database of biometric signatures according to the instruction; | Wuidart discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Wuidart discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Wuidart discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Wuidart discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

38

Exhibit C-3 (Wuidart)

| | |
|---|---|
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Wuidart discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Wuidart discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Wuidart discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |

39

Exhibit C-3 (Wuidart)

| | |
|---|---|
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Wuidart discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Wuidart discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Wuidart discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Wuidart discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |

40

Exhibit C-3 (Wuidart)

| | |
|---|---|
| 15[g]. a receiver sub-system controller capable of: | Wuidart discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Wuidart discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Wuidart discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Wuidart discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being | Wuidart discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each |

41

Exhibit C-3 (Wuidart)

| | |
|---|---|
| characterised according to at least one of the number of said entries and a duration of each said entry; | said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Wuidart discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

42

Exhibit C-3 (Wuidart)

| | |
|---|---|
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Wuidart discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Wuidart discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Wuidart discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Wuidart discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |

43

Exhibit C-3 (Wuidart)

| | |
|---|---|
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Wuidart discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a | To the extent the preamble is limiting, Wuidart discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing |

Exhibit C-3 (Wuidart)

| | |
|---|---|
| biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | Wuidart discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Wuidart discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Wuidart discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

45

Exhibit C-3 (Wuidart)

| | |
|---|---|
| | See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Wuidart discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[l] |
| 17[e]. populating the database according to the instruction; | Wuidart discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Wuidart discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Wuidart discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

46

Exhibit C-3 (Wuidart)

| | See Disclosure at Claim 1[d] |
|---|---|
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Wuidart discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Wuidart discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

47

Exhibit C-4 (Hamid)

**Exhibit C-4**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 6,877,097 ("Hamid")**

U.S. PATENT NO. 6,877,097 to Hamid ("Hamid") entitled "Security Access Method and Apparatus" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Hamid |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Hamid discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A portable biometric device enables a designated person to unlock any one portal exclusive of other portals of a secure entity and or a secure service by choosing which of their personal biometric characteristics is presented to the portable biometric device. The portable biometric device includes a biometric sensor such that a biometric characteristic of |

1

Exhibit C-4 (Hamid)

| | a person for example a finger pattern is read dependent upon the person presenting the biometric characteristic to the biometric sensor. The reading is encoded in order for a processor to determine if the biometric characteristic has been predesignated for access via a predesignated one of the plurality of portals. If so, the processor selects an appropriate authorization code which is communicated by wireless transmission for unlocking the predesignated one of the portals, to the exclusion of any other of the portals. In an alternate example the processor is a central controller remote from the biometric device. The central controller is responsive to a wireless transmission of the encoded reading, from the portable biometric device, for determining which one if any of the predesignated portals is to be unlocked." <br> Hamid at Abstract |
|---|---|
| 1[a]. a memory comprising a database of biometric signatures; | Hamid discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> <br> Fig. 3 |

2

Exhibit C-4 (Hamid)

| | |
|---|---|
| | Hamid at Fig. 3<br><br>"Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate memory management performed by the processor 50 to provide the functions of the data |

3

Exhibit C-4 (Hamid)

| | |
|---|---|
| | buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient.<br>The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data."<br>Hamid at 7:42-8:45 |
| 1[b]. a transmitter sub-system comprising: | Hamid discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-4 (Hamid)



Hamid at Fig. 1

Hamid at Fig. 3

"In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and

5

Exhibit C-4 (Hamid)

|  | corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising: a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key; a wireless transceiver for transmitting the encrypted description to the central controller; whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals. In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: |

Exhibit C-4 (Hamid)

| | a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal; at least one portable biometric device comprising: a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals; a wireless transceiver for transmitting the selected authorization code; whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked." Hamid at 4:29-5:37<br><br>"The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data." Hamid at 8:24-45 |
|---|---|

7

Exhibit C-4 (Hamid)

| | |
|---|---|
| | "In FIG. 1, the hand-held fingerprint security device resides in a housing 12, which is about the size of a cigarette package or a deck of playing cards. The housing 12 includes a front wall 13 and an upper surface 14 with a fingerprint recognition area 16 having a transparent surface 18. A keypad is provided by push switches 20 in the upper surface 14. A wireless transceiver, for transmitting fingerprint information, is housed hidden beneath the upper surface 14 and includes transmit and receive ports at openings 22 in the front wall 13. The hand-held fingerprint security device overcomes the problem of destructive vandalism sometimes suffered by permanently mounted restrictive entry devices, however as previously mentioned, the hand-held security device is bulky. If it is made much smaller the push switches 20 become difficult to selectively operate as a persons finger will span several of them. Furthermore although it is desirable to provide an inexpensive mass producible hand-held portable device, reliable push switches are relatively expensive. If the push switches 20 are eliminated, the user no longer has control over which doors or portals can be opened. It is all or nothing." <br> Hamid at 6:47-67 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Hamid discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

8

Exhibit C-4 (Hamid)



Hamid at Fig. 1

Hamid at Fig. 2a

9

Exhibit C-4 (Hamid)



Hamid at Fig. 3

"A portable biometric device in accordance with an aspect of the invention is used by a designated person in combination with a secure entity and or a secure service, which is accessible via a plurality of portals, each of which is exclusively operable in response to a corresponding authorization code. The portable biometric device includes a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor responsive to the encoded description of the presented biometric characteristic for determining if the biometric characteristic is predesignated for access via a predesignated one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals; and a wireless transceiver for transmitting the selected authorization code to the secure entity and or service; whereby said designated person, exclusive of an other person, is able to choose which of the plurality of portals is to be unlocked for their access."
Hamid at 3:31-53

10

Exhibit C-4 (Hamid)

| | |
|---|---|
| | "In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising: a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key; a wireless transceiver for transmitting the encrypted description to the central controller; whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals. In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. |

11

Exhibit C-4 (Hamid)

| | |
|---|---|
| | In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising:<br>a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal;<br>at least one portable biometric device comprising:<br>a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor;<br>a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic;<br>a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals;<br>a wireless transceiver for transmitting the selected authorization code;<br>whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked."<br>Hamid at 4:29-5:37<br><br>"In FIG. 1, the hand-held fingerprint security device resides in a housing 12, which is about the size of a cigarette package or a deck of playing cards. The housing 12 includes a front wall 13 and an upper surface 14 with a fingerprint recognition area 16 having a transparent surface 18. A keypad is provided by push switches 20 in the upper surface 14. A wireless transceiver, for transmitting fingerprint information, is housed hidden beneath the upper surface 14 and includes transmit and receive ports at openings 22 in the front wall 13. The hand-held fingerprint security device overcomes the problem of destructive vandalism sometimes suffered by permanently mounted restrictive entry devices, however as previously mentioned, the hand-held security device is bulky. If it is made much smaller the push switches 20 become difficult to selectively operate as a persons finger will span several of them. Furthermore although it is desirable to provide an inexpensive mass producible hand-held portable device, reliable push switches are relatively expensive. If the |

12

Exhibit C-4 (Hamid)

| | push switches 20 are eliminated, the user no longer has control over which doors or portals can be opened. It is all or nothing."<br>Hamid at 6:47-67<br><br>"Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate |

13

Exhibit C-4 (Hamid)

| | memory management performed by the processor 50 to provide the functions of the data buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient." <br> Hamid at 7:42-8:23 |
|---|---|
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Hamid discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> <br> Hamid at Fig. 3 |

Exhibit C-4 (Hamid)



Hamid at Fig. 5

"A portable biometric device in accordance with an aspect of the invention is used by a designated person in combination with a secure entity and or a secure service, which is accessible via a plurality of portals, each of which is exclusively operable in response to a corresponding authorization code. The portable biometric device includes a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an

Exhibit C-4 (Hamid)

| | encoded description of the biometric characteristic; a processor responsive to the encoded description of the presented biometric characteristic for determining if the biometric characteristic is predesignated for access via a predesignated one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals; and a wireless transceiver for transmitting the selected authorization code to the secure entity and or service; whereby said designated person, exclusive of another person, is able to choose which of the plurality of portals is to be unlocked for their access." Hamid at 3:31-53 |
|---|---|
| | "In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. "In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal; at least one portable biometric device comprising: a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; |

Exhibit C-4 (Hamid)

|  | a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic;<br>a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals;<br>a wireless transceiver for transmitting the selected authorization code;<br>whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked."<br>Hamid at 4:56-5:37<br><br>"Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from |

17

Exhibit C-4 (Hamid)

| | |
|---|---|
| | beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate memory management performed by the processor 50 to provide the functions of the data buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient." Hamid at 7:42-8:23 <br><br> "The flow diagram in FIG. 5 summarize a method of operation of the portable fingerprint devices illustrated in FIGS. 2 and 2 a used in conjunction with the security system in FIG. 4, after the appropriate initialization procedure has been performed. A function block 70 starts the process in response, for example, to a touch of the user's digit to the platen 32 in FIG. 2, or the platen 42 in FIG. 2 a. The process starts by capturing the user's biometric information as shown in a function block 71. As indicated in a function block 72 the biometric information is encoded and then, as stated in a function block 73, it is compared with one or more predefined data. One example of a method of comparison has been disclosed in the discussion of FIG. 3. If a substantial match is realised in accord with a decision block 74, the process ends at a block 77. In a variation wherein a plurality of fingerprints are expected from the user a decision block 77, as shown in FIG. 5 a, is inserted between the blocks 72 and 73 in FIG. 5. In this example only after the required number of finger prints has been sensed will the comparison function commence." Hamid at 8:66-9:18 |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Hamid discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

18

Exhibit C-4 (Hamid)



Hamid at Fig. 3

"In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising:
a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person;
a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic;
a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key;
a wireless transceiver for transmitting the encrypted description to the central controller;

Exhibit C-4 (Hamid)

| | whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals.<br><br>In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising:<br><br>a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and<br><br>at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person;<br><br>whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device.<br><br>In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising:<br><br>a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal;<br><br>at least one portable biometric device comprising:<br><br>a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor;<br><br>a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic;<br><br>a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals;<br><br>a wireless transceiver for transmitting the selected authorization code; |
|---|---|

Exhibit C-4 (Hamid)

| | |
|---|---|
| | whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked." Hamid at 4:29-5:37

"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." Hamid at 9:18-53 |
| 1[f]. a receiver sub-system comprising: | Hamid discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures: |

21

Exhibit C-4 (Hamid)

| | For example, see the following passages and/or figures, as well as all related disclosures: |
|---|---|
| |  |
| | Hamid at Fig. 1 |

22

Exhibit C-4 (Hamid)



Hamid at Fig. 2

23

Exhibit C-4 (Hamid)

| | Hamid at Fig. 3 |
|---|---|
| |  |
| | Hamid at Fig. 4 |

24

Exhibit C-4 (Hamid)



Hamid at Fig. 4a

"In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising:
a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person;

Exhibit C-4 (Hamid)

| | a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; |
| --- | --- |
| | a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key; |
| | a wireless transceiver for transmitting the encrypted description to the central controller; whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals. |
| | In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: |
| | a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and |
| | at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. |
| | In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: |
| | a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal; |
| | at least one portable biometric device comprising: |
| | a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; |
| | a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; |

26

Exhibit C-4 (Hamid)

<table>
<tr>
<td></td>
<td>a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals;<br>a wireless transceiver for transmitting the selected authorization code;<br>whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked."<br>Hamid at 4:29-5:37<br><br>"The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data."<br>Hamid at 8:24-45<br><br>"In FIG. 1, the hand-held fingerprint security device resides in a housing 12, which is about the size of a cigarette package or a deck of playing cards. The housing 12 includes a front wall 13 and an upper surface 14 with a fingerprint recognition area 16 having a transparent surface 18. A keypad is provided by push switches 20 in the upper surface 14. A wireless transceiver, for transmitting fingerprint information, is housed hidden beneath the upper surface 14 and includes transmit and receive ports at openings 22 in the front wall 13. The hand-held fingerprint security device overcomes the problem of destructive vandalism</td>
</tr>
</table>

27

Exhibit C-4 (Hamid)

| | |
|---|---|
| | sometimes suffered by permanently mounted restrictive entry devices, however as previously mentioned, the hand-held security device is bulky. If it is made much smaller the push switches 20 become difficult to selectively operate as a persons finger will span several of them. Furthermore although it is desirable to provide an inexpensive mass producible hand-held portable device, reliable push switches are relatively expensive. If the push switches 20 are eliminated, the user no longer has control over which doors or portals can be opened. It is all or nothing."<br>Hamid at 6:47-67<br><br>"One or a plurality of the predefined data representing different ones of the user's digits are captured in this manner, that is during the initialization. Each of the predefined data is assigned a distinct security access function. FIG. 4 shows doors 1, 2, and 3 having door locks L1, L2 and L3, respectively. The door locks although boldly illustrated in the drawing need not be visually identifiable in any actual installation. A portable fingerprint security device 30 a has been initialized to be responsive to 3 different finger print patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2 and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door. In another example, not shown, each of a multitude of locked portals can be individually accessed, each of the associated door locks is responsive to a distinct authorization signal each of which is generated upon a combination of two or more digit patterns. Each combination of digit patterns is entered at the time of initialization in session with the administrator."<br>Hamid at 8:46-65<br><br>"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any |

28

Exhibit C-4 (Hamid)

| | |
|---|---|
| | other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." <br> Hamid at 9:18-53 |
| 1[g]. a receiver sub-system controller configured to: | Hamid discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> <br> Hamid at Fig. 1 |

29

Exhibit C-4 (Hamid)



Fig. 2

Hamid at Fig. 2

Fig. 3

30

Exhibit C-4 (Hamid)

| | Hamid at Fig. 3 |
| --- | --- |
| |  |
| | Fig. 4 |
| | Hamid at Fig. 4 |

Exhibit C-4 (Hamid)



Fig. 4a

Hamid at Fig. 4a

"In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising:
a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person;

Exhibit C-4 (Hamid)

| | a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key; a wireless transceiver for transmitting the encrypted description to the central controller; whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals. In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal; at least one portable biometric device comprising: a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; |
|---|---|

Exhibit C-4 (Hamid)

a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals; a wireless transceiver for transmitting the selected authorization code; whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked."
Hamid at 4:29-5:37

"The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data."
Hamid at 8:24-45

"In FIG. 1, the hand-held fingerprint security device resides in a housing 12, which is about the size of a cigarette package or a deck of playing cards. The housing 12 includes a front wall 13 and an upper surface 14 with a fingerprint recognition area 16 having a transparent surface 18. A keypad is provided by push switches 20 in the upper surface 14. A wireless transceiver, for transmitting fingerprint information, is housed hidden beneath the upper surface 14 and includes transmit and receive ports at openings 22 in the front wall 13. The hand-held fingerprint security device overcomes the problem of destructive vandalism

Exhibit C-4 (Hamid)

|  | sometimes suffered by permanently mounted restrictive entry devices, however as previously mentioned, the hand-held security device is bulky. If it is made much smaller the push switches 20 become difficult to selectively operate as a persons finger will span several of them. Furthermore although it is desirable to provide an inexpensive mass producible hand-held portable device, reliable push switches are relatively expensive. If the push switches 20 are eliminated, the user no longer has control over which doors or portals can be opened. It is all or nothing." <br> Hamid at 6:47-67 <br><br> "One or a plurality of the predefined data representing different ones of the user's digits are captured in this manner, that is during the initialization. Each of the predefined data is assigned a distinct security access function. FIG. 4 shows doors 1, 2, and 3 having door locks L1, L2 and L3, respectively. The door locks although boldly illustrated in the drawing need not be visually identifiable in any actual installation. A portable fingerprint security device 30 a has been initialized to be responsive to 3 different finger print patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2 and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door. In another example, not shown, each of a multitude of locked portals can be individually accessed, each of the associated door locks is responsive to a distinct authorization signal each of which is generated upon a combination of two or more digit patterns. Each combination of digit patterns is entered at the time of initialization in session with the administrator." <br> Hamid at 8:46-65 <br><br> "In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." <br><br> Hamid at 9:18-53 |
| 1[h]. receive the transmitted secure access signal; and | Hamid discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

36

Exhibit C-4 (Hamid)



Hamid at Fig. 3

Hamid at Fig. 4

Exhibit C-4 (Hamid)



Hamid at Fig. 4a

"In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising:
a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person;

Exhibit C-4 (Hamid)

|  | a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key; a wireless transceiver for transmitting the encrypted description to the central controller; whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals. In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal; at least one portable biometric device comprising: a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; |
|---|---|

Exhibit C-4 (Hamid)

| | a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals; a wireless transceiver for transmitting the selected authorization code; whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked." Hamid at 4:29-5:37 |
|---|---|
| | "The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data." Hamid at 8:24-45 |
| | "One or a plurality of the predefined data representing different ones of the user's digits are captured in this manner, that is during the initialization. Each of the predefined data is assigned a distinct security access function. FIG. 4 shows doors 1, 2, and 3 having door locks L1, L2 and L3, respectively. The door locks although boldly illustrated in the drawing need not be visually identifiable in any actual installation. A portable fingerprint security device 30 a has been initialized to be responsive to 3 different finger print patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2 and L3 is |

40

Exhibit C-4 (Hamid)

|  | exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door. In another example, not shown, each of a multitude of locked portals can be individually accessed, each of the associated door locks is responsive to a distinct authorization signal each of which is generated upon a combination of two or more digit patterns. Each combination of digit patterns is entered at the time of initialization in session with the administrator." Hamid at 8:46-65<br><br>"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." Hamid at 9:18-53 |
| --- | --- |

Exhibit C-4 (Hamid)

| 1[i]. provide conditional access to the controlled item dependent upon said information; | Hamid discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"One or a plurality of the predefined data representing different ones of the user's digits are captured in this manner, that is during the initialization. Each of the predefined data is assigned a distinct security access function. FIG. 4 shows doors 1, 2, and 3 having door locks L1, L2 and L3, respectively. The door locks although boldly illustrated in the drawing need not be visually identifiable in any actual installation. A portable fingerprint security device 30 a has been initialized to be responsive to 3 different finger print patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2 and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door. In another example, not shown, each of a multitude of locked portals can be individually accessed, each of the associated door locks is responsive to a distinct authorization signal each of which is generated upon a combination of two or more digit patterns. Each combination of digit patterns is entered at the time of initialization in session with the administrator."<br>Hamid at 8:46-65<br><br>"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." <br> Hamid at 9:18-53 |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Hamid discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hamid discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-4 (Hamid)



Hamid at Fig. 5

44

Exhibit C-4 (Hamid)



*Fig. 5a*

Hamid at Fig. 5a

"One or a plurality of the predefined data representing different ones of the user's digits are captured in this manner, that is during the initialization. Each of the predefined data is assigned a distinct security access function. FIG. 4 shows doors 1, 2, and 3 having door locks L1, L2 and L3, respectively. The door locks although boldly illustrated in the drawing need not be visually identifiable in any actual installation. A portable fingerprint security device 30 a has been initialized to be responsive to 3 different finger print patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2 and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door. In another example, not shown, each of a multitude of locked portals can be individually accessed, each of the associated door locks is responsive to a distinct authorization signal each of which is generated upon a combination of two or more digit patterns. Each combination of digit patterns is entered at the time of initialization in session with the administrator."
Hamid at 8:46-65

"The flow diagram in FIG. 5 summarize a method of operation of the portable fingerprint devices illustrated in FIGS. 2 and 2 a used in conjunction with the security system in FIG. 4, after the appropriate initialization procedure has been performed. A function block 70 starts the process in response, for example, to a touch of the user's digit to the platen 32 in FIG. 2, or the platen 42 in FIG. 2 a. The process starts by capturing the user's biometric information as shown in a function block 71. As indicated in a function block 72 the

45

Exhibit C-4 (Hamid)

|  | biometric information is encoded and then, as stated in a function block 73, it is compared with one or more predefined data. One example of a method of comparison has been disclosed in the discussion of FIG. 3. If a substantial match is realised in accord with a decision block 74, the process ends at a block 77. In a variation wherein a plurality of fingerprints are expected from the user a decision block 77, as shown in FIG. 5 a, is inserted between the blocks 72 and 73 in FIG. 5. In this example only after the required number of finger prints has been sensed will the comparison function commence." Hamid at 8:66-9:18<br><br>"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." Hamid at 9:18-53 |

46

Exhibit C-4 (Hamid)

<table>
<tr>
<td></td>
<td>"Referring to FIG. 6, a flow diagram is presented. A user is provided with a number of functions each accessible by transmission of a unique access code for executing that function. As described above, typical functions include unlocking of doorways where each function unlocks a different doorway. That said, functions may include turning on and off lights, engaging security systems, checking email, checking voicemail, logging into a computer system, locking doors, unlocking a car, and so forth. Some functions are secure functions—requiring security operations—while others are optionally general access functions like turning a light on or off. The user associates each function with a biometric information source or with a sequence of provided biometric information. Thus, turning on a light may be associated with left index finger-left index finger, logging into a computer with left thumb—left index finger, and so forth. Each fingerprint is a biometric characteristic of the user.<br><br>The user provides a biometric sample of a biometric characteristic—or in this case two consecutive samples—and the samples are provided to a processor. The processing step is shown in dashed line because it is either part of the hand held portable biometric sensor device or part of the receiving device. As such, wireless data transfer is shown both before and after the processing step also in dashed line as the step may occur either before or after. The wireless transfer of data does not affect implementation of the invention and its sequence is not important."<br>Hamid at 9:61-10:22<br><br>To the extent that Plaintiff contends Hamid does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Ikegami at Claim 1[k]<br>See, e.g., Howell at Claim 1[k]<br>See, e.g., Steiner at Claim 1[k]<br>See, e.g., iPAQ 5400 series at Claim 1[k]</td>
</tr>
</table>

47

Exhibit C-4 (Hamid)

| 1[l]. map said series into an instruction; and | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>Hamid at Fig. 6 |

48

Exhibit C-4 (Hamid)



Hamid at Fig. 3

"Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion

49

Exhibit C-4 (Hamid)

<table>
<tr>
<td></td>
<td>of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate memory management performed by the processor 50 to provide the functions of the data buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient.

The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data."

Hamid at 7:42-8:45</td>
</tr>
</table>

Exhibit C-4 (Hamid)

| | |
|---|---|
| | "Referring to FIG. 6, a flow diagram is presented. A user is provided with a number of functions each accessible by transmission of a unique access code for executing that function. As described above, typical functions include unlocking of doorways where each function unlocks a different doorway. That said, functions may include turning on and off lights, engaging security systems, checking email, checking voicemail, logging into a computer system, locking doors, unlocking a car, and so forth. Some functions are secure functions—requiring security operations—while others are optionally general access functions like turning a light on or off. The user associates each function with a biometric information source or with a sequence of provided biometric information. Thus, turning on a light may be associated with left index finger-left index finger, logging into a computer with left thumb—left index finger, and so forth. Each fingerprint is a biometric characteristic of the user."<br>Hamid at 9:61-10:12 |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

51

Exhibit C-4 (Hamid)



Hamid at Fig. 3

"Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion

52

Exhibit C-4 (Hamid)

| | of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate memory management performed by the processor 50 to provide the functions of the data buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient.<br>The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data."<br>Hamid at 7:42-8:45 |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | "It is possible to envision many limited access control applications for the present invention. Among them, one can cite: computer centres; bio-hazardous areas; airport freight areas; hospital-closed areas and drug storage areas; office buildings, particularly outside of normal working hours; safety deposit boxes and vaults; and computer terminal entry or information, access to information, and access to financial services. Referring to FIG. 6, a flow diagram is presented. A user is provided with a number of functions each accessible by transmission of a unique access code for executing that function. As described above, typical functions include unlocking of doorways where each function unlocks a different doorway. That said, functions may include turning on and off lights, engaging security systems, checking email, checking voicemail, logging into a computer system, locking doors, unlocking a car, and so forth. Some functions are secure functions—requiring security operations—while others are optionally general access functions like turning a light on or off. The user associates each function with a biometric information source or with a sequence of provided biometric information. Thus, turning on a light may be associated with left index finger-left index finger, logging into a computer with left thumb—left index finger, and so forth. Each fingerprint is a biometric characteristic of the user." <br> Hamid at 9:54-10:12 |
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Hamid discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Hamid discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

54

Exhibit C-4 (Hamid)

| | |
|---|---|
| | "Some other electronic locks are opened after a computer has identified a biometric feature of the person desiring access. A biometric characteristic security system identifies a person by using a computer to compare the unique features of a fingerprint, palm, foot, voice, eye, signature or the like, with the a one in its memory. In a fingerprint system, for example, a person who wants to open a door, places his or her finger on a plate or platen mounted on or nearby the door. A scanner scans the finger's print and if it matches predeposited information in the computer's memory, the door is unlocked." <br> Hamid at 2:61-3:4 <br><br> "The fingerprint scanner may be provided by a mechanism having a prism and a light source for reading the print of a finger or a thumb. The prism has a first or platen surface upon which a finger is placed. A second surface is disposed at an acute angle to the first surface to pass light reflected from the finger. A light is directed into the prism through a third or illuminated surface to illuminate the finger. Various examples of finger print reading devices using prisms are disclosed in U.S. Pat. Nos. 5,109,427 and 5,187,482 and 5,187,748 and 5,233,404." <br> Hamid at 2:41-50 |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Hamid discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "Some other electronic locks are opened after a computer has identified a biometric feature of the person desiring access. A biometric characteristic security system identifies a person by using a computer to compare the unique features of a fingerprint, palm, foot, voice, eye, signature or the like, with the a one in its memory. In a fingerprint system, for example, a person who wants to open a door, places his or her finger on a plate or platen mounted on or nearby the door. A scanner scans the finger's print and if it matches predeposited information in the computer's memory, the door is unlocked." |

Exhibit C-4 (Hamid)

| | Hamid at 2:61-3:4<br><br>"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired."<br>Hamid at 9:18-53 |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Hamid discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-4 (Hamid)

| | "Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate memory management performed by the processor 50 to provide the functions of the data buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient." |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | Hamid at 7:42-8:23 |
| | To the extent that Plaintiff contends Hamid does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |
| | See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
| **Claim 4** | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Hamid discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Some other electronic locks are opened after a computer has identified a biometric feature of the person desiring access. A biometric characteristic security system identifies a person by using a computer to compare the unique features of a fingerprint, palm, foot, voice, eye, signature or the like, with the a one in its memory. In a fingerprint system, for example, a person who wants to open a door, places his or her finger on a plate or platen mounted on or nearby the door. A scanner scans the finger's print and if it matches predeposited information in the computer's memory, the door is unlocked."<br>Hamid at 2:61-3:4 |
| **Claim 6** | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor | To the extent the preamble is limiting, Hamid discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | |
|---|---|
| is further configured to authenticate the identity of a user; | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Hamid discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>Hamid at Fig. 1 |

Exhibit C-4 (Hamid)



Hamid at Fig. 2

Exhibit C-4 (Hamid)

| | Hamid at Fig. 3 |
|---|---|
| |  |
| | Hamid at Fig. 4 |

61

Exhibit C-4 (Hamid)



Hamid at Fig. 4a

"In accordance with another aspect of the invention a portable biometric device is for use by a person having been designated with predefined data stored in a central controller, and corresponding to biometric characteristics of the person, wherein the central controller is operative for selectively unlocking any one of a plurality of portals, exclusive of any other one of the plurality of portals, for permitting access into and or egress from a secure entity in response to receiving a signal being representative of one of the biometric characteristics of the designated person. The portable biometric device comprising:
a biometric sensor for reading a biometric characteristic having been chosen and made available for reading by a person;

Exhibit C-4 (Hamid)

| | a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; a processor for encrypting the encoded description to provide an encrypted description in accordance with a predefined encryption key; a wireless transceiver for transmitting the encrypted description to the central controller; whereby the central controller is responsive to the biometric characteristic having been made available to the biometric sensor by said designated person for unlocking one of the portals. In accordance with yet another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a central controller for permitting access, via a portal of a plurality of portals, to the secure entity and or service, contingent upon a representation of a biometric characteristic having been transmitted thereto and substantially matching with a preregistered data, of a plurality of preregistered data being representative of biometric characteristics including said transmitted biometric characteristic, and, for selecting, from within said plurality of portals, a portal being associated with said matched preregistered data; and at least one portable biometric device including a wireless transmitter for transmitting a representation of a biometric characteristic having been made available by a person; whereby a designated person is permitted entry and or egress via the selected portal in accordance with having made the designated biometric characteristic available to portable biometric device. In accordance with still another aspect of the invention, a security system provides for security of an entity and or a service from indiscriminate access. The security system comprising: a plurality of portals each being locked by a respective one of a plurality of locks, each lock being exclusively responsive to reception of one of a similar plurality of authorization codes for unlocking the portal; at least one portable biometric device comprising: a biometric sensor for reading a biometric characteristic of a person dependent upon the person presenting said biometric characteristic to the biometric sensor; a digital encoder for encoding a reading of the biometric characteristic, from the biometric sensor, to provide an encoded description of the biometric characteristic; |

63

Exhibit C-4 (Hamid)

| | |
|---|---|
| | a processor responsive to the encoded description of the biometric characteristic for determining if the biometric characteristic is one of a similar plurality of biometric characteristics predesignated for access via respective one of the plurality of portals, and if so, selecting the authorization code for unlocking said predesignated one of the portals; a wireless transceiver for transmitting the selected authorization code; whereby upon presentation of the predesignated biometric characteristic of personal choice the corresponding portal is unlocked." Hamid at 4:29-5:37 <br><br> "In FIG. 1, the hand-held fingerprint security device resides in a housing 12, which is about the size of a cigarette package or a deck of playing cards. The housing 12 includes a front wall 13 and an upper surface 14 with a fingerprint recognition area 16 having a transparent surface 18. A keypad is provided by push switches 20 in the upper surface 14. A wireless transceiver, for transmitting fingerprint information, is housed hidden beneath the upper surface 14 and includes transmit and receive ports at openings 22 in the front wall 13. The hand-held fingerprint security device overcomes the problem of destructive vandalism sometimes suffered by permanently mounted restrictive entry devices, however as previously mentioned, the hand-held security device is bulky. If it is made much smaller the push switches 20 become difficult to selectively operate as a persons finger will span several of them. Furthermore although it is desirable to provide an inexpensive mass producible hand-held portable device, reliable push switches are relatively expensive. If the push switches 20 are eliminated, the user no longer has control over which doors or portals can be opened. It is all or nothing." Hamid at 6:47-67 <br><br> "The portable fingerprint security device, as discussed in relation to the FIGS. 2 a and 3, must be preauthorized for use with a particular security system and personalized for use by a particular person. Prior to operation the portable fingerprint security device is initialized by an administrator with the assistance of either a central computer or a personal computer. When the processor 50 is initially activated by the application of power as for example can be supplied from a watch battery (not shown in FIG. 2 a) it is receptive to receiving instructions via a transceiver 58 coupled via an input output port 57. In this example the processor is caused to supervise the loading of the instruction set into the RAM 56. Then |

Exhibit C-4 (Hamid)

| | the pattern or print of a finger tip laid over the platen 42 where it is scanned or otherwise captured to provide a predefined data representative of a predesignated one of a user's biometric characteristic. The initial capture of the user's print occurs in response to an interrupt signal on the lead 59 which is generated when the user or the administrator presses the push switch 46. The digitized result is segmented by the processor and the segments are stored in a sequence of addressable locations in the RAM 56 and serves as the predefined data.<br><br>One or a plurality of the predefined data representing different ones of the user's digits are captured in this manner, that is during the initialization. Each of the predefined data is assigned a distinct security access function. FIG. 4 shows doors 1, 2, and 3 having door locks L1, L2 and L3, respectively. The door locks although boldly illustrated in the drawing need not be visually identifiable in any actual installation. A portable fingerprint security device 30 a has been initialized to be responsive to 3 different finger print patterns of the user for transmitting distinct authorization signals. Each of the locks L1, L2 and L3 is exclusively responsive to receiving the corresponding authorization signal to release for a time convenient for the user to open the door. In another example, not shown, each of a multitude of locked portals can be individually accessed, each of the associated door locks is responsive to a distinct authorization signal each of which is generated upon a combination of two or more digit patterns. Each combination of digit patterns is entered at the time of initialization in session with the administrator."<br>Hamid at 8:24-65<br><br>"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." <br> Hamid at 9:18-53 |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Hamid discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-4 (Hamid)



Hamid at Fig. 4a

"In another embodiment of a security system as illustrated in FIG. 4a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any

67

Exhibit C-4 (Hamid)

| | |
|---|---|
| | other convenient receiver, to the common controller. The processor 61 is programmed to perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired." <br> Hamid at 9:18-53 <br><br> To the extent that Plaintiff contends Hamid does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: <br><br> See, e.g., Schmitt at Claim 6[b] <br> See, e.g., Hoyos at Claim 6[b] <br> See, e.g., Mathiassen at Claim 6[b] <br> See, e.g., Steiner at Claim 6[b] |
| Claim 9 | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Hamid discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-4 (Hamid)

| | See Disclosure of Claim 1[pre] |
|---|---|
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Hamid discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Hamid does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 9[a]<br>See, e.g., Sands at Claim 9[a]<br>See, e.g., Howell at Claim 9[a]<br>See, e.g., Hoyos at Claim 9[a]<br>See, e.g., Steiner at Claim 9[a]<br>See, e.g., iPAQ 5400 series at Claim 9[a] |
| Claim 10 | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Hamid discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Hamid discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Hamid discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Hamid discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Hamid discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least | Hamid discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | |
|---|---|
| one of the number of said entries and a duration of each said entry; | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver | To the extent the preamble is limiting, Hamid discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

71

Exhibit C-4 (Hamid)

| | |
|---|---|
| sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Hamid discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Hamid discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Hamid discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[d]. mapping said series into an instruction; and | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

72

Exhibit C-4 (Hamid)

|  | For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[l] |
|---|---|
| 11[e]. populating the database according to the instruction; | Hamid discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Hamid discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Hamid discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Hamid discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: |

73

Exhibit C-4 (Hamid)

| | |
|---|---|
| | See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Hamid discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Hamid discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit C-4 (Hamid)

| | |
|---|---|
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Hamid discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Hamid does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Hamid discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Referring to FIG. 3, a sensor array or scanner unit 52, for sensing a fingertip pattern or some other biometric characteristic, is coupled with a scan/sensor buffer 51 which is responsive to a processor 50 for operating the unit 52. In this example the scan/sensor buffer 51 receives an analog signal representation of a finger tip pattern and after transfers the captured signal to an encoder 53 which digitizes or otherwise converts the analog signal into a signal format which provides an encoded description of the biometric characteristic, suitable for processing. In one example the fingertip pattern is delivered from the scan unit 52 in an analog raster scan format of rows and columns. The encoder 53 digitizes the signal differentially. That is to say that as a row signal is sampled, the first sample is encoded as a zero. If the next sample is the same or less it is encoded as a zero but if it is more it is encoded as a one. The next sample is also encoded as a one unless it is less than the |

75

Exhibit C-4 (Hamid)

| | |
|---|---|
| | previous sample. The result is in binary code which is received by and stored in a data buffer 54, preparatory to signal processing by the processor 50. The processor 50 operates as directed by an instruction set maintained in a random access memory (RAM) 56. The RAM 56 has also been written with a record of a finger print characteristic of the intended user. In operation the processor 50 fetches a segment representative of a central row portion of the finger print characteristic from the RAM 56 and progressively compares the segment with a serial nondestructive row by row readout from the data buffer 54. The processor 50 keeps a running record of where in the serial readout any substantial matches are found. Subsequently in reference keyed to a position of either the best substantial row match or as an alternative the most central of a plurality of substantial row matches, the finger print characteristic from the RAM 56 is compared row segment after row segment from beginning to end with the binary code stored in a data buffer 54 to recognize any apparent corresponding segments. This process may be repeated several times, each by passing the binary code stored in a data buffer 54 keyed with a different apparent reference position until in any one such pass a sufficient number of row segments with apparent matches are realized to warrant a transmission of a predetermined authorization signal. If there are an insufficient number of apparently matching segments, transmission of an authorization signal is unwarranted. In a different example the Ram 56 is utilized with appropriate memory management performed by the processor 50 to provide the functions of the data buffer 54. The encoding and matching operation described in the forgoing is not essential. Other known methods may be found to be more convenient." Hamid at 7:42-8:23

"In another embodiment of a security system as illustrated in FIG. 4 a. Only three portals of entry are shown for simplicity. Doors 1, 2 and 3 are equipped with door locks L1 a, L2 a and L3 a, respectively. A common controller includes a processor 61 coupled with a display and keyboard 62, the door locks L1 a, L2 a, and L3 a, and an administration input/output port 63 capable of communicating in the infrared or radio frequency spectrums. An appropriate common controller may be provided by a typical personal computer with little or no adaptation. In normal use a user's portable fingerprint device 30b in this example need only capture, digitize and encrypt the pattern of the user's finger tip before transmitting the encrypted pattern. A transmission is relayed, via a nearby one of the door locks or by any other convenient receiver, to the common controller. The processor 61 is programmed to |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | perform finger print analysis, as previously discussed, or in accordance with any one of several known processes for identifying an individual for one or more of their finger pattern characteristics. When an authorized user's desire for entry is validated the appropriate one of the door locks is released for an appropriate period of time. Before the user's portable fingerprint device 30b is functional it must first be initialized along with the common controller. Communications between the user's portable fingerprint device 30b and the common controller are accomplished via the administration input/output port 63. One after another several different finger patterns of the user are usually scanned, digitized and transferred from the device 30b via the port 63. After the desired data has been captured in the common controller an encryption key is transmitted to the user's portable fingerprint device 30b. Thereafter transmissions from the device 30b and or intended for the device 30b are normally encrypted in accordance with the encryption key. The encryption key may be altered from time to time if desired."<br>Hamid at 9:18-53 |
| 14[a]. receive a series of entries of a biometric signal; | Hamid discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Hamid discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

77

Exhibit C-4 (Hamid)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 14[d]. populate a database of biometric signatures according to the instruction; | Hamid discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Hamid discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Hamid discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Hamid discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Hamid discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Hamid discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Hamid discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
|---|---|
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Hamid discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Hamid discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Hamid discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Hamid discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

80

Exhibit C-4 (Hamid)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
|---|---|
| 15[g]. a receiver sub-system controller capable of: | Hamid discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Hamid discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Hamid discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Hamid discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

81

Exhibit C-4 (Hamid)

| | See Disclosure at Claim 1[j] |
|---|---|
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hamid discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Hamid discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Hamid discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Hamid discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Hamid discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Hamid discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-4 (Hamid)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
|---|---|
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hamid discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of | To the extent the preamble is limiting, Hamid discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric |

84

Exhibit C-4 (Hamid)

| | |
|---|---|
| biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | Hamid discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Hamid discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-4 (Hamid)

| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Hamid discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| --- | --- |
| 17[d]. mapping said series into an instruction; and | Hamid discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 17[e]. populating the database according to the instruction; | Hamid discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Hamid discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of | Hamid discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a |

Exhibit C-4 (Hamid)

| | |
|---|---|
| biometric signatures to thereby output an accessibility attribute; | matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Hamid discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hamid discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-5 (Ikegami)

**Exhibit C-5**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 6,983,061 ("Ikegami")**

U.S. PATENT NO. 6,983,061 to Ikegami ("Ikegami") entitled "Personal authentication system and method using biometrics information, and registering apparatus, authenticating apparatus and pattern information input medium for the system" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendants' Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Ikegami |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Ikegami discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A system performing secondary verification using only existing apparatuses to accomplish a measure for relief in personal authentication without causing complexity or without increasing cost. The system has a registering apparatus for obtaining data for verification |

1

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | from information inputted using an inputting unit and registering the data. The registering apparatus has a first extracting unit for extracting biometrics characteristic data from the biometrics information obtained by the inputting unit, and registering the biometrics characteristic data as registry biometrics characteristic data for primary verification, and a second extracting unit for extracting data, which is different from the registry biometrics characteristic data, from information inputted using the inputting unit and registering the data as registry data for secondary verification. The system is used for personal authentication using biometrics information such as fingerprint, palm print, finger shape, palm shape, voice, retina, iris, face image, dynamic signature, blood vessel pattern, keystroke, or the like."<br>Ikegami at Abstract |
| 1[a]. a memory comprising a database of biometric signatures; | Ikegami discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

2

Exhibit C-5 (Ikegami)



Ikegami at Fig. 3

"When the person to be registered inputs information for secondary verification trough the same information inputting unit 10 as the one through which the biometrics information for primary verification has been inputted in response to the instruction from the instruction unit 10 a, the characteristic data extracting unit 14 extracts and generates characteristic data from the information for secondary verification. The characteristic data is registered as

3

Exhibit C-5 (Ikegami)

| | registry data for secondary verification in the data storage unit 6 (step S5), and the process is terminated."<br>Ikegami at 19:38-47<br><br>"When the authenticating apparatus 3A is employed, in the registering apparatus 2 of the personal authentication system 1, the information inputting unit 10 obtains fingerprint image data of a person (user) to be registered, the biometrics characteristic data extracting unit for primary verification 11 extracts and generates biometrics characteristic data from the fingerprint image data, and the data storage unit for primary verification 5A stores the biometrics characteristic data as registry biometrics characteristic data for primary verification. The information inputting unit 10 also obtains fingerprint image data of one or more fingers (the number of fingers is described as k in this embodiment) other than the finger from which the registry biometrics characteristic data for primary verification has been obtained, the characteristic data extracting unit for secondary verification 14 extracts biometrics characteristic data from the fingerprint image data, and the data storage unit for secondary verification 6A registers the biometrics characteristic data as registry data for secondary verification. Incidentally, procedures for registering data in the data storage unit for primary verification 5A and the data storage unit for secondary verification 6A are as have been described above with reference to FIG. 3. In this case, the information inputting unit 10 is naturally configured with a fingerprint scanner (optical fingerprint unit, capacitance fingerprint unit)."<br>Ikegami at 25:39-64<br><br>"When the authenticating apparatus 3C is employed, a person to be registered taps with his/her finger an image input screen of the information inputting unit 10 according to a unique pattern determined beforehand to input time series information (Morse code or the like) in the registering apparatus 2 of the personal authentication system 1, as described before. The extracting unit 14 extracts the time series data in a predetermined pattern as non-biometrics characteristic data from image data obtained in time series at that time, and stores the time series data as registry data for secondary verification in the data storage unit for secondary verification 6C. Incidentally, procedures for registering data in the data storage unit for primary verification 5A and the data storage unit for secondary verification |

4

Exhibit C-5 (Ikegami)

|  | 6C by the registering apparatus 2 are as have been described above with reference to FIG. 3."<br><br>Ikegami at 34:33:48 |
|---|---|
| 1[b]. a transmitter sub-system comprising: | Ikegami discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-5 (Ikegami)



FIG. 3

Ikegami at Fig. 3

"When the authenticating apparatus 3A is employed, in the registering apparatus 2 of the personal authentication system 1, the information inputting unit 10 obtains fingerprint image data of a person (user) to be registered, the biometrics characteristic data extracting unit for primary verification 11 extracts and generates biometrics characteristic data from the fingerprint image data, and the data storage unit for primary verification 5A stores the biometrics characteristic data as registry biometrics characteristic data for primary

6

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | verification. The information inputting unit 10 also obtains fingerprint image data of one or more fingers (the number of fingers is described as k in this embodiment) other than the finger from which the registry biometrics characteristic data for primary verification has been obtained, the characteristic data extracting unit for secondary verification 14 extracts biometrics characteristic data from the fingerprint image data, and the data storage unit for secondary verification 6A registers the biometrics characteristic data as registry data for secondary verification. Incidentally, procedures for registering data in the data storage unit for primary verification 5A and the data storage unit for secondary verification 6A are as have been described above with reference to FIG. 3. In this case, the information inputting unit 10 is naturally configured with a fingerprint scanner (optical fingerprint unit, capacitance fingerprint unit)." <br> Ikegami at 25:39-64 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Ikegami discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "When fingerprint image data of an authenticating object person is obtained by a fingerprint scanner at the time of verification, characteristic data to be authenticated is extracted from the fingerprint image data, and it is verified whether the characteristic data to be authenticated matches the registry characteristic data registered beforehand. When a rate of matching is not less than a predetermined value, it is determined that the person to be authenticated is the person registered in the personal authentication system. <br><br> Generally, a fingerprint pattern is obtained in a form of a fingerprint image, by photographing the image by a CCD camera while a finger is contacted with a special optical system, or by detecting only a ridged part on the skin by a capacitance sensor. However, when an image of an unclear fingerprint, that is, an blurred image of a fingerprint or an image of a fingerprint in which ridges are adhered by sweat, is obtained, it is impossible to verify whether a person to be authenticated is a registered person because a rate of matching becomes less than the predetermined value when the verification is performed." |

Exhibit C-5 (Ikegami)

| | Ikegami at 2:19-39 |
|---|---|
| | "The information inputting unit (biometrics information inputting unit for registration, first biometrics information inputting unit) 10 obtains biometrics information of a person (user) to be registered. In concrete, the information inputting unit 10 is a fingerprint scanner or the like that has been already used in general. As kinds of biometrics information obtained by the information inputting unit 10, there are, for example, image data such as fingerprint, palm print, finger shape, palm shape, retina, iris, face image, blood vessel pattern and the like, and time series data such as dynamic signature, voice, key stroke and the like, any one of which is obtained by the information inputting unit 10." |
| | Ikegami at 15:18-29 |
| | "Further, it is possible to provide an apparatus having functions of both the registering apparatus 2 and the authenticating apparatus 3 described above. Such apparatus is realized by connecting an information inputting unit such as a fingerprint scanner (fingerprint unit) or the like to a computer configured with, for example, a CPU, an ROM, an RAM, a display and the like, as described above. In such case, one information inputting unit may be served as both the information inputting units 10 and 20. Additionally, the data extracting units 11 and 21, the data extracting units 14 and 25, the primary verifying units 12 and 22, and the verification determining units 13 and 23 may be realized with the same software, respectively." |
| | Ikegami at 22:10-22 |
| | "When the authenticating apparatus 3A is employed, in the registering apparatus 2 of the personal authentication system 1, the information inputting unit 10 obtains fingerprint image data of a person (user) to be registered, the biometrics characteristic data extracting unit for primary verification 11 extracts and generates biometrics characteristic data from the fingerprint image data, and the data storage unit for primary verification 5A stores the biometrics characteristic data as registry biometrics characteristic data for primary verification. The information inputting unit 10 also obtains fingerprint image data of one or more fingers (the number of fingers is described as k in this embodiment) other than the finger from which the registry biometrics characteristic data for primary verification has been obtained, the characteristic data extracting unit for secondary verification 14 extracts |

Exhibit C-5 (Ikegami)

| | biometrics characteristic data from the fingerprint image data, and the data storage unit for secondary verification 6A registers the biometrics characteristic data as registry data for secondary verification. Incidentally, procedures for registering data in the data storage unit for primary verification 5A and the data storage unit for secondary verification 6A are as have been described above with reference to FIG. 3. In this case, the information inputting unit 10 is naturally configured with a fingerprint scanner (optical fingerprint unit, capacitance fingerprint unit)."<br>Ikegami at 25:39-64 |
|---|---|
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Ikegami discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

9

Exhibit C-5 (Ikegami)



FIG. 2

Ikegami at Fig.2

10

Exhibit C-5 (Ikegami)



Ikegami at Fig. 10

11

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | "A system performing secondary verification using only existing apparatuses to accomplish a measure for relief in personal authentication without causing complexity or without increasing cost. The system has a registering apparatus for obtaining data for verification from information inputted using an inputting unit and registering the data. The registering apparatus has a first extracting unit for extracting biometrics characteristic data from the biometrics information obtained by the inputting unit, and registering the biometrics characteristic data as registry biometrics characteristic data for primary verification, and a second extracting unit for extracting data, which is different from the registry biometrics characteristic data, from information inputted using the inputting unit and registering the data as registry data for secondary verification. The system is used for personal authentication using biometrics information such as fingerprint, palm print, finger shape, palm shape, voice, retina, iris, face image, dynamic signature, blood vessel pattern, keystroke, or the like." <br> Ikegami at Abstract <br><br> "FIG. 2 is a block diagram showing a structure of the registering apparatus 2 in the personal authentication system 1 according to this embodiment. As shown in FIG. 2, the registering apparatus 2 comprises the information inputting unit 10, a biometrics characteristic data extracting unit 11 for primary verification, a primary verifying unit 12, a primary verification determining unit 13, and a characteristic data extracting unit 14 for secondary verification." <br> Ikegami at 15:10-17 <br><br> "At this time, the biometrics characteristic data extracting unit 11 for primary verification operates so as to extract and generate biometrics characteristics data for examination and verification once more, based on the re-inputted biometrics information. The primary verifying unit 12 compares and matches the biometrics characteristics data, obtained again by the extracting unit 11, with biometrics characteristics data registered in the data storage unit 5 in the last examination and verification. Namely, the primary verifying unit 12 performs examination and verification of registry biometrics characteristic data for primary verification. <br> The primary verification determining unit 13 receives a result of the verification from the primary verifying unit 12 to determine whether a rate of matching is equal to or greater than |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | a predetermined threshold value p or not, thereby determining whether the registry biometrics characteristic data for primary verification can produce a result of verification sufficient to authenticate the person in actual verification, that is, whether the characteristic data extracting unit 14 for secondary verification carries out extraction and registration. When the rate of matching is equal to or greater than the threshold value p, registration of data for secondary verification is not performed. When the rate of matching is less than the threshold value p, it is determined that the registry biometrics characteristic data for primary verification cannot produce a result of verification sufficient to authenticate the person in actual verification. The primary verification determining unit 13 thus makes the instruction unit 10 a operate to prompt the person to input data for secondary verification through the information inputting unit 10. If the threshold value p is set to 101% at this time, it becomes possible that the procedure always proceeds to an information inputting process for secondary verification, that is, the information inputting process for secondary verification is always performed on all registered persons." Ikegami at 16:9-44 <br><br> "The pattern data verifying unit 26B compares and matches the pattern data extracted by the pattern data extracting unit 25B with pattern data of the i-th finger of the person to be authenticated (step S43). The pattern data of the person registered beforehand in the data storage unit 6B. The verification determining unit 23B then determines whether the two sorts of pattern data coincide with each other or not (step S44)." Ikegami at 33:14-21 |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Ikegami discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |

13

Exhibit C-5 (Ikegami)

|  | See, e.g., Schmitt at Claim 1[e]<br>See, e.g., Wuidart at Claim 1[e]<br>See, e.g., Hamid at Claim 1[e]<br>See, e.g., Mathiassen at Claim 1[e]<br>See, e.g., Steiner at Claim 1[e] |
|---|---|
| 1[f]. a receiver sub-system comprising: | Ikegami discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The registering apparatus 2 and the plural authenticating apparatuses 3 (3A to 3G) are communicably connected over the communication network 4 such as Internet, an intranet or the like. Each of the authenticating apparatus 3 (3A to 3G) has an access to the data storage unit 5 (5A) or 6 (6A to 6G) under the registering apparatus 2 over the communication network 4 to refer to data for verification registered in the data storage unit 5 (5A) or 6 (6A to 6G)."<br>Ikegami at 14:58-65 |
| 1[g]. a receiver sub-system controller configured to: | Ikegami discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[g]<br>See, e.g., Hamid at Claim 1[g]<br>See, e.g., Sands at Claim 1[g] |

14

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | See, e.g., Howell at Claim 1[g]<br>See, e.g., Hoyos at Claim 1[g]<br>See, e.g., Mathiassen at Claim 1[g]<br>See, e.g., iPAQ 5400 series at Claim 1[g] |
| 1[h]. receive the transmitted secure access signal; and | Ikegami discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The registering apparatus 2 and the plural authenticating apparatuses 3 (3A to 3G) are communicably connected over the communication network 4 such as Internet, an intranet or the like. Each of the authenticating apparatus 3 (3A to 3G) has an access to the data storage unit 5 (5A) or 6 (6A to 6G) under the registering apparatus 2 over the communication network 4 to refer to data for verification registered in the data storage unit 5 (5A) or 6 (6A to 6G)."<br>Ikegami at 14:58-65 |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Ikegami discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The primary verification determining unit 13 determines whether a result of the verification, that is, a rate of matching, obtained in the primary verification unit 12, is equal to or greater than a predetermined threshold value p (step S4). Whereby, it is determined whether the registry biometrics characteristic data for primary verification can produce a result of verification sufficient to authenticate the person when verification is actually performed. When the rate of matching is equal to or greater than the predetermined value p (YES route at step S4), the process is terminated without registering data for secondary verification. |

15

Exhibit C-5 (Ikegami)

| | When the rate of matching is less than the threshold value p (NO route at step S4), it is determined that the registry biometrics characteristic data for primary verification cannot produce a result sufficient to authenticate the person when verification is actually performed. The instruction unit 10 a thus operates to prompt the person to be registered to input data for secondary verification through the information inputting unit 10." Ikegami at 19:19-37 <br><br> "When the verification determining unit 23 determines that the rate of matching in the secondary verification is equal to or more than the threshold value m (YES route at step S18), the final personal determining unit 27 determines and authenticates that the person to be authenticated is the person himself/herself (registered person) since a rate of matching sufficient to determine that the person to be authenticated is the person himself/herself (registered person) is obtained in the secondary verification (step S19), and the process is terminated. <br> On the other hand, when the verification determining unit 23 determines that the rate of matching in the secondary verification is less than the threshold value m (NO route at step S18), that is, when a rate of matching sufficient to determine that the person to be authenticated is the person himself/herself (registered person) cannot be obtained even in the secondary verification, the final personal determining unit 27 determines not to authenticate (does not authenticate that the person to be authenticated is the person himself/herself (registered person)) (step S20), and the process is terminated." Ikegami at 23:30-50 <br><br> To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: <br><br> See, e.g., Schmitt at Claim 1[i] <br> See, e.g., Hamid at Claim 1[i] <br> See, e.g., Sands at Claim 1[i] <br> See, e.g., Howell at Claim 1[i] <br> See, e.g., Hoyos at Claim 1[i] |
|---|---|

16

Exhibit C-5 (Ikegami)

| | See, e.g., Mathiassen at Claim 1[i]<br>See, e.g., Steiner at Claim 1[i] |
|---|---|
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Ikegami discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Ikegami discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>(i) Biometrics characteristic data extracted from biometrics information of the same type as biometrics information, which is obtained in primary verification, but obtained from one or more parts which are different from a part from which the biometrics information has been obtained in the primary verification, is used as registry data for secondary verification. More concretely, when the biometrics information is fingerprint image data, biometrics characteristic data extracted from fingerprint image data of one or more fingers which are different from a finger, from which the registry biometrics characteristic data for primary verification has been obtained, is used as registry data for secondary verification.<br>(ii) Biometrics characteristic data of a different type from biometrics characteristic data obtained in primary verification extracted from biometrics information, which is obtained from the same part or a different part but of the same type as biometrics information obtained in the primary verification, is used as registry data for secondary verification. When the biometrics information is fingerprint image data, biometrics characteristic data (for example, fingerprint pattern) of a different type from the biometrics characteristic data (for example, minutiae) obtained in primary verification, extracted from fingerprint image |

17

Exhibit C-5 (Ikegami)

| | data of the same finger as a registered finger from which the registry biometrics characteristic data for primary verification has been obtained, or, one or more fingers which are different from the registered finger, is used as registry data for secondary verification. When registry data for secondary verification is non-biometrics characteristic data, the non-biometrics characteristic data is as described in items {circle around (1)} to {circle around (6)} below. {circle around (1)} Time series data having a pattern determined by a person to be registered is used as non-biometrics characteristic data. When the information inputting unit 10 obtains fingerprint image data as biometrics information, for example, the person taps an image input screen of the information inputting unit 10 with his/her finger according to a unique pattern determined beforehand to input time series information (Morse code or the like). The extracting unit 14 extracts time series data in a predetermined pattern as non-biometrics characteristic data from image data obtained in time series at that time." <br> Ikegami at 17:1-43 |
|---|---|
| 1[l]. map said series into an instruction; and | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "When the authenticating apparatus 3C is employed, a person to be registered taps with his/her finger an image input screen of the information inputting unit 10 according to a unique pattern determined beforehand to input time series information (Morse code or the like) in the registering apparatus 2 of the personal authentication system 1, as described before. The extracting unit 14 extracts the time series data in a predetermined pattern as non-biometrics characteristic data from image data obtained in time series at that time, and stores the time series data as registry data for secondary verification in the data storage unit for secondary verification 6C. Incidentally, procedures for registering data in the data storage unit for primary verification 5A and the data storage unit for secondary verification 6C by the registering apparatus 2 are as have been described above with reference to FIG. 3." <br> Ikegami at 34:33:48 |

18

Exhibit C-5 (Ikegami)

| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | "When the person to be registered inputs information for secondary verification trough the same information inputting unit 10 as the one through which the biometrics information for primary verification has been inputted in response to the instruction from the instruction unit 10 a, the characteristic data extracting unit 14 extracts and generates characteristic data from the information for secondary verification. The characteristic data is registered as registry data for secondary verification in the data storage unit 6 (step S5), and the process is terminated."<br>Ikegami at 19:38-47 |
| | "When the authenticating apparatus 3C is employed, a person to be registered taps with his/her finger an image input screen of the information inputting unit 10 according to a unique pattern determined beforehand to input time series information (Morse code or the like) in the registering apparatus 2 of the personal authentication system 1, as described before. The extracting unit 14 extracts the time series data in a predetermined pattern as non-biometrics characteristic data from image data obtained in time series at that time, and stores the time series data as registry data for secondary verification in the data storage unit for secondary verification 6C. Incidentally, procedures for registering data in the data storage unit for primary verification 5A and the data storage unit for secondary verification 6C by the registering apparatus 2 are as have been described above with reference to FIG. 3."<br>Ikegami at 34:33:48 |
| | To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | See, e.g., Setlak at Claim 1[m]<br>See, e.g., Schmitt at Claim 1[m]<br>See, e.g., Wuidart at Claim 1[m]<br>See, e.g., Hamid at Claim 1[m]<br>See, e.g., Sands at Claim 1[m]<br>See, e.g., Howell at Claim 1[m]<br>See, e.g., Hoyos at Claim 1[m]<br>See, e.g., Mathiassen at Claim 1[m]<br>See, e.g., Steiner at Claim 1[m]<br>See, e.g., iPAQ 5400 series at Claim 1[m] |
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Ikegami discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Ikegami discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-5 (Ikegami)



Ikegami at Fig.2

"The instruction unit 10 a in the information inputting unit 10 prompts the person to be registered to input data for secondary verification through the information inputting unit 10 when it is necessary to register data for secondary verification. As the instruction unit 10 a, a light emitting element such as an LED or the like, a speaker generating buzz or the like, or an indicator such as an LCD or the like is used."
Ikegami at 15:53-60

| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the | Ikegami discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, |
| --- | --- |

Exhibit C-5 (Ikegami)

| signal matches a member of the database; and | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"According to the personal authentication system 1 (the registering apparatus 2 and the authenticating apparatus 3) of this embodiment of this invention, when biometrics characteristic data that is referred to, when normal authentication (primary verification) is performed is registered, registry data for secondary verification (personal identification information), which is different from the biometrics characteristic data and is not limited to data relating to biometrics, is registered using the information inputting unit 10. Both when the registry biometrics characteristic data for primary verification is registered, and when registry data for secondary verification is registered, the same information inputting unit 10 is used."<br>Ikegami at 24:6-18<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 2[b]<br>See, e.g., Wuidart at Claim 2[b]<br>See, e.g., Hamid at Claim 2[b]<br>See, e.g., Sands at Claim 2[b]<br>See, e.g., Howell at Claim 2[b]<br>See, e.g., Hoyos at Claim 2[b]<br>See, e.g., Mathiassen at Claim 2[b]<br>See, e.g., Steiner at Claim 2[b] |
| 2[c]. construct an audit trail of biometric signals provided to the | Ikegami discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

22

Exhibit C-5 (Ikegami)

| | |
|---|---|
| biometric sensor in order to access the controlled item. | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
| **Claim 4** | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Ikegami discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A system performing secondary verification using only existing apparatuses to accomplish a measure for relief in personal authentication without causing complexity or without increasing cost. The system has a registering apparatus for obtaining data for verification from information inputted using an inputting unit and registering the data. The registering apparatus has a first extracting unit for extracting biometrics characteristic data from the biometrics information obtained by the inputting unit, and registering the biometrics characteristic data as registry biometrics characteristic data for primary verification, and a second extracting unit for extracting data, which is different from the registry biometrics characteristic data, from information inputted using the inputting unit and registering the data as registry data for secondary verification. The system is used for personal authentication using biometrics information such as fingerprint, palm print, finger shape, |

23

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | palm shape, voice, retina, iris, face image, dynamic signature, blood vessel pattern, keystroke, or the like."<br>Ikegami at Abstract<br><br>"FIG. 1 is a block diagram showing a structure of a personal authentication system using biometrics information according to an embodiment of this invention. As shown in FIG. 1, the personal authentication system 1 according to this embodiment comprises a registering apparatus 2, an authenticating apparatus 3 (3A to 3G), a communication network 4, a data storage unit for primary verification 5 (5A), and a data storage unit for secondary verification 6 (6A to 6G) in order to authenticate a person using biometrics information (for example, fingerprint, palm print, finger shape, palm shape, voice, retina, iris, face image, dynamic signature, blood vessel pattern, keystroke, or the like)."<br>Ikegami at 14:28-39 |
| Claim 6 | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Ikegami discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Ikegami discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as |

24

Exhibit C-5 (Ikegami)

| | the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[a]<br>See, e.g., Wuidart at Claim 6[a]<br>See, e.g., Hamid at Claim 6[a]<br>See, e.g., Howell at Claim 6[a]<br>See, e.g., Mathiassen at Claim 6[a]<br>See, e.g., Steiner at Claim 6[a]<br>See, e.g., iPAQ 5400 series at Claim 6[a] |
|---|---|
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Ikegami discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[b]<br>See, e.g., Hoyos at Claim 6[b]<br>See, e.g., Mathiassen at Claim 6[b]<br>See, e.g., Steiner at Claim 6[b] |
| Claim 9 | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Ikegami discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

25

Exhibit C-5 (Ikegami)

| | See Disclosure of Claim 1[pre] |
|---|---|
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Ikegami discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 9[a]<br>See, e.g., Sands at Claim 9[a]<br>See, e.g., Howell at Claim 9[a]<br>See, e.g., Hoyos at Claim 9[a]<br>See, e.g., Steiner at Claim 9[a]<br>See, e.g., iPAQ 5400 series at Claim 9[a] |
| Claim 10 | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Ikegami discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Ikegami discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Ikegami discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Ikegami discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Ikegami discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Ikegami discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a | To the extent the preamble is limiting, Ikegami discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Ikegami discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Ikegami discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Ikegami discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

29

Exhibit C-5 (Ikegami)

| | See Disclosure at Claim 1[k] |
|---|---|
| 11[d]. mapping said series into an instruction; and | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Ikegami discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Ikegami discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Ikegami discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

30

Exhibit C-5 (Ikegami)

| | |
|---|---|
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Ikegami discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Ikegami discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Ikegami discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-5 (Ikegami)

| | See Disclosure at Claim 1[c] |
|---|---|
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Ikegami discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Ikegami does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Ikegami discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The registering apparatus 2 is realized by connecting the information inputting unit 10 such as a fingerprint scanner (fingerprint unit) or the like to a computer configured with, for example, a CPU, an ROM, an RAM, a display and the like inter-connected. In this case, functions of the biometrics characteristic data extracting unit 11 for primary verification, the primary verifying unit 12, the primary verification determining unit 13 and the characteristic data extracting unit 14 for secondary verification are realized with a CPU. Therefore, the registering apparatus 2 can be realized by using an existing registering |

32

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | apparatus as it is without modifying at all a structure of hardware of the existing registering apparatus."<br>Ikegami at 18:51-63<br><br>"Further, it is possible to provide an apparatus having functions of both the registering apparatus 2 and the authenticating apparatus 3 described above. Such apparatus is realized by connecting an information inputting unit such as a fingerprint scanner (fingerprint unit) or the like to a computer configured with, for example, a CPU, an ROM, an RAM, a display and the like, as described above. In such case, one information inputting unit may be served as both the information inputting units 10 and 20. Additionally, the data extracting units 11 and 21, the data extracting units 14 and 25, the primary verifying units 12 and 22, and the verification determining units 13 and 23 may be realized with the same software, respectively."<br>Ikegami at 22:10-22 |
| 14[a]. receive a series of entries of a biometric signal; | Ikegami discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Ikegami discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

33

Exhibit C-5 (Ikegami)

| | |
|---|---|
| 14[c]. map said series into an instruction; | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Ikegami discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Ikegami discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Ikegami discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Ikegami discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Ikegami discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Ikegami discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

35

Exhibit C-5 (Ikegami)

|  | See Disclosure at Claim 1[a] |
|---|---|
| 15[b]. a transmitter sub-system comprising: | Ikegami discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Ikegami discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Ikegami discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Ikegami discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |

36

Exhibit C-5 (Ikegami)

| | |
|---|---|
| 15[f]. a receiver sub-system comprising: | Ikegami discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Ikegami discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Ikegami discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Ikegami discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Ikegami discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-5 (Ikegami)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Ikegami discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |

38

Exhibit C-5 (Ikegami)

| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Ikegami discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Ikegami discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Ikegami discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Ikegami discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

39

Exhibit C-5 (Ikegami)

| | See Disclosure at Claim 1[e] |
|---|---|
| 16[d]. wherein the controller is further capable of: | Ikegami discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Ikegami discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-5 (Ikegami)

|  | See Disclosure at Claim 1[m] |
|---|---|
| **Claim 17** | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Ikegami discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | Ikegami discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Ikegami discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

41

Exhibit C-5 (Ikegami)

| | For example, see the following passages and/or figures, as well as all related disclosures: |
|---|---|
| | See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Ikegami discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Ikegami discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[l] |
| 17[e]. populating the database according to the instruction; | Ikegami discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Ikegami discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |

42

Exhibit C-5 (Ikegami)

| | See Disclosure at Claim 1[c] |
|---|---|
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Ikegami discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Ikegami discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Ikegami discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-6 (Sands)

**Exhibit C-6**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 7,404,086 ("Sands")**

U.S. PATENT NO. 7,404,086 to Sands ("Sands") entitled "Method and Apparatus for Biometric Authentication" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Sands |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Sands discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: "A biometric authentication method and system may be implemented in a client server architecture to provide substantial access control security and ease of administration. Users are enrolled in the system by providing multiple biometric measurements which are stored in a database as part of the user's biometric profile. Upon attempted access of a computer, |

1

Exhibit C-6 (Sands)

| | |
|---|---|
| | the biometric authentication engine determines which biometrics are required and what the biometric matching criteria are based on the location of the computer, time of day and other security conditions. If the user is determined not to be authentic, a security policy may cause an action to occur such as revoking the user's access privileges or causing the login attempt to appear to be successful while the authorities are summoned." <br> Sands at Abstract |
| 1[a]. a memory comprising a database of biometric signatures; | Sands discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A biometric authentication method and system may be implemented in a client server architecture to provide substantial access control security and ease of administration. Users are enrolled in the system by providing multiple biometric measurements which are stored in a database as part of the user's biometric profile. Upon attempted access of a computer, the biometric authentication engine determines which biometrics are required and what the biometric matching criteria are based on the location of the computer, time of day and other security conditions. If the user is determined not to be authentic, a security policy may cause an action to occur such as revoking the user's access privileges or causing the login attempt to appear to be successful while the authorities are summoned." <br> Sands at Abstract <br><br> "The server 100 may be coupled to multiple client computers which are distributed within a facility over the network 120. The server computer runs biometric authentication server software 140, which is a program run from the server's memory. The biometric authentication server software 140, hereinafter referred to as the server software 140, interacts with the biometric devices, the client computer and the computer network to authenticate users to the network. The server software 140 instructs the user how to authenticate herself to the network, collects and processes the biometrics received from the biometric scanner and user information from the user for the location where the user is logging on. The software 140 grants or denies access based on a comparison between the |

2

Exhibit C-6 (Sands)

| | collected biometrics, the biometrics in the user database for the user and the requirements and matching policies. The operation of the server software is described in more detail with reference to FIG. 2." <br>Sands at 5:20-46 |
|---|---|
| 1[b]. a transmitter sub-system comprising: | Sands discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "The client computers 110 are used to gain access to the network, generally by employees, to perform work for the business that owns the network. Positioned at each client computer is at least one biometric reader or scanner device. The biometric scanner(s) are used to read one or more particular biometrics associated with an individual and send the biometric measurements to the computer network for use in authenticating the individual as a valid user of the computer network." <br>Sands at 5:10-18 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Sands discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "The client computers 110 are used to gain access to the network, generally by employees, to perform work for the business that owns the network. Positioned at each client computer is at least one biometric reader or scanner device. The biometric scanner(s) are used to read one or more particular biometrics associated with an individual and send the biometric measurements to the computer network for use in authenticating the individual as a valid user of the computer network." <br>Sands at 5:10-18 |

3

Exhibit C-6 (Sands)

| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Sands discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>**FIGURE 2**<br>Sands at Fig. 2 |

4

Exhibit C-6 (Sands)



5

Exhibit C-6 (Sands)

| | |
|---|---|
| | Sands at Fig. 4<br><br>"According to another embodiment of the present invention, a biometric authentication system comprises: an input device for providing biometric information; a memory operatively connected to store user biometric information; a memory operatively connected to store at least one user profile; a controller operatively connected to compare at least some of the stored user biometric information and the biometric information provided by the input device, based on the user profile, and to determine if a user is authenticated based on the comparison."<br>Sands at 2:19-28<br><br>"Matching is a determination of authenticity of the user based on the authentication requirements, the user's biometric profile, and the set of biometrics gathered from an individual seeking authentication as the user. Other information or security conditions, (such as the location and time of day, etc) may be used as part of the matching criteria as well, specifically for determining a confidence threshold. The matching policy decides when the evidence presented is strong enough to grant authentication; when the evidence is weak enough to revoke authentication; or possibly when more biometrics must be acquired or re-acquired"<br>Sands at 4:27-37<br><br>"The server 100 may be coupled to multiple client computers which are distributed within a facility over the network 120. The server computer runs biometric authentication server software 140, which is a program run from the server's memory. The biometric authentication server software 140, hereinafter referred to as the server software 140, interacts with the biometric devices, the client computer and the computer network to authenticate users to the network. The server software 140 instructs the user how to authenticate herself to the network, collects and processes the biometrics received from the biometric scanner and user information from the user for the location where the user is logging on. The software 140 grants or denies access based on a comparison between the collected biometrics, the biometrics in the user database for the user and the requirements and matching policies. The operation of the server software is described in more detail with reference to FIG. 2."<br>Sands at 5:20-46 |

6

Exhibit C-6 (Sands)

| | "The matching engine 230 receives the USER ID and the biometric measurements from the acquisition layer. The matching engine then retrieves the biometric profile stored for the user in the database based on the USER ID. The matching engine then compares the biometric measurements received from the individual attempting to log on with the stored biometric profile stored in the database in connection with the USER ID. The matching engine returns to the authentication policy engine a confidence figure indicating the likelihood that the biometric measurements acquired came from the same person that provided the biometric profile stored in the database." <br> Sands at 8:28-39 <br><br> "In step 435, the authentication policy engine compares the sample set of biometrics with the biometric profile on record through the use of one or more matching algorithms. There may be multiple algorithms used depending on the set of biometrics acquired. For example, an iris matching algorithm differs from a fingerprint matching algorithm. Based on the results of comparison with the template, there is one of 3 outcomes:" <br> Sands at 10:4-11 <br><br> "In step 445, authentication is granted after a successful match. This means the authentication server software now returns a token implying "yes the user is who the user says the user is." <br> If in step 435 the authentication policy determines that the biometric profile does not match, step 450 begins. Step 450 is very similar to step 440 and results in a specified action being taken when authentication failed. In many cases, step 450 will involve logging the attempt and, possibly setting internal and external variables to support further access subterfuge. Step 452 allows the authentication an 'override' for the cases in which access subterfuge is desired, changing the authentication response from a token indicating 'Authentication Not Granted' to a token indicating 'Authentication Granted'. This step is necessary to allow access subterfuge, without it there would be no way to give the intruder appearance of success." <br><br> In step 455, user authentication is not granted, the authentication system now returns a token implying 'the user does not appear to be who they claim'. This token may then be |
|---|---|

Exhibit C-6 (Sands)

| | |
|---|---|
| | passed on to the operating system or any other program requesting authentication. This message may be conveyed to the user through the session layer to the operating system layer and security presentation layer 235."<br>Sands at 10:30-52<br><br>"Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information."<br>Sands at 11:24-33 |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Sands discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Matching is a determination of authenticity of the user based on the authentication requirements, the user's biometric profile, and the set of biometrics gathered from an individual seeking authentication as the user. Other information or security conditions, (such as the location and time of day, etc) may be used as part of the matching criteria as well, specifically for determining a confidence threshold. The matching policy decides when the evidence presented is strong enough to grant authentication; when the evidence is weak enough to revoke authentication; or possibly when more biometrics must be acquired or re-acquired."<br>Sand at 4:27-37<br><br>"The userID and biometric profile for each user is stored by the enrollment manager in the database. The biometric information may be encrypted prior to storing the data. In addition, for each biometric or biometric device that the user is entitled to use, biometric data may be |

Exhibit C-6 (Sands)

<table>
<tr>
<td></td>
<td>generated and stored for the user in the enrollment database as part of the biometric profile. FIG. 3 shows an illustrative view of a database entry for a user. The entry includes the user's USER ID, and an entry for each biometric device type that the user has been measured on up to N biometric devices. The database also stores the biometric data measured from the user for that particular biometric device. In this manner, the database stores biometric measurements for the user taken by one or more devices present on the network that the user needs to access."<br>Sands at 6:43-56<br><br>"In each case an appropriate message is sent to the user via the session layer and the security presentation layer. The message indicates that the user has successfully logged on or has failed authentication. Even if the user fails authentication, the security policy may inform the user that he has successfully logged while the access subterfuge methods defined by the security policy are carried out. In this manner, the authentication server software grants or denies access to the system based on how closely the biometric measurements received from an individual match the biometric profile stored in the database for the users."<br>Sands at 8:51-61<br><br>"In step 445, authentication is granted after a successful match. This means the authentication server software now returns a token implying "yes the user is who the user says the user is.""<br>Sands at 10:30-33<br><br>"Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information."<br>Sands at 11:24-33</td>
</tr>
</table>

9

Exhibit C-6 (Sands)

| | “Policy | Description |
|---|---|---|
| | Regular | One finger, chosen at random, is required for authentication. Confidence for a match must be in the range [90%, 100%] After 5 failed login attempts, the user is locked out of their account. |
| | Secure | Two fingers, chosen at random, are required for authentication. Confidence for a match must be in the range [96%, 100%] Access is restricted to business hours [9 am-6 pm] After three failed login attempts, the terminal and user are locked out, and an alert is sent to security by email. |
| | Highly Secure | Two fingers, chosen at random, and a voice print, are required for authentication. If access falls outside normal business hours [7 am-8 pm], a third fingerprint is required. Confidence for a match on any biometric must be in the range: [98%, 100%] If the confidence level for any biometric match falls within the range: [0%, 65%] access subterfuge is attempted, and the user is given the appearance of a successful login, the user is directed to a false 'sandbox' area with false documents, while the security desk is paged. If the failed matches were in a medium range [65%-97%], the user is given another login attempt, perhaps with a suggestion to clean the scanner. If the user or terminal requesting login is inactive, the same access subterfuge actions are performed. If the first and second attempts are both failed, the same access |

10

Exhibit C-6 (Sands)

| | |
|---|---|
| | subterfuge actions are performed, and the user and terminal are inactivated.<br><br>Admin    Users with sufficient system permissions to modify the BiObex configuration files and policies are associated with a group. Request to login as an administrator requires 2 fingerprints from any 2 active users in the administrator group. Confidence for a match must be in the range [95%, 100%] After 3 failed logins, both administrators are made inactive. If the confidence level for any biometric match falls within the range: [0%, 65%], security is alerted."<br><br>Sands at 12:31-61<br><br>To the extent that Plaintiff contends Sands does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[e]<br>See, e.g., Wuidart at Claim 1[e]<br>See, e.g., Hamid at Claim 1[e]<br>See, e.g., Mathiassen at Claim 1[e]<br>See, e.g., Steinar at Claim 1[e] |
| 1[f]. a receiver sub-system comprising: | Sands discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The server 100 may be coupled to multiple client computers which are distributed within a facility over the network 120. The server computer runs biometric authentication server |

11

Exhibit C-6 (Sands)

| | |
|---|---|
| | software 140, which is a program run from the server's memory. The biometric authentication server software 140, hereinafter referred to as the server software 140, interacts with the biometric devices, the client computer and the computer network to authenticate users to the network. The server software 140 instructs the user how to authenticate herself to the network, collects and processes the biometrics received from the biometric scanner and user information from the user for the location where the user is logging on. The software 140 grants or denies access based on a comparison between the collected biometrics, the biometrics in the user database for the user and the requirements and matching policies. The operation of the server software is described in more detail with reference to FIG. 2." <br><br> Sands at 5:20-46 <br><br> "If in step 435 the authentication policy determines that the biometric profile does not match, step 450 begins. Step 450 is very similar to step 440 and results in a specified action being taken when authentication failed. In many cases, step 450 will involve logging the attempt and, possibly setting internal and external variables to support further access subterfuge. Step 452 allows the authentication an 'override' for the cases in which access subterfuge is desired, changing the authentication response from a token indicating 'Authentication Not Granted' to a token indicating 'Authentication Granted'. This step is necessary to allow access subterfuge, without it there would be no way to give the intruder appearance of success." <br><br> Sands at 10:34-45 <br><br> "The enrollment manager 200 may be managed and operated only by a handful of people who are set up as enrollment officers. The enrollment officers must authenticate themselves to both the network and separately to the enrollment manager 200 using biometric authentication prior to enrolling any new users. The enrollment officers may also configure a user's network access privileges and other information and may modify a user's profile or delete a user altogether. In this manner, the enrollment manager controls which users are allowed to use the system and stores the biometric profiles of all users in the enrollment database." <br><br> Sands at 6:56-67 |

Exhibit C-6 (Sands)

| | |
|---|---|
| | "In step 445, authentication is granted after a successful match. This means the authentication server software now returns a token implying "yes the user is who the user says the user is.""<br>Sands at 10:30-33 |
| 1[g]. a receiver sub-system controller configured to: | Sands discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-6 (Sands)



14

Exhibit C-6 (Sands)

<table>
<tr>
<td></td>
<td>

Sands at Fig. 4

"The server 100 may be coupled to multiple client computers which are distributed within a facility over the network 120. The server computer runs biometric authentication server software 140, which is a program run from the server's memory. The biometric authentication server software 140, hereinafter referred to as the server software 140, interacts with the biometric devices, the client computer and the computer network to authenticate users to the network. The server software 140 instructs the user how to authenticate herself to the network, collects and processes the biometrics received from the biometric scanner and user information from the user for the location where the user is logging on. The software 140 grants or denies access based on a comparison between the collected biometrics, the biometrics in the user database for the user and the requirements and matching policies. The operation of the server software is described in more detail with reference to FIG. 2."
Sands at 5:20-46

"The userID and biometric profile for each user is stored by the enrollment manager in the database. The biometric information may be encrypted prior to storing the data. In addition, for each biometric or biometric device that the user is entitled to use, biometric data may be generated and stored for the user in the enrollment database as part of the biometric profile. FIG. 3 shows an illustrative view of a database entry for a user. The entry includes the user's USER ID, and an entry for each biometric device type that the user has been measured on up to N biometric devices. The database also stores the biometric data measured from the user for that particular biometric device. In this manner, the database stores biometric measurements for the user taken by one or more devices present on the network that the user needs to access.
The enrollment manager 200 may be managed and operated only by a handful of people who are set up as enrollment officers. The enrollment officers must authenticate themselves to both the network and separately to the enrollment manager 200 using biometric authentication prior to enrolling any new users. The enrollment officers may also configure a user's network access privileges and other information and may modify a user's profile or delete a user altogether. In this manner, the enrollment manager controls which users are

</td>
</tr>
</table>

15

Exhibit C-6 (Sands)

<table>
<tr>
<td></td>
<td>

allowed to use the system and stores the biometric profiles of all users in the enrollment database."
Sands at 6:43-67

"The matching engine 230 receives the USER ID and the biometric measurements from the acquisition layer. The matching engine then retrieves the biometric profile stored for the user in the database based on the USER ID. The matching engine then compares the biometric measurements received from the individual attempting to log on with the stored biometric profile stored in the database in connection with the USER ID. The matching engine returns to the authentication policy engine a confidence figure indicating the likelihood that the biometric measurements acquired came from the same person that provided the biometric profile stored in the database."
Sands at 8:28-39

"In each case an appropriate message is sent to the user via the session layer and the security presentation layer. The message indicates that the user has successfully logged on or has failed authentication. Even if the user fails authentication, the security policy may inform the user that he has successfully logged while the access subterfuge methods defined by the security policy are carried out. In this manner, the authentication server software grants or denies access to the system based on how closely the biometric measurements received from an individual match the biometric profile stored in the database for the users."
Sands at 8:51-61

"In step 445, authentication is granted after a successful match. This means the authentication server software now returns a token implying "yes the user is who the user says the user is."
If in step 435 the authentication policy determines that the biometric profile does not match, step 450 begins. Step 450 is very similar to step 440 and results in a specified action being taken when authentication failed. In many cases, step 450 will involve logging the attempt and, possibly setting internal and external variables to support further access subterfuge. Step 452 allows the authentication an 'override' for the cases in which access subterfuge is desired, changing the authentication response from a token indicating 'Authentication Not

</td>
</tr>
</table>

16

Exhibit C-6 (Sands)

| | Granted' to a token indicating 'Authentication Granted'. This step is necessary to allow access subterfuge, without it there would be no way to give the intruder appearance of success." |
| --- | --- |
| | In step 455, user authentication is not granted, the authentication system now returns a token implying 'the user does not appear to be who they claim'. This token may then be passed on to the operating system or any other program requesting authentication. This message may be conveyed to the user through the session layer to the operating system layer and security presentation layer 235." <br> Sands at 10:30-52 |
| | "Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information." <br> Sands at 11:24-33 |
| | "Authentication Across the Internet <br> The above embodiment will function correctly and securely over public, wide area networks, such as the Internet; given the following conditions are met. 1) The scanning devices used at the remote site are capable of communicating with the authentication server either directly or through a layer provided by the authentication client, 2) Communications are implemented using a protocol which is secure across a public network (such as the Transport Layer Security (TLS) protocol). 3) The client has a way of communicating either: a) a token known to the server with the logical addresses of any scanners derived from this token by the server; b) directly indicating its logical address (such as the IP address or hostname) as well as the logical address and descriptions of any scanning devices; or c) the client can provide communication to any scanning devices with the client acting as a conduit for communication. 4) Ideally, either the scanning devices or authentication clients are capable of proving the authenticity of the scan—that is that the scan produced actually |

Exhibit C-6 (Sands)

| | |
|---|---|
| | came from the physical scanning device: for example each scanner may contain a separate encryption key, known only to the server." <br> Sands at 11:59-12:2 |
| 1[h]. receive the transmitted secure access signal; and | Sands discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-6 (Sands)



19

Exhibit C-6 (Sands)

| | Sands at Fig. 4 |
| --- | --- |
| | "Device—Any physical electronic device requiring authentication that a user would use. This could be a personal computer, thin client to a computer server, PDA, automobile, etc." Sands at 3:14-16 |
| | "Access Subterfuge—An attempt by the system to escape intrusion by an attacker. The system may use a variety of mechanisms that seek to delay an imposter, who has been detected attempting to gain access to unauthorized resources. The delay is intended to occupy the intruder until designated authorities can arrive. For example, the imposter may be re-directed to a false area or resource which the imposter will spend time examining while authorities arrive. Or simply a long time may pass before (possibly false) access is granted. In addition the system may attempt to 'bluff' potential imposters by always rejecting the first access attempt. Also the system may lock out the machine from which failed access was attempted, as well as locking out the user from future authentication." Sands at 3:29-42 |
| | "The userID and biometric profile for each user is stored by the enrollment manager in the database. The biometric information may be encrypted prior to storing the data. In addition, for each biometric or biometric device that the user is entitled to use, biometric data may be generated and stored for the user in the enrollment database as part of the biometric profile. FIG. 3 shows an illustrative view of a database entry for a user. The entry includes the user's USER ID, and an entry for each biometric device type that the user has been measured on up to N biometric devices. The database also stores the biometric data measured from the user for that particular biometric device. In this manner, the database stores biometric measurements for the user taken by one or more devices present on the network that the user needs to access." Sands at 6:43-56 |
| | "The matching engine 230 receives the USER ID and the biometric measurements from the acquisition layer. The matching engine then retrieves the biometric profile stored for the user in the database based on the USER ID. The matching engine then compares the biometric measurements received from the individual attempting to log on with the stored |

20

Exhibit C-6 (Sands)

| | biometric profile stored in the database in connection with the USER ID. The matching engine returns to the authentication policy engine a confidence figure indicating the likelihood that the biometric measurements acquired came from the same person that provided the biometric profile stored in the database." Sands at 8:28-39 "In each case an appropriate message is sent to the user via the session layer and the security presentation layer. The message indicates that the user has successfully logged on or has failed authentication. Even if the user fails authentication, the security policy may inform the user that he has successfully logged while the access subterfuge methods defined by the security policy are carried out. In this manner, the authentication server software grants or denies access to the system based on how closely the biometric measurements received from an individual match the biometric profile stored in the database for the users." Sands at 8:51-61 "In step 445, authentication is granted after a successful match. This means the authentication server software now returns a token implying "yes the user is who the user says the user is." If in step 435 the authentication policy determines that the biometric profile does not match, step 450 begins. Step 450 is very similar to step 440 and results in a specified action being taken when authentication failed. In many cases, step 450 will involve logging the attempt and, possibly setting internal and external variables to support further access subterfuge. Step 452 allows the authentication an 'override' for the cases in which access subterfuge is desired, changing the authentication response from a token indicating 'Authentication Not Granted' to a token indicating 'Authentication Granted'. This step is necessary to allow access subterfuge, without it there would be no way to give the intruder appearance of success." In step 455, user authentication is not granted, the authentication system now returns a token implying 'the user does not appear to be who they claim'. This token may then be passed on to the operating system or any other program requesting authentication. This message may be conveyed to the user through the session layer to the operating system layer and security presentation layer 235." |
|---|---|

21

Exhibit C-6 (Sands)

| | |
|---|---|
| | Sands at 10:30-52<br><br>"Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information."<br>Sands at 11:24-33<br><br>"Authentication Across the Internet<br>The above embodiment will function correctly and securely over public, wide area networks, such as the Internet; given the following conditions are met. 1) The scanning devices used at the remote site are capable of communicating with the authentication server either directly or through a layer provided by the authentication client, 2) Communications are implemented using a protocol which is secure across a public network (such as the Transport Layer Security (TLS) protocol). 3) The client has a way of communicating either: a) a token known to the server with the logical addresses of any scanners derived from this token by the server; b) directly indicating its logical address (such as the IP address or hostname) as well as the logical address and descriptions of any scanning devices; or c) the client can provide communication to any scanning devices with the client acting as a conduit for communication. 4) Ideally, either the scanning devices or authentication clients are capable of proving the authenticity of the scan—that is that the scan produced actually came from the physical scanning device: for example each scanner may contain a separate encryption key, known only to the server."<br>Sands at 11:59-12:2 |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Sands discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

22

Exhibit C-6 (Sands)



Sands at Fig. 4

23

Exhibit C-6 (Sands)

| | |
|---|---|
| | "Matching is a determination of authenticity of the user based on the authentication requirements, the user's biometric profile, and the set of biometrics gathered from an individual seeking authentication as the user. Other information or security conditions, (such as the location and time of day, etc) may be used as part of the matching criteria as well, specifically for determining a confidence threshold. The matching policy decides when the evidence presented is strong enough to grant authentication; when the evidence is weak enough to revoke authentication; or possibly when more biometrics must be acquired or re-acquired." <br> Sand at 4:27-37 <br><br> "Access Subterfuge—An attempt by the system to escape intrusion by an attacker. The system may use a variety of mechanisms that seek to delay an imposter, who has been detected attempting to gain access to unauthorized resources. The delay is intended to occupy the intruder until designated authorities can arrive. For example, the imposter may be re-directed to a false area or resource which the imposter will spend time examining while authorities arrive. Or simply a long time may pass before (possibly false) access is granted. In addition the system may attempt to 'bluff' potential imposters by always rejecting the first access attempt. Also the system may lock out the machine from which failed access was attempted, as well as locking out the user from future authentication." <br> Sands at 3:29-42 <br><br> "In each case an appropriate message is sent to the user via the session layer and the security presentation layer. The message indicates that the user has successfully logged on or has failed authentication. Even if the user fails authentication, the security policy may inform the user that he has successfully logged while the access subterfuge methods defined by the security policy are carried out. In this manner, the authentication server software grants or denies access to the system based on how closely the biometric measurements received from an individual match the biometric profile stored in the database for the users." <br> Sands at 8:51-61 |

24

Exhibit C-6 (Sands)

| | "In step 445, authentication is granted after a successful match. This means the authentication server software now returns a token implying "yes the user is who the user says the user is.""<br>Sands at 10:30-33<br><br>"In step 455, user authentication is not granted, the authentication system now returns a token implying 'the user does not appear to be who they claim'. This token may then be passed on to the operating system or any other program requesting authentication. This message may be conveyed to the user through the session layer to the operating system layer and security presentation layer 235."<br>Sands at 10:46-52<br><br><table><tr><td>"Policy</td><td>Description</td></tr><tr><td>Regular</td><td>One finger, chosen at random, is required for authentication. Confidence for a match must be in the range [90%, 100%] After 5 failed login attempts, the user is locked out of their account.</td></tr><tr><td>Secure</td><td>Two fingers, chosen at random, are required for authentication. Confidence for a match must be in the range [96%, 100%] Access is restricted to business hours [9 am-6 pm] After three failed login attempts, the terminal and user are locked out, and an alert is sent to security by email.</td></tr><tr><td>Highly Secure</td><td>Two fingers, chosen at random, and a voice print, are required for authentication. If access falls outside normal business hours [7 am-8 pm], a third fingerprint is required. Confidence for a match on any biometric must be in the range: [98%, 100%] If the confidence level for any biometric match falls within the</td></tr></table> |

25

Exhibit C-6 (Sands)

| | | |
|---|---|---|
| | | range: [0%, 65%] access subterfuge is attempted, and the user is given the appearance of a successful login, the user is directed to a false 'sandbox' area with false documents, while the security desk is paged. If the failed matches were in a medium range [65%-97%], the user is given another login attempt, perhaps with a suggestion to clean the scanner.<br><br>If the user or terminal requesting login is inactive, the same access subterfuge actions are performed.<br><br>If the first and second attempts are both failed, the same access subterfuge actions are performed, and the user and terminal are inactivated. |
| | Admin | Users with sufficient system permissions to modify the BiObex configuration files and policies are associated with a group. Request to login as an administrator requires 2 fingerprints from any 2 active users in the administrator group. Confidence for a match must be in the range [95%, 100%] After 3 failed logins, both administrators are made inactive. If the confidence level for any biometric match falls within the range: [0%, 65%], security is alerted." |
| | Sands at 12:31-61 | |
| | "The enrollment manager 200 may be managed and operated only by a handful of people who are set up as enrollment officers. The enrollment officers must authenticate themselves to both the network and separately to the enrollment manager 200 using biometric authentication prior to enrolling any new users. The enrollment officers may also configure a user's network access privileges and other information and may modify a user's profile or delete a user altogether. In this manner, the enrollment manager controls which users are | |

Exhibit C-6 (Sands)

| | |
|---|---|
| | allowed to use the system and stores the biometric profiles of all users in the enrollment database."<br>Sands at 6:56-67 |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Sands discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Sands discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The client computers 110 are used to gain access to the network, generally by employees, to perform work for the business that owns the network. Positioned at each client computer is at least one biometric reader or scanner device. The biometric scanner(s) are used to read one or more particular biometrics associated with an individual and send the biometric measurements to the computer network for use in authenticating the individual as a valid user of the computer network."<br>Sands at 5:10-18<br><br>"The enrollment manager 200 is responsible for collecting and storing information for each valid user of the network into the storage media 205. The enrollment manager 200 may collect user identification information (USER ID) from a new user, such as the user's name or a derivative of the user's name. The enrollment manager 200 also collects from the user one or more biometric profiles. The user's biometric profile comprises one or more |

27

Exhibit C-6 (Sands)

| | biometric scans of a particular characteristic of the user using one or more biometric scanning devices. |
|---|---|
| | According to the present invention, any biometric scanner may be used to acquire any particular biometric characteristic of the user for inclusion in the biometric profile. In the case of fingerprints, one or more fingerprints of each user may be scanned using one or more fingerprint scanning devices. Fingerprint scanning and storage for biometric authentication is well known and any technique may be used in connection with the present invention."<br>Sands at 6:10-27 |
| | "The acquisition layer 225 receives biometric measurements from the biometric equipment at the user's location via the session layer and network. The acquisition layer may send messages to the user when a poor sample was received via the session layer and the security presentation layer prompting the user to perform a rescan. Upon acquiring one or more biometric measurements required by the system, the acquisition layer makes the measurements available to the matching engine 230."<br>Sands at 8:18-27 |
| | "Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information."<br>Sands at 11:24-33 |

"Policy    Description

Regular    One finger, chosen at random, is required for authentication.

Confidence for a match must be in the range [90%, 100%]

After 5 failed login attempts, the user is locked out of their

Exhibit C-6 (Sands)

| | | |
|---|---|---|
| | | account. |
| | Secure | Two fingers, chosen at random, are required for authentication. Confidence for a match must be in the range [96%, 100%] Access is restricted to business hours [9 am-6 pm] After three failed login attempts, the terminal and user are locked out, and an alert is sent to security by email. |
| | Highly Secure | Two fingers, chosen at random, and a voice print, are required for authentication. If access falls outside normal business hours [7 am-8 pm], a third fingerprint is required. Confidence for a match on any biometric must be in the range: [98%, 100%] If the confidence level for any biometric match falls within the range: [0%, 65%] access subterfuge is attempted, and the user is given the appearance of a successful login, the user is directed to a false 'sandbox' area with false documents, while the security desk is paged. If the failed matches were in a medium range [65%-97%], the user is given another login attempt, perhaps with a suggestion to clean the scanner. If the user or terminal requesting login is inactive, the same access subterfuge actions are performed. If the first and second attempts are both failed, the same access subterfuge actions are performed, and the user and terminal are inactivated. |
| | Admin | Users with sufficient system permissions to modify the BiObex configuration files and policies are associated with a group. Request to login as an administrator requires 2 fingerprints |

29

Exhibit C-6 (Sands)

| | |
|---|---|
| | from any 2 active users in the administrator group.<br><br>Confidence for a match must be in the range [95%, 100%]<br><br>After 3 failed logins, both administrators are made inactive.<br><br>If the confidence level for any biometric match falls within the<br><br>range: [0%, 65%], security is alerted."<br><br>Sands at 12:31-61<br><br>To the extent that Plaintiff contends Sands does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Ikegami at Claim 1[k]<br>See, e.g., Howell at Claim 1[k]<br>See, e.g., Steiner at Claim 1[k]<br>See, e.g., iPAQ 5400 series at Claim 1[k] |
| 1[l]. map said series into an instruction; and | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"FIG. 2 depicts a functional block diagram of the biometric authentication server software 140. The server software 140 is generally stored on a hard disk drive associated with the server and is loaded into the memory of the server for execution when the server is turned on and is running. The server software includes an enrollment manager 200 that interacts with a persistent storage medium 205. This storage 205, may be a centralized database or distributed, as in the case where each user carries a portable storage media, such as a smart card, containing one or more biometric profiles. In either case it must be accessible by the server. The profile on the storage media may optionally be cryptographically protected as discussed in a later section. |

30

Exhibit C-6 (Sands)

| | |
|---|---|
| | The enrollment manager 200 is responsible for collecting and storing information for each valid user of the network into the storage media 205. The enrollment manager 200 may collect user identification information (USER ID) from a new user, such as the user's name or a derivative of the user's name. The enrollment manager 200 also collects from the user one or more biometric profiles. The user's biometric profile comprises one or more biometric scans of a particular characteristic of the user using one or more biometric scanning devices."<br>Sands at 5:64-6:19 |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Sands discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

31

Exhibit C-6 (Sands)



**FIGURE 2**

Sands at Fig. 2

"Device—Any physical electronic device requiring authentication that a user would use. This could be a personal computer, thin client to a computer server, PDA, automobile, etc." Sands at 3:14-16

"Access Subterfuge—An attempt by the system to escape intrusion by an attacker. The system may use a variety of mechanisms that seek to delay an imposter, who has been detected attempting to gain access to unauthorized resources. The delay is intended to occupy the intruder until designated authorities can arrive. For example, the imposter may

32

Exhibit C-6 (Sands)

| | be re-directed to a false area or resource which the imposter will spend time examining while authorities arrive. Or simply a long time may pass before (possibly false) access is granted. In addition the system may attempt to 'bluff' potential imposters by always rejecting the first access attempt. Also the system may lock out the machine from which failed access was attempted, as well as locking out the user from future authentication." Sands at 3:29-42 <br><br> "FIG. 2 depicts a functional block diagram of the biometric authentication server software 140. The server software 140 is generally stored on a hard disk drive associated with the server and is loaded into the memory of the server for execution when the server is turned on and is running. The server software includes an enrollment manager 200 that interacts with a persistent storage medium 205. This storage 205, may be a centralized database or distributed, as in the case where each user carries a portable storage media, such as a smart card, containing one or more biometric profiles. In either case it must be accessible by the server. The profile on the storage media may optionally be cryptographically protected as discussed in a later section. <br><br> The enrollment manager 200 is responsible for collecting and storing information for each valid user of the network into the storage media 205. The enrollment manager 200 may collect user identification information (USER ID) from a new user, such as the user's name or a derivative of the user's name. The enrollment manager 200 also collects from the user one or more biometric profiles. The user's biometric profile comprises one or more biometric scans of a particular characteristic of the user using one or more biometric scanning devices." Sands at 5:64-6:19 <br><br> "The userID and biometric profile for each user is stored by the enrollment manager in the database. The biometric information may be encrypted prior to storing the data. In addition, for each biometric or biometric device that the user is entitled to use, biometric data may be generated and stored for the user in the enrollment database as part of the biometric profile. FIG. 3 shows an illustrative view of a database entry for a user. The entry includes the user's USER ID, and an entry for each biometric device type that the user has been measured on up to N biometric devices. The database also stores the biometric data |

33

Exhibit C-6 (Sands)

<table>
<tr><td></td><td colspan="2">measured from the user for that particular biometric device. In this manner, the database stores biometric measurements for the user taken by one or more devices present on the network that the user needs to access."<br>Sands at 6:43-56</td></tr>
<tr><td></td><td>"Policy</td><td>Description</td></tr>
<tr><td></td><td>Regular</td><td>One finger, chosen at random, is required for authentication.<br>Confidence for a match must be in the range [90%, 100%]<br>After 5 failed login attempts, the user is locked out of their account.</td></tr>
<tr><td></td><td>Secure</td><td>Two fingers, chosen at random, are required for authentication.<br>Confidence for a match must be in the range [96%, 100%]<br>Access is restricted to business hours [9 am-6 pm]<br>After three failed login attempts, the terminal and user are locked out, and an alert is sent to security by email.</td></tr>
<tr><td></td><td>Highly Secure</td><td>Two fingers, chosen at random, and a voice print, are required for authentication. If access falls outside normal business hours [7 am-8 pm], a third fingerprint is required.<br>Confidence for a match on any biometric must be in the range: [98%, 100%]<br>If the confidence level for any biometric match falls within the range: [0%, 65%] access subterfuge is attempted, and the user is given the appearance of a successful login, the user is directed to a false 'sandbox' area with false documents, while the security desk is paged. If the failed matches were in a medium range [65%-97%], the user is given another login attempt, perhaps with a suggestion to clean the scanner.</td></tr>
</table>

34

Exhibit C-6 (Sands)

| | |
|---|---|
| | If the user or terminal requesting login is inactive, the same access subterfuge actions are performed. <br><br> If the first and second attempts are both failed, the same access subterfuge actions are performed, and the user and terminal are inactivated. <br><br> Admin   Users with sufficient system permissions to modify the BiObex configuration files and policies are associated with a group. Request to login as an administrator requires 2 fingerprints from any 2 active users in the administrator group. Confidence for a match must be in the range [95%, 100%] After 3 failed logins, both administrators are made inactive. If the confidence level for any biometric match falls within the range: [0%, 65%], security is alerted." <br><br> Sands at 12:31-61 |
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Sands discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Sands discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

35

Exhibit C-6 (Sands)

| | |
|---|---|
| | "The server 100 may be coupled to multiple client computers which are distributed within a facility over the network 120. The server computer runs biometric authentication server software 140, which is a program run from the server's memory. The biometric authentication server software 140, hereinafter referred to as the server software 140, interacts with the biometric devices, the client computer and the computer network to authenticate users to the network. The server software 140 instructs the user how to authenticate herself to the network, collects and processes the biometrics received from the biometric scanner and user information from the user for the location where the user is logging on. The software 140 grants or denies access based on a comparison between the collected biometrics, the biometrics in the user database for the user and the requirements and matching policies. The operation of the server software is described in more detail with reference to FIG. 2"<br>Sands at 5:30-46 |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Sands discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-6 (Sands)



Sands at Fig. 4

37

Exhibit C-6 (Sands)

| | |
|---|---|
| | "The security policy determines if any special action is required based on the past history of events for that user, location or network. The special action may include access subterfuge and storing a log entry identifying each failed login attempt. Other examples of special action might be locking a user out based on a number of failed authentication attempts, or alerting a user to re-enroll because the user's fingerprints appear to have changed slightly since the user enrolled."<br>Sands at 4:42-50<br><br>"The userID and biometric profile for each user is stored by the enrollment manager in the database. The biometric information may be encrypted prior to storing the data. In addition, for each biometric or biometric device that the user is entitled to use, biometric data may be generated and stored for the user in the enrollment database as part of the biometric profile. FIG. 3 shows an illustrative view of a database entry for a user. The entry includes the user's USER ID, and an entry for each biometric device type that the user has been measured on up to N biometric devices. The database also stores the biometric data measured from the user for that particular biometric device. In this manner, the database stores biometric measurements for the user taken by one or more devices present on the network that the user needs to access."<br>Sands at 6:43-56<br><br>"The matching engine 230 receives the USER ID and the biometric measurements from the acquisition layer. The matching engine then retrieves the biometric profile stored for the user in the database based on the USER ID. The matching engine then compares the biometric measurements received from the individual attempting to log on with the stored biometric profile stored in the database in connection with the USER ID. The matching engine returns to the authentication policy engine a confidence figure indicating the likelihood that the biometric measurements acquired came from the same person that provided the biometric profile stored in the database."<br>Sands at 8:28-39 |

Exhibit C-6 (Sands)

| | |
|---|---|
| | "FIG. 4 depicts a method of operating the biometric server authentication software according to an embodiment of the present invention. Referring to FIG. 4, in step 400, the user initiates request for authentication. Typically users identify themselves with a name, or token known to the system, for example their UNIX login or an ID stored on a token card"<br>Sands at 8:62-67 |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Sands discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

39

Exhibit C-6 (Sands)



**FIGURE 2**

Sands at Fig. 2

"The security policy determines if any special action is required based on the past history of events for that user, location or network. The special action may include access subterfuge and storing a log entry identifying each failed login attempt. Other examples of special action might be locking a user out based on a number of failed authentication attempts, or alerting a user to re-enroll because the user's fingerprints appear to have changed slightly since the user enrolled."
Sands at 4:42-50

40

Exhibit C-6 (Sands)

| | |
|---|---|
| | "The authentication policy engine 215 implements the authentication policy of the network. It is configured based on the defined requirements, matching criteria and security policy to carry out the authentication policy of the system. It interfaces with the location identification engine 210, session layer 220, acquisition layer 225, and the matching engine 230."<br>Sands at 7:1-7 |
| **Claim 4** | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Sands discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Biometric—A biometric is any measurable aspect of a lifeform, such as a fingerprint, iris scan, voice print, or even a person's height. The term also refers to the measurement itself."<br>Sands at 2:60-63 |
| **Claim 6** | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Sands discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a | Sands discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as |

Exhibit C-6 (Sands)

| | |
|---|---|
| secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Sands does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[a]<br>See, e.g., Wuidart at Claim 6[a]<br>See, e.g., Hamid at Claim 6[a]<br>See, e.g., Howell at Claim 6[a]<br>See, e.g., Mathiassen at Claim 6[a]<br>See, e.g., Steiner at Claim 6[a]<br>See, e.g., iPAQ 5400 series at Claim 6[a] |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Sands discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Sands does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[b]<br>See, e.g., Hoyos at Claim 6[b]<br>See, e.g., Mathiassen at Claim 6[b]<br>See, e.g., Steiner at Claim 6[b] |

Exhibit C-6 (Sands)

| Claim 9 | |
|---|---|
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Sands discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Sands discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information."<br>Sands at 11:24-33 |
| Claim 10 | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Sands discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-6 (Sands)

| | |
|---|---|
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Sands discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Sands discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Sands discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Sands discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure for Claim 10[b] |

Exhibit C-6 (Sands)

| | |
|---|---|
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Sands discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Sands discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter | To the extent the preamble is limiting, Sands discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, |

Exhibit C-6 (Sands)

| | |
|---|---|
| configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Sands discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Sands discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Sands discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-6 (Sands)

| | |
|---|---|
| 11[d]. mapping said series into an instruction; and | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Sands discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Sands discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Sands discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Sands discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-6 (Sands)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Sands discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Sands discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database  explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Sands discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit C-6 (Sands)

| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Sands discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Sands does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| **Claim 14** | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Sands discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Each computer system described in the application may be implemented as a general purpose computer system and may include an input/output unit for connection to the communication network, a memory for storing program instructions and data received from the communication network and a processor coupled to the memory and input/output unit for executing the program instructions. The computer may be a desktop or portable type of computer, a handheld computer, a personal organizer or any other type of electronic device that provides access to sensitive information."<br>Sands at 11:24-33 |

Exhibit C-6 (Sands)

| | |
|---|---|
| 14[a]. receive a series of entries of a biometric signal; | Sands discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Sands discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Sands discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Sands discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-6 (Sands)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Sands discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Sands discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Sands discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |

Exhibit C-6 (Sands)

| | |
|---|---|
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Sands discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Sands discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Sands discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Sands discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the | Sands discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an |

Exhibit C-6 (Sands)

| | |
|---|---|
| biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Sands discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Sands discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Sands discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Sands discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

53

Exhibit C-6 (Sands)

| | For example, see the following passages and/or figures, as well as all related disclosures: |
|---|---|
| | See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Sands discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Sands discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Sands discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-6 (Sands)

| | See Disclosure at Claim 1[l] |
|---|---|
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Sands discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Sands discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Sands discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against | Sands discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, |

Exhibit C-6 (Sands)

| | |
|---|---|
| members of a database of biometric signatures to thereby output an accessibility attribute; and | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Sands discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Sands discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Sands discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

56

Exhibit C-6 (Sands)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Sands discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Sands discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |

Exhibit C-6 (Sands)

| 17[a]. populating the database of biometric signatures by: | Sands discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 17[b]. receiving a series of entries of the biometric signal; | Sands discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Sands discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Sands discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

Exhibit C-6 (Sands)

| | |
|---|---|
| 17[e]. populating the database according to the instruction; | Sands discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Sands discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Sands discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Sands discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon | Sands discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical |

59

Exhibit C-6 (Sands)

| | |
|---|---|
| said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-7 (Howell)

**Exhibit C-7**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT NO. 7,697,729 ("Howell")**

U.S. PATENT NO. 7,697,729 to Howell ("Howell") entitled "System for and method of finger initiated actions" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Howell |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Howell discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A device for and method of performing a task associated with fingerprint data is disclosed. The method comprises reading fingerprint data, matching the read fingerprint data to stored fingerprint data, the stored fingerprint data having an associated task, and performing the task. The associated task is part of a chain of tasks that are automatically executed when the |

1

Exhibit C-7 (Howell)

| | |
|---|---|
| | read fingerprint data is matched to the stored fingerprint data. Preferably, at least one task has associated user profile data that is used to perform the task. An electronic device that can be controlled in accordance with the present invention includes, but is not limited to, a telephone, a personal computer, a personal digital assistant, and a remote controlled device."<br>Howell at Abstract<br><br>"Embodiments of the present invention thus advantageously (1) reduce the number of entries that a user must make to perform a task—rather than entering numerous keystrokes to connect to an e-mail account, a single finger placement or swipe can accomplish the same task; (2) reduce the footprint of an electronic device since keypads, function buttons, joy sticks, and mice can be replaced with a fingerprint image sensor; (3) reduce the complexity of user interfaces since a user does not have to remember keystrokes, logon information, or other information needed to perform a task; and (4) increase the security of electronic devices since, using a fingerprint, a user can be authenticated each time she requests that a task be performed so that the authentication and the performance of the task can be accomplished using a single finger swipe or placement. Embodiments of the present invention accomplish any one or more of these results."<br>Howell at 4:45-60 |
| 1[a]. a memory comprising a database of biometric signatures; | Howell discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"FIG. 2 illustrates one embodiment of a fingerprint array 200 in accordance with one embodiment of the present invention. The fingerprint array 200 comprises rows 210, 220, 230, 240, and 250 and columns 201, 204, and 206. It will be understood by those of ordinary skill in the are that rows and columns are representative only. Any other database technique can be used with equal success. The column 201 contains multiple fingerprint images, 211, 221, 231,241 and 251. The column 204 contains associated tasks (here, scripts or executable files). The column 206 contains any parameters for each associated task. In |

2

Exhibit C-7 (Howell)

| | |
|---|---|
| | one embodiment, the parameters are input to the programs or scripts shown in the column 204."<br>Howell at 6:59-7:3<br><br>"It will be appreciated that fingerprint images can be correlated to tasks using structures other than the fingerprint array 200. Rather than storing fingerprint images 211, 221, 231, 241, and 251 in the column 201, other fingerprint identifiers that uniquely identify a fingerprint image can be used. For example, rather than storing fingerprint images in the array 200, pointers to fingerprint images can be stored. The fingerprint pointers can contain the address of fingerprint images stored elsewhere in the storage 120 (FIG. 1) or at other locations, as described below. In addition, fingerprint images, associated tasks and their parameters can be stored in other data structures such as a hash (associative array), with each fingerprint image as a key, and the corresponding tasks and parameters as values. Alternatively, the fingerprint image and corresponding tasks and parameters can be stored in a database. Many structures can be used, depending on the application at hand. For example, if the electronic device is a PC, then a database and its associated database management system can be used in conjunction with the control program. If the electronic device is smaller, such as a PDA, and has less memory, an array can be used."<br>Howell at 8:28-48 |
| 1[b]. a transmitter sub-system comprising: | Howell discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one embodiment, the electronic device further comprises a telephone operatively coupled to the processor. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number on the telephone. The electronic device further comprises a link to a network, such as the Internet. The user profile data comprises a resource locator, and the corresponding task comprises connecting the electronic device to a host identified by the resource locator and accessible over the network. In one embodiment, the link comprises a wireless transmitter. The fingerprint |

Exhibit C-7 (Howell)

| | |
|---|---|
| | image sensor comprises a thermal sensor, an optical sensor, a pressure sensor, or a capacitive sensor. Preferably, the processor is configured to execute two tasks in parallel." Howell at 3:15-28

"It will be appreciated that the fingerprint control system 100 can be coupled to the electronic device in any number of ways, depending on the application at hand. The fingerprint control system 100 can be directly coupled to the electronic device using control wires. Alternatively, the fingerprint control system 100 can be coupled to the electronic device over a local area network, using for example the Ethernet protocol, or over a wide area network, using, for example, TCP/IP. Also, the fingerprint control system 100 can be wirelessly coupled to the electronic device using radio or infrared signals. It will also be appreciated that the electronic device can also be coupled to a remote host using, for example, a wireless transmitter or a wireless transceiver." Howell at 6:46-58 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Howell discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-7 (Howell)



Howell at Fig. 1

5

Exhibit C-7 (Howell)



Howell at Fig. 8

"In one embodiment, the method further comprises reading biometric data. Reading biometric data comprises reading data captured during a finger placement on a fingerprint image sensor. Alternatively, reading biometric data comprises reading data captured during a finger swipe over a fingerprint image sensor. In one embodiment, matching biometric data to stored biometric data comprises identifying a direction of the finger swipe, a first direction having the corresponding task and a second direction having a different corresponding task. Matching read biometric data to stored biometric data comprises

6

Exhibit C-7 (Howell)

<table>
<tr>
<td></td>
<td>

determining whether a threshold number of points of read fingerprint data coincide with a number of points of stored fingerprint data."
Howell at 2:34-46

"In a second aspect of the present invention, an electronic device comprises (a) a biometric sensor for reading biometric data; (b) a memory storing a plurality of stored biometric data each having a corresponding task identifier used to perform a corresponding task, at least one task comprising a chain of tasks; and (c) a processor coupled to both the biometric sensor and the memory, the processor configured to match read biometric data with stored biometric data and to automatically perform a corresponding task on the electronic device. Preferably, the biometric sensor comprises a fingerprint image sensor, such as a placement sensor or a swipe sensor. In one embodiment, the swipe sensor is configured to detect a direction of a swipe, a first direction having a first task identifier and a second direction having a second task identifier."
Howell at 2:63-3:9

"In one embodiment, the electronic device further comprises a telephone operatively coupled to the processor. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number on the telephone. The electronic device further comprises a link to a network, such as the Internet. The user profile data comprises a resource locator, and the corresponding task comprises connecting the electronic device to a host identified by the resource locator and accessible over the network. In one embodiment, the link comprises a wireless transmitter. The fingerprint image sensor comprises a thermal sensor, an optical sensor, a pressure sensor, or a capacitive sensor. Preferably, the processor is configured to execute two tasks in parallel."
Howell at 3:15-28

"FIG. 1 is a schematic diagram of a fingerprint control system 100 in accordance with the present invention. The fingerprint control system 100 comprises a central processing unit 110 electronically coupled to a fingerprint sensor 115, a storage unit 120, a display unit 130, and an input unit 135. The storage unit 120 comprises a mapping store 125 containing fingerprint mapping information, such as the task information and associated parameters described in more detail below. It will be appreciated that the fingerprint control system 100

</td>
</tr>
</table>

7

Exhibit C-7 (Howell)

| | can be a stand-alone system comprising an electronic device or can be coupled to an external electronic device (not shown) and used to control the external electronic device as described below.<br>The fingerprint sensor 115 is used to read the image of a fingerprint placed upon it. The fingerprint sensor 115 can be a placement sensor or a swipe sensor. Placement sensors require a user to place her finger on a reading surface of the fingerprint sensor until a fingerprint image is captured. Placement sensors are designed to actively sense the entire surface of a finger at once. Placement sensors can be based on optical, thermal, pressure, electrical, or other sensing means. In general placement sensors are designed to have a reading surface with an area as large as the pad of a typical human finger, typically 15 mm2. It will be appreciated that the area of the reading surface in accordance with the present invention can be larger or smaller than 15 mm2.<br>Alternatively, the fingerprint sensor 115 can be a swipe sensor. In general, swipe sensors are fully sized in one direction (typically in width) but abbreviated in the other (typically in height). Swipe sensors are thus configured to sense only a small rectangular portion of a finger at any one time. To capture a fingerprint image, a user needs to swipe his finger over the sensor. Swipe sensors are especially suitable for portable devices because they are smaller than placement sensors. Methods of and systems for fingerprint sensing are described in detail in the U.S. patent application Ser. No. 10/194,994, filed Jul. 12, 2002, and titled "Method and System for Biometric Image Assembly from Multiple Partial Biometric Frame Scans," and in the U.S. patent application Ser. No. 10/099,558, filed Mar. 13, 2002, and titled "Fingerprint Biometric Capture Device and Method with Integrated On-Chip Data Buffering," both of which are hereby incorporated by reference in their entireties. In the preferred embodiment, the fingerprint sensor is a ATW100 capacitive swipe sensor by Atrua Technologies, Inc., at 1696 Dell Avenue, Campbell, Calif. 95008. It will be appreciated that any sensor technology can be used in accordance with the present invention."<br>Howell at 4:61-5:41<br><br>"The electronic device to be controlled by the fingerprint control system 100 can include the same hardware as the fingerprint control system 100. Thus, for example, if the electronic device is a PC, the PC can also comprise one or more of the CPU 110, the fingerprint sensor 115, the storage 120, the display 130, and the input device 135. The CPU |

Exhibit C-7 (Howell)

| | |
|---|---|
| | 110 can execute fingerprint operations as well as other application programs. Similarly, if the electronic device is a telephone, the fingerprint control system 100 can reside on and form part of the telephone. Thus, the fingerprint sensor 115 can be integrated into a telephone case, the display 130 can be a telephone liquid crystal display unit, and the input 135 can be the telephone keypad. Alternatively, the fingerprint control system 100 can reside on hardware separate from the electronic device it controls. Thus, for example, if the electronic device is a coffee maker, the fingerprint control system can be electronically coupled to the coffee maker. Thus, a user can use the fingerprint control system 100 to launch a program, and the program can send control signals to the coffee maker, thereby controlling the coffee maker." Howell at 6:26-45 <br><br> "FIG. 8 illustrates the relationship between the elements of a fingerprint control system 800 comprising a fingerprint reader 845, an initialization program 825, a fingerprint array 835, and a control program 840. The initialization program 825 comprises an Enrollment engine 810, a Task Definition engine 820, and a Task Configuration engine 815. The fingerprint array 835 contains a column of 10 fingerprint images labeled A through J (also referred to as row A through row J, respectively). Each fingerprint image has associated with it a task chain. The task chain corresponds to multiple tasks that are executed by the control program 840 when a fingerprint image read by the fingerprint reader 845 matches a fingerprint image stored in the fingerprint array 835. Preferably, read fingerprint data (e.g., minutiae points) are compared to fingerprint data stored in the fingerprint array 835. The row A has associated with it the chain of tasks (e.g., executable files or scripts) A1, A2, and A3. Each task A1, A2, and A3 can have one or more parameters associated with it. The result of each task depends on the values of these parameters. It will also be appreciated that while FIG. 8 shows a linear (one-dimensional) task chain A1, A2, and A3, such that task A1 is performed, followed by task A2 and then task A3, tasks can also be performed in parallel. Thus, for example, when a read fingerprint image matches the fingerprint image A, a first task A1 and a second task A11 (not shown) can be performed in parallel, thus allowing for the performance of tasks in a two-dimensional manner. Thus, in accordance with the present invention, tasks can be performed linearly (e.g., sequentially) and in parallel (e.g., concurrently). It will be appreciated that in accordance with the present invention, tasks can be executed in many dimensions. One such embodiment is illustrated in FIG. 10. It will also |

9

Exhibit C-7 (Howell)

| | |
|---|---|
| | be appreciated that a task in a task chain can be performed when called (e.g., launched) by a control program, when called by another task (e.g., program performing a task) in the task chain, or in any other manner." <br> Howell at 11:58-12:25 |
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Howell discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

10

Exhibit C-7 (Howell)



Fig. 2

Howell at Fig. 2

11

Exhibit C-7 (Howell)



Fig. 3

Howell at Fig. 3

12

Exhibit C-7 (Howell)



Fig. 4

Howell at Fig. 4

"A device for and method of performing a task associated with fingerprint data is disclosed. The method comprises reading fingerprint data, matching the read fingerprint data to stored fingerprint data, the stored fingerprint data having an associated task, and performing the task. The associated task is part of a chain of tasks that are automatically executed when the read fingerprint data is matched to the stored fingerprint data. Preferably, at least one task has associated user profile data that is used to perform the task. An electronic device that

Exhibit C-7 (Howell)

<table>
<tr>
<td></td>
<td>

can be controlled in accordance with the present invention includes, but is not limited to, a telephone, a personal computer, a personal digital assistant, and a remote controlled device."
Howell at Abstract

"In a first aspect of the present invention, a method of performing a task on an electronic device comprises matching read biometric data to stored biometric data having a corresponding task comprising a first chain of tasks and automatically performing the corresponding task on the electronic device. Preferably, the biometric data comprises fingerprint data. The corresponding task is selected from a plurality of tasks that the electronic device is configured to perform. The corresponding task has optional parameters."
Howell at 2:4-12

"Preferably, the electronic device is portable, such as a personal digital assistant, a telephone, or any other hand-held device. Alternatively, the electronic device comprises a personal computer, a remote controller, a security system, a television set, an audio player, a game device, or any combination of these."
Howell 2:47-52

"In a second aspect of the present invention, an electronic device comprises (a) a biometric sensor for reading biometric data; (b) a memory storing a plurality of stored biometric data each having a corresponding task identifier used to perform a corresponding task, at least one task comprising a chain of tasks; and (c) a processor coupled to both the biometric sensor and the memory, the processor configured to match read biometric data with stored biometric data and to automatically perform a corresponding task on the electronic device. Preferably, the biometric sensor comprises a fingerprint image sensor, such as a placement sensor or a swipe sensor. In one embodiment, the swipe sensor is configured to detect a direction of a swipe, a first direction having a first task identifier and a second direction having a second task identifier."
Howell at 2:63-3:9

</td>
</tr>
</table>

Exhibit C-7 (Howell)

| | |
|---|---|
| | "The storage unit 120 comprises a fingerprint mapping store 125 used to store fingerprint mapping information. As described in more detail below, the fingerprint mapping information comprises a plurality of fingerprint images, their associated tasks, and the parameters used by the tasks. Thus, when the fingerprint sensor 115 reads a fingerprint image (the read fingerprint image), a control program executed by the CPU 110 compares the read fingerprint image to fingerprint images stored in the fingerprint mapping store 125. These stored fingerprint images are referred to as "enrolled fingerprint images" or "stored fingerprint images." When the control program matches the read fingerprint image to an stored fingerprint image, the CPU 110 will execute the tasks associated with the matched stored fingerprint image, using the associated parameters, if any. In a preferred embodiment, the fingerprint mapping information is stored in a fingerprint array (table) where the index or key is a fingerprint image and the associated task is the value for the array. FIG. 2 shows one embodiment of a fingerprint array, described in more detail below. Using a fingerprint array, the control program can quickly associate a fingerprint image to its corresponding task." <br> Howell at 6:4-25 <br><br> "The row 210 contains the stored fingerprint image 211, its associated task 214, and the parameter list 216 used to perform the associated task 214. In this example, the associated task 214 contains the PERL script email.pls, which is used to access an email account. Of course, any other software language can be used. The parameter list 216 contains a first element, "John Doe", and a second element, "password1". The performance of a task to access an email account using the associated task 214 and its parameter list 216 are described in detail relative to FIG. 4 below, describing the steps performed to execute a task when a read fingerprint image matches the stored fingerprint image 211. The first element, "John Doe", and the second element, "password1", are one example of what are referred to as user profile data, that is, data specific to a fingerprint image (or other fingerprint data) and used to perform a task" <br> Howell at 7:4-19 <br><br> "FIG. 4 illustrates the steps 400 taken to perform the task of automatically logging a user into her e-mail account so that the logon page is automatically bypassed, and the command page is displayed. The steps 400 correspond to the step 330 in FIG. 3 and are performed, for |

15

Exhibit C-7 (Howell)

| | |
|---|---|
| | example, when a read fingerprint image matches the stored fingerprint image 211 in FIG. 2. Referring to FIGS. 1 and 2, for this example, it is assumed that the stored fingerprint image 211 is read by the fingerprint sensor 115. First, in the Start step 401, the fingerprint sensor 115 and any data structures used by the control program are initialized. Next, in the step 410 the Web browser is automatically launched on the user's electronic device. A Uniform Resource Locator (URL) for her e-mail account is automatically input into the address field of the Web browser in the step 415. In the step 420, the home page for the user's e-mail server is received and displayed on the user's electronic device. Next, in the step 425, the user's login ID ("John Doe", the first element in the parameter list 216) and password ("password1", the second element in the parameter list 216) are automatically input into the appropriate fields of the e-mail home page. The SUBMIT command is then automatically invoked in the step 430. The user's mailbox can then be manipulated in the step 435, either manually, by the user, or automatically, by software in accordance with the present invention. The mailbox can be manipulated by, for example, displaying messages from the user's e-mail account, automatically composing a new e-mail message, allowing the user to compose a new e-mail or delete an old one. The process ends in the step 440 when, for example, the user logs off from her e-mail account. It will be appreciated that a user can access her mailbox or e-mail account in accordance with the present invention in other ways. For example, the control program can call other software, such as Messaging Application Programming Interface (MAPI), which allows a user to seamlessly manipulate e-mail accounts and mailboxes. The control program can invoke a Web browser and post an HTML form to automatically log on to an e-mail server to access her account. The user can manipulate her e-mail account without using a Web browser, by using, for example, a command line such as used in the UNIX environment. It will be appreciated that user name, passwords, and other secured information can be used in other environments in accordance with the present invention, such as with online banking or other online purchasing where credit card and other confidential information can be transmitted." Howell at 9:59-10:37 |
| 1[e]. a transmitter configured to emit a secure access signal conveying | Howell discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

16

Exhibit C-7 (Howell)

| information dependent upon said accessibility attribute; and | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one embodiment, automatically performing a task comprises retrieving user profile data corresponding to a user and the task, and using the user profile data to perform the task. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number. Alternatively, the user profile data comprises login information for accessing a host system and the corresponding task comprises transmitting the login information to the host system. The corresponding task comprises accessing a resource over a network such as a local area network or the Internet. A task in the first chain of tasks comprises encrypting the login information before transmitting the login information to the host system. The corresponding task comprises an interactive task." Howell at 2:13-26<br><br>To the extent that Plaintiff contends Howell does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[e]<br>See, e.g., Wuidart at Claim 1[e]<br>See, e.g., Hamid at Claim 1[e]<br>See, e.g., Mathiassen at Claim 1[e]<br>See, e.g., Steinar at Claim 1[e] |
| 1[f]. a receiver sub-system comprising: | Howell discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"FIG. 4 illustrates the steps 400 taken to perform the task of automatically logging a user into her e-mail account so that the logon page is automatically bypassed, and the command page is displayed. The steps 400 correspond to the step 330 in FIG. 3 and are performed, for |

Exhibit C-7 (Howell)

| | |
|---|---|
| | example, when a read fingerprint image matches the stored fingerprint image 211 in FIG. 2. Referring to FIGS. 1 and 2, for this example, it is assumed that the stored fingerprint image 211 is read by the fingerprint sensor 115. First, in the Start step 401, the fingerprint sensor 115 and any data structures used by the control program are initialized. Next, in the step 410 the Web browser is automatically launched on the user's electronic device. A Uniform Resource Locator (URL) for her e-mail account is automatically input into the address field of the Web browser in the step 415. In the step 420, the home page for the user's e-mail server is received and displayed on the user's electronic device. Next, in the step 425, the user's login ID ("John Doe", the first element in the parameter list 216) and password ("password1", the second element in the parameter list 216) are automatically input into the appropriate fields of the e-mail home page. The SUBMIT command is then automatically invoked in the step 430. The user's mailbox can then be manipulated in the step 435, either manually, by the user, or automatically, by software in accordance with the present invention. The mailbox can be manipulated by, for example, displaying messages from the user's e-mail account, automatically composing a new e-mail message, allowing the user to compose a new e-mail or delete an old one. The process ends in the step 440 when, for example, the user logs off from her e-mail account." <br><br> Howell at 9:59-10:21 |
| 1[g]. a receiver sub-system controller configured to: | Howell discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "It will be appreciated that the fingerprint control system 100 can be coupled to the electronic device in any number of ways, depending on the application at hand. The fingerprint control system 100 can be directly coupled to the electronic device using control wires. Alternatively, the fingerprint control system 100 can be coupled to the electronic device over a local area network, using for example the Ethernet protocol, or over a wide area network, using, for example, TCP/IP. Also, the fingerprint control system 100 can be wirelessly coupled to the electronic device using radio or infrared signals. It will also be appreciated that the electronic device can also be coupled to a remote host using, for example, a wireless transmitter or a wireless transceiver." |

Exhibit C-7 (Howell)

| | Howell at 6:46-58 |
|---|---|
| | "FIG. 4 illustrates the steps 400 taken to perform the task of automatically logging a user into her e-mail account so that the logon page is automatically bypassed, and the command page is displayed. The steps 400 correspond to the step 330 in FIG. 3 and are performed, for example, when a read fingerprint image matches the stored fingerprint image 211 in FIG. 2. Referring to FIGS. 1 and 2, for this example, it is assumed that the stored fingerprint image 211 is read by the fingerprint sensor 115. First, in the Start step 401, the fingerprint sensor 115 and any data structures used by the control program are initialized. Next, in the step 410 the Web browser is automatically launched on the user's electronic device. A Uniform Resource Locator (URL) for her e-mail account is automatically input into the address field of the Web browser in the step 415. In the step 420, the home page for the user's e-mail server is received and displayed on the user's electronic device. Next, in the step 425, the user's login ID ("John Doe", the first element in the parameter list 216) and password ("password1", the second element in the parameter list 216) are automatically input into the appropriate fields of the e-mail home page. The SUBMIT command is then automatically invoked in the step 430. The user's mailbox can then be manipulated in the step 435, either manually, by the user, or automatically, by software in accordance with the present invention. The mailbox can be manipulated by, for example, displaying messages from the user's e-mail account, automatically composing a new e-mail message, allowing the user to compose a new e-mail or delete an old one. The process ends in the step 440 when, for example, the user logs off from her e-mail account." Howell at 9:59-10:21 |
| 1[h]. receive the transmitted secure access signal; and | Howell discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"It will be appreciated that the fingerprint control system 100 can be coupled to the electronic device in any number of ways, depending on the application at hand. The fingerprint control system 100 can be directly coupled to the electronic device using control |

19

Exhibit C-7 (Howell)

| | wires. Alternatively, the fingerprint control system 100 can be coupled to the electronic device over a local area network, using for example the Ethernet protocol, or over a wide area network, using, for example, TCP/IP. Also, the fingerprint control system 100 can be wirelessly coupled to the electronic device using radio or infrared signals. It will also be appreciated that the electronic device can also be coupled to a remote host using, for example, a wireless transmitter or a wireless transceiver."<br>Howell at 6:46-58<br><br>"FIG. 4 illustrates the steps 400 taken to perform the task of automatically logging a user into her e-mail account so that the logon page is automatically bypassed, and the command page is displayed. The steps 400 correspond to the step 330 in FIG. 3 and are performed, for example, when a read fingerprint image matches the stored fingerprint image 211 in FIG. 2. Referring to FIGS. 1 and 2, for this example, it is assumed that the stored fingerprint image 211 is read by the fingerprint sensor 115. First, in the Start step 401, the fingerprint sensor 115 and any data structures used by the control program are initialized. Next, in the step 410 the Web browser is automatically launched on the user's electronic device. A Uniform Resource Locator (URL) for her e-mail account is automatically input into the address field of the Web browser in the step 415. In the step 420, the home page for the user's e-mail server is received and displayed on the user's electronic device. Next, in the step 425, the user's login ID ("John Doe", the first element in the parameter list 216) and password ("password1", the second element in the parameter list 216) are automatically input into the appropriate fields of the e-mail home page. The SUBMIT command is then automatically invoked in the step 430. The user's mailbox can then be manipulated in the step 435, either manually, by the user, or automatically, by software in accordance with the present invention. The mailbox can be manipulated by, for example, displaying messages from the user's e-mail account, automatically composing a new e-mail message, allowing the user to compose a new e-mail or delete an old one. The process ends in the step 440 when, for example, the user logs off from her e-mail account."<br>Howell at 9:59-10:21 |
|---|---|
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Howell discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

20

Exhibit C-7 (Howell)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures: <br>Howell at Fig.8 |

Exhibit C-7 (Howell)



Fig. 10

Howell at Fig. 10

"In a first aspect of the present invention, a method of performing a task on an electronic device comprises matching read biometric data to stored biometric data having a corresponding task comprising a first chain of tasks and automatically performing the corresponding task on the electronic device. Preferably, the biometric data comprises fingerprint data. The corresponding task is selected from a plurality of tasks that the electronic device is configured to perform. The corresponding task has optional parameters."
Howell at 2:4-12

Exhibit C-7 (Howell)

| | |
|---|---|
| | "FIG. 10 shows a graph 920 illustrating how one task can automatically launch a plurality of tasks, each task being a part of a task chain, in accordance with one embodiment of the present invention. Thus, for example, when read fingerprint data corresponds to stored fingerprint data having an associated task 925, the associated task 925 launches the tasks (also referred to as sub tasks) 930A, 940A, 950A, and 960A. Each task 930A, 940A, 950A, and 960A can have any number of associated parameters (e.g., user profile data) that can be dependent on the stored fingerprint data. Thus, in one embodiment, the task 930A can have a first element that corresponds to a script (e.g., 214 in FIG. 2) and a second element that corresponds to the parameters used by the script (e.g., 216 in FIG. 2). For the embodiment shown in FIG. 10, the tasks 930A, 940A, 950A, and 960A are launched concurrently and can execute in parallel." <br><br> Howell at 14:1-16 |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Howell discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Howell discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

23

Exhibit C-7 (Howell)



Howell at Fig.8

"In one embodiment, the method further comprises reading biometric data. Reading biometric data comprises reading data captured during a finger placement on a fingerprint image sensor. Alternatively, reading biometric data comprises reading data captured during a finger swipe over a fingerprint image sensor. In one embodiment, matching biometric data to stored biometric data comprises identifying a direction of the finger swipe, a first

24

Exhibit C-7 (Howell)

| | |
|---|---|
| | direction having the corresponding task and a second direction having a different corresponding task. Matching read biometric data to stored biometric data comprises determining whether a threshold number of points of read fingerprint data coincide with a number of points of stored fingerprint data."<br>Howell at 2:34-46<br><br>"The fingerprint sensor 115 is used to read the image of a fingerprint placed upon it. The fingerprint sensor 115 can be a placement sensor or a swipe sensor. Placement sensors require a user to place her finger on a reading surface of the fingerprint sensor until a fingerprint image is captured. Placement sensors are designed to actively sense the entire surface of a finger at once. Placement sensors can be based on optical, thermal, pressure, electrical, or other sensing means. In general placement sensors are designed to have a reading surface with an area as large as the pad of a typical human finger, typically 15 mm$^2$. It will be appreciated that the area of the reading surface in accordance with the present invention can be larger or smaller than 15 mm$^2$."<br>Howell at 5:7-19<br><br>In the step 615, the Enrollment Program prompts the user whether she would like to change the mapping (association) currently stored in the fingerprint array 200. Preferably, the system of the present invention disallows two fingerprint images from mapping to the same task. It will be appreciated, however, that two fingers can be mapped to the same task. If the user would not like to remap the action already stored in the fingerprint array 200, the Enrollment Program proceeds to the step 605; otherwise, the Enrollment Program proceeds to the step 620. In the step 620, the user is prompted to select a finger that she will later swipe and whose image will be mapped to the selected task. The user can be prompted in a variety of ways. For example, she can be presented with a screen image (similar to column 201 in FIG. 4) of fingers and a means (e.g., mouse click or keypad entry) for selecting one of the fingers presented."<br>Howell at 11:14-29<br><br>"FIG. 8 also shows two hands having associated fingers and their corresponding fingerprint images 860A through 860J. The fingerprint image corresponding to the finger 860A is |

25

Exhibit C-7 (Howell)

| | |
|---|---|
| | stored in the fingerprint array 835 at the location A; the fingerprint image corresponding to the finger 860B is stored in the fingerprint array 835 at the location B; etc." <br> Howell at 12:26-31 <br><br> "In one embodiment of the present invention, ten tasks can be performed by a single user, one for each finger. Another embodiment expands the number of action sequences by mapping permutations of fingerprint images. If two fingerprint images are required to start an action sequence, then the maximum number of tasks that can be performed is 102 or 100. The two images may come from the same finger or different fingers of the same person. For example, a user may define the sequence of fingerprint images for her left small finger followed by her right small finger to map to the action sequence that turns OFF the electronic device. The associated tasks will be appropriately mapped to allow users to link and map multiple finger images to an action sequence. In general, the number of action sequence equals ion, where n is the required number of finger images to start a task." <br> Howell at 15:19-33 |
| 1[l]. map said series into an instruction; and | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-7 (Howell)



Howell at Fig. 1

27

Exhibit C-7 (Howell)



Fig. 2

Howell at Fig. 2

28

Exhibit C-7 (Howell)



Fig. 3

Howell at Fig. 3

29

Exhibit C-7 (Howell)



Howell at Fig. 6

30

Exhibit C-7 (Howell)



Howell at Fig. 7

31

Exhibit C-7 (Howell)



Howell at Fig. 8

"FIG. 2 shows an array used to store fingerprint images and to associate each fingerprint image with a task and the task's parameters in accordance with one embodiment of the present invention."
Howell at 3:40-43

"FIG. 1 is a schematic diagram of a fingerprint control system 100 in accordance with the present invention. The fingerprint control system 100 comprises a central processing unit

32

Exhibit C-7 (Howell)

|  | 110 electronically coupled to a fingerprint sensor 115, a storage unit 120, a display unit 130, and an input unit 135. The storage unit 120 comprises a mapping store 125 containing fingerprint mapping information, such as the task information and associated parameters described in more detail below. It will be appreciated that the fingerprint control system 100 can be a stand-alone system comprising an electronic device or can be coupled to an external electronic device (not shown) and used to control the external electronic device as described below."<br>Howell at 4:61-5:6<br><br>"The storage unit 120 comprises a fingerprint mapping store 125 used to store fingerprint mapping information. As described in more detail below, the fingerprint mapping information comprises a plurality of fingerprint images, their associated tasks, and the parameters used by the tasks. Thus, when the fingerprint sensor 115 reads a fingerprint image (the read fingerprint image), a control program executed by the CPU 110 compares the read fingerprint image to fingerprint images stored in the fingerprint mapping store 125. These stored fingerprint images are referred to as "enrolled fingerprint images" or "stored fingerprint images." When the control program matches the read fingerprint image to an stored fingerprint image, the CPU 110 will execute the tasks associated with the matched stored fingerprint image, using the associated parameters, if any. In a preferred embodiment, the fingerprint mapping information is stored in a fingerprint array (table) where the index or key is a fingerprint image and the associated task is the value for the array. FIG. 2 shows one embodiment of a fingerprint array, described in more detail below. Using a fingerprint array, the control program can quickly associate a fingerprint image to its corresponding task."<br>Howell at 6:4-25<br><br>"Next, in the step 320, the control program checks whether the read fingerprint image matches the current candidate stored fingerprint image. If a match is not found, the control program proceeds to the step 305. If a match was found (e.g., matching the read fingerprint image to the stored fingerprint image 211), the control program continues processing at the step 325. At the step 325, the control program retrieves the corresponding task (e.g., the script email.pls in the field 214) and the corresponding parameters (e.g., the parameter list 216). Next, in the step 330, the control program performs the corresponding task (e.g., calls |

Exhibit C-7 (Howell)

<table>
<tr>
<td></td>
<td>

or launches the script email.pls) using the corresponding parameters (e.g., the user name "John Doe" and the password "password1"). It will be appreciated that executing one task can comprise executing one or more tasks in a task chain. Next, in the step 335, the control program ENDS."
Howell at 9:15-30

"FIG. 7 is a screen shot 700 of a display showing the relationship between fingers (and thus fingerprint images) and the corresponding tasks. Embodiments of the present invention can display the screen shot 700 to remind a user of the tasks associated with each finger. For example, referring to FIG. 1, by pressing a button on the input device 135, the screen shot 700 can be displayed on the display unit 130. The screen shot 700 shows that when the user swipes her right pinkie finger on the fingerprint sensor 115, a Web browser is automatically launched; when she swipes her right ring finger, an e-mail program is automatically launched; when she swipes her middle finger, a calculator program is automatically launched; when she swipes her right index finger, a word processor is automatically launched; and when she swipes her right thumb, a telephone number is automatically dialed."
Howell at 11:43-57

"Multiple users may share the electronic device 100 of FIG. 1. In such case, the electronic device 100 can have separate profiles for each user. Each profile will consist of the enrolled fingerprint data (e.g., minutiae points) and the mapping information (e.g., associated tasks and their parameters) of the user. Different users enroll their fingers and associated tasks and parameters. Since fingerprint authentication is technically reliable, a fingerprint image from a user will not trigger the performance of a task associated with the fingerprint image of another user. It will be appreciated that the fingerprint array 200 can hold fingerprint images from one person or more than one person. Thus, multiple persons can use a single fingerprint control system in accordance with the present invention, with each person's fingerprints mapping to particular tasks. Thus, one person's right index fingerprint image can map to the task of opening a Web browser and a second person's right index fingerprint image can map to the task of automatically logging in to the second person's e-mail account."
Howell at 14:42-60

</td>
</tr>
</table>

Exhibit C-7 (Howell)

| | |
|---|---|
| | "In one embodiment of the present invention, ten tasks can be performed by a single user, one for each finger. Another embodiment expands the number of action sequences by mapping permutations of fingerprint images. If two fingerprint images are required to start an action sequence, then the maximum number of tasks that can be performed is 102 or 100. The two images may come from the same finger or different fingers of the same person. For example, a user may define the sequence of fingerprint images for her left small finger followed by her right small finger to map to the action sequence that turns OFF the electronic device. The associated tasks will be appropriately mapped to allow users to link and map multiple finger images to an action sequence. In general, the number of action sequence equals ion, where n is the required number of finger images to start a task." Howell at 15:19-33 |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one embodiment, automatically performing a task comprises retrieving user profile data corresponding to a user and the task, and using the user profile data to perform the task. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number. Alternatively, the user profile data comprises login information for accessing a host system and the corresponding task comprises transmitting the login information to the host system. The corresponding task comprises accessing a resource over a network such as a local area network or the Internet. A task in the first chain of tasks comprises encrypting the login information before transmitting the login information to the host system. The corresponding task comprises an interactive task." Howell at 2:23-26<br><br>"As used herein, a task is any operation on an electronic device. Thus, the performance of a task includes, but is not limited to, (1) the execution of an inherent function of an electronic |

35

Exhibit C-7 (Howell)

device, such as copying on a photocopier; (2) the launching of a program, such as a Web browser, e-mail program, or electronic calculator, that is not specific or inherent to a particular electronic device, including interactive programs; (3) any performance of one or more steps on the electronic device to perform any operation; or (4) any combination or permutation of the above. Thus, a task can include the inherent function of powering ON an electronic device, launching a Web browser to connect to a remote host machine, and automatically transmitting a user name and password to the host machine to log on to the host machine. The words "tasks" and "actions" are used interchangeably herein. As used herein, the term "computer program" refers to executable files, scripts, macros, and any sequence of instructions that can control the performance of tasks on an electronic device." Howell at 4:26-44

"The row 210 contains the stored fingerprint image 211, its associated task 214, and the parameter list 216 used to perform the associated task 214. In this example, the associated task 214 contains the PERL script email.pls, which is used to access an email account. Of course, any other software language can be used. The parameter list 216 contains a first element, "John Doe", and a second element, "password1". The performance of a task to access an email account using the associated task 214 and its parameter list 216 are described in detail relative to FIG. 4 below, describing the steps performed to execute a task when a read fingerprint image matches the stored fingerprint image 211. The first element, "John Doe", and the second element, "password1", are one example of what are referred to as user profile data, that is, data specific to a fingerprint image (or other fingerprint data) and used to perform a task"
Howell at 7:4-19

"It will be appreciated that fingerprint images can be correlated to tasks using structures other than the fingerprint array 200. Rather than storing fingerprint images 211, 221, 231, 241, and 251 in the column 201, other fingerprint identifiers that uniquely identify a fingerprint image can be used. For example, rather than storing fingerprint images in the array 200, pointers to fingerprint images can be stored. The fingerprint pointers can contain the address of fingerprint images stored elsewhere in the storage 120 (FIG. 1) or at other locations, as described below. In addition, fingerprint images, associated tasks and their parameters can be stored in other data structures such as a hash (associative array), with

36

Exhibit C-7 (Howell)

<table>
<tr>
<td></td>
<td>each fingerprint image as a key, and the corresponding tasks and parameters as values. Alternatively, the fingerprint image and corresponding tasks and parameters can be stored in a database. Many structures can be used, depending on the application at hand. For example, if the electronic device is a PC, then a database and its associated database management system can be used in conjunction with the control program. If the electronic device is smaller, such as a PDA, and has less memory, an array can be used."<br>Howell at 8:28-48<br><br>"FIG. 4 illustrates the steps 400 taken to perform the task of automatically logging a user into her e-mail account so that the logon page is automatically bypassed, and the command page is displayed. The steps 400 correspond to the step 330 in FIG. 3 and are performed, for example, when a read fingerprint image matches the stored fingerprint image 211 in FIG. 2. Referring to FIGS. 1 and 2, for this example, it is assumed that the stored fingerprint image 211 is read by the fingerprint sensor 115. First, in the Start step 401, the fingerprint sensor 115 and any data structures used by the control program are initialized. Next, in the step 410 the Web browser is automatically launched on the user's electronic device. A Uniform Resource Locator (URL) for her e-mail account is automatically input into the address field of the Web browser in the step 415. In the step 420, the home page for the user's e-mail server is received and displayed on the user's electronic device. Next, in the step 425, the user's login ID ("John Doe", the first element in the parameter list 216) and password ("password1", the second element in the parameter list 216) are automatically input into the appropriate fields of the e-mail home page. The SUBMIT command is then automatically invoked in the step 430. The user's mailbox can then be manipulated in the step 435, either manually, by the user, or automatically, by software in accordance with the present invention. The mailbox can be manipulated by, for example, displaying messages from the user's e-mail account, automatically composing a new e-mail message, allowing the user to compose a new e-mail or delete an old one. The process ends in the step 440 when, for example, the user logs off from her e-mail account.<br>It will be appreciated that a user can access her mailbox or e-mail account in accordance with the present invention in other ways. For example, the control program can call other software, such as Messaging Application Programming Interface (MAPI), which allows a user to seamlessly manipulate e-mail accounts and mailboxes. The control program can invoke a Web browser and post an HTML form to automatically log on to an e-mail server</td>
</tr>
</table>

Exhibit C-7 (Howell)

| | to access her account. The user can manipulate her e-mail account without using a Web browser, by using, for example, a command line such as used in the UNIX environment. It will be appreciated that user name, passwords, and other secured information can be used in other environments in accordance with the present invention, such as with online banking or other online purchasing where credit card and other confidential information can be transmitted."<br>Howell at 9:59-10:37<br><br>"It will be appreciated that a fingerprint image can have any number of tasks in its respective task chain. Thus, for example, the fingerprint image B has four tasks B1-B4 in its task chain; the fingerprint image C has one task C1 in its task chain; etc. Each task in a task chain has any number of optional parameters. Parameters can include those used to perform a task (e.g., execute a program) regardless of the fingerprint data that are matched, or those used when particular fingerprint data are read (e.g., user profile data), or any combination of these.<br>In one embodiment, the fingerprint array 835 and the initialization program 825 can both reside in a single memory storage, such as the storage 120 in FIG. 1. It will be appreciated, however, that the fingerprint array 835 and the initialization program 825 can reside on different storage devices at different locations. For example, the initialization program 825 can reside on an electronic device (not shown) and the fingerprint array 835 can be coupled to the electronic device over a network. The initialization program 825 is not required after the set up process. In one embodiment, fingerprint images are stored on a storage device in encrypted form, thus adding an additional level of security."<br>Howell at 12:50-13:4 |
|---|---|
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Howell discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

Exhibit C-7 (Howell)

| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Howell discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"FIG. 3 is a flow chart illustrating the steps 300 taken by a control program in accordance with the present invention and used to perform a task after a fingerprint image is read from the fingerprint sensor 115 of FIG. 1. Referring to FIGS. 1 and 3, in the start step 301, the fingerprint sensor 115 and any data and variables used by the control program are initialized. Next, in the step 305, the user swipes or places her finger on the fingerprint sensor 115. Next, in the step 310, the control program determines whether the image quality of the read (scanned) fingerprint image is acceptable. If it is not, the user is prompted (for example on the display device 130) to again swipe or place her finger on the fingerprint sensor 115. Alternatively, if an optional display is absent the unit can beep or blink on LED to signal the user. The control program then loops back to the step 305. It will be appreciated that the control program can be configured to allow only a pre-determined number of unacceptable images to be scanned. After this limit is reached, the control program can alert the user that the fingerprint sensor 115 is dirty or damaged."<br>Howell at 8:49-67 |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Howell discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one embodiment, automatically performing a task comprises retrieving user profile data corresponding to a user and the task, and using the user profile data to perform the task. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number. Alternatively, the user profile data comprises login information for accessing a host system and the corresponding task comprises transmitting |

Exhibit C-7 (Howell)

| | |
|---|---|
| | the login information to the host system. The corresponding task comprises accessing a resource over a network such as a local area network or the Internet. A task in the first chain of tasks comprises encrypting the login information before transmitting the login information to the host system. The corresponding task comprises an interactive task." Howell at 2:13-26<br><br>"Preferably, fingerprint data that uniquely identifies a fingerprint image rather than an entire fingerprint image is stored in the fingerprint array 200. The fingerprint data will correspond to a subset of the entire fingerprint image, thus requiring less data storage. This fingerprint data can correspond, for example, to multiple minutiae points for a fingerprint. Thus, for example, when a fingerprint image is read by a fingerprint sensor, an extracted set of unique fingerprint data is stored in a template. It will be appreciated that any reference herein to fingerprint images will also correspond to fingerprint data.<br>It will be appreciated that fingerprint images can be correlated to tasks using structures other than the fingerprint array 200. Rather than storing fingerprint images 211, 221, 231, 241, and 251 in the column 201, other fingerprint identifiers that uniquely identify a fingerprint image can be used. For example, rather than storing fingerprint images in the array 200, pointers to fingerprint images can be stored. The fingerprint pointers can contain the address of fingerprint images stored elsewhere in the storage 120 (FIG. 1) or at other locations, as described below. In addition, fingerprint images, associated tasks and their parameters can be stored in other data structures such as a hash (associative array), with each fingerprint image as a key, and the corresponding tasks and parameters as values. Alternatively, the fingerprint image and corresponding tasks and parameters can be stored in a database. Many structures can be used, depending on the application at hand. For example, if the electronic device is a PC, then a database and its associated database management system can be used in conjunction with the control program. If the electronic device is smaller, such as a PDA, and has less memory, an array can be used." Howell at 8:17-48<br><br>"As shown in FIG. 8, when the user chooses to enroll a fingerprint image into the fingerprint control system 800, the Enrollment engine 810 is executed. The Enrollment engine 810 processes a fingerprint image captured by the fingerprint scanner 845 and passes the fingerprint image, a pointer to a memory location containing the fingerprint image, or |

Exhibit C-7 (Howell)

| | |
|---|---|
| | any other fingerprint image identifier to the Task Configuration engine 815. A Task Definition (i.e., associated tasks or programs) are then supplied to the Task Definition engine 820. In one embodiment, the user types tasks using the an input device such as the input device 135 shown in FIG. 1. The Task Configuration engine 815 then stores the fingerprint image identifier (e.g., a fingerprint image, fingerprint minutiae points, pointer to fingerprint minutiae points) into the first column of a row in the Fingerprint Array 835 (e.g. A) and then stores the task chain (e.g., action sequence) and their associated parameters in the remaining elements in the row (e.g., A1, A2, and A3)."<br>Howell at 12:32-49 |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Howell discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Howell does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
| Claim 4 | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the | Howell discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-7 (Howell)

| transmitter sub-system and the receiver sub-system. | "In one embodiment, the fingerprint array 835 and the initialization program 825 can both reside in a single memory storage, such as the storage 120 in FIG. 1. It will be appreciated, however, that the fingerprint array 835 and the initialization program 825 can reside on different storage devices at different locations. For example, the initialization program 825 can reside on an electronic device (not shown) and the fingerprint array 835 can be coupled to the electronic device over a network. The initialization program 825 is not required after the set up process. In one embodiment, fingerprint images are stored on a storage device in encrypted form, thus adding an additional level of security." Howell at 12:60-13:4 |
|---|---|
| | To the extent that Plaintiff contends Howell does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |
| | See, e.g., Wuidart at Claim 4<br>See, e.g., Hamid at Claim 4<br>See, e.g., Ikegami at Claim 4<br>See, e.g., Sands at Claim 4<br>See, e.g., Hoyos at Claim 4<br>See, e.g., Mathiassen at Claim 4 |
| **Claim 6** | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Howell discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| | For example, see the following passages and/or figures, as well as all related disclosures: |
| | See Disclosure at Claim 2[b] |

42

Exhibit C-7 (Howell)

| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Howell discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one embodiment, automatically performing a task comprises retrieving user profile data corresponding to a user and the task, and using the user profile data to perform the task. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number. Alternatively, the user profile data comprises login information for accessing a host system and the corresponding task comprises transmitting the login information to the host system. The corresponding task comprises accessing a resource over a network such as a local area network or the Internet. A task in the first chain of tasks comprises encrypting the login information before transmitting the login information to the host system. The corresponding task comprises an interactive task." Howell at 2:13-26<br><br>"In one embodiment, the electronic device further comprises a telephone operatively coupled to the processor. The user profile data comprises a telephone number and the corresponding task comprises dialing the telephone number on the telephone. The electronic device further comprises a link to a network, such as the Internet. The user profile data comprises a resource locator, and the corresponding task comprises connecting the electronic device to a host identified by the resource locator and accessible over the network. In one embodiment, the link comprises a wireless transmitter. The fingerprint image sensor comprises a thermal sensor, an optical sensor, a pressure sensor, or a capacitive sensor. Preferably, the processor is configured to execute two tasks in parallel." Howell at 3:15-28<br><br>"It will be appreciated that the fingerprint control system 100 can be coupled to the electronic device in any number of ways, depending on the application at hand. The fingerprint control system 100 can be directly coupled to the electronic device using control |

Exhibit C-7 (Howell)

| | |
|---|---|
| | wires. Alternatively, the fingerprint control system 100 can be coupled to the electronic device over a local area network, using for example the Ethernet protocol, or over a wide area network, using, for example, TCP/IP. Also, the fingerprint control system 100 can be wirelessly coupled to the electronic device using radio or infrared signals. It will also be appreciated that the electronic device can also be coupled to a remote host using, for example, a wireless transmitter or a wireless transceiver." <br> Howell at 6:46-58 |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Howell discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "As used herein, a task is any operation on an electronic device. Thus, the performance of a task includes, but is not limited to, (1) the execution of an inherent function of an electronic device, such as copying on a photocopier; (2) the launching of a program, such as a Web browser, e-mail program, or electronic calculator, that is not specific or inherent to a particular electronic device, including interactive programs; (3) any performance of one or more steps on the electronic device to perform any operation; or (4) any combination or permutation of the above. Thus, a task can include the inherent function of powering ON an electronic device, launching a Web browser to connect to a remote host machine, and automatically transmitting a user name and password to the host machine to log on to the host machine. The words "tasks" and "actions" are used interchangeably herein. As used herein, the term "computer program" refers to executable files, scripts, macros, and any sequence of instructions that can control the performance of tasks on an electronic device." <br> Howell at 4:26-44 <br><br> "The electronic device to be controlled by the fingerprint control system 100 can include the same hardware as the fingerprint control system 100. Thus, for example, if the electronic device is a PC, the PC can also comprise one or more of the CPU 110, the fingerprint sensor 115, the storage 120, the display 130, and the input device 135. The CPU 110 can execute fingerprint operations as well as other application programs. Similarly, if |

Exhibit C-7 (Howell)

| | |
|---|---|
| | the electronic device is a telephone, the fingerprint control system 100 can reside on and form part of the telephone. Thus, the fingerprint sensor 115 can be integrated into a telephone case, the display 130 can be a telephone liquid crystal display unit, and the input 135 can be the telephone keypad. Alternatively, the fingerprint control system 100 can reside on hardware separate from the electronic device it controls. Thus, for example, if the electronic device is a coffee maker, the fingerprint control system can be electronically coupled to the coffee maker. Thus, a user can use the fingerprint control system 100 to launch a program, and the program can send control signals to the coffee maker, thereby controlling the coffee maker.<br>It will be appreciated that the fingerprint control system 100 can be coupled to the electronic device in any number of ways, depending on the application at hand. The fingerprint control system 100 can be directly coupled to the electronic device using control wires. Alternatively, the fingerprint control system 100 can be coupled to the electronic device over a local area network, using for example the Ethernet protocol, or over a wide area network, using, for example, TCP/IP. Also, the fingerprint control system 100 can be wirelessly coupled to the electronic device using radio or infrared signals. It will also be appreciated that the electronic device can also be coupled to a remote host using, for example, a wireless transmitter or a wireless transceiver."<br>Howell at 6:26-58<br><br>To the extent that Plaintiff contends Howell does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[b]<br>See, e.g., Hoyos at Claim 6[b]<br>See, e.g., Mathiassen at Claim 6[b]<br>See, e.g., Steiner at Claim 6[b] |
| **Claim 9** | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Howell discloses the system explicitly, |

Exhibit C-7 (Howell)

| | |
|---|---|
| | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Howell discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A device for and method of performing a task associated with fingerprint data is disclosed. The method comprises reading fingerprint data, matching the read fingerprint data to stored fingerprint data, the stored fingerprint data having an associated task, and performing the task. The associated task is part of a chain of tasks that are automatically executed when the read fingerprint data is matched to the stored fingerprint data. Preferably, at least one task has associated user profile data that is used to perform the task. An electronic device that can be controlled in accordance with the present invention includes, but is not limited to, a telephone, a personal computer, a personal digital assistant, and a remote controlled device."<br>Howell at Abstract<br><br>"Preferably, the electronic device is portable, such as a personal digital assistant, a telephone, or any other hand-held device. Alternatively, the electronic device comprises a personal computer, a remote controller, a security system, a television set, an audio player, a game device, or any combination of these."<br>Howell 2:47-52<br><br>"The electronic device to be controlled by the fingerprint control system 100 can include the same hardware as the fingerprint control system 100. Thus, for example, if the electronic device is a PC, the PC can also comprise one or more of the CPU 110, the |

Exhibit C-7 (Howell)

| | fingerprint sensor 115, the storage 120, the display 130, and the input device 135. The CPU 110 can execute fingerprint operations as well as other application programs. Similarly, if the electronic device is a telephone, the fingerprint control system 100 can reside on and form part of the telephone. Thus, the fingerprint sensor 115 can be integrated into a telephone case, the display 130 can be a telephone liquid crystal display unit, and the input 135 can be the telephone keypad. Alternatively, the fingerprint control system 100 can reside on hardware separate from the electronic device it controls. Thus, for example, if the electronic device is a coffee maker, the fingerprint control system can be electronically coupled to the coffee maker. Thus, a user can use the fingerprint control system 100 to launch a program, and the program can send control signals to the coffee maker, thereby controlling the coffee maker." <br> Howell at 6:26-45 |
|---|---|
| **Claim 10** | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Howell discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[e] |
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Howell discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against | Howell discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, |

47

Exhibit C-7 (Howell)

| | |
|---|---|
| members of a database of biometric signatures to thereby output an accessibility attribute; and | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Howell discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Howell discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Howell discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-7 (Howell)

| | |
|---|---|
| 10[f]. map said series into an instruction; and | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon | To the extent the preamble is limiting, Howell discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |

Exhibit C-7 (Howell)

| information in said secure access signal, the method comprising: | |
|---|---|
| 11[a]. populating the database of biometric signatures by: | Howell discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Howell discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Howell discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[d]. mapping said series into an instruction; and | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

Exhibit C-7 (Howell)

| | |
|---|---|
| 11[e]. populating the database according to the instruction; | Howell discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Howell discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Howell discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Howell discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-7 (Howell)

| | |
|---|---|
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Howell discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Howell discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Howell discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

52

Exhibit C-7 (Howell)

| | |
|---|---|
| | To the extent that Plaintiff contends Howell does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| **Claim 14** | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Howell discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In a second aspect of the present invention, an electronic device comprises (a) a biometric sensor for reading biometric data; (b) a memory storing a plurality of stored biometric data each having a corresponding task identifier used to perform a corresponding task, at least one task comprising a chain of tasks; and (c) a processor coupled to both the biometric sensor and the memory, the processor configured to match read biometric data with stored biometric data and to automatically perform a corresponding task on the electronic device. Preferably, the biometric sensor comprises a fingerprint image sensor, such as a placement sensor or a swipe sensor. In one embodiment, the swipe sensor is configured to detect a direction of a swipe, a first direction having a first task identifier and a second direction having a second task identifier."<br>Howell at 2:63-3:9 |
| 14[a]. receive a series of entries of a biometric signal; | Howell discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-7 (Howell)

| | For example, see the following passages and/or figures, as well as all related disclosures: |
|---|---|
| | See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Howell discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Howell discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Howell discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

54

Exhibit C-7 (Howell)

| | |
|---|---|
| | See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Howell discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Howell discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Howell discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-7 (Howell)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
|---|---|
| 15[a]. a memory comprising a database of biometric signatures; | Howell discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Howell discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Howell discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures | Howell discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-7 (Howell)

| | |
|---|---|
| to thereby output an accessibility attribute; and | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Howell discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Howell discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Howell discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Howell discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |

Exhibit C-7 (Howell)

| 15[i]. providing conditional access to the controlled item dependent upon said information; | Howell discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
|---|---|
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Howell discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Howell discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

58

Exhibit C-7 (Howell)

| | |
|---|---|
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Howell discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Howell discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Howell discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

59

Exhibit C-7 (Howell)

| | For example, see the following passages and/or figures, as well as all related disclosures: |
|---|---|
| | See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Howell discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Howell discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Howell discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-7 (Howell)

| | |
|---|---|
| | See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| **Claim 17** | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Howell discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |

Exhibit C-7 (Howell)

| | |
|---|---|
| 17[a]. populating the database of biometric signatures by: | Howell discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Howell discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Howell discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Howell discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

Exhibit C-7 (Howell)

| | |
|---|---|
| 17[e]. populating the database according to the instruction; | Howell discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Howell discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Howell discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Howell discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-7 (Howell)

| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Howell discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

64

Exhibit C-8 (Hoyos)

**Exhibit C-8**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 2002/0063154 ("Hoyos")**

U.S. PATENT APP. PUB. NO. 2002/0063154 to Hoyos ("Hoyos") entitled "Security system database management" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendants' Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Hoyos |
|---|---|
| **Claim 1** | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Hoyos discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A security system database is configured to store a unique identifier and a biometrics feature for each user's. This information is periodically transferred from a central server to a plurality of access controllers. The access controllers in turn control building access based upon the information received from the central server. The access data is in turn |

1

Exhibit C-8 (Hoyos)

| | periodically transferred from the access controllers to the central server. The central server uses this information to generate access reports."<br>Hoyos at Abstract<br><br>"According to one aspect of the invention, a security system database of user information is maintained. The database is used to grant or deny a user access to a property, such as a building. To begin configuration, a central server receives a representation of a fingerprint from a system administrator. The representation of the system administrator's fingerprint is saved in a memory along with access privileges that permit complete system access. Subsequently, the system administrator must present his or her fingerprint in order to gain access to the system. The resulting fingerprint is compared with the representation saved in memory. If a match is detected, the system administrator is permitted access to the database, otherwise not. After gaining access, the system administrator may create access privileges for other users by first entering a new record command. The new user's fingerprint is captured and saved in memory as a record associated with the new user. The system administrator also determines access privileges for the new user."<br>Hoyos at [0008] |
|---|---|
| 1[a]. a memory comprising a database of biometric signatures; | Hoyos discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A security system database is configured to store a unique identifier and a biometrics feature for each user's. This information is periodically transferred from a central server to a plurality of access controllers. The access controllers in turn control building access based upon the information received from the central server. The access data is in turn periodically transferred from the access controllers to the central server. The central server uses this information to generate access reports."<br>Hoyos at Abstract |

2

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | "According to one aspect of the invention, a security system database of user information is maintained. The database is used to grant or deny a user access to a property, such as a building. To begin configuration, a central server receives a representation of a fingerprint from a system administrator. The representation of the system administrator's fingerprint is saved in a memory along with access privileges that permit complete system access. Subsequently, the system administrator must present his or her fingerprint in order to gain access to the system. The resulting fingerprint is compared with the representation saved in memory. If a match is detected, the system administrator is permitted access to the database, otherwise not. After gaining access, the system administrator may create access privileges for other users by first entering a new record command. The new user's fingerprint is captured and saved in memory as a record associated with the new user. The system administrator also determines access privileges for the new user." <br> Hoyos at [0008] <br><br> "The remote access controller includes a database of user information that is used in determining whether to allow a person access. That database is generated at central server. The central server connects to each of the remote access controllers. The central computer is used to generate the database of user information. It is also used to configure and control the remote access controllers. For example, the central server is used to configure the database of user information to specify the hours during which a particular user may gain access to a particular door or to the entire building. The central server connects with the remote access computers through an Ethernet network." <br> Hoyos at [0035] |
| 1[b]. a transmitter sub-system comprising: | Hoyos discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

3

Exhibit C-8 (Hoyos)



Fig. 13

Hoyos at Fig. 13

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | Fig. 16<br>Hoyos at Fig. 16<br><br>"The remote access controller includes a database of user information that is used in determining whether to allow a person access. That database is generated at central server. The central server connects to each of the remote access controllers. The central computer is used to generate the database of user information. It is also used to configure and control the remote access controllers. For example, the central server is used to configure the database of user information to specify the hours during which a particular user may gain access to a particular door or to the entire building. The central server connects with the remote access computers through an Ethernet network."<br>Hoyos at [0035] |

5

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | "One preferred computerized security system is shown in FIG. 13. It includes a central computer 1300. The central computer 1300 includes a display 1302, a keyboard 1304, a mouse 1306 and a fingerprint sensor 1308. The central computer 1300 also includes a processor and a memory configured to store a database of user information. The processor and memory are housed within enclosure 1310 and operationally coupled with the other components of the central computer 1300. Preferably, the central computer 1300 operates using Windows NT, though other operating systems configured to support a network could also be used."<br>Hoyos at [0041]<br><br>"User interface 1332 functions, in many respects, in the same manner as computer 1320 itself. As a user approaches, display 1338 prompts the user to present his or her finger on fingerprint sensor 1342. An electronic representation is generated and passed through communication channel 1344 to remote computer 1320. Remote computer 1320 pre-processes the representation. Meanwhile, remote computer 1320 commands user interface 1332 to present a message to the user requesting entry of the user's ID. The user then enters an ID through keypad 1340. The ID is transmitted through communication channel 1344 to remote computer 1320. The pre-processed representation of a user's fingerprint is then compared with the appropriate database entry. If it matches, the remote computer 120 changes the state of a circuit that controls the associated access point. This permits the user to pass through the associated access point. Otherwise, remote computer 1320 commands user interface 1332 to present a message on display 1338 that the fingerprint did not match. The user may then re-attempt the access process."<br>Hoyos at [0049]<br><br>"According to another aspect of the invention, the security system is used to monitor time in and time out for system users. In operation, the remote computers 1320, 1322, 1324 and 1326 can transmit to central computer 1300 the time in and time out of each user. A database for this information is maintained on the central computer 1300. When the remote computer recognizes a user by generating a feature and user ID match, that information is sent through the network 1312 to central computer 1300. The system administrator may generate reports or transfer this data to other applications." |

6

Exhibit C-8 (Hoyos)

| | Hoyos at [0051] |
|---|---|
| | "After receiving a new entry, the central server transmits the updated database records to the remote access controllers. The updated database information is used in future access transactions. This completes the enrollment process and the new user is able to access the security system."<br>Hoyos at [0087]<br><br>"Turning to FIG. 16, one preferred method of delivering a message to a user is described. Beginning at step 1610, the administrator enters a new message record. This includes one or more intended recipients and a message. The record may also include a start and end date. At step 1612, the message is transmitted to the remote access controllers where it is saved in a local message database. Here, the remote access controller monitors incoming access requests. These requests include a user identification that is compared with the message database. At step 1614, the remote access controller detects a match either directly as when the message is directed to the specific user or indirectly as when the message is directed to a group to which the user belongs. Then, at step 1616, the remote access controller presents the message. The message database is updated to reflect that the message has been presented to the particular user. This information is also transmitted to the central server."<br>Hoyos at [0093] |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Hoyos discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one preferred embodiment a building includes a number of doors through which a person may enter. A security device, also referred to as a remote access controller, is provided at each such door. The remote access controller includes an electrical control for a locking mechanism that restricts the opening of the associated door. The remote access controller also includes a user interface that includes both a touch screen and a fingerprint sensor. A user may gain entry to the building by placing his or her finger on a fingerprint |

7

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | sensor and keying a unique identifier. The remote access controller includes a computer having software necessary to perform all related control functions. |
| | In some applications, both the entry and the exit from a building will be controlled. In such cases an additional security device, also referred to as a companion user interface, may be provided on the other side of the door. The companion connects with the locking mechanism. To exit the building, or secured area, a user may place his or her finger on a fingerprint sensor and key the unique identifier. The companion does not include a computer and necessary software to perform this functionality, but instead connects with the remote access controller. The remote access controller provides the necessary support. This helps reduce the overall system cost and complexity by reducing the number of computers required for the various access points." |
| | Hoyos at [0033]-[0034] |
| | "One preferred computerized security system is shown in FIG. 13. It includes a central computer 1300. The central computer 1300 includes a display 1302, a keyboard 1304, a mouse 1306 and a fingerprint sensor 1308. The central computer 1300 also includes a processor and a memory configured to store a database of user information. The processor and memory are housed within enclosure 1310 and operationally coupled with the other components of the central computer 1300. Preferably, the central computer 1300 operates using Windows NT, though other operating systems configured to support a network could also be used. |
| | The central computer 1300 connects through a network 1312 to a plurality of remote computers 1320, 1322, 1324 and 1326. The remote computers 1320, 1322, 1324 and 1326 are positioned within the interior of an access area 1314. Access to this area is restricted to authorized users. Remote computer 1320 includes a processor and memory. Remote computer 1320 also includes a touch screen 1328 and a fingerprint sensor 1330. |
| | Remote computer 1320 receives user data from central computer 1300 through the network 1312. The user data is stored locally in memory. In a default state, touch screen 1328 displays a prompt message advising a user to place his or her finger upon the fingerprint sensor 130 in order to begin the access process. |
| | Preferably, when a user presents his or her finger to the fingerprint sensor 1330, an electronic representation is generated. This representation is pre-processed to extract salient features for comparison. Meanwhile, the user prompted to enter his or her ID through a |

8

Exhibit C-8 (Hoyos)

| | keypad presented on touch screen 1328. The user's ID is used to access the appropriate database record. The representation of a fingerprint associated with that record is compared with the pre-processed fingerprint to detect a match. If this comparison generates a match, then the remote computer 1320 changes the state of an external circuit controlling the associated access point. This permits the user to pass through the access point.<br>In a second alternative embodiment, when a user presents his or her finger to the fingerprint sensor 1330, an electronic representation is generated. That representation is compared to the local database of user information. If it generates a match, then a message is displayed on touch screen 1328. Preferably, the message includes the user's name and advises the user to enter his or her user ID. At this time a keypad is also displayed on the touch screen 1328. The user may then enter a password. If the password matches the user's password from the local database, then the remote computer 1320 changes the state of an external circuit controlling the associated access point. This permits the user to pass through the access point."<br>Hoyos at [0041]-[0045]<br><br>"User interface 1332 includes a display 1338, a keypad 1340 and a fingerprint sensor 1342. Preferably, user interface 1332 does not include a computer processor or associated memory. This background support is provided by remote computer 1320. This configuration helps to reduce system cost and complexity by reducing the total number of computers.<br>User interface 1332 functions, in many respects, in the same manner as computer 1320 itself. As a user approaches, display 1338 prompts the user to present his or her finger on fingerprint sensor 1342. An electronic representation is generated and passed through communication channel 1344 to remote computer 1320. Remote computer 1320 pre-processes the representation. Meanwhile, remote computer 1320 commands user interface 1332 to present a message to the user requesting entry of the user's ID. The user then enters an ID through keypad 1340. The ID is transmitted through communication channel 1344 to remote computer 1320. The pre-processed representation of a user's fingerprint is then compared with the appropriate database entry. If it matches, the remote computer 120 changes the state of a circuit that controls the associated access point. This permits the user to pass through the associated access point. Otherwise, remote computer 1320 commands |

Exhibit C-8 (Hoyos)

| | user interface 1332 to present a message on display 1338 that the fingerprint did not match. The user may then re-attempt the access process." <br> Hoyos at [0048]-[0049] |
|---|---|
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Hoyos discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "According to one aspect of the invention, a security system database of user information is maintained. The database is used to grant or deny a user access to a property, such as a building. To begin configuration, a central server receives a representation of a fingerprint from a system administrator. The representation of the system administrator's fingerprint is saved in a memory along with access privileges that permit complete system access. Subsequently, the system administrator must present his or her fingerprint in order to gain access to the system. The resulting fingerprint is compared with the representation saved in memory. If a match is detected, the system administrator is permitted access to the database, otherwise not. After gaining access, the system administrator may create access privileges for other users by first entering a new record command. The new user's fingerprint is captured and saved in memory as a record associated with the new user. The system administrator also determines access privileges for the new user." <br> Hoyos at [0008] <br><br> "Preferably, when a user presents his or her finger to the fingerprint sensor 1330, an electronic representation is generated. This representation is pre-processed to extract salient features for comparison. Meanwhile, the user prompted to enter his or her ID through a keypad presented on touch screen 1328. The user's ID is used to access the appropriate database record. The representation of a fingerprint associated with that record is compared with the pre-processed fingerprint to detect a match. If this comparison generates a match, then the remote computer 1320 changes the state of an external circuit controlling the associated access point. This permits the user to pass through the access point. |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | In a second alternative embodiment, when a user presents his or her finger to the fingerprint sensor 1330, an electronic representation is generated. That representation is compared to the local database of user information. If it generates a match, then a message is displayed on touch screen 1328. Preferably, the message includes the user's name and advises the user to enter his or her user ID. At this time a keypad is also displayed on the touch screen 1328. The user may then enter a password. If the password matches the user's password from the local database, then the remote computer 1320 changes the state of an external circuit controlling the associated access point. This permits the user to pass through the access point."<br>Hoyos at [0044]-[0045]<br><br>"User interface 1332 functions, in many respects, in the same manner as computer 1320 itself. As a user approaches, display 1338 prompts the user to present his or her finger on fingerprint sensor 1342. An electronic representation is generated and passed through communication channel 1344 to remote computer 1320. Remote computer 1320 pre-processes the representation. Meanwhile, remote computer 1320 commands user interface 1332 to present a message to the user requesting entry of the user's ID. The user then enters an ID through keypad 1340. The ID is transmitted through communication channel 1344 to remote computer 1320. The pre-processed representation of a user's fingerprint is then compared with the appropriate database entry. If it matches, the remote computer 120 changes the state of a circuit that controls the associated access point. This permits the user to pass through the associated access point. Otherwise, remote computer 1320 commands user interface 1332 to present a message on display 1338 that the fingerprint did not match. The user may then re-attempt the access process."<br>Hoyos at [0049]<br><br>"According to another aspect of the invention, the security system is used to monitor time in and time out for system users. In operation, the remote computers 1320, 1322, 1324 and 1326 can transmit to central computer 1300 the time in and time out of each user. A database for this information is maintained on the central computer 1300. When the remote computer recognizes a user by generating a feature and user ID match, that information is sent through the network 1312 to central computer 1300. The system administrator may generate reports or transfer this data to other applications." |

11

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | Hoyos at [0051]<br><br>"Turning to FIG. 16, one preferred method of delivering a message to a user is described. Beginning at step 1610, the administrator enters a new message record. This includes one or more intended recipients and a message. The record may also include a start and end date. At step 1612, the message is transmitted to the remote access controllers where it is saved in a local message database. Here, the remote access controller monitors incoming access requests. These requests include a user identification that is compared with the message database. At step 1614, the remote access controller detects a match either directly as when the message is directed to the specific user or indirectly as when the message is directed to a group to which the user belongs. Then, at step 1616, the remote access controller presents the message. The message database is updated to reflect that the message has been presented to the particular user. This information is also transmitted to the central server." Hoyos at [0093] |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Hoyos discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"According to a further aspect of the invention, the fingerprint data is transformed and encrypted to prevent disclosure of private data.<br>According to another aspect of the invention, the fingerprint data may be replaced by an electronic representation of the user's face.<br>According to a further aspect of the invention, a user's access privilege information includes access hours, access days and access points.<br>According to another aspect of the invention, the access to a building is monitored by a security system having a database of user information. The database is established at a central server and includes a unique identifier and a biometric feature for each authorized user's. This database is transferred through a computerized network to a plurality of access controllers. The access controllers receive requests from the users to enter the secure area. The access requests each include a unique identifier and a biometric feature such as a |

Exhibit C-8 (Hoyos)

<table>
<tr>
<td></td>
<td>fingerprint. The access request is compared with the database of authorized users to determine access privileges. The comparison is made locally at the access controller. Access records are generated based upon these requests and transferred to the central server. This, in turn, permits the generation of attendance reports at the central server based upon the records of the access requests."<br>Hoyos at [0009]-[0012]<br><br>Remote computer 1320 receives user data from central computer 1300 through the network 1312. The user data is stored locally in memory. In a default state, touch screen 1328 displays a prompt message advising a user to place his or her finger upon the fingerprint sensor 130 in order to begin the access process.<br>Hoyos at [0043]<br><br>"Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers.<br>After configuring the database on the central server, the user records are transferred through the computerized network to the remote access controllers. The remote access controllers use this information to grant or deny access at an access point. During operation the remote access controllers save a log of access information for each user (or attempted intruder) interaction. These logs are periodically transferred to the central server for use in creating various reports."<br>Hoyos at [0079]-[0080]<br><br>To the extent that Plaintiff contends Hoyos does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:</td>
</tr>
</table>

13

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | See, e.g., Schmitt at Claim 1[e]<br>See, e.g., Wuidart at Claim 1[e]<br>See, e.g., Hamid at Claim 1[e]<br>See, e.g., Mathiassen at Claim 1[e]<br>See, e.g., Steiner at Claim 1[e] |
| 1[f]. a receiver sub-system comprising: | Hoyos discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>Fig. 13 |

14

Exhibit C-8 (Hoyos)

| | Hoyos at Fig. 13 |
|---|---|
| | "According to one aspect of the invention, a security system database of user information is maintained. The database is used to grant or deny a user access to a property, such as a building. To begin configuration, a central server receives a representation of a fingerprint from a system administrator. The representation of the system administrator's fingerprint is saved in a memory along with access privileges that permit complete system access. Subsequently, the system administrator must present his or her fingerprint in order to gain access to the system. The resulting fingerprint is compared with the representation saved in memory. If a match is detected, the system administrator is permitted access to the database, otherwise not. After gaining access, the system administrator may create access privileges for other users by first entering a new record command. The new user's fingerprint is captured and saved in memory as a record associated with the new user. The system administrator also determines access privileges for the new user." |
| | Hoyos at [0008] |
| | "The remote access controller includes a database of user information that is used in determining whether to allow a person access. That database is generated at central server. The central server connects to each of the remote access controllers. The central computer is used to generate the database of user information. It is also used to configure and control the remote access controllers. For example, the central server is used to configure the database of user information to specify the hours during which a particular user may gain access to a particular door or to the entire building. The central server connects with the remote access computers through an Ethernet network." |
| | Hoyos at [0035] |
| | "One preferred computerized security system is shown in FIG. 13. It includes a central computer 1300. The central computer 1300 includes a display 1302, a keyboard 1304, a mouse 1306 and a fingerprint sensor 1308. The central computer 1300 also includes a processor and a memory configured to store a database of user information. The processor and memory are housed within enclosure 1310 and operationally coupled with the other components of the central computer 1300. Preferably, the central computer 1300 operates |

15

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | using Windows NT, though other operating systems configured to support a network could also be used." <br><br> The central computer 1300 connects through a network 1312 to a plurality of remote computers 1320, 1322, 1324 and 1326. The remote computers 1320, 1322, 1324 and 1326 are positioned within the interior of an access area 1314. Access to this area is restricted to authorized users. Remote computer 1320 includes a processor and memory. Remote computer 1320 also includes a touch screen 1328 and a fingerprint sensor 1330. <br><br> Remote computer 1320 receives user data from central computer 1300 through the network 1312. The user data is stored locally in memory. In a default state, touch screen 1328 displays a prompt message advising a user to place his or her finger upon the fingerprint sensor 130 in order to begin the access process." <br> Hoyos at [0041]-[0043] |
| 1[g]. a receiver sub-system controller configured to: | Hoyos discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

16

Exhibit C-8 (Hoyos)



Fig. 13

Hoyos at Fig. 13

"A security system database is configured to store a unique identifier and a biometrics feature for each user's. This information is periodically transferred from a central server to a plurality of access controllers. The access controllers in turn control building access based upon the information received from the central server. The access data is in turn periodically transferred from the access controllers to the central server. The central server uses this information to generate access reports."
Hoyos at Abstract

"According to one aspect of the invention, a security system database of user information is maintained. The database is used to grant or deny a user access to a property, such as a

17

Exhibit C-8 (Hoyos)

<table>
<tr>
<td></td>
<td>

building. To begin configuration, a central server receives a representation of a fingerprint from a system administrator. The representation of the system administrator's fingerprint is saved in a memory along with access privileges that permit complete system access. Subsequently, the system administrator must present his or her fingerprint in order to gain access to the system. The resulting fingerprint is compared with the representation saved in memory. If a match is detected, the system administrator is permitted access to the database, otherwise not. After gaining access, the system administrator may create access privileges for other users by first entering a new record command. The new user's fingerprint is captured and saved in memory as a record associated with the new user. The system administrator also determines access privileges for the new user."
According to a further aspect of the invention, the fingerprint data is transformed and encrypted to prevent disclosure of private data."
Hoyos at [0008]-[0009]

"According to another aspect of the invention, the access to a building is monitored by a security system having a database of user information. The database is established at a central server and includes a unique identifier and a biometric feature for each authorized user's. This database is transferred through a computerized network to a plurality of access controllers. The access controllers receive requests from the users to enter the secure area. The access requests each include a unique identifier and a biometric feature such as a fingerprint. The access request is compared with the database of authorized users to determine access privileges. The comparison is made locally at the access controller. Access records are generated based upon these requests and transferred to the central server. This, in turn, permits the generation of attendance reports at the central server based upon the records of the access requests."
Hoyos at [0012]

"The remote access controller includes a database of user information that is used in determining whether to allow a person access. That database is generated at central server. The central server connects to each of the remote access controllers. The central computer is used to generate the database of user information. It is also used to configure and control the remote access controllers. For example, the central server is used to configure the database of user information to specify the hours during which a particular user may gain

</td>
</tr>
</table>

Exhibit C-8 (Hoyos)

| | access to a particular door or to the entire building. The central server connects with the remote access computers through an Ethernet network."<br>Hoyos at [0035]<br><br>"One preferred computerized security system is shown in FIG. 13. It includes a central computer 1300. The central computer 1300 includes a display 1302, a keyboard 1304, a mouse 1306 and a fingerprint sensor 1308. The central computer 1300 also includes a processor and a memory configured to store a database of user information. The processor and memory are housed within enclosure 1310 and operationally coupled with the other components of the central computer 1300. Preferably, the central computer 1300 operates using Windows NT, though other operating systems configured to support a network could also be used.<br>[0042] The central computer 1300 connects through a network 1312 to a plurality of remote computers 1320, 1322, 1324 and 1326. The remote computers 1320, 1322, 1324 and 1326 are positioned within the interior of an access area 1314. Access to this area is restricted to authorized users. Remote computer 1320 includes a processor and memory. Remote computer 1320 also includes a touch screen 1328 and a fingerprint sensor 1330. Remote computer 1320 receives user data from central computer 1300 through the network 1312. The user data is stored locally in memory. In a default state, touch screen 1328 displays a prompt message advising a user to place his or her finger upon the fingerprint sensor 130 in order to begin the access process."<br>Hoyos at [0041]-[0043]<br><br>"Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers.<br>After configuring the database on the central server, the user records are transferred through the computerized network to the remote access controllers. The remote access controllers |

19

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | use this information to grant or deny access at an access point. During operation the remote access controllers save a log of access information for each user (or attempted intruder) interaction. These logs are periodically transferred to the central server for use in creating various reports."<br>Hoyos at [0079]-[0080]<br><br>"After receiving a new entry, the central server transmits the updated database records to the remote access controllers. The updated database information is used in future access transactions. This completes the enrollment process and the new user is able to access the security system."<br>Hoyos at [0087] |
| 1[h]. receive the transmitted secure access signal; and | Hoyos discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-8 (Hoyos)



Fig. 13

Hoyos at Fig. 13

"A security system database is configured to store a unique identifier and a biometrics feature for each user's. This information is periodically transferred from a central server to a plurality of access controllers. The access controllers in turn control building access based upon the information received from the central server. The access data is in turn periodically transferred from the access controllers to the central server. The central server uses this information to generate access reports."
Hoyos at Abstract

"According to one aspect of the invention, a security system database of user information is maintained. The database is used to grant or deny a user access to a property, such as a

21

Exhibit C-8 (Hoyos)

|  | building. To begin configuration, a central server receives a representation of a fingerprint from a system administrator. The representation of the system administrator's fingerprint is saved in a memory along with access privileges that permit complete system access. Subsequently, the system administrator must present his or her fingerprint in order to gain access to the system. The resulting fingerprint is compared with the representation saved in memory. If a match is detected, the system administrator is permitted access to the database, otherwise not. After gaining access, the system administrator may create access privileges for other users by first entering a new record command. The new user's fingerprint is captured and saved in memory as a record associated with the new user. The system administrator also determines access privileges for the new user." According to a further aspect of the invention, the fingerprint data is transformed and encrypted to prevent disclosure of private data." Hoyos at [0008]-[0009] "According to another aspect of the invention, the access to a building is monitored by a security system having a database of user information. The database is established at a central server and includes a unique identifier and a biometric feature for each authorized user's. This database is transferred through a computerized network to a plurality of access controllers. The access controllers receive requests from the users to enter the secure area. The access requests each include a unique identifier and a biometric feature such as a fingerprint. The access request is compared with the database of authorized users to determine access privileges. The comparison is made locally at the access controller. Access records are generated based upon these requests and transferred to the central server. This, in turn, permits the generation of attendance reports at the central server based upon the records of the access requests." Hoyos at [0012] "The remote access controller includes a database of user information that is used in determining whether to allow a person access. That database is generated at central server. The central server connects to each of the remote access controllers. The central computer is used to generate the database of user information. It is also used to configure and control the remote access controllers. For example, the central server is used to configure the database of user information to specify the hours during which a particular user may gain |

Exhibit C-8 (Hoyos)

|  | access to a particular door or to the entire building. The central server connects with the remote access computers through an Ethernet network." Hoyos at [0035]<br><br>"One preferred computerized security system is shown in FIG. 13. It includes a central computer 1300. The central computer 1300 includes a display 1302, a keyboard 1304, a mouse 1306 and a fingerprint sensor 1308. The central computer 1300 also includes a processor and a memory configured to store a database of user information. The processor and memory are housed within enclosure 1310 and operationally coupled with the other components of the central computer 1300. Preferably, the central computer 1300 operates using Windows NT, though other operating systems configured to support a network could also be used.<br>[0042] The central computer 1300 connects through a network 1312 to a plurality of remote computers 1320, 1322, 1324 and 1326. The remote computers 1320, 1322, 1324 and 1326 are positioned within the interior of an access area 1314. Access to this area is restricted to authorized users. Remote computer 1320 includes a processor and memory. Remote computer 1320 also includes a touch screen 1328 and a fingerprint sensor 1330.<br>Remote computer 1320 receives user data from central computer 1300 through the network 1312. The user data is stored locally in memory. In a default state, touch screen 1328 displays a prompt message advising a user to place his or her finger upon the fingerprint sensor 130 in order to begin the access process."<br>Hoyos at [0041]-[0043]<br><br>"Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers.<br>After configuring the database on the central server, the user records are transferred through the computerized network to the remote access controllers. The remote access controllers |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | use this information to grant or deny access at an access point. During operation the remote access controllers save a log of access information for each user (or attempted intruder) interaction. These logs are periodically transferred to the central server for use in creating various reports."<br>Hoyos at [0079]-[0080]<br><br>"After receiving a new entry, the central server transmits the updated database records to the remote access controllers. The updated database information is used in future access transactions. This completes the enrollment process and the new user is able to access the security system."<br>Hoyos at [0087] |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Hoyos discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Preferred embodiments of the database are also described below with reference to the figures. More particularly, FIGS. 1-10 show aspects of the database that are used to enroll users and to grant them access privileges to various access points. These access privileges are entered and configured through a central server, and transferred through a computerized network to remote access controllers. The remote access controllers receive access requests and determine whether to permit entry through an associated access point based upon the user's information and the database of access privileges. Each of the remote access controllers saves a database log of access attempts. These logs are transferred through the computerized network to the central server."<br>Hoyos at [0038]<br><br>"In an alternative preferred embodiment, a particular user may be given access permission only to certain access points. In this configuration, the respective remote computer will also check for access privileges. If the user does not have access privileges for the associated access point, then the remote computer will not permit access through that access point. For |

Exhibit C-8 (Hoyos)

| | example, a user may have access privileges for the access point associated with remote computer 1320 and user interface 1332, but not for any other access point. In this configuration, when the user is properly identified at the access point then he or she will be permitted to pass through the access point. However, when the user attempts to access any other access point, the user will be advised that he or she does not have privileges for that access point."<br>Hoyos at [0052]<br><br>"Returning to FIG. 1, one preferred database structure used to maintain the database of user access privileges is described. In particular, one preferred structure for identifying the various access points is described. Specifically, the database of access points includes a number column 102, a network ID column 104, and a name column 106. As with the database structures that will be described below, the first row lists a column descriptor. The following rows each comprise one entry, so that each entry includes one field for each column. With reference to FIG. 1, the number column 102 simply identifies the memory location of the particular entry. The network ID column 104 is used to save the network ID for each remote access controller. The name column 106 is used to save a common name that identifies the access point. This name is used in report generation.<br>In alternative preferred embodiments, one remote access controller may be used to control access to more than one access point. In addition, the remote access controller may be connected to additional user interfaces that do not themselves connect to the computerized network. Nonetheless, these user interfaces are used to control access to an access point and are controlled by the associated remote access controller. In such configurations, the database further includes fields for the additional access points and user interfaces. Each is also given a common name for use in generating reports."<br>Hoyos at [0055]-[0056]<br><br>"The various access points are preferably organized into access groups. In operation a system administrator defines a group and associates various access points with the group. For example, a company may have an engineering department located in a particular area of a building. That area will have a number of access points. Rather than grant access privileges to each user for each access point, the access points for the engineering area are associated with an engineering group. Later, employees that work in that group can be |

25

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | given access more simply by granting privileges to the engineering group. Such privileges will include access privileges to all access points associated with the engineering group. With reference to FIG. 2, one preferred database of access groups is described. It includes an entry number column 202, a group name column 206, and a plurality of access point columns 206-214. Each access column is associated with one access point. For example, access column 206 is associated with the first access point. In FIG. 1, this would be the South Parking Lot Entry. Each of the entries across a row of access columns 206-214 are set or cleared to permit or deny access to the associated group.<br>The first group, basic, permits access only to the first and fourth access points. The second group, software, permits access only to the first and third access points. Additional groups may be defined depending upon the requirements of the particular application. A user may be given access to one or more access group. These may be categorized by department or by areas of a building or any other desired organization."<br>Hoyos at [0058]-[0060]<br><br>"More specifically, the database as shown with reference to FIG. 5 includes an entry number column 502, a name column 504, a time frame column 506 and an account disabled column 508. Preferably, the database includes five named entries. A visitor entry has neither a fixed time frame nor an account disable set. A temporary leave entry has both a time frame and an account disable set. A voluntary leave entry has a time frame cleared and an account disable set. An active entry has both a time frame and an account disabled cleared. A user associated with a temporary or voluntary leave entry or a termination entry will have their account disabled. This ends any access privileges."<br>Hoyos at [0064] |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Hoyos discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

26

Exhibit C-8 (Hoyos)

| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hoyos discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br>(Database of Users)<br><br>Fig. 8<br><br>Hoyos at Fig. 8 |

27

Exhibit C-8 (Hoyos)



(Database of Users' Fingerprints)

Fig. 10

Hoyos at Fig. 10

"Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers."
Hoyos at [0079]

"At block 1418, the administrator selects an employee type. At block 1420, the administrator enters a temporary end date, if appropriate. At block 1422, the administrator enters a status option, and at block 1424 a leave date if appropriate. At block 1426, the administrator selects database rights and at block 1428 selects a report group. At block

28

Exhibit C-8 (Hoyos)

<table>
<tr>
<td></td>
<td>1430, the administrator selects access groups. Finally, at block 1432 the new user presents his or her fingerprint for scanning. A number of duplicates are taken and processed to create a comparison template."<br>Hoyos at [0086]<br><br>To the extent that Plaintiff contends Hoyos does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Ikegami at Claim 1[k]<br>See, e.g., Howell at Claim 1[k]<br>See, e.g., Steiner at Claim 1[k]<br>See, e.g., iPAQ 5400 series at Claim 1[k]</td>
</tr>
<tr>
<td>1[l]. map said series into an instruction; and</td>
<td>Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>

| 802 | 804 | 806 | 808 | 810 | 812 | 814 | 816 | 818 | 820 | 822 | 824 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Name | Employ. Number | PID | Dept. | Employ. Type | End Date | Employ. Status | Leave Date | DB Rights | Report Group | Other |
| 1 | A. Rivera | 1 | 1776 | Eng. | F.T. A | -- | Active | -- | User | Exempt | 0 |
| 2 | M. Berrios | 2 | 9999 | Soft. | F.T. B | -- | Active | -- | Admin. | Exempt | 1 |
| . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| N | Others | | | | | | | | | | |

(Database of Users)<br><br>Fig. 8<br>Hoyos at Fig. 8</td>
</tr>
</table>

29

Exhibit C-8 (Hoyos)



| # | Employ. Number | Print 1 | Print 2 | Print 3 | Print 4 | Print 5 | Print 6 | Print Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1–1.dat | 1–2.dat | 1–3.dat | 1–4.dat | 1–5.dat | 1–6.dat | 1–C.dat |
| 2 | 2 | 2–1.dat | 2–2.dat | 2–3.dat | 2–4.dat | 2–5.dat | 2–6.dat | 2–C.dat |
| . | . | . | . | . | . | . | . | |
| . | . | . | . | . | . | . | . | |
| . | . | . | . | . | . | . | . | |
| N | N | N–1.dat | N–2.dat | N–3.dat | N–4.dat | N–5.dat | N–6.dat | N–C.dat |

(Database of Users' Fingerprints)

Fig. 10

Hoyos at Fig. 10

"Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers."
Hoyos at [0079]

"At block 1418, the administrator selects an employee type. At block 1420, the administrator enters a temporary end date, if appropriate. At block 1422, the administrator enters a status option, and at block 1424 a leave date if appropriate. At block 1426, the administrator selects database rights and at block 1428 selects a report group. At block

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | 1430, the administrator selects access groups. Finally, at block 1432 the new user presents his or her fingerprint for scanning. A number of duplicates are taken and processed to create a comparison template." <br> Hoyos at [0086] |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hoyos discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

| 1002 | 1004 | 1006 | 1008 | 1010 | 1012 | 1014 | 1016 | 1018 |
|---|---|---|---|---|---|---|---|---|
| # | Employ. Number | Print 1 | Print 2 | Print 3 | Print 4 | Print 5 | Print 6 | Print Composite |
| 1 | 1 | 1–1.dat | 1–2.dat | 1–3.dat | 1–4.dat | 1–5.dat | 1–6.dat | 1–C.dat |
| 2 | 2 | 2–1.dat | 2–2.dat | 2–3.dat | 2–4.dat | 2–5.dat | 2–6.dat | 2–C.dat |
| . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | |
| N | N | N–1.dat | N–2.dat | N–3.dat | N–4.dat | N–5.dat | N–6.dat | N–C.dat |

(Database of Users' Fingerprints)

Fig. 10

Hoyos at Fig. 10

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | "The present invention relates generally to a computerized security system used to restrict entry to a building or property, and more specifically to the maintenance of a database of user information used in such a security system."<br>Hoyos at [0001]<br><br>"In one preferred embodiment a building includes a number of doors through which a person may enter. A security device, also referred to as a remote access controller, is provided at each such door. The remote access controller includes an electrical control for a locking mechanism that restricts the opening of the associated door. The remote access controller also includes a user interface that includes both a touch screen and a fingerprint sensor. A user may gain entry to the building by placing his or her finger on a fingerprint sensor and keying a unique identifier. The remote access controller includes a computer having software necessary to perform all related control functions."<br>Hoyos at [0033]<br><br>"Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers."<br>Hoyos at [0079] |
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Hoyos discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

32

Exhibit C-8 (Hoyos)

| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Hoyos discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

"Remote computer 1320 receives user data from central computer 1300 through the network 1312. The user data is stored locally in memory. In a default state, touch screen 1328 displays a prompt message advising a user to place his or her finger upon the fingerprint sensor 130 in order to begin the access process."
Hoyos at [0043]

"User interface 1332 functions, in many respects, in the same manner as computer 1320 itself. As a user approaches, display 1338 prompts the user to present his or her finger on fingerprint sensor 1342. An electronic representation is generated and passed through communication channel 1344 to remote computer 1320. Remote computer 1320 pre-processes the representation. Meanwhile, remote computer 1320 commands user interface 1332 to present a message to the user requesting entry of the user's ID. The user then enters an ID through keypad 1340. The ID is transmitted through communication channel 1344 to remote computer 1320. The pre-processed representation of a user's fingerprint is then compared with the appropriate database entry. If it matches, the remote computer 120 changes the state of a circuit that controls the associated access point. This permits the user to pass through the associated access point. Otherwise, remote computer 1320 commands user interface 1332 to present a message on display 1338 that the fingerprint did not match. The user may then re-attempt the access process."
Hoyos at [0049]

"Turning to FIG. 11, one preferred access log is described. It includes a record number column 1102. A date and time column 1104. This column records the date and time of the user transaction. It includes an access point column 1106. This records the name identifier of the access point. It includes a PID column 1108. When a user attempts to enter an access point, they are prompted to present their fingerprint for scanning and to enter a PID. The PID is saved in the access log. The associated name is also saved in name column 1110. In |

33

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | an alternative embodiment, the employee number is used instead of the PID. In yet another alternative embodiment, both the employee number and PID are used in conjunction with the fingerprint scan to ensure the highest level of security. It also includes a result column 1112. This indicates whether the transaction resulted in a successful access." <br><br>Hoyos at [0081] |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Hoyos discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br>For example, see the following passages and/or figures, as well as all related disclosures: <br><br>"According to a further aspect of the invention, the fingerprint data is transformed and encrypted to prevent disclosure of private data. <br>According to another aspect of the invention, the fingerprint data may be replaced by an electronic representation of the user's face. <br>According to a further aspect of the invention, a user's access privilege information includes access hours, access days and access points. <br>According to another aspect of the invention, the access to a building is monitored by a security system having a database of user information. The database is established at a central server and includes a unique identifier and a biometric feature for each authorized user's. This database is transferred through a computerized network to a plurality of access controllers. The access controllers receive requests from the users to enter the secure area. The access requests each include a unique identifier and a biometric feature such as a fingerprint. The access request is compared with the database of authorized users to determine access privileges. The comparison is made locally at the access controller. Access records are generated based upon these requests and transferred to the central server. This, in turn, permits the generation of attendance reports at the central server based upon the records of the access requests." <br>Hoyos at [0009]-[0012] |

34

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | "Finally, after configuring a users' access information, a biometrics database record is created. Preferably, six scans of the users' thumbprint are made. This data is compressed in an encrypted format and saved in a database of users' fingerprints as shown in FIG. 10. More specifically, this database includes a record number column 1002, and an employee number column 1004. Again, the employee number column is associated with the employee number column 806 of FIG. 8. The fingerprint data are saved as pointers to database entries along the columns 1006 through 1016. In addition, a composite print is derived from the six entries. This composite is used for matching by remote access controllers. After configuring the database on the central server, the user records are transferred through the computerized network to the remote access controllers. The remote access controllers use this information to grant or deny access at an access point. During operation the remote access controllers save a log of access information for each user (or attempted intruder) interaction. These logs are periodically transferred to the central server for use in creating various reports." <br><br> Hoyos at [0079]-[0080] |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Hoyos discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "According to another aspect of the invention, a security system includes a central server and a plurality of access controllers. The central server is configured to establish a database of user information including a unique identifier and a biometrics feature for each user. The central server is further configured to generate reports of user access information. The plurality of access controllers coupled with the central server through a network. The plurality of access controllers are each configured to control associated access points based upon the database of user information and to retain access records. The the central server periodically transfers an updated copy of the database of user information to the plurality of access controllers. The plurality of access controllers each periodically transfer an updated copy of access records to the central server for use in generating the reports of user access information." |

Exhibit C-8 (Hoyos)

| | Hoyos at [0015] |
|---|---|
| | "In addition to these units, the system may include video monitoring. The video monitoring includes intelligent video surveillance and exception generation capability. These capabilities may be tied with the employee fingerprint ID logs from the remote access controllers. The video surveillance also connects to the remote access controllers through the Ethernet network." |
| | Hoyos at [0036] |
| | "Preferred embodiments of the database are also described below with reference to the figures. More particularly, FIGS. 1-10 show aspects of the database that are used to enroll users and to grant them access privileges to various access points. These access privileges are entered and configured through a central server, and transferred through a computerized network to remote access controllers. The remote access controllers receive access requests and determine whether to permit entry through an associated access point based upon the user's information and the database of access privileges. Each of the remote access controllers saves a database log of access attempts. These logs are transferred through the computerized network to the central server. The central server compiles the access logs from the various remote access controllers into a common access log database. A system administrator can generate reports based upon the access log database. One preferred access log is shown in FIG. 11." |
| | Hoyos at [0038]-[0039] |
| | "Turning to FIG. 11, one preferred access log is described. It includes a record number column 1102. A date and time column 1104. This column records the date and time of the user transaction. It includes an access point column 1106. This records the name identifier of the access point. It includes a PID column 1108. When a user attempts to enter an access point, they are prompted to present their fingerprint for scanning and to enter a PID. The PID is saved in the access log. The associated name is also saved in name column 1110. In an alternative embodiment, the employee number is used instead of the PID. In yet another alternative embodiment, both the employee number and PID are used in conjunction with the fingerprint scan to ensure the highest level of security. It also includes a result column 1112. This indicates whether the transaction resulted in a successful access. |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | In operation, the transaction can fail either because the user does not enter a valid employee number, or because the user does not present a fingerprint match, or because the user did not have privileges to the particular access point. In addition, the access log can include optional columns, shown as 1114, used to indicated equipment failures or damage, or emergency entries or exits, or any other preconfigured condition." <br> Hoyos at [0081]-[0082] |
| **Claim 4** | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Hoyos discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "According to another aspect of the invention, the fingerprint data may be replaced by an electronic representation of the user's face." <br> Hoyos at [0010] |
| **Claim 6** | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Hoyos discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a | Hoyos discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Hoyos does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[a]<br>See, e.g., Wuidart at Claim 6[a]<br>See, e.g., Hamid at Claim 6[a]<br>See, e.g., Howell at Claim 6[a]<br>See, e.g., Mathiassen at Claim 6[a]<br>See, e.g., Steiner at Claim 6[a]<br>See, e.g., iPAQ 5400 series at Claim 6[a] |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Hoyos discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one preferred embodiment a building includes a number of doors through which a person may enter. A security device, also referred to as a remote access controller, is provided at each such door. The remote access controller includes an electrical control for a locking mechanism that restricts the opening of the associated door. The remote access controller also includes a user interface that includes both a touch screen and a fingerprint sensor. A user may gain entry to the building by placing his or her finger on a fingerprint sensor and keying a unique identifier. The remote access controller includes a computer having software necessary to perform all related control functions." |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | In some applications, both the entry and the exit from a building will be controlled. In such cases an additional security device, also referred to as a companion user interface, may be provided on the other side of the door. The companion connects with the locking mechanism. To exit the building, or secured area, a user may place his or her finger on a fingerprint sensor and key the unique identifier. The companion does not include a computer and necessary software to perform this functionality, but instead connects with the remote access controller. The remote access controller provides the necessary support. This helps reduce the overall system cost and complexity by reducing the number of computers required for the various access points." <br> Hoyos at [0033]-[0034] |
| **Claim 9** | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Hoyos discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Hoyos discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "In one preferred embodiment a building includes a number of doors through which a person may enter. A security device, also referred to as a remote access controller, is provided at each such door. The remote access controller includes an electrical control for a locking mechanism that restricts the opening of the associated door. The remote access controller also includes a user interface that includes both a touch screen and a fingerprint sensor. A user may gain entry to the building by placing his or her finger on a fingerprint |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | sensor and keying a unique identifier. The remote access controller includes a computer having software necessary to perform all related control functions." <br> Hoyos at [0033] |
| **Claim 10** | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Hoyos discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[e] |
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Hoyos discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Hoyos discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Hoyos discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | Hoyos discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hoyos discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein | Hoyos discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| **Claim 11** | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Hoyos discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Hoyos discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |

42

Exhibit C-8 (Hoyos)

| 11[b]. receiving a series of entries of the biometric signal; | Hoyos discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| --- | --- |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Hoyos discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[d]. mapping said series into an instruction; and | Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Hoyos discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Hoyos discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

43

Exhibit C-8 (Hoyos)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Hoyos discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Hoyos discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hoyos discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |

44

Exhibit C-8 (Hoyos)

| | |
|---|---|
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, Hoyos discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Hoyos discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Hoyos discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The configuration of the database begins by establishing a system administrator. For maximum system security, the system immediately requests that the system administrator present his or her fingerprint and enter a personal identifier. This will be required to make subsequent access of the system as the administrator."<br>Hoyos at [0054]<br><br>"1. A method of creating a user database suitable for use in conjunction with a security system to grant or deny a user access to a property, such as a building, comprising the steps of: |

45

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | receiving first data from an input device representing a biometric feature of an administrator;<br>saving the first data in a memory as a record associated with the administrator;<br>saving access privilege information in the record associated with the administrator;<br>receiving second data from the input device representing the biometric feature of the administrator and comparing the second data to the first data to detect a match;<br>receiving a command from the administrator to create a user record associated with a user;<br>receiving third data from the input device representing a biometric feature of the user;<br>saving the third data in the memory as a record associated with the user; and<br>saving access privilege information in the record associated with the user."<br>Hoyos at Claim 1 |
| **Claim 14** | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Hoyos discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one preferred embodiment a building includes a number of doors through which a person may enter. A security device, also referred to as a remote access controller, is provided at each such door. The remote access controller includes an electrical control for a locking mechanism that restricts the opening of the associated door. The remote access controller also includes a user interface that includes both a touch screen and a fingerprint sensor. A user may gain entry to the building by placing his or her finger on a fingerprint sensor and keying a unique identifier. The remote access controller includes a computer having software necessary to perform all related control functions."<br>Hoyos at [0033] |
| 14[a]. receive a series of entries of a biometric signal; | Hoyos discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Hoyos discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Hoyos discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Hoyos discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

47

Exhibit C-8 (Hoyos)

| | See Disclosure at Claim 1[c] |
|---|---|
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Hoyos discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Hoyos discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hoyos discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Hoyos discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

48

Exhibit C-8 (Hoyos)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
|---|---|
| 15[a]. a memory comprising a database of biometric signatures; | Hoyos discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Hoyos discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Hoyos discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures | Hoyos discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| to thereby output an accessibility attribute; and | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Hoyos discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Hoyos discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Hoyos discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Hoyos discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Hoyos discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Hoyos discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hoyos discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |

Exhibit C-8 (Hoyos)

| | |
|---|---|
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hoyos discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Hoyos discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Hoyos discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Hoyos discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

52

Exhibit C-8 (Hoyos)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Hoyos discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Hoyos discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Hoyos discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-8 (Hoyos)

| | See Disclosure at Claim 1[l] |
|---|---|
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Hoyos discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Hoyos discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | Hoyos discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-8 (Hoyos)

| | For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[c] |
|---|---|
| 17[b]. receiving a series of entries of the biometric signal; | Hoyos discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Hoyos discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Hoyos discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[l] |
| 17[e]. populating the database according to the instruction; | Hoyos discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-8 (Hoyos)

| | See Disclosure at Claim 1[m] |
|---|---|
| 17[f]. receiving the biometric signal; | Hoyos discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Hoyos discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Hoyos discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access | Hoyos discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

56

Exhibit C-8 (Hoyos)

| structure or an electronic lock on an electronic computing device. | For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[i] and Claim 1[m] |
|---|---|

Exhibit C-9 (Mathiassen)

**Exhibit C-9**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. US20040123113A1 ("Mathiassen")**

U.S. PATENT APP. PUB. US20040123113A1 to Mathiassen ("Mathiassen") entitled "Portable or embedded access and input devices and methods for giving access to access limited devices, apparatuses, appliances, systems or networks" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Mathiassen |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Mathiassen discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

1

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 2a

2

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 2b

3

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 8

"A portable or embedded access device is provided for being coupled to, and for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g. a computer terminal, an internet bank or a corporate or government intranet. The access device comprises an integrated circuit (IC) (1) providing increased security by bridging the functionality of biometrics input from a user and, upon positive authentication of the user's fingerprint locally to provide secure communication with the said access-limited apparatus, device, network or system, whether local or remote.
A corresponding method of using the portable device or the embedded device is disclosed for providing a bridge from biometrics input to a computer locally, into secure communication protocol responses to a non-biometrics network.
An embedded access control and user input device or apparatus for being a built-in part of stand alone appliances with some form of access control, e.g. hotel safes, medicine cabinet or the like, and for providing increased security, is also provided.

4

Exhibit C-9 (Mathiassen)

| | Further, a method of providing secured access control and user input in stand-alone appliances having an embedded access control or user input device according to the invention is also explained."<br>Mathiassen at ABSTRACT<br><br>"[0016] It is one object of the present invention to overcome the above limitations by providing a portable access device for being coupled to, and for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g. a computer terminal, an internet bank or a corporate or government intranet comprising a device interface, being electronic or mechanical or both, for coupling the device to the access-limited unit, e.g. a computer terminal port."<br>Mathiassen at [0016]<br><br>"[0047]In an access-limited apparatus, device, network or system (N), e.g. a computer terminal, an internet bank or a corporate or government intranet, a portable access device for allowing only authorized users access is preferably arranged as shown schematically in FIG. 1B. A biometrics processor (F 1) may be integrated with the sensor (B), or alternatively mounted as a separate integrated circuit (F2) next to or closely coupled to the sensor (B), or alternatively be embedded in a PC or its peripherals (F3). The sensor (B) and the biometrics processor (F; referring to F1, F2, or F3) may work in a stand-alone mode (e.g. in a hotel safe without connection to a network) or be may be connected to another device (C) and optionally networked (E). The biometrics processor as an integrated circuit is exemplified in FIGS. 2A and 2B. The advantages of this configuration are multiple. As the biometrics processor (F) is directly connected to he sensor (B) the biometrics processor (F) can be tailored to optimize the interaction between the sensor (B) and the biometrics processor (F). Such tailoring of the biometrics processor (F) to the sensor (B) combined with is direct connection to the sensor (B), or integration therein, enables inclusion of methods and procedures that severely constrains interception of the signals between the sensor (B) and the biometrics processor (F). It further significantly reduces the network traffic between the sensor (B)/biometrics processor (F) and the other networked processors (C and N). The major advantage is, however, that the biometrics processor can transform the biometrics from the sensor (B) to general communication security measures in a network, such as including Secure Key Generation (SKG) as basis for encryption into the |

Exhibit C-9 (Mathiassen)

|  | biometrics processor (F). By this method biometrics sensors (B) may be connected to a network (C and N) in a secure manner according to existing infrastructure, without requiring that the supplier of the network system architecture makes any decision on which biometrics standard will evolve in the future as the winning standard. By this method the biometrics processor (F) becomes a bridge between biometrics sensors (B) and current infrastructure of networks (E).<br><br>[0048] A biometrics sensor in the form of a fingerprint sensor ( 5) is coupled with a biometrics processor in the form of an integrated circuit—IC (1) that is the core device of the invention. Two versions of the IC are shown in FIGS. 2A and 2B. The details of the ICs will now be explained.<br><br>[0049] The sensor ( 5) is connected to a fingerprint sensor signal capturing and pre-processing block (5C) via a first interface block (5A) as well as a wake-up circuit (5B), the function of the latter being to power up all other blocks of the IC (1). When a finger is detected on the sensor (5) surface, the output signals from the sensor (5) will raise beyond a pre-set threshold, triggering the wake-up circuit (5B) to power up the rest of the IC (1) in a pre-set sequence. The first blocks to be powered up are the Image Capture and Pre-processing block (5C) as well as the high-speed bus (3) and the volatile memory (6 or 6C), all of which are connected to the high-speed bus (3). The pre-processing block is designed to perform the initial, heavy-duty processing of the captured raw images from the sensor (5). The intermediate results are stored in the volatile memory (6A or 6C) that is interfaced via the high speed bus (3) to a first memory interface block (6B or 6D). The volatile memory (6A or 6C) thus provides working memory that is available to other modules on the IC (1).<br><br>[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y |

6

Exhibit C-9 (Mathiassen)

| | coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint |
|---|---|

7

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N).<br>
[0051] Thereby the IC ( 1) is designed as a multi-purpose tool that can service a fingerprint sensor (5) in a stand-alone mode, but it can also communicate with external devices and networks (N) by bridging the biometrics from the sensor (5) to a non-biometrics representation into the network (N) and onto its server(s) (30). The IC (1) transforms the fingerprint, under prevailing secure communication rules, to a regular representation by e.g. password and User ID on a server (30)."<br>
Mathiassen at [0047]-[0051]<br>
<br>
"[0053] The utilization of the IC ( 1) for authentication of an authorized user to access an intranet comprising a server (30) in a network (N) will first be explained for the alternative where the IC (1) is a portable device to be plugged into a terminal (31) of the network, either as USB dongle, as illustrated in FIGS. 3A and 3B, or as a PCMCIA card, as illustrated in FIGS. 4A and 4B.<br>
[0054] In one embodiment of the invention, the portable device has an IC ( 1) being mounted on a small printed circuit board PCB (12B) also carrying a fingerprint sensor (5). The PCB (12B) is connected to at least one of a USB interface (12C) or a PCMCIA mechanical interface (13B). Electronic surface components to support at least one of the USB mechanical interface (12C) and the PCMCIA mechanical interface (13B) are mounted</td>
</tr>
</table>

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | on the PCB (12B). An SDRAM chip (6), typically at least with 4 MB capacity, is also mounted on the same PCB (12B). Further a non-volatile serial Flash chip (7), typically with at least 256 Kbytes capacity, is also mounted on the same PCB (12B). In this embodiment all preceding components and chips are protected inside a housing (12A or 13C)." Mathiassen at [0053]-[0054]<br><br>"[0108] Yet another aspect of the invention is related to stand-alone applications, or applications within a local network e.g. within a car. Examples of such applications are;" Mathiassen at [0108]<br><br>"[0119] The hotel safe stand-alone application will be explained with reference to FIG. 6. The hotel safe ( 50) of this example is not connected to any network, and has only a power supply from the mains (not shown). The safe is equipped with a hinged door (51) with locking bolts (52). At the front of the hinged door (51) there is a cover (53) accommodating the user interfaces comprising a fingerprint sensor (5) and a socket for connection of a service unit (not shown). The service unit may be a PDA that may be used to re-set the settings of the safe's administrative software, downloading event tables, and download fingerprints from unsuccessful opening attempts. The fingerprint sensor (5) is connected by a cable (15B) to the printed circuit board PCB (15). The PCB (15A) accommodates the integrated circuit (1), external volatile memory (6), external non-volatile memory (7) and optionally a connector (15C) to another printed circuit board (54) containing the control system for the safe, including a connection to the service unit (not shown). The two printed circuit boards (15 and 54) are mounted on the inside of the hinged door (51) on the "safe side", while the sensor (5) is mounted on the outside, in the cover (53)." Mathiassen at [0119]<br><br>"[0122] Medicine cabinets will have a different set-up than the above safe versions. The main purpose of a biometrics medicine cabinet is to prevent theft of narcotics and prescription drugs. Considering consequences from any emergency situations, the main purpose of the biometrics medicine cabinet is not to block access to the cabinet, but to log all accesses for subsequent review if inventory discrepancies are discovered at say each change of shifts. Further, this requires that the biometrics medicine cabinet fails to open mode, in case of a power cut, etc. Accordingly, the principles of the invention will be the |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | same, but the flexibility of the invention will be utilized to accommodate these user interface principles. The functioning of the biometrics medicine cabinet will be made by reference to FIG. 7, and FIGS. 2 a and 2 b.<br>[0123]The biometrics medicine cabinet will be made in two versions; a networked cabinet for clinics and hospitals, and a stand-alone version e.g. for private homes. The networked version will have an external terminal ( 42) for administration and printing of access logs, while the stand-alone cabinet version will have a front cover (62) only. The description will first be made for the networked cabinet, and thereafter for the stand-alone cabinet."<br>Mathiassen at [0122]-[0123]<br><br>"[0145] Application of the invention to car systems for the automotive industry will be explained by two different preferable versions of hardware; for key to the doors of the car (central locking system) and for ignition control (ignition blocking). Although these are preferred placements of the devices according to the invention it will be understood that the same device could be embedded in any part of car that a user operates, but that it is particularly suitable to the parts where additional access limitation is useful. A key issue of application of the invention to car systems is the security issue, to prevent theft or non-authorized use of the car. Thereby this application is fundamentally different from the network version of the biometrics medicine cabinet, where the main intention was not to prevent access, but to guarantee access but leaving an audit trail by fingerprints of who has accessed the networked medicine cabinet. The automotive industry is emphasizing secure access by blocking non-authorized users access to the car. These two different applications of the invention demonstrate its versatility and flexibility, as the very same principles are applied, though with different settings of the administrative software.<br>[0146] The automotive application of the invention will be explained by reference to FIGS. 2B, 8 and 9.<br>[0147] The door control (central locking system) is outlined in FIG. 8. The door control, being a portable device ( 20), comprises an external housing (20) which contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1). The remote control (20) further comprises a battery (25) for power supply retained in the housing (20) by a removable lid (26). The battery (25) is connected to the PCB (21) by wires. The remote control is also equipped with a wireless 2-way transceiver (27), and all the active components are connected to the IC (1) by cables (23) via the PCB |

10

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | (21). This remote control for the car doors can be made very compact, where the size of the housing (20) is determined by the size of the battery (25). Thereby the physical size of the housing may be compressed to the size of a key-ring holder."<br>Mathiassen at [0145]-[0147]<br><br>"[0149] These two elements; the portable remote door control ( 20) and the embedded ignition control (15) are both connected to a central computer in the car. The connection of the portable remote door control (20) is by 2-way wireless transceiver (27), while hard wires to the central computer (not shown) of the car connect the embedded ignition control (15)."<br>Mathiassen at [0149]<br><br>"[0167] This password will then be fed to the encryption block ( 8B or 8C) of the IC (1) at the portable door control (20), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (20) by means of two-way wireless transceiver (27) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae tables are transmitted from the portable door unit (20). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door".<br>[0168] If the central computer of the car is capable of successfully decrypting the message from the portable door control ( 20) it will forward the encrypted message to the embedded ignition control (15). Failure by the central computer of the car to decrypt the message (e.g. by non-matching temporary pseudo-random password) will terminate the communication procedure."<br>Mathiassen at [0167]-[0168]<br><br>"[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer.<br>[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer.<br>[0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control."<br>Mathiassen at [0186]-[0188] |
| 1[a]. a memory comprising a database of biometric signatures; | Mathiassen discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 2b

"[0005] An alternative identification method is by something you are, meaning some sort of secure identification by biometrics, such as fingerprints. Although biometrics is gaining ground, this happens slowly and is not employed in a greater scale. There are several reasons for this slow growth in biometrics identification for access to networks and servers;"
Mathiassen at [0005]

13

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | "[0049] The sensor ( 5) is connected to a fingerprint sensor signal capturing and pre-processing block (5C) via a first interface block (5A) as well as a wake-up circuit (5B), the function of the latter being to power up all other blocks of the IC (1). When a finger is detected on the sensor (5) surface, the output signals from the sensor (5) will raise beyond a pre-set threshold, triggering the wake-up circuit (5B) to power up the rest of the IC (1) in a pre-set sequence. The first blocks to be powered up are the Image Capture and Pre-processing block (5C) as well as the high-speed bus (3) and the volatile memory (6 or 6C), all of which are connected to the high-speed bus (3). The pre-processing block is designed to perform the initial, heavy-duty processing of the captured raw images from the sensor (5). The intermediate results are stored in the volatile memory (6A or 6C) that is interfaced via the high speed bus (3) to a first memory interface block (6B or 6D). The volatile memory (6A or 6C) thus provides working memory that is available to other modules on the IC (1).<br><br>[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non- |

14

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high</td>
</tr>
</table>

15

Exhibit C-9 (Mathiassen)

| | speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0049]-[0050]<br><br>[0147] The door control (central locking system) is outlined in FIG. 8. The door control, being a portable device ( 20), comprises an external housing (20) which contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1). The remote control (20) further comprises a battery (25) for power supply retained in the housing (20) by a removable lid (26). The battery (25) is connected to the PCB (21) by wires. The remote control is also equipped with a wireless 2-way transceiver (27), and all the active components are connected to the IC (1) by cables (23) via the PCB (21). This remote control for the car doors can be made very compact, where the size of the housing (20) is determined by the size of the battery (25). Thereby the physical size of the housing may be compressed to the size of a key-ring holder." Mathiassen at [0147]<br><br>"[0162] Then the IC ( 1) of the portable door control (20) will be set in protected mode, waiting for the first user to be enrolled to be the system administrator of the biometrics system in the car. [0163] The purchaser of the car (the car "owner") may then train in fingerprint capturing by a training module on the terminal ( 42). [0164] Then the car owner will enroll one or more of his fingers on the portable door control unit ( 20). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20). These master minutiae tables will be stored in the non-volatile memory (7A) of the IC (1)." Mathiassen at [0162]-[0164]<br><br>"[0190] Another benefit from this application of the invention is that the security of the complete system resides in the fingerprints of the car owner (or other users he may have |

16

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | enrolled), and not in some tokens, such as e.g. electronic keys with complex key generation algorithms. If such an electronic key is lost, considerable logistics are involved in issuing a new electronic key. The involved logistics make such a key replacement both very expensive, and time-consuming. The latter may cause considerable grievances to the car owner." Mathiassen at [0190] |
| 1[b]. a transmitter sub-system comprising: | Mathiassen discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 2b

18

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 8

"[0147] The door control (central locking system) is outlined in FIG. 8. The door control, being a portable device ( 20), comprises an external housing (20) which contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1). The remote control (20) further comprises a battery (25) for power supply retained in the housing (20) by a removable lid (26). The battery (25) is connected to the PCB (21) by wires. The remote control is also equipped with a wireless 2-way transceiver (27), and all the active components are connected to the IC (1) by cables (23) via the PCB (21). This remote control for the car doors can be made very compact, where the size of the housing (20) is determined by the size of the battery (25). Thereby the physical size of the housing may be compressed to the size of a key-ring holder.
[0148] Inside the car is mounted another embedded device ( 15) (refer FIG. 6) e.g. mounted on the gear stick (71) or on the steering wheel (72), for ignition control of the engine.

19

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | [0149] These two elements; the portable remote door control ( 20) and the embedded ignition control (15) are both connected to a central computer in the car. The connection of the portable remote door control (20) is by 2-way wireless transceiver (27), while hard wires to the central computer (not shown) of the car connect the embedded ignition control (15)."<br>Mathiassen at [0147]-[0149]<br><br>"[0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A).<br>[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer.<br>[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer.<br>[0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control."<br>Mathiassen at [0185]-[0188] |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Mathiassen discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0049] The sensor ( 5) is connected to a fingerprint sensor signal capturing and pre-processing block (5C) via a first interface block (5A) as well as a wake-up circuit (5B), the function of the latter being to power up all other blocks of the IC (1). When a finger is detected on the sensor (5) surface, the output signals from the sensor (5) will raise beyond a |

Exhibit C-9 (Mathiassen)

| | pre-set threshold, triggering the wake-up circuit (5B) to power up the rest of the IC (1) in a pre-set sequence. The first blocks to be powered up are the Image Capture and Pre-processing block (5C) as well as the high-speed bus (3) and the volatile memory (6 or 6C), all of which are connected to the high-speed bus (3). The pre-processing block is designed to perform the initial, heavy-duty processing of the captured raw images from the sensor (5). The intermediate results are stored in the volatile memory (6A or 6C) that is interfaced via the high speed bus (3) to a first memory interface block (6B or 6D). The volatile memory (6A or 6C) thus provides working memory that is available to other modules on the IC (1).<br>[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the |

21

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0049]-[0050] "[0175] The "owner" of the car may now access the car as follows; [0176] He will swipe his finger across the sensor ( 5) of the portable door control (20). [0177] His finger on the sensor will trigger a signal from the sensor ( 5) to the wake-up circuit (5B) of the IC (1), powering up the IC (1) in a pre-set sequence. [0178] The pre-processing block ( 5C) will reduce the captured fingerprint image to a reduced intermediate format, feeding it via volatile working memory (6B or 6C) and the high-speed bus (3) to the processor (2). [0179] The processor ( 2) will reduce the captured and pre-processed fingerprint image to compact master minutiae format." Mathiassen at [0175]-[0179] |
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Mathiassen discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: "[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an |

23

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or |

Exhibit C-9 (Mathiassen)

|  | 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0050]

"[0145] Application of the invention to car systems for the automotive industry will be explained by two different preferable versions of hardware; for key to the doors of the car (central locking system) and for ignition control (ignition blocking). Although these are preferred placements of the devices according to the invention it will be understood that the same device could be embedded in any part of car that a user operates, but that it is particularly suitable to the parts where additional access limitation is useful. A key issue of application of the invention to car systems is the security issue, to prevent theft or non-authorized use of the car. Thereby this application is fundamentally different from the network version of the biometrics medicine cabinet, where the main intention was not to prevent access, but to guarantee access but leaving an audit trail by fingerprints of who has accessed the networked medicine cabinet. The automotive industry is emphasizing secure access by blocking non-authorized users access to the car. These two different applications of the invention demonstrate its versatility and flexibility, as the very same principles are applied, though with different settings of the administrative software." Mathiassen at [0145] |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | "[0164] Then the car owner will enroll one or more of his fingers on the portable door control unit ( 20). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20). These master minutiae tables will be stored in the non-volatile memory (7A) of the IC (1)."<br>Mathiassen at [0164]<br><br>"[0173]The "owner's" master minutiae tables of his finger(s), as retrieved from the decrypted message, will be stored in the non-volatile memory ( 7A) of the IC (1) of the embedded ignition control (15)."<br>Mathiassen at [0173]<br><br>"[0175] The "owner" of the car may now access the car as follows;<br>[0176] He will swipe his finger across the sensor ( 5) of the portable door control (20)."<br>Mathiassen at [0175]-[0176]<br><br>"[0178] The pre-processing block ( 5C) will reduce the captured fingerprint image to a reduced intermediate format, feeding it via volatile working memory (6B or 6C) and the high-speed bus (3) to the processor (2).<br>[0179] The processor ( 2) will reduce the captured and pre-processed fingerprint image to compact master minutiae format.<br>[0180] The processor ( 2) will then compare this access minutiae table with the master minutiae table(s) pre-stored at time of enrolment in non-volatile memory (7A).<br>[0181] In case of a match the process will be allowed to continue. If no match, the process will be aborted.<br>[0182] Provided the processor ( 2) established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors;"<br>Mathiassen at [0178]-[0182]<br><br>"[0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A)." |

26

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | Mathiassen at [0185]<br><br>"[0192] As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory ( 7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences. A command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor."<br>Mathiassen at [0192] |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Mathiassen discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or |

27

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given</td>
</tr>
</table>

28

Exhibit C-9 (Mathiassen)

| | to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0050] |
| --- | --- |
| | [0147] The door control (central locking system) is outlined in FIG. 8. The door control, being a portable device ( 20), comprises an external housing (20) which contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1). The remote control (20) further comprises a battery (25) for power supply retained in the housing (20) by a removable lid (26). The battery (25) is connected to the PCB (21) by wires. The remote control is also equipped with a wireless 2-way transceiver (27), and all the active components are connected to the IC (1) by cables (23) via the PCB (21). This remote control for the car doors can be made very compact, where the size of the housing (20) is determined by the size of the battery (25). Thereby the physical size of the housing may be compressed to the size of a key-ring holder." Mathiassen at [0147] |
| | "[0182] Provided the processor ( 2) established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors; |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | [0183] The processor ( 2) will fetch the seed from the non-volatile memory (7A) and feed it to the SKG block (8A). [0184] The SKG block will generate a valid, and temporary, password that will be input to the encryption block ( 8B or 8C)." [0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A). [0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer. [0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer. [0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control." Mathiassen at [0182]-[0188] |
| 1[f]. a receiver sub-system comprising: | Mathiassen discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0149] These two elements; the portable remote door control ( 20) and the embedded ignition control (15) are both connected to a central computer in the car. The connection of the portable remote door control (20) is by 2-way wireless transceiver (27), while hard wires to the central computer (not shown) of the car connect the embedded ignition control (15)." Mathiassen at [0149] |

30

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | "[0167] This password will then be fed to the encryption block ( 8B or 8C) of the IC (1) at the portable door control (20), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (20) by means of two-way wireless transceiver (27) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae tables are transmitted from the portable door unit (20). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door"." <br> Mathiassen at [0167] <br><br> "[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer. <br> [0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer. <br> [0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control." <br> Mathiassen at [0186]-[0188] |
| 1[g]. a receiver sub-system controller configured to: | Mathiassen discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "[0149] These two elements; the portable remote door control ( 20) and the embedded ignition control (15) are both connected to a central computer in the car. The connection of the portable remote door control (20) is by 2-way wireless transceiver (27), while hard wires to the central computer (not shown) of the car connect the embedded ignition control (15)." |

31

Exhibit C-9 (Mathiassen)

| | Mathiassen at [0149] |
|---|---|
| | "[0167] This password will then be fed to the encryption block ( 8B or 8C) of the IC (1) at the portable door control (20), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (20) by means of two-way wireless transceiver (27) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae tables are transmitted from the portable door unit (20). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door"."<br>Mathiassen at [0167]<br><br>"[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer.<br>[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer.<br>[0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control."<br>Mathiassen at [0186]-[0188] |
| 1[h]. receive the transmitted secure access signal; and | Mathiassen discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0149] These two elements; the portable remote door control ( 20) and the embedded ignition control (15) are both connected to a central computer in the car. The connection of |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | the portable remote door control (20) is by 2-way wireless transceiver (27), while hard wires to the central computer (not shown) of the car connect the embedded ignition control (15)."<br>Mathiassen at [0149]<br><br>"[0167] This password will then be fed to the encryption block ( 8B or 8C) of the IC (1) at the portable door control (20), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (20) by means of two-way wireless transceiver (27) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae tables are transmitted from the portable door unit (20). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door"."<br>Mathiassen at [0167]<br><br>"[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer.<br>[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer.<br>[0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control."<br>Mathiassen at [0186]-[0188] |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Mathiassen discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

33

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | "[0167] This password will then be fed to the encryption block ( 8B or 8C) of the IC (1) at the portable door control (20), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (20) by means of two-way wireless transceiver (27) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae tables are transmitted from the portable door unit (20). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door"." Mathiassen at [0167]<br><br>"[0182] Provided the processor ( 2) established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors;" Mathiassen at [0182]<br><br>"[0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A)." Mathiassen at [0185]<br><br>"[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer." Mathiassen at [0187] |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Mathiassen discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>

For example, see the following passages and/or figures, as well as all related disclosures:

"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by

</td>
</tr>
</table>

35

Exhibit C-9 (Mathiassen)

| | block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0050]<br><br>[0147] The door control (central locking system) is outlined in FIG. 8. The door control, being a portable device ( 20), comprises an external housing (20) which contains a fingerprint sensor (5) coupled to a miniature printed circuit board (21) on which is mounted the IC (1). The remote control (20) further comprises a battery (25) for power supply |

Exhibit C-9 (Mathiassen)

| | retained in the housing (20) by a removable lid (26). The battery (25) is connected to the PCB (21) by wires. The remote control is also equipped with a wireless 2-way transceiver (27), and all the active components are connected to the IC (1) by cables (23) via the PCB (21). This remote control for the car doors can be made very compact, where the size of the housing (20) is determined by the size of the battery (25). Thereby the physical size of the housing may be compressed to the size of a key-ring holder." Mathiassen at [0147] |
|---|---|
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Mathiassen discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A |

37

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus</td>
</tr>
</table>

38

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." <br> Mathiassen at [0050] <br><br> "[0164] Then the car owner will enroll one or more of his fingers on the portable door control unit ( 20). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20). These master minutiae tables will be stored in the non-volatile memory (7A) of the IC (1)." <br> Mathiassen at [0164] <br><br> "[0176] He will swipe his finger across the sensor ( 5) of the portable door control (20)." <br> Mathiassen at [0176] <br><br> "[0179] The processor ( 2) will reduce the captured and pre-processed fingerprint image to compact master minutiae format." <br> Mathiassen at [0179] <br><br> "[0192] As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory ( 7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | sequences including directional and touch/no-touch finger movement sequences. A command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor."<br>Mathiassen at [0192]<br><br>To the extent that Plaintiff contends Mathiassen does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Ikegami at Claim 1[k]<br>See, e.g., Howell at Claim 1[k]<br>See, e.g., Steiner at Claim 1[k]<br>See, e.g., iPAQ 5400 series at Claim 1[k] |
| 1[l]. map said series into an instruction; and | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0192] As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory ( 7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences. A |

40

Exhibit C-9 (Mathiassen)

| | command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor." Mathiassen at [0192] |
|---|---|
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0071] Then the central processor ( 2) will retrieve the compact fingerprint minutia information from a master minutiae table, created during the enrolment of the authorized user(s), stored in non-volatile memory (7, 7A or 7C), and compare it with the access minutiae table temporarily stored in working volatile memory (6A or 6C)." Mathiassen at [0071]<br><br>"[0131] When the next user is to be enrolled, the system administrator will have to open this procedure by authenticating himself by his fingerprint. When such access by the system administrator is authenticated by a positive match versus the master minutiae tables of the system administrator stored in the non-volatile memory ( 7, 7A or 7C), the next user can be enrolled. Such enrolment is performed as described above, by a training session followed by enrolment of a minimum (say three) fingerprint minutiae (per finger) of acceptable quality. The system administrator then enters the user name and user ID of the user, and finally assigns the user's access privileges (if any restrictions). Temporary staff can be enrolled for a given calendar period. Finally when all data are entered, the system administrator must countersign with his own fingerprint, to be authenticated versus the stored master minutiae of the system administrator. The enrolment of the new user will only be completed, and accepted, upon such authenticated counter-signature." Mathiassen at [0131] |

41

Exhibit C-9 (Mathiassen)

|  | "[0162] Then the IC ( 1) of the portable door control (20) will be set in protected mode, waiting for the first user to be enrolled to be the system administrator of the biometrics system in the car.<br><br>[0163] The purchaser of the car (the car "owner") may then train in fingerprint capturing by a training module on the terminal ( 42).<br><br>[0164] Then the car owner will enroll one or more of his fingers on the portable door control unit ( 20). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20). These master minutiae tables will be stored in the non-volatile memory (7A) of the IC (1).<br><br>[0165] This first person to enroll his fingerprint on the portable door control ( 20) becomes the "owner" of the car, in the sense that he becomes the system administrator. When he has successfully enrolled on the portable door control (20) he will countersign by his fingerprint to authorize and initiate encryption of his master minutiae table(s) from the IC (1) on the portable door control (20) via the door locks and the central car computer (not shown) to the IC (1) of the embedded ignition control (15) of the car.<br><br>[0166] Such transfer of authorized master minutiae will start with retrieving the unique seed of the car from non-volatile memory ( 7A) of the IC (1) of the portable door control (20). The seed will be fed to the secure key generation SKG block (8A) of the IC (1) to generate a valid password.<br><br>[0167] This password will then be fed to the encryption block ( 8B or 8C) of the IC (1) at the portable door control (20), initiating encryption of the master minutiae tables of the "owner's" finger(s). The encrypted message will be transmitted wirelessly from the portable door control (20) by means of two-way wireless transceiver (27) via the door locks to the central computer of the car. Note that such enrolment is the only event when encrypted minutiae tables are transmitted from the portable door unit (20). At normal opening of the door matching minutiae will only be used to-authorize encryption and transmission of straight commands, such as "open door" or "lock door".<br>Mathiassen at [0162]-[0167]<br><br>"[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer."<br>Mathiassen at [0187]<br><br>"[0190] Another benefit from this application of the invention is that the security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled), and not in some tokens, such as e.g. electronic keys with complex key generation algorithms. If such an electronic key is lost, considerable logistics are involved in issuing a new electronic key. The involved logistics make such a key replacement both very expensive, and time-consuming. The latter may cause considerable grievances to the car owner."<br>Mathiassen at [0190]<br><br>"[0192] As an additional safety feature the portable or embedded device could be equipped with means for the input of code or commands. This is achieved by defining a fingerprint storage segment in non-volatile memory ( 7, 7A or 7E) where the device may store a series of consecutive fingerprint representations generated by the fingerprint sensor signal capturing and pre-processing block (5C). Movement analyzing means, in the form of a hardware or a software movement analyzing program module analyzes the obtained series of fingerprint representations to obtain a measure of the omni-directional finger movements across the sensor in two dimensions. Translation means in the form of a hardware or a software translation program module analyzes and categorizes the omni-directional finger movements across the fingerprint sensor according to predefined sets of finger movement sequences including directional and touch/no-touch finger movement sequences. A command table is used to translate the categorized finger movements into control signals whereby the translating means generates control signal for controlling the device, e.g. the stand-alone appliance, in response to the finger movements on the sensor."<br>Mathiassen at [0192] |
| Claim 2 | |

Exhibit C-9 (Mathiassen)

| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Mathiassen discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Mathiassen discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key |

44

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) |

45

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0050]<br><br>"[0124]The biometrics medicine cabinet ( 60) has a hinged front door (61) containing a locking mechanism (65) and a front cover with a user interface (62) comprising a keyboard, a slot for the finger including a fingerprint sensor (5) plus 3 LEDs (Light Emitting Diodes; green, yellow and red). The user interface (62) and the locking mechanism (65) are connected to a printed circuit board PCB (15) (refer FIG. 6). The PCB (15) accommodates the IC (1), the external volatile memory (7), the external non-volatile memory (6) and a connector for connection (63) to the external terminal (42) as well as power supply (64) from the mains (64A) and from a rechargeable battery (64B) for emergency power." Mathiassen at [0124]<br><br>"[0131] When the next user is to be enrolled, the system administrator will have to open this procedure by authenticating himself by his fingerprint. When such access by the system administrator is authenticated by a positive match versus the master minutiae tables of the system administrator stored in the non-volatile memory ( 7, 7A or 7C), the next user can be enrolled. Such enrolment is performed as described above, by a training session followed by enrolment of a minimum (say three) fingerprint minutiae (per finger) of acceptable quality. The system administrator then enters the user name and user ID of the user, and finally assigns the user's access privileges (if any restrictions). Temporary staff can be enrolled for a given calendar period. Finally when all data are entered, the system administrator must countersign with his own fingerprint, to be authenticated versus the stored master minutiae of the system administrator. The enrolment of the new user will only be completed, and accepted, upon such authenticated counter-signature." Mathiassen at [0131] |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | "[0135] The administrative software of the IC (l) will keep the locking pin of the locking mechanism ( 65) engaged for a pre-set time (e.g. 30 seconds) while one of the LEDs (light-emitting diodes) of the user interface cover (62) is flashing."<br>Mathiassen at [0135]<br><br>"[0163] The purchaser of the car (the car "owner") may then train in fingerprint capturing by a training module on the terminal ( 42).<br>[0164] Then the car owner will enroll one or more of his fingers on the portable door control unit ( 20). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20). These master minutiae tables will be stored in the non-volatile memory (7A) of the IC (1)."<br>Mathiassen at [0163]-[0164]<br><br>To the extent that Plaintiff contends Mathiassen does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 2[a]<br>See, e.g., Hamid at Claim 2[a]<br>See, e.g., Ikegami at Claim 2[a]<br>See, e.g., Sands at Claim 2[a]<br>See, e.g., Howell at Claim 2[a]<br>See, e.g., Hoyos at Claim 2[a]<br>See, e.g., Steiner at Claim 2[a]<br>See, e.g., iPAQ 5400 series at Claim 2[a] |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Mathiassen discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

47

Exhibit C-9 (Mathiassen)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by |

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)."
Mathiassen at [0050]

"[0077] The secure key will be input to the encryption block ( 8, 8B or 8C) for encryption of a message/communication. The message will comprise the following elements;"
Mathiassen at [0077]</td>
</tr>
</table>

49

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | "[0081] The user ID, in encrypted format."<br>Mathiassen at [0081]<br><br>"[0084] The calculated communication response is thus a result depending on the above comparison of fingerprints. This message/communication is encrypted to form a secure output in a predefined format and sequence (e.g. handshake procedures) and transferred to an external unit, network or system through one of the communication interfaces.<br>[0085] Thus if a positive match of the captured fingerprint with the fingerprint representation of an authorized user is obtained, an output signal from the IC/chip ( 1) including target IP address and encrypted communication is generated"<br>Mathiassen at [0084] – [0085]<br><br>"[0182] Provided the processor ( 2) established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors;"<br>Mathiassen at [0182]<br><br>"[0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A)."<br>Mathiassen at [0185]<br><br>"[0190]Another benefit from this application of the invention is that the security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled), and not in some tokens, such as e.g. electronic keys with complex key generation algorithms. If such an electronic key is lost, considerable logistics are involved in issuing a new electronic key. The involved logistics make such a key replacement both very expensive, and time-consuming. The latter may cause considerable grievances to the car owner."<br>Mathiassen at [0190] |

50

Exhibit C-9 (Mathiassen)

| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Mathiassen discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | pseudo-random identical key on both computers (2 and 30) that is either valid for a time frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0050] |

Exhibit C-9 (Mathiassen)

<table>
<tr>
<td></td>
<td>

"[0134] Any authorized user may enter the biometrics medicine cabinet by punching a user ID onto the keyboard of the user interface cover at the front of the hinged door, followed by a fingerprint image capturing on the sensor ( 5) of the user interface cover (62). Punching the user ID will trigger the wake-up circuitry (5B) powering up the complete IC (1). When the user ID has been punched in on the keyboard of the user interface cover (62) the user will submit his fingerprint on the sensor (5) mounted in the user interface cover (62). The IC (1) will process the fingerprint image captured from the sensor (5) to compact access minutiae fingerprint representation locally in the IC (1). The administrative software on the IC (1) then looks up the user ID punched in on the local keyboard of the user interface cover (62) and then compares the access minutiae table with the master minutiae table stored together with the user ID on the non-volatile memory (7, 7A or 7C) of the IC (1) during enrolment. If the minutiae matching by the central processor (2) confirms that the person seeking access is the authentic owner of the user ID, then the administrative software of the IC (1) will power up the solenoid of the locking mechanism (65) thereby extending the locking pin with external splines to connect the two cylinders with internal splines of the locking mechanism (65). This connection by the locking pin will enable the medicine cabinet to be opened by pushing down the handle of the locking mechanism." Mathiassen at [0134]

"[0138] An option, to guarantee access, may be to open the medicine cabinet even if the fingerprint does not match, but then to record the fingerprint image and store it for later check. The opening procedure will be initiated the same way as above. The user enters his user ID on the keyboard of the user interface cover ( 62). If the user ID does not match any of the pre-stored authenticated users, the process is aborted and the red LED will flash. When a user ID match is established with a pre-stored authenticated user, his fingerprint image will be captured by the sensor (5) and reduced to access attempt minutiae by the IC (1). If there is no match of the pre-stored master minutiae of the user ID entered, the administrative software on the IC (1) may still open the medicine cabinet by extending the locking pin of the locking mechanism (65), but now this event will be recorded as a non-authenticated access event. This will cause the IC (1) to store the complete fingerprint image captured by the sensor (5) in the event table, for subsequent comparison with the owner of the user ID entered, or of other persons suspected to have accessed the medicine cabinet at the recorded time of entry. The prerequisite for such emergency opening of the

</td>
</tr>
</table>

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | cabinet is that the fingerprint image captured is of acceptable quality for subsequent matching of prints from candidate persons.<br><br>[0139] The above procedure ensures that the biometrics medicine cabinet can be accessed even in case of an emergency, but the identity of the person seeking access is either authenticated by a matching fingerprint minutiae, or the complete fingerprint image is stored for subsequent identity search. The above method of looking up the user ID and then checking the authenticity of the owner by his fingerprint enables a so-called "one-to-one" match. Thereby the number of users does not dilute the security of the system. The system will thereby provide maximum security, even for large user groups e.g. within a hospital. In this case the fingerprint will be reduced to compact minutiae form locally on the IC ( 1) of the PCB (15) in the door of the medicine cabinet, then encrypted by IC (1) before being transferred to a server (30) for authentication in the server data base."<br>Mathiassen at [0138]-[0139]<br><br>"[0145] Application of the invention to car systems for the automotive industry will be explained by two different preferable versions of hardware; for key to the doors of the car (central locking system) and for ignition control (ignition blocking). Although these are preferred placements of the devices according to the invention it will be understood that the same device could be embedded in any part of car that a user operates, but that it is particularly suitable to the parts where additional access limitation is useful. A key issue of application of the invention to car systems is the security issue, to prevent theft or non-authorized use of the car. Thereby this application is fundamentally different from the network version of the biometrics medicine cabinet, where the main intention was not to prevent access, but to guarantee access but leaving an audit trail by fingerprints of who has accessed the networked medicine cabinet. The automotive industry is emphasizing secure access by blocking non-authorized users access to the car. These two different applications of the invention demonstrate its versatility and flexibility, as the very same principles are applied, though with different settings of the administrative software."<br>Mathiassen at [0145]<br><br>"[0173]The "owner's" master minutiae tables of his finger(s), as retrieved from the decrypted message, will be stored in the non-volatile memory ( 7A) of the IC (1) of the embedded ignition control (15)." |

54

Exhibit C-9 (Mathiassen)

| | Mathiassen at [0173]<br><br>"[0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A)."<br>Mathiassen at [0185]<br><br>"[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer."<br>Mathiassen at [0187]<br><br>"[0190] Another benefit from this application of the invention is that the security of the complete system resides in the fingerprints of the car owner (or other users he may have enrolled), and not in some tokens, such as e.g. electronic keys with complex key generation algorithms. If such an electronic key is lost, considerable logistics are involved in issuing a new electronic key. The involved logistics make such a key replacement both very expensive, and time-consuming. The latter may cause considerable grievances to the car owner."<br>Mathiassen at [0190] |
| **Claim 4** | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the | Mathiassen discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| transmitter sub-system and the receiver sub-system. | See Disclosure at claim 1[a] |
| Claim 6 | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Mathiassen discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A portable or embedded access device is provided for being coupled to, and for allowing only authorized users access to, an access-limited apparatus, device, network or system, e.g. a computer terminal, an internet bank or a corporate or government intranet. The access device comprises an integrated circuit (IC) (1) providing increased security by bridging the functionality of biometrics input from a user and, upon positive authentication of the user's fingerprint locally to provide secure communication with the said access-limited apparatus, device, network or system, whether local or remote.<br>A corresponding method of using the portable device or the embedded device is disclosed for providing a bridge from biometrics input to a computer locally, into secure communication protocol responses to a non-biometrics network.<br>An embedded access control and user input device or apparatus for being a built-in part of stand alone appliances with some form of access control, e.g. hotel safes, medicine cabinet or the like, and for providing increased security, is also provided.<br>Further, a method of providing secured access control and user input in stand-alone appliances having an embedded access control or user input device according to the invention is also explained."<br>Mathiassen at ABSTRACT<br><br>"[0053] The utilization of the IC ( 1) for authentication of an authorized user to access an intranet comprising a server (30) in a network (N) will first be explained for the alternative where the IC (1) is a portable device to be plugged into a terminal (31) of the network, either as USB dongle, as illustrated in FIGS. 3A and 3B, or as a PCMCIA card, as illustrated in FIGS. 4A and 4B."<br>Mathiassen at [0053] |

Exhibit C-9 (Mathiassen)

| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Mathiassen discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0176] He will swipe his finger across the sensor ( 5) of the portable door control (20).<br>[0177] His finger on the sensor will trigger a signal from the sensor ( 5) to the wake-up circuit (5B) of the IC (1), powering up the IC (1) in a pre-set sequence.<br>[0178] The pre-processing block ( 5C) will reduce the captured fingerprint image to a reduced intermediate format, feeding it via volatile working memory (6B or 6C) and the high-speed bus (3) to the processor (2).<br>[0179] The processor ( 2) will reduce the captured and pre-processed fingerprint image to compact master minutiae format.<br>[0180] The processor ( 2) will then compare this access minutiae table with the master minutiae table(s) pre-stored at time of enrolment in non-volatile memory (7A).<br>[0181] In case of a match the process will be allowed to continue. If no match, the process will be aborted.<br>[0182] Provided the processor ( 2) established a match between the access attempt and one of the resident master minutiae tables, the processor will proceed to open (or lock) the car doors;<br>[0183] The processor ( 2) will fetch the seed from the non-volatile memory (7A) and feed it to the SKG block (8A).<br>[0184] The SKG block will generate a valid, and temporary, password that will be input to the encryption block ( 8B or 8C).<br>[0185] The processor will issue the "open door" command to the encryption block ( 8B or 8C) that in turn will encrypt it based on the valid, and temporary password from the SKG block (8A).<br>[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer. |

57

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | [0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer.<br>[0188] Alternatively the decryption and authentication algorithms may be performed on the central car computer instead of on the embedded ignition control."<br>Mathiassen at [0176]-[0188] |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Mathiassen discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-9 (Mathiassen)



Mathiassen at Fig. 2b

"[0186] The encrypted "open door" command will then be wirelessly transmitted by the transceiver ( 27) from the portable door control (20) to the embedded ignition control (15) via the transceivers of the door locks and the central car computer.
[0187] The encrypted message will be decrypted by the embedded ignition control ( 15) by its processor (2) on its resident IC (1) fetching the seed from the non-volatile memory (7A). The seed will be entered into the SKG block (8A) to generate the identical, and temporary password fed on to the encryption block (8B or 8C). If the decrypted message confirms a

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | valid and authenticated "open door" command, a similar encrypted command will be relayed to the door locks by the car computer."<br>Mathiassen at [0186]-[0187] |
| **Claim 9** | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Mathiassen discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Mathiassen discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Mathiassen does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 9[a]<br>See, e.g., Sands at Claim 9[a]<br>See, e.g., Howell at Claim 9[a]<br>See, e.g., Hoyos at Claim 9[a]<br>See, e.g., Steiner at Claim 9[a]<br>See, e.g., iPAQ 5400 series at Claim 9[a] |
| **Claim 10** | |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Mathiassen discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Mathiassen discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Mathiassen discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Mathiassen discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 10[d]. wherein the controller is further configured to: | Mathiassen discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Mathiassen discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |

62

Exhibit C-9 (Mathiassen)

| Claim 11 | |
|---|---|
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Mathiassen discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Mathiassen discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Mathiassen discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

63

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Mathiassen discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[d]. mapping said series into an instruction; and | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Mathiassen discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Mathiassen discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of | Mathiassen discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a |

64

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| biometric signatures to thereby output an accessibility attribute; | matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Mathiassen discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein | To the extent the preamble is limiting, Mathiassen discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures: |

65

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| enrolling the biometric signature into the database comprises: | See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Mathiassen discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Mathiassen discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0164] Then the car owner will enroll one or more of his fingers on the portable door control unit ( 20). This involves successful capturing of a minimum of images (say three) reduced to master minutiae tables by the pre-processing block (5C) and the central processor (2) of the IC (1) on the portable device (20). These master minutiae tables will be stored in the non-volatile memory (7A) of the IC (1).<br>[0165] This first person to enroll his fingerprint on the portable door control ( 20) becomes the "owner" of the car, in the sense that he becomes the system administrator. When he has successfully enrolled on the portable door control (20) he will countersign by his fingerprint to authorize and initiate encryption of his master minutiae table(s) from the IC (1) on the portable door control (20) via the door locks and the central car computer (not shown) to the IC (1) of the embedded ignition control (15) of the car."<br>Mathiassen at [0164]-[0165] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a | To the extent the preamble is limiting, Mathiassen discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when |

Exhibit C-9 (Mathiassen)

| computer program comprising instructions, which when executed by processors causes the processors to: | executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"[0050] Meanwhile the remaining blocks of the IC ( 1) are powered up in a pre-set sequence, starting with the central processor (2) being a powerful processor, such as ARM 9, or equivalent. The processor unit (2) is also connected to the high-speed bus (3) for allowing communication with the other on-chip components or modules. When the pre-processing block (5C) has crunched the captured raw images to an intermediate stage of significantly compressed information, i.e. a dataset of reduced size, denoted intermediate fingerprint data. The intermediate fingerprint data are fed to the central processor (2) for final reduction of the captured fingerprint image to compact fingerprint representations, called minutiae. Such minutiae are distinct points where fingerprint lines (ridges) starts or stops, or locations of bifurcation of the ridges and may be described by at least a vector comprising X and Y coordinates, and direction of the individual minutiae, stored as an alphanumeric string in non-volatile memory (7, 7A or 7C). The non-volatile memory (7, 7A or 7E) being coupled to the high-speed bus (3) via a second memory interface block (7B or 7D), is typically used for storing program code, e.g. administrative software, tailored security output responses, secret information like seed and key number(s) for the encryption, electronic certificates and fingerprint representations in the form of so-called minutiae. These fingerprint representations (master minutiae) are compared by the central processor (2) with master fingerprint representations stored in non-volatile memory (7, 7A or 7C). If a positive match is established, the chip may proceed with generating a secure key (SKG) either processed by a special algorithm on the central processor (2) based on a seed pre-stored in the non-volatile memory (7, 7A or 7C), or alternatively embedded in hardware block (8A). If the same SKG algorithm is run on two separate computers (e.g. a server (30) and the central processor (2) on the IC (1)) it will yield the same key, or password, when the identical algorithm on both of the two separate computers is fed with the identical seed. While the algorithms normally are assumed known, and may be the same for all computers in a network (N), or for a user sub-set, the seed is individual and secret and only known by the system administrator and the user. The SKG algorithm may be constructed to produce a pseudo-random identical key on both computers (2 and 30) that is either valid for a time |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| | frame, or alternatively changes for each transaction. This may require that the present key number as well as the past key number is stored in the non-volatile memory (7, 7A or 7C). Secret information such as seed, key numbers, IP address, etc. may either be scrambled by block (8) and stored on a regular Flash memory (7), or securely stored in SmartCard environments (7A or 7C). When a key is generated, as per above, the administrative software, stored in the non-volatile memory (7, 7A or 7C) and run on the central processor (2) may then combine information to be part of a secure communication between the IC (1) and the network server (30). The information to be encrypted may comprise User ID, password and other info. Encryption is performed in hardware blocks (8 or 8B or 8C). The rules of secure communication enforced on the prevailing network (N) are embedded in the administrative software executed on the central processor (2), and may be adapted to include PKI biometrics verification and hand-shake sequences. The encryption blocks (8, 8B or 8C) may also be used to encrypt general information transactions between the IC (1) and the network server (30), if desirable. Access to such extended encryption will be given to the user pending a positive match of his fingerprint with an authorized fingerprint representation by compact minutiae tables, pre-stored in the non-volatile memory (7, 7A or 7C). The IC (1) also comprises hardware and/or software required to supply output signals to a number of second interface blocks (9A, 9B, 9C or 9D) for transferring data to other devices and networks (N) external to the IC (1). In the present invention the IC (1) is adapted to provide data to the external access-limited apparatus, device or system. This second interface block may comprise hardware and software for supporting a USB (9A), Ethernet (9B), GPIO (9C), PCMCIA/UART (9D) and/or SmartCard (7C) interface. Except from the USB and the Ethernet interfaces, the second interface blocks are serviced by a bus (4) with lower bandwidth and capacity than the high-speed bus (3). The two buses (3 and 4) are connected by a bus bridge (11C). The hardware blocks that are not dependent on high speed are connected to the slower bus (4). The hardware blocks of the IC (1) are designed to perform their respective tasks in a minimum of time, and to interact with each other with a minimum of delays and queuing. In addition to the hardware blocks the central processor (2) executing the administrative software renders a high degree of flexibility in adapting the programming to secure communication with external devices and networks (N)." Mathiassen at [0050] |

68

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 14[a]. receive a series of entries of a biometric signal; | Mathiassen discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Mathiassen discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | Mathiassen discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 14[e]. receive the biometric signal; | Mathiassen discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Mathiassen discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Mathiassen discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

70

Exhibit C-9 (Mathiassen)

| Claim 15 | |
|---|---|
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Mathiassen discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Mathiassen discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | Mathiassen discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Mathiassen discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

71

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Mathiassen discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Mathiassen discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | Mathiassen discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Mathiassen discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 15[h]. receiving the transmitted secure access signal; and | Mathiassen discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Mathiassen discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Mathiassen discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Mathiassen discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| 15[l]. mapping said series into an instruction; and | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Mathiassen discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Mathiassen discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-9 (Mathiassen)

| | See Disclosure at Claim 1[c] |
|---|---|
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Mathiassen discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Mathiassen discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | Mathiassen discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Mathiassen discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

75

Exhibit C-9 (Mathiassen)

| | See Disclosure at Claim 1[k] |
|---|---|
| 16[f]. mapping said series into an instruction; and | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of | To the extent the preamble is limiting, Mathiassen discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: |

76

Exhibit C-9 (Mathiassen)

| | |
|---|---|
| receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | Mathiassen discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Mathiassen discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Mathiassen discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[d]. mapping said series into an instruction; and | Mathiassen discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

77

Exhibit C-9 (Mathiassen)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 17[e]. populating the database according to the instruction; | Mathiassen discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Mathiassen discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Mathiassen discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Mathiassen discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-9 (Mathiassen)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Mathiassen discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-10 (Steiner)

**Exhibit C-10**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**W.O. PATENT APP. WO2005043451A2 ("Steiner")**

W.O. PATENT APP. WO2005043451A2 Steiner ("Steiner") entitled "System for identification of a person" anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '705 Patent | Steiner |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Steiner discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The present application relates to a system for identification and authorisation of a person. In preferred embodiments the system utilises finger print scanning by means of capacitive, optical, optoelectronic, thermic, or other physical principles of measurement. The present application further relates to the use of the system in bank cards, proximity cards, |

1

Exhibit C-10 (Steiner)

| | identification terminals, admission control systems, smart cards, transaction cards, mobile phones, PDA's, and other types of equipment utilized for determining and confirming the identity of a person." Steinar at 1:1-8 |
|---|---|
| 1[a]. a memory comprising a database of biometric signatures; | Steiner discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: "The scanned finger print is analysed and compared to finger prints stored in a finger print database, containing finger prints of persons which have access to the system, or in the contrary, which do not have access to the system. If the finger print is identified positive, the finger print scanning system provides access to, for example, a building." Steinar at 1:17-21 "In another preferred embodiment of the system according to the invention, the additional personal information used in combination with the system is stored by means of any type of data memory applicable for the specific use, where there is a connection between the electronic identification and authorisation system and the additional personal information stored in the data memory." Steinar at 4:21-26 |
| 1[b]. a transmitter sub-system comprising: | Steiner discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: "One preferred method for use of the system according to the invention comprises the steps of coming within the range of a sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by |

Exhibit C-10 (Steiner)

| | |
|---|---|
| | tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed." <br> Steinar at 6:7-14 <br><br> "22. Method for use of the system in accordance with one or more of the previous claims in a proximity card for access to a building, where the proximity card comprises a unit for sending and transmission of secure radio signals, characterised by the following steps: coming within the range of the sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed." <br> Steinar at 17:18-29 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | Steiner discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "The invention concerns a system for identification of a person using a finger print scan in combination with a personal code in the form of a personal pattern which is tapped, touched, rubbed, or the like, onto the sensor surface of a finger print sensor." <br> Steinar at Abstract <br><br> "The present invention is characterised by that the system comprises a finger print sensor comprising a sensor surface divided into one or more sections, which is able to register a user specific code which is input with the finger to be scanned, onto the sensor surface of the finger print sensor." <br> Steinar at 3:5-8 |

Exhibit C-10 (Steiner)

<table>
<tr><td></td><td>

"One preferred embodiment of the system according to the invention comprises a finger print sensor comprising a sensor surface divided into one or more sections, which finger print sensor is adapted to register a user specific code which is input with the finger to be scanned, onto the sensor surface of the finger print sensor"
Steinar at 3:19-23

"One preferred method for use of the system according to the invention comprises the steps of coming within the range of a sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed."
Steinar at 6:7-14



**Cross-section of finger/sensor interface:**                                    1



| Maximum heat transfer across ridges | Minimum heat transfer across insulating air pockets in valleys |

Fig. 1
Steinar at Fig. 1

"Figure 1 shows an example of the sensor surface of a finger print sensor registering differences in heat transmission from the finger of a person to the sensor surface."

</td></tr>
</table>

4

Exhibit C-10 (Steiner)

|  | Steinar at 7:7-9 |
|---|---|
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Steiner discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The scanned finger print is analysed and compared to finger prints stored in a finger print database, containing finger prints of persons which have access to the system, or in the contrary, which do not have access to the system. If the finger print is identified positive, the finger print scanning system provides access to, for example, a building."<br>Steinar at 1:17-21<br><br>"US 6325285 B1 discloses a smart card with a fingerprint reader including a sensing surface. When an individual inserts the smart card into a write/read unit, the smart card creates an electrical representation of the individual's fingerprint and compares the acquired representation to a stored fingerprint representation in the card's memory. If the acquired representation matches the stored representation, the user is given access to information and/or services."<br>Steinar at 2:21-26<br><br>"The thermal sensor may, for certain applications, be based on the use of flexible polymer components as substitutes from conducting, semi-conducting, and isolating components of aluminium, silica, gallium, other metals or transition metals and their oxides and other chemical modifications.<br>The identification process utilises biometric principles where stored information about the finger surface's unique ridge and branching pattern (minutia) of one or several individuals are compared with the minutia pattern on the finger of the user in question, and where a minimum number of coinciding minutia (minutia hits) is used to establish identity."<br>Steinar at 12:1-9 |

5

Exhibit C-10 (Steiner)

| | |
|---|---|
| | To the extent that Plaintiff contends Steiner does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Setlak at Claim 1[d]<br>See, e.g., Schmitt at Claim 1[d]<br>See, e.g., Wuidart at Claim 1[d]<br>See, e.g., Hamid at Claim 1[d]<br>See, e.g., Ikegami at Claim 1[d]<br>See, e.g., Sands at Claim 1[d]<br>See, e.g., Howell at Claim 1[d]<br>See, e.g., Hoyos at Claim 1[d]<br>See, e.g., Mathiassen at Claim 1[d]<br>See, e.g., iPAQ 5400 series at Claim 1[d] |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | Steiner discloses a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"22. Method for use of the system in accordance with one or more of the previous claims in a proximity card for access to a building, where the proximity card comprises a unit for sending and transmission of secure radio signals, characterised by the following steps: coming within the range of the sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed."<br>Steinar at 17:18-29 |

6

Exhibit C-10 (Steiner)

| 1[f]. a receiver sub-system comprising: | Steiner discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Steinar does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[f]<br>See, e.g., Wuidart at Claim 1[f]<br>See, e.g., Hamid at Claim 1[f]<br>See, e.g., Ikegami at Claim 1[f]<br>See, e.g., Sands at Claim 1[f]<br>See, e.g., Howell at Claim 1[f]<br>See, e.g., Hoyos at Claim 1[f]<br>See, e.g., Mathiassen at Claim 1[f]<br>See, e.g., iPAQ 5400 series at Claim 1[f] |
| 1[g]. a receiver sub-system controller configured to: | Steiner discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Steinar does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[g]<br>See, e.g., Hamid at Claim 1[g]<br>See, e.g., Sands at Claim 1[g] |

7

Exhibit C-10 (Steiner)

| | |
|---|---|
| | See, e.g., Howell at Claim 1[g]<br>See, e.g., Hoyos at Claim 1[g]<br>See, e.g., Mathiassen at Claim 1[g]<br>See, e.g., iPAQ 5400 series at Claim 1[g] |
| 1[h]. receive the transmitted secure access signal; and | Steiner discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Steinar does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[h]<br>See, e.g., Wuidart at Claim 1[h]<br>See, e.g., Hamid at Claim 1[h]<br>See, e.g., Ikegami at Claim 1[h]<br>See, e.g., Sands at Claim 1[h]<br>See, e.g., Howell at Claim 1[h]<br>See, e.g., Hoyos at Claim 1[h]<br>See, e.g., Mathiassen at Claim 1[h] |
| 1[i]. provide conditional access to the controlled item dependent upon said information; | Steiner discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The scanned finger print is analysed and compared to finger prints stored in a finger print database, containing finger prints of persons which have access to the system, or in the |

8

Exhibit C-10 (Steiner)

| | |
|---|---|
| | contrary, which do not have access to the system. If the finger print is identified positive, the finger print scanning system provides access to, for example, a building." Steinar at 1:17-21 |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | Steiner discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Steiner discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"US 6373967 B2 discloses an entry device recognizes user's fingerprints which are entered as a sequence, where the fingerprints of different fingers must be entered in the proper sequence in order to be recognized by the system." Steinar at 2:11-14<br><br>"One preferred method for use of the system according to the invention comprises the steps of coming within the range of a sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed." Steinar at 6:7-14 |

9

Exhibit C-10 (Steiner)



Steinar at Fig. 3

Fig 4

Exhibit C-10 (Steiner)

<table>
<tr>
<td></td>
<td>Steinar at Fig. 4

"Figure 3 shows the creating of codes of variable complexity by sequentially increasing and decreasing pressure, and varying the duration (L, S) of increased pressure in long (dash) and short (dot) pressure applications.
Figure 4 shows the potential for an unlimited number of codes by increasing the number of pressure applications and by organising applications into sequences separated by intervals."
Steinar at 7:11-17

"Figure 12 shows that combined drawing pattern and dot/dash codes are easy to enter and memorise, and that an unlimited number of code patterns are available, from very simple to very complex."
Steinar at 8:3-5</td>
</tr>
<tr>
<td>1[l]. map said series into an instruction; and</td>
<td>Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

"In another preferred embodiment of the system according to the invention, the identity of the user is determined by the user specific code input by means of the sensor surface of the finger print sensor, in combination with any type of additional personal information used in combination with the system.
In another preferred embodiment of the system according to the invention, the additional personal information used in combination with the system is stored by means of any type of data memory applicable for the specific use, where there is a connection between the electronic identification and authorisation system and the additional personal information stored in the data memory.
In another preferred embodiment of the system according to the invention, the additional data memory is ROM memory programmed on a hard disk, a micro chip, an optical disk, or the like.</td>
</tr>
</table>

11

Exhibit C-10 (Steiner)

| | |
|---|---|
| | In another preferred embodiment of the system according to the invention, the sensor surface is physically, or by definition in a program, divided into one or more sections, which sections can be used for input of a pattern or sequence distributed over said number of sections." <br> Steinar at 4:17-33 <br><br> "In another preferred embodiment of the system according to the invention, a movement of a finger back and forth is considered continuous when the finger is in constant contact with the sensor surface under the movement, or when the time interval between two contacts is shorter than a time interval programmed in the system." <br> Steiner at 5:18-22 <br><br> "Although a segmented sensor surface provides many advantages, user specific patterns may also be drawn on a non-segmented surface, e.g. in the form of alphanumeric symbols. This requires the use of a pattern recognition program, which again puts a more heavy demand on the processing power of the device." <br> Steinar at 10:24-28 |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "The scanned finger print is analysed and compared to finger prints stored in a finger print database, containing finger prints of persons which have access to the system, or in the contrary, which do not have access to the system. If the finger print is identified positive, the finger print scanning system provides access to, for example, a building." <br> Steinar at 1:17-21 <br><br> "US 6325285 B1 discloses a smart card with a fingerprint reader including a sensing surface. When an individual inserts the smart card into a write/read unit, the smart card |

Exhibit C-10 (Steiner)

| | |
|---|---|
| | creates an electrical representation of the individual's fingerprint and compares the acquired representation to a stored fingerprint representation in the card's memory. If the acquired representation matches the stored representation, the user is given access to information and/or services."<br>Steinar at 2:21-26<br><br>"In another preferred embodiment of the system according to the invention, the identity of the user is determined by the user specific code input by means of the sensor surface of the finger print sensor, in combination with any type of additional personal information used in combination with the system.<br>In another preferred embodiment of the system according to the invention, the additional personal information used in combination with the system is stored by means of any type of data memory applicable for the specific use, where there is a connection between the electronic identification and authorisation system and the additional personal information stored in the data memory.<br>In another preferred embodiment of the system according to the invention, the additional data memory is ROM memory programmed on a hard disk, a micro chip, an optical disk, or the like.<br>In another preferred embodiment of the system according to the invention, the sensor surface is physically, or by definition in a program, divided into one or more sections, which sections can be used for input of a pattern or sequence distributed over said number of sections."<br>Steinar at 4:17-33<br><br>25. Use of the system in accordance with one or more of the claims 1 - 21, in bank cards, proximity cards, identification terminals, admission control systems, smart cards, transaction cards, mobile phones, PDA's, and other types of equipment utilized for determining and confirming the identity of a person.<br>Steinar at 19:1-5 |
| Claim 2 | |

13

Exhibit C-10 (Steiner)

| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, Steiner discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | Steiner discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>**Based on division of sensor surface into four segments:**<br><br><br><br>Movement of fingertip from B to D represents a simple, single-segment pattern. …<br><br>**Fig 10**<br>Steinar at Fig. 10 |

14

Exhibit C-10 (Steiner)

| | |
|---|---|
| | "Figure 10 shows a sensor surface divided into four sections, where for example the movement of a fingertip from B to D represents a simple, single-segment pattern, encoded BD."<br>Steinar at 7:30-32 |
| 2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | Steiner discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The scanned finger print is analysed and compared to finger prints stored in a finger print database, containing finger prints of persons which have access to the system, or in the contrary, which do not have access to the system. If the finger print is identified positive, the finger print scanning system provides access to, for example, a building."<br>Steinar at 1:17-21<br><br>"US 6325285 B1 discloses a smart card with a fingerprint reader including a sensing surface. When an individual inserts the smart card into a write/read unit, the smart card creates an electrical representation of the individual's fingerprint and compares the acquired representation to a stored fingerprint representation in the card's memory. If the acquired representation matches the stored representation, the user is given access to information and/or services."<br>Steinar at 2:21-26<br><br>"The thermal sensor may, for certain applications, be based on the use of flexible polymer components as substitutes from conducting, semi-conducting, and isolating components of aluminium, silica, gallium, other metals or transition metals and their oxides and other chemical modifications.<br>The identification process utilises biometric principles where stored information about the finger surface's unique ridge and branching pattern (minutia) of one or several individuals |

15

Exhibit C-10 (Steiner)

| | |
|---|---|
| | are compared with the minutia pattern on the finger of the user in question, and where a minimum number of coinciding minutia (minutia hits) is used to establish identity." Steinar at 12:1-9 |
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | Steiner discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Steinar does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
| Claim 4 | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Steiner discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"CA 2340501 discloses finger print or hand palm scanning, where finger or palm prints are consecutive print images where the subject exerts force, torque and/or rolling over an interval of time." Steinar at 2:27-29 |

Exhibit C-10 (Steiner)

| | To the extent that Plaintiff contends Steinar does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Wuidart at Claim 4<br>See, e.g., Hamid at Claim 4<br>See, e.g., Ikegami at Claim 4<br>See, e.g., Sands at Claim 4<br>See, e.g., Hoyos at Claim 4<br>See, e.g., Mathiassen at Claim 4 |
|---|---|
| Claim 6 | |
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, Steiner discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | Steiner discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"One preferred method for use of the system according to the invention comprises the steps of coming within the range of a sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by |

17

Exhibit C-10 (Steiner)

| | |
|---|---|
| | tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed." <br> Steinar at 6:7-14 <br><br> "Use of the system according to the invention can preferably be made in bank cards, proximity cards, identification terminals, admission control systems, smart cards, transaction cards, mobile phones, PDA's, and other types of equipment utilized for determining and confirming the identity of a person." <br> Steiner at 7:3-6 <br><br> "The position of the finger during a push or surface movement is established in the form of a calculated, geometrical centre or centre of gravity of the current finger/sensor interface. Identification/authentication by use of traditional transaction cards and proximity cards has certain disadvantages and limitations: - usually kept in wallet; not readily accessible; may be lost or stolen - proximity cards are powered by radio waves;" <br> Steiner at 12:19-26 <br><br> "22. Method for use of the system in accordance with one or more of the previous claims in a proximity card for access to a building, where the proximity card comprises a unit for sending and transmission of secure radio signals, characterised by the following steps: coming within the range of the sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed." <br> Steinar at 17:18-29 |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | Steiner discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

18

Exhibit C-10 (Steiner)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"One preferred method for use of the system according to the invention comprises the steps of coming within the range of a sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed.<br>Another preferred method for use of the system according to the invention comprises the steps of inserting the authorisation card partially into the card terminal, therewith indicating that input of the code is to start; carrying out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the card from the card terminal to indicate that the input of the code is completed.<br>Another preferred method for use of the system according to the invention comprises the steps of inserting the authorisation card partially into a cash dispenser, therewith indicating that automated bank services are required; choosing the planned service using the buttons on the cash dispenser; carrying out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code, when prompted to do so; removing the card from the card terminal when prompted to do so; make the choices necessary to complete the planned service, or abort the action."<br>Steinar at 6:7-28<br><br>"22. Method for use of the system in accordance with one or more of the previous claims in a proximity card for access to a building, where the proximity card comprises a unit for sending and transmission of secure radio signals, characterised by the following steps: coming within the range of the sender/transmitter of radio signals; placing the finger to be scanned onto the sensor surface of the finger print sensor on the proximity card to indicate that the user is ready to input his or her code; carry out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the finger from the sensor surface of the finger print sensor to indicate that the input of the code is completed."<br>Steinar at 17:18-29 |
|---|---|

Exhibit C-10 (Steiner)

| Claim 9 | |
|---|---|
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, Steiner discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |
| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | Steiner discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The present application further relates to the use of the system in bank cards, proximity cards, identification terminals, admission control systems, smart cards, transaction cards, mobile phones, PDA's, and other types of equipment utilized for determining and confirming the identity of a person."<br>Steinar at 1:5-8<br><br>"Another preferred method for use of the system according to the invention comprises the steps of inserting the authorisation card partially into the card terminal, therewith indicating that input of the code is to start; carrying out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code; removing the card from the card terminal to indicate that the input of the code is completed.<br>Another preferred method for use of the system according to the invention comprises the steps of inserting the authorisation card partially into a cash dispenser, therewith indicating that automated bank services are required; choosing the planned service using the buttons on the cash dispenser; carrying out the input of the personal code by tapping, moving, or rolling the pattern or frequency constituting the personal code, when prompted to do so; removing the card from the card terminal when prompted to do so; make the choices necessary to complete the planned service, or abort the action." |

20

Exhibit C-10 (Steiner)

| | Steinar at 6:15-28 |
|---|---|
| **Claim 10** | |
| 10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, Steiner discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[a]. a biometric sensor configured to receiving a biometric signal; | Steiner discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Steiner discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | Steiner discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

21

Exhibit C-10 (Steiner)

| | For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[e] |
|---|---|
| 10[d]. wherein the controller is further configured to: | Steiner discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Steiner discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: |

22

Exhibit C-10 (Steiner)

| | See Disclosure at Claim 1[m] |
|---|---|
| **Claim 11** | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Steiner discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | Steiner discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | Steiner discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-10 (Steiner)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
|---|---|
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | Steiner discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[d]. mapping said series into an instruction; and | Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 11[e]. populating the database according to the instruction; | Steiner discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | Steiner discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

24

Exhibit C-10 (Steiner)

| | |
|---|---|
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Steiner discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Steiner discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database | To the extent the preamble is limiting, Steiner discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-10 (Steiner)

| | |
|---|---|
| of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | Steiner discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | Steiner discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends Steiner does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 12[b]<br>See, e.g., Mathiassen at Claim 12[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, Steiner discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

26

Exhibit C-10 (Steiner)

|  | To the extent that Plaintiff contends Steiner does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Setlak at Claim 14[pre]<br>See, e.g., Schmitt at Claim 14[pre]<br>See, e.g., Wuidart at Claim 14[pre]<br>See, e.g., Hamid at Claim 14[pre]<br>See, e.g., Ikegami at Claim 14[pre]<br>See, e.g., Sands at Claim 14[pre]<br>See, e.g., Howell at Claim 14[pre]<br>See, e.g., Hoyos at Claim 14[pre]<br>See, e.g., Mathiassen at Claim 14[pre]<br>See, e.g., iPAQ 5400 series at Claim 14[pre] |
|---|---|
| 14[a]. receive a series of entries of a biometric signal; | Steiner discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | Steiner discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

27

Exhibit C-10 (Steiner)

| 14[c]. map said series into an instruction; | Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 14[d]. populate a database of biometric signatures according to the instruction; | Steiner discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | Steiner discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | Steiner discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

Exhibit C-10 (Steiner)

| | |
|---|---|
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | Steiner discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, Steiner discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | Steiner discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-10 (Steiner)

|  | See Disclosure at Claim 1[a] |
|---|---|
| 15[b]. a transmitter sub-system comprising: | Steiner discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | Steiner discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | Steiner discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Steiner discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[e] |

Exhibit C-10 (Steiner)

| | |
|---|---|
| 15[f]. a receiver sub-system comprising: | Steiner discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | Steiner discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |
| 15[h]. receiving the transmitted secure access signal; and | Steiner discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | Steiner discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | Steiner discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

31

Exhibit C-10 (Steiner)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
|---|---|
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Steiner discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 15[l]. mapping said series into an instruction; and | Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing | To the extent the preamble is limiting, Steiner discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, |

32

Exhibit C-10 (Steiner)

| secure access to a controlled item, wherein the transmitter sub-system comprises: | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 16[a]. a biometric sensor capable of receiving a biometric signal; | Steiner discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | Steiner discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | Steiner discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

33

Exhibit C-10 (Steiner)

| | |
|---|---|
| 16[d]. wherein the controller is further capable of: | Steiner discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | Steiner discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 16[f]. mapping said series into an instruction; and | Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |

34

Exhibit C-10 (Steiner)

| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | To the extent the preamble is limiting, Steiner discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
|---|---|
| 17[a]. populating the database of biometric signatures by: | Steiner discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | Steiner discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

35

Exhibit C-10 (Steiner)

| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | Steiner discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
|---|---|
| 17[d]. mapping said series into an instruction; and | Steiner discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 17[e]. populating the database according to the instruction; | Steiner discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | Steiner discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of | Steiner discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a |

Exhibit C-10 (Steiner)

| | |
|---|---|
| biometric signatures to thereby output an accessibility attribute; | matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | Steiner discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | Steiner discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

Exhibit C-11 (iPAQ 5400 Series System)

**Exhibit C-11**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**Hewlett Packard iPAQ 5400 Series System ("iPAQ 5400 Series System")**

Hewlett Packard iPAQ 5400 Series System ("iPAQ 5400 Series System") anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendants' present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

System:

- HP iPAQ 5450
- HP invent, reference guide, hp iPAQ Pocket PC h5400 series ("iPAQ 5400 series Guide"), Document Part Number 281984-001.  September 2002.
- White Paper "biometric security with the iPAQ Pocket PC h5400 series" ("White Paper") ©2003 Hewlett-Packard Company First Edition January 2003 Part Number 5981-4266EN
- QuickSpecs hp iPAQ Pocket PC h5400 Series Overview. ("QuickSpecs") DA-11427 World Wide — Version 2 — December 12, 2002

1

Exhibit C-11 (iPAQ 5400 Series System)

| '705 Patent | iPAQ 5400 Series System |
|---|---|
| Claim 1 | |
| 1[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>HP iPAQ 5450 |

2

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "You can increase the security of the data stored in your iPAQ Pocket PC by using the iPAQ Fingerprint Reader. This feature allows you to require a PIN, password, and/or fingerprint be entered before you can log on to your iPAQ Pocket PC."<br>iPAQ 5400 series Guide at 5-1<br><br>"Biometric technology is the latest trend in security. From securing access to a building or preventing unauthorized logons, this technology and the software designed for it, work together to provide an extra layer of security for your iPAQ Pocket PC h5400 Series. This easy-to-implement security capability goes beyond requiring a simple logon name and password to gain access to the data on your iPAQ Pocket PC.<br><br>This paper discusses the biometric technology, notably the fingerprint, and how it is used with the iPAQ Pocket PC. The biometric software for administering this security feature  is also discussed."<br>White Paper at 1<br><br>"Standard Features<br>MODELS<br>      iPAQ Pocket PC h5450 – 48-MB ROM/64-MB RAM WLAN/BT/Biometrics/SD<br>         264493-001 – U.S. Commercial"<br>QuickSpecs at 2 |
| 1[a]. a memory comprising a database of biometric signatures; | iPAQ 5400 Series System discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br>"Back up Files, Registry, and Databases<br>You can back up files, registry, and databases. A backup file can<br>be saved to any media (for example, storage card or hard drive)<br>that you would use for storing any other file. |

3

Exhibit C-11 (iPAQ 5400 Series System)

| | To back up files, registry, and databases:<br>1. From the Start menu, tap Programs.<br>2. Tap iPAQ Backup.<br>3. Tap the check boxes to select files, folders, or databases from the tree view.<br><br><br><br>4. Tap the … button."<br>iPAQ 5400 series Guide at 2-18<br><br>"CAUTION: Because most of the applications and data you install on your iPAQ Pocket PC are held in memory (RAM), you will need to reinstall them if the battery completely discharges."<br>iPAQ 5400 series Guide at 2-35<br><br>"Work with Fingerprints<br>iPAQ Fingerprint Reader suggests fingers for you to use during the swiping activity. You can select a different finger at any time. It is recommended that you enroll at least two fingers (index fingers are suggested). To enroll a fingerprint, you must take between two and eight quality finger swipes."<br>iPAQ 5400 series Guide at 5-5 |
| --- | --- |

4

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "Set "PIN OR fingerprint" for Logon<br>In this mode, you are required to enter a 4-digit PIN or fingerprint to logon.<br>1. From the Start menu, tap Settings, then Password.<br>2. Select "PIN OR fingerprint" from the down arrow list.<br>3. Tap 4 digits in the PIN field.<br>4. Select from the down arrow list the length of time the iPAQ Pocket PC can remain unused before you must reenter the PIN.<br>5. Tap OK or ENTR.<br>6. Tap the finger to enroll.<br>7. Swipe the selected finger, as instructed.<br>✎For more information on finger swiping, see the section "Enroll a Fingerprint" or tap the Training button.<br>8. Tap OK.<br>9. Tap Yes to save changes."<br>*iPAQ 5400 series Guide at 5-13*<br><br>"Set "PIN AND fingerprint" for Logon<br>In this mode, you are required to enter both a PIN and a fingerprint to logon.<br>1. From the Start menu, tap Settings, then Password.<br>2. Select "PIN AND fingerprint" from down arrow list.<br>3. Select from the down arrow list the length of time the iPAQ Pocket PC can remain unused before you must reenter the PIN.<br>4. Tap 4 digits in the PIN field.<br>5. Tap OK or ENTR.<br>6. Tap the finger to enroll.<br>7. Swipe the selected finger, as instructed.<br>✎For more information on finger swiping, see the section "Enroll a fingerprint" or tap the Training button.<br>8. Tap OK.<br>9. Tap Yes to save changes.<br>*iPAQ 5400 series Guide at 5-14*<br><br>"Set "Fingerprint-only" for Logon |

5

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | In this mode, you are required to enter a successful fingerprint to logon.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features.<br>1. From the Start menu, tap Settings, then Password.<br>2. Select "fingerprint-only" from the down arrow list.<br>✎ If you are using ActiveSync, you must enter a password on your personal computer to begin synchronization.<br>3. Tap the finger to enroll.<br>4. Swipe the selected finger as instructed.<br>✎ For more information on finger swiping, see the section "Enroll a Fingerprint" or tap the Training button.<br>5. Tap OK.<br>6. Tap Yes to save changes."<br>iPAQ 5400 series Guide at 5-16 to 5-17<br><br>"how it works<br>Biometric security on your iPAQ Pocket PC works in two basic steps: fingerprint enrollment and fingerprint verification. Fingerprint enrollment involves fingerprint acquisition and image reconstruction, fingerprint image processing and feature extraction, fingerprint image quality evaluation, and template generation. Fingerprint verification involves fingerprint acquisition and image reconstruction, fingerprint image processing and feature extraction, fingerprint image quality evaluation, template generation, and template matching.<br><br>enrollment<br>Enrollment is the process of collecting, processing, and registering reference versions of the fingerprints of the person authorized to use the secured device, in this case, the iPAQ Pocket PC. This is the initial step. The user is guided through the process for selecting one or more fingers to enroll and swiping the selected fingers across the FingerChip sensor to capture associated fingerprint images. Enrollment assesses the quality of the captured images and directs the user, as required, to repeat the swiping activity until adequate images |

Exhibit C-11 (iPAQ 5400 Series System)

| | are obtained. This process may require several attempts to ensure good prints are captured. A dataset is extracted from the images for each finger enrolled. These datasets are the reference templates used to ensure that only the authorized user is allowed to logon to your iPAQ Pocket PC during verification. The iPAQ Pocket PC enrollment process includes user training designed to teach proper swiping of fingers across the FingerChip sensor.<br><br>These templates are stored locally on the iPAQ Pocket PC (in a BioSwipe.dat file) and are encrypted. The file is only decrypted when used by the BioSwipe software. Template coding is a Cogent private format. Only Cogent software can read and use the template data. The encryption code is also private. Only BioSwipe or Cogent software can decrypt the data."<br>White Paper at 4<br><br>"authentication software security levels<br>The biometric software called BioSwipe is based on capabilities developed by Cogent for use in criminal Automatic Fingerprint Identification Systems that require highly accurate capabilities for performing 1-to-many searches of very large databases. The Cogent algorithms analytically model natural irregularities that define uniqueness in fingerprints, providing the scientific foundation for establishing positive identification. BioSwipe adapts the Cogent algorithms to the one-to-few verification requirements of the iPAQ Pocket PC. In establishing authentication, the biometric software can be set up to operate in three security level environments: Regular, High, and Extra High. These security levels are based on expected false rejection rates (FRR), false acceptance rates (FAR), and enrollment strategies (see the table that follows). As the security level rises, so does the intensity of the parameters that are used for enrolling a fingerprint and for achieving a match."<br>White Paper at 6 |
|---|---|
| 1[b]. a transmitter sub-system comprising: | iPAQ 5400 Series System discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)



## Front Panel

"Front Panel Components
1 Speaker: Alarms, voice, music
2 Power Indicator:
      amber flash = charging
      amber solid = charged
      green flash = alarm, calendar, event
3 Stylus: Push to eject, push to lock
4 Power Button: Turn unit on and off
5 Color Display: High contrast color screen
6 *Inbox Button: Access your Inbox for sending and receiving e-mail
7 *iTask Button: Open, close, and switch between applications, run utilities, and change
      settings
8 5-Way Navigation Button: Scroll through a list and push to select (similar to using a
      joystick)
9 Fingerprint Reader: Biometric enhanced security"

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | iPAQ 5400 series Guide at 1-4<br><br>**Top Panel**<br><br><br><br>"Top Panel Components<br>1 Antenna: Transmits and receives signals<br>2 Stylus: Push to eject, push to lock<br>3 Infrared/Universal Remote: Beams information to/from other infrared-enabled devices<br>4 Secure Digital I/O (SDIO) Expansion Slot: Supports Secure Digital (SD) storage and expansion cards"<br>iPAQ 5400 series Guide at 1-6<br><br>"Your HP iPAQ Pocket PC h5400 Series can connect to an 802.11b Wireless LAN (WLAN) or connect directly to other WLAN-enabled devices."<br>iPAQ 5400 series Guide at 3-1 |

Exhibit C-11 (iPAQ 5400 Series System)



iPAQ 5400 series Guide at 5-3

"Logon Using a PIN or Fingerprint
You must enter a PIN or swipe the fingerprint you entered during setup. iPAQ Fingerprint Reader remembers your logon preference.
The next time you logon, the PIN or Fingerprint window corresponding to your last logon will be displayed.
1. Turn on your iPAQ Pocket PC.
2. Enter your 4-digit PIN or tap the Fingerprint tab to swipe your enrolled finger.
✎ If your fingerprint was of poor quality, iPAQ Fingerprint Reader will ask you to swipe it again. If the quality was good, but there was not a match, the message "No match" will be displayed."
iPAQ 5400 series Guide at 5-18

10

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "Logon Using a Fingerprint Only<br>You must successfully swipe the fingerprint you entered during setup.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features. The default number of attempts is six. You can select the maximum number of attempts for your security needs.<br>1. Turn on your iPAQ Pocket PC.<br>2. Swipe your enrolled finger."<br>iPAQ 5400 series Guide at 5-20<br><br>"Bluetooth Specifications*<br>    Technology high-speed, low-power, short-range<br>    Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>    System interface 921k high-speed UART processor interface<br>    User Interface Bluetooth Manager<br>    Operating system support Microsoft Pocket PC and Pocket PC 2002<br>    Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>    Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>    Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6 |
| 1[c]. a biometric sensor configured to receive a biometric signal; | iPAQ 5400 Series System discloses a biometric sensor configured to receive a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)



HP iPAQ 5450

## Front Panel



"Front Panel Components
1 Speaker: Alarms, voice, music
2 Power Indicator:

12

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr><td></td><td>

amber flash = charging
amber solid = charged
green flash = alarm, calendar, event
3 Stylus: Push to eject, push to lock
4 Power Button: Turn unit on and off
5 Color Display: High contrast color screen
6 *Inbox Button: Access your Inbox for sending and receiving e-mail
7 *iTask Button: Open, close, and switch between applications, run utilities, and change settings
8 5-Way Navigation Button: Scroll through a list and push to select (similar to using a joystick)
9 Fingerprint Reader: Biometric enhanced security"
iPAQ 5400 series Guide at 1-4



</td></tr>
</table>

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | iPAQ 5400 series Guide at 5-3<br><br>"Logon Using a PIN or Fingerprint<br>You must enter a PIN or swipe the fingerprint you entered during setup. iPAQ Fingerprint Reader remembers your logon preference.<br>The next time you logon, the PIN or Fingerprint window corresponding to your last logon will be displayed.<br>1. Turn on your iPAQ Pocket PC.<br>2. Enter your 4-digit PIN or tap the Fingerprint tab to swipe your enrolled finger.<br>✎ If your fingerprint was of poor quality, iPAQ Fingerprint Reader will ask you to swipe it again. If the quality was good, but there was not a match, the message "No match" will be displayed."<br>iPAQ 5400 series Guide at 5-18<br><br>"overview<br>Biometrics is the process of measuring a physical or behavioral characteristic of a person and using that measurement as a basis for later identifying that same person. This measurement could be a face or eye measurement or in the case of the iPAQ Pocket PC, the fingerprint. Two things are essential to the biometrics application for the iPAQ. One is collecting biometric information like fingerprint images. The other is classifying, analyzing, and identifying biometric data. The iPAQ Pocket PC h5400 Series is enabled with fingerprint capture technology known as the FingerChip that was developed by Atmel Corporation, a leader in the design and development of biometric technology. The iPAQ Pocket PC fingerprint identification technology is provided by Cogent Systems, Inc., a global leader in automatic fingerprint identification system."<br>White Paper at 3<br><br>"Enrollment is the process of collecting, processing, and registering reference versions of the fingerprints of the person authorized to use the secured device, in this case, the iPAQ Pocket PC. This is the initial step. The user is guided through the process for selecting one or more fingers to enroll and swiping the selected fingers across the FingerChip sensor to capture associated fingerprint images. Enrollment assesses the quality of the captured images and directs the user, as required, to repeat the swiping activity until adequate images |

14

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | are obtained. This process may require several attempts to ensure good prints are captured. A dataset is extracted from the images for each finger enrolled. These datasets are the reference templates used to ensure that only the authorized user is allowed to logon to your iPAQ Pocket PC during verification. The iPAQ Pocket PC enrollment process includes user training designed to teach proper swiping of fingers across the FingerChip sensor."<br>White Paper at 4<br><br>"fingerprint acquisition and image reconstruction<br>As mentioned earlier, scanned thermal imaging works because the fingerprint is made up of ridges and valleys that each emits different thermal readings. Pyro-electric material converts the differences in these temperatures into corresponding voltages. Since fingerprints are unique, so to are the voltages that are derived from them.<br>The question now becomes how best to capture this thermal fingerprint image? The process that works best for this image capture is known as image scanning. With this process, a rectangular window (with a width the size of a finger) is used. The fingertip is swept vertically over this sensor window and the image is recorded in sections and then reconstructed by software."<br>White Paper at 4<br><br>"Standard Features<br>Biometric Fingerprint Reader<br>      Thermal Silicon Sensor - measures the temperature differential between the skin ridges and the air caught in the fingerprint valleys.<br>      280 pixel image width<br>      500 dpi pixel pitch<br>      Small sensor size (0.4 x 14 mm) optimized for handheld devices.<br>      Full fingerprint image is captured by sweeping the finger across the sensor area<br>      High quality image even with dry or difficult fingerprints<br>      Self-cleaning - no latent print is left on the imaging surface<br>--------------------------------------------------------------------------------<br>Operating System      Microsoft Pocket PC 2002"<br>QuickSpecs at 7 |

15

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | White Paper at p. 7:<br>"The iPAQ Pocket PC h5400 Series, combined with the FingerChip technology and the BioSwipe software, provides you with a complete biometric option for securing your data." |
| 1[d]. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | iPAQ 5400 Series System discloses a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"System Specifications<br>Specifications<br>System Feature        hp iPAQ h5400 Series<br>Processor        Intel PXA250 (400 MHz)<br>Memory        64 MB SDRAM or greater"<br>iPAQ 5400 series Guide at B-1<br><br>"QuickSpecs        hp iPAQ Pocket PC h5400 Series<br>Standard Features<br>Processor        400 MHz Intel PXA250 Application Processor"<br>QuickSpecs at 3<br><br>"Logon Using a PIN or Fingerprint<br>You must enter a PIN or swipe the fingerprint you entered during setup. iPAQ Fingerprint Reader remembers your logon preference.<br>The next time you logon, the PIN or Fingerprint window corresponding to your last logon will be displayed.<br>1. Turn on your iPAQ Pocket PC.<br>2. Enter your 4-digit PIN or tap the Fingerprint tab to swipe your enrolled finger.<br>✎If your fingerprint was of poor quality, iPAQ Fingerprint Reader will ask you to swipe it again. If the quality was good, but there was not a match, the message "No match" will be displayed." |

Exhibit C-11 (iPAQ 5400 Series System)

| | iPAQ 5400 series Guide at 5-18 |
|---|---|
| | "Logon Using a Fingerprint Only<br>You must successfully swipe the fingerprint you entered during setup.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features. The default number of attempts is six. You can select the maximum number of attempts for your security needs.<br>1. Turn on your iPAQ Pocket PC.<br>2. Swipe your enrolled finger."<br>iPAQ 5400 series Guide at 5-20<br><br>"verification<br>Verification is the process of collecting, processing, and comparing a person's fingerprint with the fingerprints on record to confirm identification or deny access. Based on the designated authentication mode, the user will swipe an enrolled finger across the FingerChip sensor to capture the associated fingerprint image. Verification assesses the quality of the captured image and, if necessary, directs the user, to repeat the swiping activity to ensure that a good quality image is obtained. A dataset is extracted from the fingerprint, designated the sample template. The sample template is matched against the reference templates stored on your iPAQ Pocket PC. The result of the match is used by Pocket PC authentication to permit or deny access as appropriate."<br>White Paper at 4<br><br>"template matching<br>During template matching, the sample template is compared to the set of reference templates stored on your iPAQ Pocket PC. Because a 100% exact match is unlikely due to various factors, a probability is established. This is done by using a matching algorithm that tests various orientations of the extracted image and the degree of correspondence of the minutiae. The algorithm assigns a numerical score to the match. This score is then compared to a pre-established setting. If the numerical score is above the threshold, then a match is declared. Otherwise, logon fails." |

17

Exhibit C-11 (iPAQ 5400 Series System)

| | White Paper at 5 |
|---|---|
| | White Paper at p. 7: "The iPAQ Pocket PC h5400 Series, combined with the FingerChip technology and the BioSwipe software, provides you with a complete biometric option for securing your data." |
| 1[e]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | iPAQ 5400 Series System discloses ]. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Encryption (WEP) A set of security services used to protect 802.11 networks from unauthorized access."<br>iPAQ 5400 series Guide at 3-2<br><br>"Get Acquainted<br>With WLAN, you can:<br>■ Access the Internet<br>■ Send and receive e-mail<br>■ Access corporate network information<br>■ Use virtual private networks (VPN) for secure remote access<br>■ Use hot spots for wireless connectivity"<br>iPAQ 5400 series Guide at 3-2<br><br>"Create Profiles with Security<br>You can use encryption to increase security to prevent data theft. This device supports open system (no encryption), 64-bit shared key, and 128-bit shared key encryption.<br>The wireless access point that you are connecting to must use the same encryption to receive and transmit data.<br>To create profiles with security:<br>1. Follow steps 1 through 6 in the section "Create Profiles without Security." |

18

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | 2. Tap Next.<br>3. Select "64" or "128" bit from the Wireless Encryption down arrow list.<br>4. Select "hexadecimal" or "alphanumeric" from the WEP Keys down arrow list."<br>iPAQ 5400 series Guide at 3-7<br><br>"Require a Passkey or Bond to Access Services<br>To establish a connection, the other device must have a passkey or an established bond for added security. You can add data encryption to this type of security.<br>A passkey is a code you enter to authenticate connections requested by other devices. The passkey must be known and used by both parties or the connection will not be allowed.<br><br>{table}<br><br>To require a passkey or bond:<br>1. From the Today screen, tap the Bluetooth icon.<br>2. Tap the tab for the service you want to enable: File Transfer, Information Exchange, Serial Port, Dial-up Networking, Audio Gateway, or Personal Network Server.<br>3. Select Authentication (Passkey) required.<br>4. Select Encryption Required if you want to require all data exchanged between the devices to be encrypted.<br>5. Tap OK."<br>iPAQ 5400 series Guide at 4-17<br><br>"QuickSpecs hp iPAQ Pocket PC h5400 Series<br>Standard Features<br>WLAN Specifications*<br>{wlan table} |

Table embedded:

| If... | Then... |
|---|---|
| Both devices successfully enter the known passkey | A bond is created between the devices. You do not have to enter the passkey again to exchange information. |
| You want to require a passkey exchange each time you transmit information | You must remove the bond ("Unpair Devices") prior to establishing the connection. |

WLAN table:

| Radio Specifications | RF Network Standard | IEEE 802 Part 11b (802.11b) |
|---|---|---|
| | Frequency Band | 2,4000 to 2.4835 GHz |
| | | 2,4465 to 2.4835 GHz (France) |
| | | 2,4000 to 2,4697 GHz (Japan) |

19

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr><td rowspan="8"></td><td>Number of Selectable<br>Subchannels</td><td>United States (FCC)   11<br>France (FR)           4<br>Japan (JP)          14<br>Other countries (ETSI)  13</td></tr>
<tr><td>Data Rates</td><td>1, 2, 5.5, 11 Mbps</td></tr>
<tr><td>Antenna type</td><td>High performance ½<br>   wavelength stub, connected<br>   via micro strip touch pad</td></tr>
<tr><td>WEP Security</td><td>64 bit encryption keys<br>   compliant to IEEE 802.11<br>128 bit encryption key<br>   compliant to IEEE 802.11"</td></tr>
<tr><td colspan="2">QuickSpecs at 5<br><br>"Bluetooth Specifications*<br>     Technology high-speed, low-power, short-range<br>     Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>     System interface 921k high-speed UART processor interface<br>     User Interface Bluetooth Manager<br>     Operating system support Microsoft Pocket PC and Pocket PC 2002<br>     Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>     Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>     Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[e]<br>See, e.g., Wuidart at Claim 1[e]<br>See, e.g., Hamid at Claim 1[e]</td></tr>
</table>

20

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | See, e.g., Mathiassen at Claim 1[e]<br>See, e.g., Steiner at Claim 1[e] |
| 1[f]. a receiver sub-system comprising: | iPAQ 5400 Series System discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>**Top Panel**<br><br><br><br>"Top Panel Components<br>1 Antenna: Transmits and receives signals<br>2 Stylus: Push to eject, push to lock<br>3 Infrared/Universal Remote: Beams information to/from other infrared-enabled devices<br>4 Secure Digital I/O (SDIO) Expansion Slot: Supports Secure Digital (SD) storage and expansion cards"<br>iPAQ 5400 series Guide at 1-6<br><br>"Your HP iPAQ Pocket PC h5400 Series can connect to an 802.11b Wireless LAN (WLAN) or connect directly to other WLAN-enabled devices."<br>iPAQ 5400 series Guide at 3-1 |

21

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "The result of the match is used by Pocket PC authentication to permit or deny access as appropriate."<br>White Paper at 4<br><br>"Bluetooth Specifications*<br>      Technology high-speed, low-power, short-range<br>      Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>      System interface 921k high-speed UART processor interface<br>      User Interface Bluetooth Manager<br>      Operating system support Microsoft Pocket PC and Pocket PC 2002<br>      Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>      Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>      Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6 |
| 1[g]. a receiver sub-system controller configured to: | iPAQ 5400 Series System discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"QuickSpecs                  hp iPAQ Pocket PC h5400 Series<br>Standard Features<br>Processor               400 MHz Intel PXA250 Application Processor<br>Memory               64-MB SDRAM; 48-MB Flash ROM Memory<br>Input Method          Handwriting recognition, soft keyboard, character<br>                    recognition, voice recorder, inking<br>Interfaces           3-mode alarm notification<br>                 Vibrate, Flashing green LED, tone, pop-up message<br>                 Charge active: flashing / solid amber LED<br>                 Bluetooth active: flashing /solid blue LED<br>                 WLAN active: Flashing green LED<br>                 WLAN enabled, searching, but not |

22

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | connected: flashing amber LED<br>Cradle Interfaces      Connector      1<br>           Cable           1 USB or Serial cable connects to PC<br>DC Jack connector 1<br>    For AC Adapter<br>Stylus Holder       2 holes, on left and right front<br>Stabilizing Tab Release Button    2  Tabs engage the<br>                                sides of Pocket PC when no<br>                                Expansion Pack is in use<br>            Base extension           An extendable base which<br>                           can be used to raise cradle to enhance<br>                         biometric fingerprint swipe motion<br>                         while in cradle"<br>QuickSpecs at 3<br><br>"Bluetooth Specifications*<br>    Technology high-speed, low-power, short-range<br>    Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>    System interface 921k high-speed UART processor interface<br>    User Interface Bluetooth Manager<br>    Operating system support Microsoft Pocket PC and Pocket PC 2002<br>    Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>    Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>    Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6 |
| 1[h]. receive the transmitted secure access signal; and | iPAQ 5400 Series System discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr><td></td><td>

"Encryption (WEP) A set of security services used to protect 802.11 networks from unauthorized access."
iPAQ 5400 series Guide at 3-2

"Create Profiles with Security
You can use encryption to increase security to prevent data theft. This device supports open system (no encryption), 64-bit shared key, and 128-bit shared key encryption.
The wireless access point that you are connecting to must use the same encryption to receive and transmit data.
To create profiles with security:
1. Follow steps 1 through 6 in the section "Create Profiles without Security."
2. Tap Next.
3. Select "64" or "128" bit from the Wireless Encryption down arrow list.
4. Select "hexadecimal" or "alphanumeric" from the WEP Keys down arrow list."
iPAQ 5400 series Guide at 3-7

"Require a Passkey or Bond to Access Services
To establish a connection, the other device must have a passkey or an established bond for added security. You can add data encryption to this type of security.
A passkey is a code you enter to authenticate connections requested by other devices. The passkey must be known and used by both parties or the connection will not be allowed.

| If... | Then... |
|---|---|
| Both devices successfully enter the known passkey | A bond is created between the devices. You do not have to enter the passkey again to exchange information. |
| You want to require a passkey exchange each time you transmit information | You must remove the bond ("Unpair Devices") prior to establishing the connection. |

To require a passkey or bond:
1. From the Today screen, tap the Bluetooth icon.
2. Tap the tab for the service you want to enable: File Transfer, Information Exchange, Serial Port, Dial-up Networking, Audio Gateway, or Personal Network Server.
3. Select Authentication (Passkey) required.

</td></tr>
</table>

24

Exhibit C-11 (iPAQ 5400 Series System)

| | 4. Select Encryption Required if you want to require all data exchanged between the devices to be encrypted.<br>5. Tap OK."<br>iPAQ 5400 series Guide at 4-17<br><br>"Logon Using PIN, Passwords, and Fingerprints<br>    If you have set up a PIN, password, and/or fingerprint for logon, you must enter the correct PIN, password, and/or successfully swipe the correct fingerprint to use your iPAQ Pocket PC. When you power on your iPAQ Pocket PC, you will be required to enter your logon information on the PIN, Password and/or Fingerprint screen."<br>iPAQ 5400 series Guide at 5-17<br><br>"The result of the match is used by Pocket PC authentication to permit or deny access as appropriate."<br>White Paper at 4<br><br>"Bluetooth Specifications*<br>    Technology high-speed, low-power, short-range<br>    Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>    System interface 921k high-speed UART processor interface<br>    User Interface Bluetooth Manager<br>    Operating system support Microsoft Pocket PC and Pocket PC 2002<br>    Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>    Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>    Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[h] |

25

Exhibit C-11 (iPAQ 5400 Series System)

| | See, e.g., Wuidart at Claim 1[h]<br>See, e.g., Hamid at Claim 1[h]<br>See, e.g., Ikegami at Claim 1[h]<br>See, e.g., Sands at Claim 1[h]<br>See, e.g., Howell at Claim 1[h]<br>See, e.g., Hoyos at Claim 1[h]<br>See, e.g., Mathiassen at Claim 1[h] |
|---|---|
| 1[i]. provide conditional access to the controlled item dependent upon said information; | iPAQ 5400 Series System discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Set Security Options<br>You can set the Fingerprint Reader security on your iPAQ Pocket PC to one of three levels:<br>　■ Regular (default)<br>　■ High<br>　■ Extra High<br>It is recommended that you use the Regular security setting. You can set the maximum number of attempts allowed for logging on to your iPAQ Pocket PC."<br>iPAQ 5400 series Guide at 5-20<br><br>"Understand Profiles<br>You can use profiles to quickly enable selected personal settings in multiple environments."<br>iPAQ 5400 series Guide at 4-8<br><br>"Using the Universal Remote<br>You can use Nevo software to turn your iPAQ Pocket PC into a universal remote control. With the universal remote control, you can:<br>■ Operate infrared supported office, entertainment, and home automation equipment<br>■ Set up favorite channels<br>■ Share the remote with others |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | ■ Create unique personal settings and profiles"<br>iPAQ 5400 series Guide at 10-1<br><br>"Use the Configuration Icons<br>You can use the configuration icons to customize, select user menus, or select rooms. The configuration icons are located at the bottom of the main Nevo screen.<br>      To customize the home, screens, or favorites, tap the Customize icon. This allows additional customizing for controlling equipment in different rooms. You can add, edit, and delete devices and activities.<br>      To specify user defined favorites or device settings, tap the User icon. You can add, edit, and delete user settings.<br>      To select a device in a specific room, tap the Room icon. You can add, edit, and delete room assignments."<br>iPAQ 5400 series Guide at 10-2<br><br>"Set Up User Profile<br>You can set up multiple users for the universal remote. Each user can have his/her own personal preferences and favorites.<br>To set up a user profile:<br>1. From the Start menu, tap Nevo.<br>2. Tap the User icon, the Add User.<br>3. Tap Next.<br>4. Type a name for the user, then tap Next."<br>iPAQ 5400 series Guide at 10-17<br><br>"verification<br>Verification is the process of collecting, processing, and comparing a person's fingerprint with the fingerprints on record to confirm identification or deny access. Based on the designated authentication mode, the user will swipe an enrolled finger across the FingerChip sensor to capture the associated fingerprint image. Verification assesses the quality of the captured image and, if necessary, directs the user, to repeat the swiping activity to ensure that a good quality image is obtained. A dataset is extracted from the fingerprint, designated the sample template. The sample template is matched against the |

27

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | reference templates stored on your iPAQ Pocket PC. The result of the match is used by Pocket PC authentication to permit or deny access as appropriate."<br>White Paper at 4<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 1[i]<br>See, e.g., Hamid at Claim 1[i]<br>See, e.g., Sands at Claim 1[i]<br>See, e.g., Howell at Claim 1[i]<br>See, e.g., Hoyos at Claim 1[i]<br>See, e.g., Mathiassen at Claim 1[i]<br>See, e.g., Steiner at Claim 1[i] |
| 1[j]. wherein the transmitter sub-system controller is further configured to: | iPAQ 5400 Series System discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 1[k]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | iPAQ 5400 Series System discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)



HP iPAQ 5450

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | <br><br>HP iPAQ 5450<br><br>"To learn to enroll fingerprints:<br>✎.You can tap OK at the top of the screen at anytime to exit the training.<br>1. From the Start menu, tap Settings, then Password.<br>2. Select PIN or fingerprint from the down arrow list to access<br>training. |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | <br>3. Tap 4 digits in the PIN field.<br>4. Tap OK or ENTR.<br>5. Tap Yes to begin Fingerprint Reader training. |

31

Exhibit C-11 (iPAQ 5400 Series System)



6. Read the swiping tips.
7. Tap the double arrows button.
8. Follow the on-screen demonstration to swipe a finger.

32

Exhibit C-11 (iPAQ 5400 Series System)

|  | ✎ If the finger swipe is acceptable, the oval frame turns green and the message "Good! Please continue" displays. If the finger swipe is unacceptable, the oval frame turns red and the message "Poor quality. Try again!" displays.<br>9. Repeat the finger swiping exercise as prompted until you have completed six out of eight successful swipes.<br>✎ You must perform six acceptable swipes to continue the training.<br>10. Tap the double arrows button to continue the Self-test.<br>11. Perform eight finger swipes in the Self-test.<br>✎ You must perform seven acceptable swipes to complete the training.<br>12. Tap Finish to end the training.<br>13. Tap OK to exit or tap a finger to enroll.<br><br><br><br>Work with Fingerprints<br>iPAQ Fingerprint Reader suggests fingers for you to use during the swiping activity. You can select a different finger at any time. It is recommended that you enroll at least two fingers (index fingers are suggested). To enroll a fingerprint, you must take between two and eight quality finger swipes.<br><br>Enroll a Fingerprint |

33

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr><td></td><td>

The Fingerprint screen uses color coding to display the status of your fingerprint swipe.

Fingerprint Status

| If the color around the oval is... | Then... |
| --- | --- |
| Blue | No fingerprint has been taken for the finger. |
| Green | The fingerprint swipe was good quality. |
| Red | The fingerprint swipe was poor quality. |

To enroll a fingerprint:
1. From the Start menu, tap Settings, then Password.
2. Select the option from the down arrow list that you choose for your security setting.



3. Enter either your PIN or password, when prompted.
4. On the Fingerprint screen, tap the finger on the display you want to enroll.
5. Swipe the selected finger, as instructed.
</td></tr>
</table>

Exhibit C-11 (iPAQ 5400 Series System)



✎ It is recommended that you gently swipe your finger downward across the sensor. You should begin the swipe at the first joint of your finger and continue downward with a smooth slow motion.
If you need additional assistance at any time, tap the Training button.
6. Monitor the status to see if your fingerprint was correctly swiped.

✎ If OK, the perimeter of the oval turns green and a message displays indicating the quality was good. If poor quality, the perimeter of the oval turns red and a message displays.
7. Repeat steps 5 and 6 to acquire a sufficient number of quality swipes (notice the progress bar) to enroll the print.

35

Exhibit C-11 (iPAQ 5400 Series System)



8. Tap OK.
9. Tap Yes."
iPAQ 5400 series Guide at 5-2 to 5-8

"enrollment
Enrollment is the process of collecting, processing, and registering reference versions of the fingerprints of the person authorized to use the secured device, in this case, the iPAQ Pocket PC. This is the initial step. The user is guided through the process for selecting one or more fingers to enroll and swiping the selected fingers across the FingerChip sensor to capture associated fingerprint images. Enrollment assesses the quality of the captured images and directs the user, as required, to repeat the swiping activity until adequate images are obtained. This process may require several attempts to ensure good prints are captured. A dataset is extracted from the images for each finger enrolled. These datasets are the reference templates used to ensure that only the authorized user is allowed to logon to your iPAQ Pocket PC during verification. The iPAQ Pocket PC enrollment process includes user training designed to teach proper swiping of fingers across the FingerChip sensor."
White Paper at 4

"enrolling your fingerprint

36

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | When you first setup the iPAQ Pocket PC h5400 Series, if any of the fingerprint-related authentication functions are selected, then one or more fingers must be enrolled. A reference template will be created for each enrolled finger. These templates will be used to compare to future fingerprint logon attempts. This process is aided by a training tool that is available with the iPAQ Pocket PC h5400 Series.<br><br><br><br>You have the option of enrolling any fingers on either hand. It is recommended that at least two fingers be enrolled in the event that one of the enrolled fingers is damaged. The index fingers of both hands are recommended. Because of the size of the images available, it is recommended that the little fingers not be used. In order to enroll a fingerprint, you must take between two and eight qualified finger swipes. A qualified swipe is one that produces an acceptable image. Feedback is provided to let the user know that: a swipe was too fast, a swipe was too slow, a poor quality image resulted, or a good image resulted."<br>White Paper at 8 |
| 1[l]. map said series into an instruction; and | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

37

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "Set "Fingerprint-only" for Logon<br>In this mode, you are required to enter a successful fingerprint to logon.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features.<br>1. From the Start menu, tap Settings, then Password.<br>2. Select "fingerprint-only" from the down arrow list.<br>✎If you are using ActiveSync, you must enter a password on your personal computer to begin synchronization.<br>3. Tap the finger to enroll.<br>4. Swipe the selected finger as instructed.<br>✎For more information on finger swiping, see the section "Enroll a Fingerprint" or tap the Training button.<br>5. Tap OK.<br>6. Tap Yes to save changes."<br>iPAQ 5400 series Guide at 5-16 to 5-17<br><br>"how it works<br>Biometric security on your iPAQ Pocket PC works in two basic steps: fingerprint enrollment and fingerprint verification. Fingerprint enrollment involves fingerprint acquisition and image reconstruction, fingerprint image processing and feature extraction, fingerprint image quality evaluation, and template generation. Fingerprint verification involves fingerprint acquisition and image reconstruction, fingerprint image processing and feature extraction, fingerprint image quality evaluation, template generation, and template matching.<br><br>enrollment<br>Enrollment is the process of collecting, processing, and registering reference versions of the fingerprints of the person authorized to use the secured device, in this case, the iPAQ Pocket PC. This is the initial step. The user is guided through the process for selecting one or more fingers to enroll and swiping the selected fingers across the FingerChip sensor to capture associated fingerprint images. Enrollment assesses the quality of the captured |

Exhibit C-11 (iPAQ 5400 Series System)

| | images and directs the user, as required, to repeat the swiping activity until adequate images are obtained. This process may require several attempts to ensure good prints are captured. A dataset is extracted from the images for each finger enrolled. These datasets are the reference templates used to ensure that only the authorized user is allowed to logon to your iPAQ Pocket PC during verification. The iPAQ Pocket PC enrollment process includes user training designed to teach proper swiping of fingers across the FingerChip sensor.<br><br>These templates are stored locally on the iPAQ Pocket PC (in a BioSwipe.dat file) and are encrypted. The file is only decrypted when used by the BioSwipe software. Template coding is a Cogent private format. Only Cogent software can read and use the template data. The encryption code is also private. Only BioSwipe or Cogent software can decrypt the data."<br>White Paper at 4<br><br>"**fingerprint image processing and feature extraction**<br>Reliable fingerprint feature extraction is the foundation of accurate fingerprint matching. Algorithms and software are developed to analyze a fingerprint image and to extract the information that can be used to uniquely identify a person. This is achieved in two steps. First, the fingerprint image is transformed into a form that facilitates feature detection. Second, the image is further analyzed to detect local and global features like ridge flow, minutiae points, fingerprint pattern, ridge counts, etc. The results are passed on to fingerprint image quality control.<br>Fingerprint image processing and feature extraction is used for both enrollment and verification.<br>**fingerprint image quality control**<br>Image quality control is introduced to maintain the quality of the data collected. This is very important to a fingerprint security application since data reliability contributes directly to verification accuracy. Each captured fingerprint image is evaluated and only those that pass the quality criteria are accepted for further use.<br>Fingerprint image quality control is used for both enrollment and verification.<br>**template generation** |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | In the process of enrollment, fingerprint features extracted, like minutia and ridge counts, are organized into templates. These templates are called reference templates, or the templates on record.<br>During verification, when you scan your fingerprint, a similar template is created. This template is called a sample template."<br>White Paper at 5 |
| 1[m]. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>" You can increase the security of the data stored in your iPAQ Pocket PC by using the iPAQ Fingerprint Reader. This feature allows you to require a PIN, password, and/or fingerprint be entered before you can log on to your iPAQ Pocket PC."<br>iPAQ 5400 series Guide at 5-1<br><br>"Set "Fingerprint-only" for Logon<br>In this mode, you are required to enter a successful fingerprint to logon.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features.<br>1. From the Start menu, tap Settings, then Password.<br>2. Select "fingerprint-only" from the down arrow list.<br>✎ If you are using ActiveSync, you must enter a password on your personal computer to begin synchronization.<br>3. Tap the finger to enroll.<br>4. Swipe the selected finger as instructed.<br>✎ For more information on finger swiping, see the section "Enroll a Fingerprint" or tap the Training button.<br>5. Tap OK. |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | 6. Tap Yes to save changes."<br>iPAQ 5400 series Guide at 5-16 to 5-17<br><br>"Logon Using a Fingerprint Only<br>You must successfully swipe the fingerprint you entered during setup.<br><br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features.The default number of attempts is six. You can select the maximum number of attempts for your security needs.<br>1. Turn on your iPAQ Pocket PC.<br>2. Swipe your enrolled finger."<br>iPAQ 5400 series Guide at 5-20<br><br>"Biometric technology is the latest trend in security. From securing access to a building or preventing unauthorized logons, this technology and the software designed for it, work together to provide an extra layer of security for your iPAQ Pocket PC h5400 Series. This easy-to-implement security capability goes beyond requiring a simple logon name and password to gain access to the data on your iPAQ Pocket PC.<br><br>This paper discusses the biometric technology, notably the fingerprint, and how it is used with the iPAQ Pocket PC. The biometric software for administering this security feature  is also discussed."<br>White Paper at 1<br><br>"how it works<br>Biometric security on your iPAQ Pocket PC works in two basic steps: fingerprint enrollment and fingerprint verification. Fingerprint enrollment involves fingerprint acquisition and image reconstruction, fingerprint image processing and feature extraction, fingerprint image quality evaluation, and template generation. Fingerprint verification involves fingerprint acquisition and image reconstruction, fingerprint image processing and |

Exhibit C-11 (iPAQ 5400 Series System)

| | feature extraction, fingerprint image quality evaluation, template generation, and template matching. |
|---|---|
| | enrollment<br>Enrollment is the process of collecting, processing, and registering reference versions of the fingerprints of the person authorized to use the secured device, in this case, the iPAQ Pocket PC. This is the initial step. The user is guided through the process for selecting one or more fingers to enroll and swiping the selected fingers across the FingerChip sensor to capture associated fingerprint images. Enrollment assesses the quality of the captured images and directs the user, as required, to repeat the swiping activity until adequate images are obtained. This process may require several attempts to ensure good prints are captured. A dataset is extracted from the images for each finger enrolled. These datasets are the reference templates used to ensure that only the authorized user is allowed to logon to your iPAQ Pocket PC during verification. The iPAQ Pocket PC enrollment process includes user training designed to teach proper swiping of fingers across the FingerChip sensor.<br><br>These templates are stored locally on the iPAQ Pocket PC (in a BioSwipe.dat file) and are encrypted. The file is only decrypted when used by the BioSwipe software. Template coding is a Cogent private format. Only Cogent software can read and use the template data. The encryption code is also private. Only BioSwipe or Cogent software can decrypt the data."<br>White Paper at 4 |
| **Claim 2** | |
| 2[pre]. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses the transmitter sub-system controller is further configured explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

Exhibit C-11 (iPAQ 5400 Series System)

| 2[a]. provide a signal for directing input of the series of entries of the biometric signal; | iPAQ 5400 Series System discloses providing a signal for directing input of the series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br><br><br>HP iPAQ 5450 |

Exhibit C-11 (iPAQ 5400 Series System)



HP iPAQ 5450

"If the finger swipe is acceptable, the oval frame turns green and the message "Good! Please continue" displays. If the finger swipe is unacceptable, the oval frame turns red and the message "Poor quality. Try again!" displays."
iPAQ 5400 series Guide at 5-4

"Enroll a Fingerprint
The Fingerprint screen uses color coding to display the status of your fingerprint swipe.

Fingerprint Status

| If the color around the oval is... | Then... |
|---|---|
| Blue | No fingerprint has been taken for the finger. |
| Green | The fingerprint swipe was good quality. |
| Red | The fingerprint swipe was poor quality." |

iPAQ 5400 series Guide at 5-6

44

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "enrollment<br><br>Enrollment is the process of collecting, processing, and registering reference versions of the fingerprints of the person authorized to use the secured device, in this case, the iPAQ Pocket PC. This is the initial step. The user is guided through the process for selecting one or more fingers to enroll and swiping the selected fingers across the FingerChip sensor to capture associated fingerprint images. Enrollment assesses the quality of the captured images and directs the user, as required, to repeat the swiping activity until adequate images are obtained. This process may require several attempts to ensure good prints are captured. A dataset is extracted from the images for each finger enrolled. These datasets are the reference templates used to ensure that only the authorized user is allowed to logon to your iPAQ Pocket PC during verification. The iPAQ Pocket PC enrollment process includes user training designed to teach proper swiping of fingers across the FingerChip sensor."<br>White Paper at 4<br><br>"verification<br><br>Verification is the process of collecting, processing, and comparing a person's fingerprint with the fingerprints on record to confirm identification or deny access. Based on the designated authentication mode, the user will swipe an enrolled finger across the FingerChip sensor to capture the associated fingerprint image. Verification assesses the quality of the captured image and, if necessary, directs the user, to repeat the swiping activity to ensure that a good quality image is obtained. A dataset is extracted from the fingerprint, designated the sample template. The sample template is matched against the reference templates stored on your iPAQ Pocket PC. The result of the match is used by Pocket PC authentication to permit or deny access as appropriate."<br>White Paper at 4<br><br>"enrolling your fingerprint<br><br>When you first setup the iPAQ Pocket PC h5400 Series, if any of the fingerprint-related authentication functions are selected, then one or more fingers must be enrolled. A reference template will be created for each enrolled finger. These templates will be used to compare to future fingerprint logon attempts. This process is aided by a training tool that is available with the iPAQ Pocket PC h5400 Series. |

45

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr>
<td></td>
<td>



You have the option of enrolling any fingers on either hand. It is recommended that at least two fingers be enrolled in the event that one of the enrolled fingers is damaged. The index fingers of both hands are recommended. Because of the size of the images available, it is recommended that the little fingers not be used. In order to enroll a fingerprint, you must take between two and eight qualified finger swipes. A qualified swipe is one that produces an acceptable image. Feedback is provided to let the user know that: a swipe was too fast, a swipe was too slow, a poor quality image resulted, or a good image resulted."

White Paper at 8
</td>
</tr>
<tr>
<td>

2[b]. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and
</td>
<td>

iPAQ 5400 Series System discloses incorporating into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

"overview
Biometrics is the process of measuring a physical or behavioral characteristic of a person and using that measurement as a basis for later identifying that same person. This
</td>
</tr>
</table>

46

Exhibit C-11 (iPAQ 5400 Series System)

| | measurement could be a face or eye measurement or in the case of the iPAQ Pocket PC, the fingerprint. Two things are essential to the biometrics application for the iPAQ. One is collecting biometric information like fingerprint images. The other is classifying, analyzing, and identifying biometric data. The iPAQ Pocket PC h5400 Series is enabled with fingerprint capture technology known as the FingerChip that was developed by Atmel Corporation, a leader in the design and development of biometric technology. The iPAQ Pocket PC fingerprint identification technology is provided by Cogent Systems, Inc., a global leader in automatic fingerprint identification system. Why the finger? According to studies, fingerprints are the most reliable biometric feature for identifying individuals. Even identical twins have different fingerprints. In over 100 years of use, fingerprints have proven to be a reliable tool for establishing identification." White Paper at 3 |
|---|---|
| | "verification Verification is the process of collecting, processing, and comparing a person's fingerprint with the fingerprints on record to confirm identification or deny access. Based on the designated authentication mode, the user will swipe an enrolled finger across the FingerChip sensor to capture the associated fingerprint image. Verification assesses the quality of the captured image and, if necessary, directs the user, to repeat the swiping activity to ensure that a good quality image is obtained. A dataset is extracted from the fingerprint, designated the sample template. The sample template is matched against the reference templates stored on your iPAQ Pocket PC. The result of the match is used by Pocket PC authentication to permit or deny access as appropriate." White Paper at 4 |
| | "fingerprint image processing and feature extraction Reliable fingerprint feature extraction is the foundation of accurate fingerprint matching. Algorithms and software are developed to analyze a fingerprint image and to extract the information that can be used to uniquely identify a person. This is achieved in two steps. First, the fingerprint image is transformed into a form that facilitates feature detection. Second, the image is further analyzed to detect local and global features like ridge flow, minutiae points, fingerprint pattern, ridge counts, etc. The results are passed on to fingerprint image quality control." |

Exhibit C-11 (iPAQ 5400 Series System)

| | White Paper at 5<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 2[b]<br>See, e.g., Wuidart at Claim 2[b]<br>See, e.g., Hamid at Claim 2[b]<br>See, e.g., Sands at Claim 2[b]<br>See, e.g., Howell at Claim 2[b]<br>See, e.g., Hoyos at Claim 2[b]<br>See, e.g., Mathiassen at Claim 2[b]<br>See, e.g., Steiner at Claim 2[b] |
|---|---|
| 2[c]. construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | iPAQ 5400 Series System discloses constructing an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Sands at Claim 2[c]<br>See, e.g., Hoyos at Claim 2[c]<br>See, e.g., Mathiassen at Claim 2[c] |
| Claim 4 | |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | iPAQ 5400 Series System discloses the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-systemexplicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"overview<br>Biometrics is the process of measuring a physical or behavioral characteristic of a person and using that measurement as a basis for later identifying that same person. This measurement could be a face or eye measurement or in the case of the iPAQ Pocket PC, the fingerprint. Two things are essential to the biometrics application for the iPAQ. One is collecting biometric information like fingerprint images. The other is classifying, analyzing, and identifying biometric data. The iPAQ Pocket PC h5400 Series is enabled with fingerprint capture technology known as the FingerChip that was developed by Atmel Corporation, a leader in the design and development of biometric technology. The iPAQ Pocket PC fingerprint identification technology is provided by Cogent Systems, Inc., a global leader in automatic fingerprint identification system."<br>White Paper at 3<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Wuidart at Claim 4<br>See, e.g., Hamid at Claim 4<br>See, e.g., Ikegami at Claim 4<br>See, e.g., Sands at Claim 4<br>See, e.g., Hoyos at Claim 4<br>See, e.g., Mathiassen at Claim 4 |

49

Exhibit C-11 (iPAQ 5400 Series System)

| Claim 6 | |
|---|---|
| 6[pre]. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | To the extent the preamble is limiting, iPAQ 5400 Series System discloses the biometric sensor is further configured to authenticate the identity of a user explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 2[b] |
| 6[a]. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | iPAQ 5400 Series System discloses the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>**Top Panel**<br><br>"Top Panel Components<br>1 Antenna: Transmits and receives signals<br>2 Stylus: Push to eject, push to lock<br>3 Infrared/Universal Remote: Beams information to/from other infrared-enabled devices |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | 4 Secure Digital I/O (SDIO) Expansion Slot: Supports Secure Digital (SD) storage and expansion cards"<br>iPAQ 5400 series Guide at 1-6<br><br>"Get Acquainted<br>With WLAN, you can:<br>　■ Access the Internet<br>　■ Send and receive e-mail<br>　■ Access corporate network information<br>　■ Use virtual private networks (VPN) for secure remote access<br>　■ Use hot spots for wireless connectivity"<br>iPAQ 5400 series Guide at 3-2<br><br>"QuickSpecs hp iPAQ Pocket PC h5400 Series<br>Standard Features<br>WLAN Specifications* |

| Radio Specifications | RF Network Standard | IEEE 802 Part 11b (802.11b) |
|---|---|---|
| | Frequency Band | 2,4000 to 2.4835 GHz<br>2,4465 to 2.4835 GHz (France)<br>2,4000 to 2,4697 GHz (Japan) |
| | Number of Selectable Subchannels | United States (FCC)　11<br>France (FR)　4<br>Japan (JP)　14<br>Other countries (ETSI)　13 |
| | Data Rates | 1, 2, 5.5, 11 Mbps |
| | Antenna type | High performance ½ wavelength stub, connected via micro strip touch pad |
| | WEP Security | 64 bit encryption keys compliant to IEEE 802.11<br>128 bit encryption key compliant to IEEE 802.11" |

QuickSpecs at 5

51

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | "Bluetooth Specifications*<br>　　　Technology high-speed, low-power, short-range<br>　　　Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>　　　System interface 921k high-speed UART processor interface<br>　　　User Interface Bluetooth Manager<br>　　　Operating system support Microsoft Pocket PC and Pocket PC 2002<br>　　　Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>　　　Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>　　　Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6 |
| 6[b]. the system further comprising a control panel configured to receive the information and provide the secure access requested. | iPAQ 5400 Series System discloses the system further comprising a control panel configured to receive the information and provide the secure access requested explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

52

Exhibit C-11 (iPAQ 5400 Series System)



**Front Panel**

"Front Panel Components

1 Speaker: Alarms, voice, music

2 Power Indicator:
   amber flash = charging
   amber solid = charged
   green flash = alarm, calendar, event

3 Stylus: Push to eject, push to lock

4 Power Button: Turn unit on and off

5 Color Display: High contrast color screen

6 *Inbox Button: Access your Inbox for sending and receiving e-mail

7 *iTask Button: Open, close, and switch between applications, run utilities, and change settings

8 5-Way Navigation Button: Scroll through a list and push to select (similar to using a joystick)

9 Fingerprint Reader: Biometric enhanced security"

Exhibit C-11 (iPAQ 5400 Series System)

| | iPAQ 5400 series Guide at 1-4<br><br>"Logon Using a Fingerprint Only<br>You must successfully swipe the fingerprint you entered during setup.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features. The default number of attempts is six. You can select the maximum number of attempts for your security needs.<br>1. Turn on your iPAQ Pocket PC.<br>2. Swipe your enrolled finger."<br>iPAQ 5400 series Guide at 5-20<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Schmitt at Claim 6[b]<br>See, e.g., Hoyos at Claim 6[b]<br>See, e.g., Mathiassen at Claim 6[b]<br>See, e.g., Steiner at Claim 6[b] |
|---|---|
| **Claim 9** | |
| 9[pre]. The system according to claim 1, wherein: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses the system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure of Claim 1[pre] |

Exhibit C-11 (iPAQ 5400 Series System)

| 9[a]. the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | iPAQ 5400 Series System discloses the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>**Front Panel**<br><br><br><br>"Front Panel Components<br>1 Speaker: Alarms, voice, music<br>2 Power Indicator:<br>    amber flash = charging<br>    amber solid = charged<br>    green flash = alarm, calendar, event<br>3 Stylus: Push to eject, push to lock<br>4 Power Button: Turn unit on and off<br>5 Color Display: High contrast color screen<br>6 *Inbox Button: Access your Inbox for sending and receiving e-mail |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | 7 *iTask Button: Open, close, and switch between applications, run utilities, and change settings<br>8 5-Way Navigation Button: Scroll through a list and push to select (similar to using a joystick)<br>9 Fingerprint Reader: Biometric enhanced security"<br>iPAQ 5400 series Guide at 1-4<br><br>"Logon Using a Fingerprint Only<br>You must successfully swipe the fingerprint you entered during setup.<br>CAUTION: In the event that an incorrect or unsuccessful fingerprint is repeatedly or incorrectly entered, all data and applications stored in RAM are erased and the iPAQ Pocket PC is returned to the as-shipped configuration. It is recommended that you back up all data frequently when using the security features. The default number of attempts is six. You can select the maximum number of attempts for your security needs.<br>1. Turn on your iPAQ Pocket PC.<br>2. Swipe your enrolled finger."<br>iPAQ 5400 series Guide at 5-20<br><br>"QuickSpecs hp iPAQ Pocket PC h5400 Series<br>Standard Features<br>WLAN Specifications* |

| | | | |
|---|---|---|---|
| | Radio Specifications | RF Network Standard | IEEE 802 Part 11b (802.11b) |
| | | Frequency Band | 2,4000 to 2.4835 GHz<br>2,4465 to 2.4835 GHz (France)<br>2,4000 to 2,4697 GHz (Japan) |
| | | Number of Selectable Subchannels | United States (FCC)    11<br>France (FR)            4<br>Japan (JP)            14<br>Other countries (ETSI)  13 |
| | | Data Rates | 1, 2, 5.5, 11 Mbps |
| | | Antenna type | High performance ½ wavelength stub, connected via micro strip touch pad |

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr>
<td></td>
<td>WEP Security       64 bit encryption keys<br>                compliant to IEEE 802.11<br>            128 bit encryption key<br>                compliant to IEEE 802.11"<br><br>QuickSpecs at 5<br><br>"Bluetooth Specifications*<br>    Technology high-speed, low-power, short-range<br>    Bluetooth specification 1.1 compliant (2.4-GHz Industrial Scientific Medical Band)<br>    System interface 921k high-speed UART processor interface<br>    User Interface Bluetooth Manager<br>    Operating system support Microsoft Pocket PC and Pocket PC 2002<br>    Device type Class II device; up to 4 dBm transmit, typical 10 meter range<br>    Power 3.3V ± 5% Peak current - typical TX current at approximately 140 mA<br>    Receiver sensitivity –78 dBm or greater"<br>QuickSpecs at 6</td>
</tr>
<tr>
<td colspan="2"><strong>Claim 10</strong></td>
</tr>
<tr>
<td>10[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises:</td>
<td>To the extent the preamble is limiting, iPAQ 5400 Series System discloses a transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e]</td>
</tr>
<tr>
<td>10[a]. a biometric sensor configured to receiving a biometric signal;</td>
<td>iPAQ 5400 Series System discloses a biometric sensor configured to receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:</td>
</tr>
</table>

57

Exhibit C-11 (iPAQ 5400 Series System)

| | See Disclosure at Claim 1[c] |
|---|---|
| 10[b]. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | iPAQ 5400 Series System discloses a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 10[c]. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | iPAQ 5400 Series System discloses a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 10[d]. wherein the controller is further configured to: | iPAQ 5400 Series System discloses the controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure for Claim 10[b] |
| 10[e]. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | iPAQ 5400 Series System discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | See Disclosure at Claim 1[k] |
| 10[f]. map said series into an instruction; and | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 10[g]. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 11 | |
| 11[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to | To the extent the preamble is limiting, iPAQ 5400 Series System discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | See Disclosure at Claim 1 |
| 11[a]. populating the database of biometric signatures by: | iPAQ 5400 Series System discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[b]. receiving a series of entries of the biometric signal; | iPAQ 5400 Series System discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[c]. determining at least one of the number of said entries and a duration of each said entry; | iPAQ 5400 Series System discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 11[d]. mapping said series into an instruction; and | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-11 (iPAQ 5400 Series System)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 11[e]. populating the database according to the instruction; | iPAQ 5400 Series System discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 11[f]. receiving the biometric signal; | iPAQ 5400 Series System discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 11[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | iPAQ 5400 Series System discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 11[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | iPAQ 5400 Series System discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

61

Exhibit C-11 (iPAQ 5400 Series System)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 11[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 12 | |
| 12[pre]. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database  explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 12[a]. receiving a biometric signal; and | iPAQ 5400 Series System discloses receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit C-11 (iPAQ 5400 Series System)

| 12[b]. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | iPAQ 5400 Series System discloses enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>To the extent that Plaintiff contends iPAQ 5400 Series System does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Hoyos at Claim 11[b]<br>See, e.g., Mathiassen at Claim 11[b] |
| Claim 14 | |
| 14[pre]. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Hardware Specifications<br>System Specifications<br>Specifications<br>System Feature hp iPAQ h5400 Series<br>Processor Intel PXA250 (400 MHz)<br>Memory 64 MB SDRAM or greater<br>ROM 48 MB or greater<br>SD Storage Memory card and SDIO ready<br>Display Transflective color TFT, 240 x 320 pixels, 64Kcolor |

Exhibit C-11 (iPAQ 5400 Series System)

<table>
<tr>
<td></td>
<td>support, .24-dot pitch<br>
LED Backlight Multi-level brightness adjustment, light sensor for automatic adjustment of brightness level<br>
Audio Speaker, 3.5 mm stereo headphone and microphone jack<br>
Infrared IrDA, data transfer up to 115.2 Kb per second and Universal Remote Control for control of home entertainment units<br>
Bluetooth All models<br>
Fingerprint Reader Thermal swipe technology<br>
Communications Communication port, Expansion Pack connector<br>
Indicators 3-mode alarm notification:<br>
Flashing green LED, tone, pop-up message<br>
Chargeactive: flashing/solid amber LED<br>
Bluetooth active: flashing/solid blue LED<br>
WLAN active: flashing green LED<br>
WLAN enabled but not connected: flashing amber LED<br>
Battery Removable/rechargeable Lithium Polymer with internal memory backup battery"<br>
iPAQ 5400 series Guide at B-1 to B2<br>
<br>
"authentication software security levels<br>
The biometric software called BioSwipe is based on capabilities developed by Cogent for use in criminal Automatic Fingerprint Identification Systems that require highly accurate capabilities for performing 1-to-many searches of very large databases. The Cogent algorithms analytically model natural irregularities that define uniqueness in fingerprints, providing the scientific foundation for establishing positive identification. BioSwipe adapts the Cogent algorithms to the one-to-few verification requirements of the iPAQ Pocket PC. In establishing authentication, the biometric software can be set up to operate in three security level environments: Regular, High, and Extra High. These security levels are based on expected false rejection rates (FRR), false acceptance rates (FAR), and enrollment strategies (see the table that follows). As the security level rises, so does the intensity of the parameters that are used for enrolling a fingerprint and for achieving a match."</td>
</tr>
</table>

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| | White Paper at 6<br><br>"HP Exclusive Applications (On device)    These are the extras that HP put in ROM<br>iPAQ Fingerprint Reader: enhanced security<br>iPAQ File Store: non-volatile storage in flash ROM;<br>iPAQ Task Manager: access and launch programs easily,<br>iPAQ Backup: utility for Backup/Restore to Main Memory, Memory Card, or iPAQ File Store:<br>iPAQ Image Viewer: view images and create slide shows,<br>Nevo: Universal Remote Control,<br>Adjustable Standby Settings: Utility for adjusting power conservation modes, Utilities:<br>Self Test, Expansion pack, iPAQ Audio, Power Status"<br>QuickSpecs at 3<br><br>"Standard Features<br>Biometric Fingerprint Reader<br>    Thermal Silicon Sensor - measures the temperature differential between the skin ridges and the air caught in the fingerprint valleys.<br>    280 pixel image width<br>    500 dpi pixel pitch<br>    Small sensor size (0.4 x 14 mm) optimized for handheld devices.<br>    Full fingerprint image is captured by sweeping the finger across the sensor area<br>    High quality image even with dry or difficult fingerprints<br>    Self-cleaning - no latent print is left on the imaging surface<br>-------------------------------------------------------------------------------------<br>Operating System      Microsoft Pocket PC 2002"<br>QuickSpecs at 7 |
| 14[a]. receive a series of entries of a biometric signal; | iPAQ 5400 Series System discloses receiving a series of entries of a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit C-11 (iPAQ 5400 Series System)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
|---|---|
| 14[b]. determine at least one of a number of said entries and a duration of each of said entries; | iPAQ 5400 Series System discloses determining at least one of a number of said entries and a duration of each of said entries explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 14[c]. map said series into an instruction; | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 14[d]. populate a database of biometric signatures according to the instruction; | iPAQ 5400 Series System discloses populating a database of biometric signatures according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 14[e]. receive the biometric signal; | iPAQ 5400 Series System discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit C-11 (iPAQ 5400 Series System)

| | See Disclosure at Claim 1[c] |
|---|---|
| 14[f]. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | iPAQ 5400 Series System discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 14[g]. emit a secure access signal conveying information dependent upon said accessibility attribute; and | iPAQ 5400 Series System discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 14[h]. provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses providing conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |
| Claim 15 | |

67

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| 15[pre]. A system for providing secure access to a controlled item, the system comprising: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 15[a]. a memory comprising a database of biometric signatures; | iPAQ 5400 Series System discloses a memory comprising a database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 15[b]. a transmitter sub-system comprising: | iPAQ 5400 Series System discloses a transmitter sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 15[c]. a biometric sensor capable of receiving a biometric signal; | iPAQ 5400 Series System discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| 15[d]. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | iPAQ 5400 Series System discloses a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 15[e]. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | iPAQ 5400 Series System discloses a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 15[f]. a receiver sub-system comprising: | iPAQ 5400 Series System discloses a receiver sub-system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[f] |
| 15[g]. a receiver sub-system controller capable of: | iPAQ 5400 Series System discloses a receiver sub-system controller explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[g] |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| 15[h]. receiving the transmitted secure access signal; and | iPAQ 5400 Series System discloses receiving the transmitted secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[h] |
| 15[i]. providing conditional access to the controlled item dependent upon said information; | iPAQ 5400 Series System discloses providing conditional access to the controlled item dependent upon said information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] |
| 15[j]. wherein the transmitter sub-system controller is further capable of: | iPAQ 5400 Series System discloses the transmitter sub-system controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 15[k]. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | iPAQ 5400 Series System discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| 15[l]. mapping said series into an instruction; and | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 15[m]. populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses populating the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 16 | |
| 16[pre]. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | To the extent the preamble is limiting, iPAQ 5400 Series System discloses transmitter sub-system for operating in a system for providing secure access to a controlled item explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[a]. a biometric sensor capable of receiving a biometric signal; | iPAQ 5400 Series System discloses a biometric sensor capable of receiving a biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

71

Exhibit C-11 (iPAQ 5400 Series System)

| | See Disclosure at Claim 1[c] |
|---|---|
| 16[b]. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | iPAQ 5400 Series System discloses a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 16[c]. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | iPAQ 5400 Series System discloses a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| 16[d]. wherein the controller is further capable of: | iPAQ 5400 Series System discloses the controller is further capable explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[j] |
| 16[e]. receiving a series of entries of the biometric signal, said series being characterised according to at least | iPAQ 5400 Series System discloses receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

72

Exhibit C-11 (iPAQ 5400 Series System)

| one of the number of said entries and a duration of each said entry; | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
|---|---|
| 16[f]. mapping said series into an instruction; and | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
| 16[g]. populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses populating the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| Claim 17 | |
| 17[pre]. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver | To the extent the preamble is limiting, iPAQ 5400 Series System discloses a method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

73

Exhibit C-11 (iPAQ 5400 Series System)

| | |
|---|---|
| sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1 |
| 17[a]. populating the database of biometric signatures by: | iPAQ 5400 Series System discloses populating the database of biometric signatures explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[b]. receiving a series of entries of the biometric signal; | iPAQ 5400 Series System discloses receiving a series of entries of the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |
| 17[c]. determining at least one of the number of said entries and a duration of each said entry; | iPAQ 5400 Series System discloses determining at least one of the number of said entries and a duration of each said entry explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[k] |

Exhibit C-11 (iPAQ 5400 Series System)

| 17[d]. mapping said series into an instruction; and | iPAQ 5400 Series System discloses mapping said series into an instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[l] |
|---|---|
| 17[e]. populating the database according to the instruction; | iPAQ 5400 Series System discloses populating the database according to the instruction explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[m] |
| 17[f]. receiving the biometric signal; | iPAQ 5400 Series System discloses receiving the biometric signal explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 17[g]. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | iPAQ 5400 Series System discloses matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |

75

Exhibit C-11 (iPAQ 5400 Series System)

| 17[h]. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | iPAQ 5400 Series System discloses emitting a secure access signal conveying information dependent upon said accessibility attribute explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|
| 17[i]. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | iPAQ 5400 Series System discloses providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[i] and Claim 1[m] |

76

Exhibit C-12 (Kensaku)

**Exhibit C-12**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**Japanese Patent Application Publication No. 2003323412A ("Kensaku")**

Japanese Patent Application Publication No. 2003323412A to Kensaku ("Kensaku") anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 1. A system for providing secure access to a controlled item, the system comprising: | *See, e.g.:*<br><br>Kensaku at [0001]-[0005]:<br><br>"[0001] BACKGROUND OF THE INVENTION 1. Field of the Invention The present invention relates to a personal authentication method, a personal authentication apparatus and a client server type personal authentication system for identifying and authenticating an individual using biometric information as image data. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | [0005] The present invention has been made in view of the above problems, and the problem is that a personal authentication method that does not give a sense of discomfort and resistance to the user while improving the safety of personal authentication, A personal authentication apparatus and a client server type personal authentication system are provided." <br><br> Kensaku at [0018]: <br><br> "[0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone." |
| 1a. a memory comprising a database of biometric signatures; | *See, e.g.:* <br> Kensaku at [0012]: <br><br> [0012] The personal authentication method using biometric information according to the present invention is the personal authentication method according to claim 7, wherein the biometric information includes at least one of voice, iris, face, retina, blood vessel, palm, and signature. It is characterized by representing one piece of information. <br><br> Kensaku at [0017]: <br><br> "[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used." |
| | Kensaku at [0022]: |
| | "[0022] When the algorithm corresponding to P_1 is determined by the control unit 14 as described above (here, it is assumed that algorithm A is determined), algorithm A is performed so that feature extraction is performed according to the determined algorithm A. Is output to the feature extraction unit 13. Thereafter, a message to put the finger on the fingerprint input sensor 11 is displayed on the display unit 16. When the user places his / her finger on the fingerprint input sensor 11 according to this message, the image information collected by the fingerprint input sensor 11 is converted into digital information by the A / D conversion unit 12 and output to the feature extraction unit 13. Is done. The feature extraction unit 13 processes the input digital information according to the algorithm A, and extracts feature information (here, B_i = B_1). The control unit |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | 14 causes the feature information storage unit 18 to register (S3) the feature information B_1 associated with P_1 as a password." |
| 1b.    a transmitter sub-system comprising: | *See, e.g.:*<br><br>Kensaku at [0017]:<br><br>"[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used." |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | |
| 1b1. a biometric sensor configured to receive a biometric signal; | *See, e.g.:*<br><br>Kensaku at [0006]:<br>"[0006] In order to solve the above-mentioned problems, the personal authentication method using biometric information according to the present invention provides personal identification / authentication using biometric information as described in claim 1. In the personal authentication method, the biometric information input unit having a function of collecting the biometric information is provided, a set including the personal confidential information as a constituent element is created in advance, and the biometric information collected by the biometric information input unit From the information, biometric feature data is extracted and registered according to a feature extraction algorithm associated with an element determined from the constituent elements of the set, and the feature information of the biometric information corresponding to the registered element is collated. It is characterized in that it is used as data for personal identification and authentication."<br><br>Kensaku at [0017]:<br>"[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used." |
| 1b2. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See, e.g.:*<br><br>Kensaku at [0024]-[0026]:<br><br>[0024] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Description of First Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message for prompting fingerprint collation is displayed on the display unit 16. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S of characters / pictures as password candidates is displayed on the display unit 16 (S11). Is done. When the user selects a password P_i from the set S (S12) (here, P_1 used in the first registration process is first selected), information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. The control unit 14 determines a feature extraction algorithm corresponding to P_1, and outputs the |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
|  | algorithm A to the feature extraction unit 13 so that feature extraction is performed according to the determined algorithm (here, the algorithm corresponding to P_1 is algorithm A). Thereafter, a message indicating that the finger is put on the fingerprint input sensor 11 is displayed on the display unit 16, and when the user places the finger on the fingerprint input sensor 11 according to this display, the image information collected by the fingerprint input sensor 11 is changed to A The data is converted into digital information by the / D conversion unit 12 and output to the feature extraction unit 13. The feature extraction unit 13 processes the input digital information according to the algorithm A, and extracts feature information (here, $B'\_i = B'\_1$). The feature information B′1 extracted in this way is sent to the collation / determination unit 15 and collated with the feature information B_1 registered in the feature information storage unit 18 (S14). $B'\_1 \neq B\_1$), NO in S14), another person is determined at that time, and the use of the mobile terminal is rejected. On the other hand, if they match (($B'\_1 = B\_1$), YES in S14), it is further determined (S15) whether or not the same collation process is repeated n (= B_n) times, and n times A series of collation processing is finished at the time of reaching YES at S15. However, if it is determined in the above determination (S15) that i is not n (NO in S15), i is incremented by +1 (S16), and the processing from (S11) is performed again. That is, until i reaches n, $B'\_i$ and B_1 are repeatedly checked for collation, and only when they all match, the person is determined.<br><br>[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as P_1, the character "R", P_2 as the character "y", P_3 as the character "H", P_4 as the character "a", and P_n (P_5) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information B_1, B_2,... B_n is used instead of the password. |

- 7 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | [0026] In the fingerprint collation process of the first embodiment, the fingerprint feature information B_1 corresponding to P_1 and the fingerprint feature information corresponding to the newly read P_1 are first collated, and if they match, similarly P_2. , P_3... Are repeatedly checked in the same manner as described above, and the use of the mobile terminal is rejected when they do not match. That is, in order to use a mobile terminal, it is necessary to pass the above verification several times." <br><br> Kensaku at [0039]-[0041]: <br><br> "[0039] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Explanation of Second Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message prompting fingerprint collation is displayed on the display unit 16 as in the first collation processing. Is done. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S as a password candidate is displayed on the display unit 16 (S31). When the user selects the password P_i from the set S (S32) (here, P_1 used in the second registration process is first selected), the information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. Thereafter, a message for prompting fingerprint collection is displayed on the display unit 16. When the user places a finger on the fingerprint input sensor 11 in accordance with this message, the image information of the fingerprint is read and converted into digital information by the A / D conversion unit 12. The converted image information is output to the feature extraction unit 13. The feature extraction unit 13 extracts feature information B ′ of the fingerprint image according to a predetermined feature extraction algorithm. The control unit 14 divides the feature information B ′ output from the feature extraction unit 13 into small regions (m |

- 8 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | division: B′_1 to B′_m), and is associated with P_1 received via the operation unit 17 Is determined from among the small regions 1 to m (in this example, K1 is determined), and the feature information B′_K1 of the determined region is sent to the collation / determination unit 15. It is done. The collation / determination unit 15 collates the feature information B′_K1 with the feature information B_1 registered in the feature information storage unit 18 (S34). If they do not match ((B′_K1 ≠ B_K1)), S34 NO), the other person is determined at that time and the use of the mobile terminal is rejected. On the other hand, if they match ((B′_K1 = B_K1), YES in S34), it is further determined (S35) whether or not the same collation processing is repeated n (= B_n) times, and n times When it reaches (YES in S35), the series of collation processing is finished. However, if it is determined in the determination (S35) that i is not n (NO in S35), i is incremented by +1 (S36), and the processing from (S31) is performed again. That is, until i reaches n, B′_Ki and B_K1 are collated repeatedly, and if all match, the person is determined.<br><br>[0040] In this example, when each Pi is determined, it is necessary to read the finger characteristic information B′_1 to B′_m corresponding to B_1 to B_m every time. In this example, the case where the control unit 14 divides the region of the fingerprint image information read by the fingerprint input sensor 11 has been described. However, the region extraction of the fingerprint image information is performed by the feature extraction unit 13. Also good. In this case, the parameter m for the number of area divisions may be stored in advance by itself or may be instructed by the control unit 14.<br><br>[0041] As described above, according to the present embodiment, the fingerprint feature information is divided into a plurality of regions, and the information obtained by combining the feature information of the divided regions, the feature information, and the character / picture information as a password is used for personal authentication. It is used as collation data. That is, compared with the conventional password-only authentication, authentication with a stronger |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | connection with the individual biometric features is possible, security is further enhanced, and "spoofing" by a malicious third party is difficult." |
| 1b3. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See, e.g.:*<br><br>Kensaku at [0024]-[0026]:<br><br>[0024] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Description of First Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message for prompting fingerprint collation is displayed on the display unit 16. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S of characters / pictures as password candidates is displayed on the display unit 16 (S11). Is done. When the user selects a password P_i from the set S (S12) (here, P_1 used in the first registration process is first selected), information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. The control unit 14 determines a feature extraction algorithm corresponding to P_1, and outputs the algorithm A to the feature extraction unit 13 so that feature extraction is performed according to the determined algorithm (here, the algorithm corresponding to P_1 is algorithm A). Thereafter, a message indicating that the finger is put on the fingerprint input sensor 11 is displayed on the display unit 16, and when the user places the finger on the fingerprint input sensor 11 according to this display, the image information collected by the fingerprint input sensor 11 is changed to A The data is converted into digital information by the / D conversion unit 12 and output to the feature extraction unit 13. The feature extraction unit 13 processes the input digital information according to the algorithm A, and extracts feature information (here, B′_i = B′_1). The feature information B′1 extracted in this way |

- 10 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | is sent to the collation / determination unit 15 and collated with the feature information B_1 registered in the feature information storage unit 18 (S14). B′_1 ≠ B_1), NO in S14), another person is determined at that time, and the use of the mobile terminal is rejected. On the other hand, if they match ((B′_1 = B_1), YES in S14), it is further determined (S15) whether or not the same collation process is repeated n (= B_n) times, and n times A series of collation processing is finished at the time of reaching YES at S15. However, if it is determined in the above determination (S15) that i is not n (NO in S15), i is incremented by +1 (S16), and the processing from (S11) is performed again. That is, until i reaches n, B′_i and B_1 are repeatedly checked for collation, and only when they all match, the person is determined.<br><br>[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as P_1, the character "R", P_2 as the character "y", P_3 as the character "H", P_4 as the character "a", and P_n (P_5) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information B_1, B_2,... B_n is used instead of the password.<br><br>[0026] In the fingerprint collation process of the first embodiment, the fingerprint feature information B_1 corresponding to P_1 and the fingerprint feature information corresponding to the newly read P_1 are first collated, and if they match, similarly P_2. , P_3... Are repeatedly checked in the same manner as described above, and the use of the mobile terminal is rejected when they do not match. That is, in order to use a mobile terminal, it is necessary to pass the above verification several times."<br><br>Kensaku at [0039]-[0041]: |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
|  | "[0039] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Explanation of Second Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message prompting fingerprint collation is displayed on the display unit 16 as in the first collation processing. Is done. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S as a password candidate is displayed on the display unit 16 (S31). When the user selects the password P_i from the set S (S32) (here, P_1 used in the second registration process is first selected), the information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. Thereafter, a message for prompting fingerprint collection is displayed on the display unit 16. When the user places a finger on the fingerprint input sensor 11 in accordance with this message, the image information of the fingerprint is read and converted into digital information by the A / D conversion unit 12. The converted image information is output to the feature extraction unit 13. The feature extraction unit 13 extracts feature information B ′ of the fingerprint image according to a predetermined feature extraction algorithm. The control unit 14 divides the feature information B ′ output from the feature extraction unit 13 into small regions (m division: B′_1 to B′_m), and is associated with P_1 received via the operation unit 17 Is determined from among the small regions 1 to m (in this example, K1 is determined), and the feature information B′_K1 of the determined region is sent to the collation / determination unit 15. It is done. The collation / determination unit 15 collates the feature information B′_K1 with the feature information B_1 registered in the feature information storage unit 18 (S34). If they do not match ((B′_K1 ≠ B_K1)), S34 NO), the other person is determined at that time and the use of the mobile terminal is rejected. On the other hand, if they match ((B′_K1 = B_K1), YES in S34), it is further determined (S35) whether or not the same collation processing is repeated n (= B_n) times, and n times When it reaches |

- 12 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | (YES in S35), the series of collation processing is finished. However, if it is determined in the determination (S35) that i is not n (NO in S35), i is incremented by +1 (S36), and the processing from (S31) is performed again. That is, until i reaches n, B′_Ki and B_K1 are collated repeatedly, and if all match, the person is determined. [0040] In this example, when each Pi is determined, it is necessary to read the finger characteristic information B′_1 to B′_m corresponding to B_1 to B_m every time. In this example, the case where the control unit 14 divides the region of the fingerprint image information read by the fingerprint input sensor 11 has been described. However, the region extraction of the fingerprint image information is performed by the feature extraction unit 13. Also good. In this case, the parameter m for the number of area divisions may be stored in advance by itself or may be instructed by the control unit 14. [0041] As described above, according to the present embodiment, the fingerprint feature information is divided into a plurality of regions, and the information obtained by combining the feature information of the divided regions, the feature information, and the character / picture information as a password is used for personal authentication. It is used as collation data. That is, compared with the conventional password-only authentication, authentication with a stronger connection with the individual biometric features is possible, security is further enhanced, and "spoofing" by a malicious third party is difficult." |
| 1c.  a receiver sub-system comprising: | *See, e.g.:* Kensaku at [0018]: [0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Kensaku** |
| | will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone.<br><br>Kensaku at [0024]-[0026]:<br><br>[0024] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Description of First Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message for prompting fingerprint collation is displayed on the display unit 16. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S of characters / pictures as password candidates is displayed on the display unit 16 (S11). Is done. When the user selects a password $P\_i$ from the set S (S12) (here, $P\_1$ used in the first registration process is first selected), information on the selected $P\_1$ is displayed on the operation unit 17. To the control unit 14. The control unit 14 determines a feature extraction algorithm corresponding to $P\_1$, and outputs the algorithm A to the feature extraction unit 13 so that feature extraction is performed according to the determined algorithm (here, the algorithm corresponding to $P\_1$ is algorithm A). Thereafter, a message indicating that the finger is put on the fingerprint input sensor 11 is displayed on the display unit 16, and when the user places the finger on the fingerprint input sensor 11 according to this display, the image information collected by the fingerprint input sensor 11 is changed to A The data is converted into digital information by the / D conversion unit 12 and output to the feature extraction unit 13. The feature extraction unit 13 processes the input digital information according to the algorithm A, and extracts feature information (here, $B'\_i = B'\_1$). The feature information $B'1$ extracted in this way is sent to the collation / determination unit 15 and collated with the feature information $B\_1$ registered in the feature information storage unit 18 (S14). $B'\_1$ |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Kensaku |
| --- | --- |
|  | $\neq$ B_1), NO in S14), another person is determined at that time, and the use of the mobile terminal is rejected. On the other hand, if they match ((B′_1 = B_1), YES in S14), it is further determined (S15) whether or not the same collation process is repeated n (= B_n) times, and n times A series of collation processing is finished at the time of reaching YES at S15. However, if it is determined in the above determination (S15) that i is not n (NO in S15), i is incremented by +1 (S16), and the processing from (S11) is performed again. That is, until i reaches n, B′_i and B_1 are repeatedly checked for collation, and only when they all match, the person is determined.<br><br>[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as P_1, the character "R", P_2 as the character "y", P_3 as the character "H", P_4 as the character "a", and P_n (P_5) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information B_1, B_2,... B_n is used instead of the password.<br><br>[0026] In the fingerprint collation process of the first embodiment, the fingerprint feature information B_1 corresponding to P_1 and the fingerprint feature information corresponding to the newly read P_1 are first collated, and if they match, similarly P_2. , P_3... Are repeatedly checked in the same manner as described above, and the use of the mobile terminal is rejected when they do not match. That is, in order to use a mobile terminal, it is necessary to pass the above verification several times."<br><br>Kensaku at [0039]-[0041]: |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | "[0039] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Explanation of Second Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message prompting fingerprint collation is displayed on the display unit 16 as in the first collation processing. Is done. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S as a password candidate is displayed on the display unit 16 (S31). When the user selects the password P_i from the set S (S32) (here, P_1 used in the second registration process is first selected), the information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. Thereafter, a message for prompting fingerprint collection is displayed on the display unit 16. When the user places a finger on the fingerprint input sensor 11 in accordance with this message, the image information of the fingerprint is read and converted into digital information by the A / D conversion unit 12. The converted image information is output to the feature extraction unit 13. The feature extraction unit 13 extracts feature information B ′ of the fingerprint image according to a predetermined feature extraction algorithm. The control unit 14 divides the feature information B ′ output from the feature extraction unit 13 into small regions (m division: B′_1 to B′_m), and is associated with P_1 received via the operation unit 17 Is determined from among the small regions 1 to m (in this example, K1 is determined), and the feature information B′_K1 of the determined region is sent to the collation / determination unit 15. It is done. The collation / determination unit 15 collates the feature information B′_K1 with the feature information B_1 registered in the feature information storage unit 18 (S34). If they do not match ((B′_K1 ≠ B_K1)), S34 NO), the other person is determined at that time and the use of the mobile terminal is rejected. On the other hand, if they match ((B′_K1 = B_K1), YES in S34), it is further determined (S35) whether or not the same collation processing is repeated n (= B_n) times, and n times When it reaches (YES in S35), the series of collation processing is finished. However, if it is |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | determined in the determination (S35) that i is not n (NO in S35), i is incremented by +1 (S36), and the processing from (S31) is performed again. That is, until i reaches n, B′_Ki and B_K1 are collated repeatedly, and if all match, the person is determined.<br><br>[0040] In this example, when each Pi is determined, it is necessary to read the finger characteristic information B′_1 to B′_m corresponding to B_1 to B_m every time. In this example, the case where the control unit 14 divides the region of the fingerprint image information read by the fingerprint input sensor 11 has been described. However, the region extraction of the fingerprint image information is performed by the feature extraction unit 13. Also good. In this case, the parameter m for the number of area divisions may be stored in advance by itself or may be instructed by the control unit 14.<br><br>[0041] As described above, according to the present embodiment, the fingerprint feature information is divided into a plurality of regions, and the information obtained by combining the feature information of the divided regions, the feature information, and the character / picture information as a password is used for personal authentication. It is used as collation data. That is, compared with the conventional password-only authentication, authentication with a stronger connection with the individual biometric features is possible, security is further enhanced, and "spoofing" by a malicious third party is difficult." |
| 1c1. a receiver sub-system controller configured to: receive the transmitted secure access signal; and | *See, e.g.:*<br><br>Kensaku at [0018]:<br><br>[0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information |

- 17 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone.<br><br>Kensaku at [0024]-[0026]:<br><br>[0024] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Description of First Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message for prompting fingerprint collation is displayed on the display unit 16. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S of characters / pictures as password candidates is displayed on the display unit 16 (S11). Is done. When the user selects a password P_i from the set S (S12) (here, P_1 used in the first registration process is first selected), information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. The control unit 14 determines a feature extraction algorithm corresponding to P_1, and outputs the algorithm A to the feature extraction unit 13 so that feature extraction is performed according to the determined algorithm (here, the algorithm corresponding to P_1 is algorithm A). Thereafter, a message indicating that the finger is put on the fingerprint input sensor 11 is displayed on the display unit 16, and when the user places the finger on the fingerprint input sensor 11 according to this display, the image information collected by the fingerprint input sensor 11 is changed to A The data is converted into digital information by the / D conversion unit 12 and output to the feature extraction unit 13. The feature extraction unit 13 processes the input digital information according to the algorithm A, and extracts feature information (here, B′_i = B′_1). The feature information B′1 extracted in this way is sent to the collation / determination unit 15 and collated with the feature information B_1 registered in the feature information storage unit 18 (S14). B′_1 |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | $\neq B\_1$), NO in S14), another person is determined at that time, and the use of the mobile terminal is rejected. On the other hand, if they match $((B'\_1 = B\_1)$, YES in S14), it is further determined (S15) whether or not the same collation process is repeated n $(= B\_n)$ times, and n times A series of collation processing is finished at the time of reaching YES at S15. However, if it is determined in the above determination (S15) that i is not n (NO in S15), i is incremented by +1 (S16), and the processing from (S11) is performed again. That is, until i reaches n, $B'\_i$ and $B\_1$ are repeatedly checked for collation, and only when they all match, the person is determined.<br><br>[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as P\_1, the character "R", P\_2 as the character "y", P\_3 as the character "H", P\_4 as the character "a", and P\_n (P\_5) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information B\_1, B\_2,... B\_n is used instead of the password.<br><br>[0026] In the fingerprint collation process of the first embodiment, the fingerprint feature information B\_1 corresponding to P\_1 and the fingerprint feature information corresponding to the newly read P\_1 are first collated, and if they match, similarly P\_2. , P\_3... Are repeatedly checked in the same manner as described above, and the use of the mobile terminal is rejected when they do not match. That is, in order to use a mobile terminal, it is necessary to pass the above verification several times." |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 1c2. provide conditional access to the controlled item dependent upon said information; | *See, e.g.:*<br><br>Kensaku at [0018]:<br><br>[0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone.<br><br>Kensaku at [0024]-[0026]:<br><br>[0024] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Description of First Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message for prompting fingerprint collation is displayed on the display unit 16. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S of characters / pictures as password candidates is displayed on the display unit 16 (S11). Is done. When the user selects a password P_i from the set S (S12) (here, P_1 used in the first registration process is first selected), information on the selected P_1 is displayed on the operation unit 17. To the control unit 14. The control unit 14 determines a feature extraction algorithm corresponding to P_1, and outputs the algorithm A to the feature extraction unit 13 so that feature extraction is performed according to the determined algorithm (here, the algorithm corresponding to P_1 is algorithm A). Thereafter, a message indicating that the finger is put on the fingerprint input sensor 11 is displayed on the display unit 16, and when the user places the finger on the fingerprint input sensor 11 according to this display, the image information collected by the fingerprint input sensor 11 is changed to A |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | The data is converted into digital information by the / D conversion unit 12 and output to the feature extraction unit 13. The feature extraction unit 13 processes the input digital information according to the algorithm A, and extracts feature information (here, $B'\_i = B'\_1$). The feature information $B'1$ extracted in this way is sent to the collation / determination unit 15 and collated with the feature information $B\_1$ registered in the feature information storage unit 18 (S14). $B'\_1 \neq B\_1$), NO in S14), another person is determined at that time, and the use of the mobile terminal is rejected. On the other hand, if they match (($B'\_1 = B\_1$), YES in S14), it is further determined (S15) whether or not the same collation process is repeated n ($= B\_n$) times, and n times A series of collation processing is finished at the time of reaching YES at S15. However, if it is determined in the above determination (S15) that i is not n (NO in S15), i is incremented by +1 (S16), and the processing from (S11) is performed again. That is, until i reaches n, $B'\_i$ and $B\_1$ are repeatedly checked for collation, and only when they all match, the person is determined.<br><br>[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as $P\_1$, the character "R", $P\_2$ as the character "y", $P\_3$ as the character "H", $P\_4$ as the character "a", and $P\_n$ ($P\_5$) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information $B\_1, B\_2,... B\_n$ is used instead of the password.<br><br>[0026] In the fingerprint collation process of the first embodiment, the fingerprint feature information $B\_1$ corresponding to $P\_1$ and the fingerprint feature information corresponding to the newly read $P\_1$ are first collated, and if they match, similarly $P\_2$. , $P\_3$... Are repeatedly checked in the same manner as described above, and the use of the mobile terminal is rejected when they do not |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | match. That is, in order to use a mobile terminal, it is necessary to pass the above verification several times."<br><br>Kensaku at [0039]-[0041]:<br><br>"[0039] Next, collation processing for performing individual collation using the finger feature information registered as described above will be described with reference to the flowchart shown in FIG. (Explanation of Second Collation Processing) When a predetermined operation for starting the fingerprint collation processing is performed by the user at the mobile terminal, a message prompting fingerprint collation is displayed on the display unit 16 as in the first collation processing. Is done. Thereafter, when the user performs an input operation for starting fingerprint collation according to this message, the screen is switched, and a set S as a password candidate is displayed on the display unit 16 (S31). When the user selects the password $P\_i$ from the set S (S32) (here, $P\_1$ used in the second registration process is first selected), the information on the selected $P\_1$ is displayed on the operation unit 17. To the control unit 14. Thereafter, a message for prompting fingerprint collection is displayed on the display unit 16. When the user places a finger on the fingerprint input sensor 11 in accordance with this message, the image information of the fingerprint is read and converted into digital information by the A / D conversion unit 12. The converted image information is output to the feature extraction unit 13. The feature extraction unit 13 extracts feature information B ′ of the fingerprint image according to a predetermined feature extraction algorithm. The control unit 14 divides the feature information B ′ output from the feature extraction unit 13 into small regions (m division: $B'\_1$ to $B'\_m$), and is associated with $P\_1$ received via the operation unit 17 Is determined from among the small regions 1 to m (in this example, K1 is determined), and the feature information $B'\_{K1}$ of the determined region is sent to the collation / determination unit 15. It is done. The collation / determination unit 15 collates the feature information $B'\_{K1}$ with the feature information $B\_1$ registered in the feature information storage unit 18 (S34). If they do not match |

- 22 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | $((B'\_K1 \neq B\_K1))$, S34 NO), the other person is determined at that time and the use of the mobile terminal is rejected. On the other hand, if they match $((B'\_K1 = B\_K1)$, YES in S34), it is further determined (S35) whether or not the same collation processing is repeated n $(= B\_n)$ times, and n times When it reaches (YES in S35), the series of collation processing is finished. However, if it is determined in the determination (S35) that i is not n (NO in S35), i is incremented by +1 (S36), and the processing from (S31) is performed again. That is, until i reaches n, $B'\_Ki$ and $B\_K1$ are collated repeatedly, and if all match, the person is determined.<br><br>[0040] In this example, when each Pi is determined, it is necessary to read the finger characteristic information $B'\_1$ to $B'\_m$ corresponding to $B\_1$ to $B\_m$ every time. In this example, the case where the control unit 14 divides the region of the fingerprint image information read by the fingerprint input sensor 11 has been described. However, the region extraction of the fingerprint image information is performed by the feature extraction unit 13. Also good. In this case, the parameter m for the number of area divisions may be stored in advance by itself or may be instructed by the control unit 14.<br><br>[0041] As described above, according to the present embodiment, the fingerprint feature information is divided into a plurality of regions, and the information obtained by combining the feature information of the divided regions, the feature information, and the character / picture information as a password is used for personal authentication. It is used as collation data. That is, compared with the conventional password-only authentication, authentication with a stronger connection with the individual biometric features is possible, security is further enhanced, and "spoofing" by a malicious third party is difficult." |

- 23 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 1d.  wherein the transmitter sub-system controller is further configured to: | *See* Claim Element 1b. |
| 1d1.  receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; | *See, e.g.:*<br><br>Kensaku at [0015]:<br>"[0015] According to the present invention, since a plurality of pieces of biometric information are ordered and used in the same manner as passwords, it is difficult to link registered biometric information and individuals without knowing the arrangement order of the biometric information. "Spoofing" by the three parties can be prevented. As a result, personal authentication with higher security can be realized as compared with the conventional password-only authentication. In addition, since the registered biometric information is stored in a random order, the user's resistance to registration of biometric information compared to conventional biometric information authentication that collects and authenticates one piece of biometric information. Can be reduced."<br><br>Kensaku at [0017]:<br><br>**"[0017]** (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| **Claim Element** | **Kensaku** |
| | CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used. <br><br> Kensaku at [0023]: <br><br> [0023] When the feature information B_1 associated with P_1 is registered in the feature information storage unit 18 in this way, it is determined (S4) whether or not the same process is repeated n (= B_n) times. If it is determined in (S4) that the process has been repeated n (= B_n) times (YES in S4), the series of registration processes is terminated. However, if it is determined in the determination (S4) that the number has not reached n times (NO in S4), i is incremented by +1 (S5), and the process from (S1) is performed again. That is, the same process as described above is performed on P_2, and the feature information of B_2 is extracted and registered according to the feature extraction algorithm determined for P_2. At this time, even if the same fingerprint is used, the feature information extracted in B_2 is different between the extracted feature information B_2 and B_1 because the feature extraction algorithm is determined to be different from that in B_1. In the above example, the case where feature extraction is performed using the same fingerprint has been described. However, the present invention is not limited to this, and a different fingerprint may be used." |

- 25 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | Kensaku at [0038]: <br><br> [0038] When the feature information of B_K1 is registered as described above, it is determined whether or not the same processing as described above has been repeated n (= B_n) times (S25), and if it has reached n times at this time (S25) YES), a series of registration processing is completed. On the other hand, if it is determined in the above determination (S25) that the number has not reached n times (NO in S25), i is incremented by +1 (S26), and the process from (S22) is performed again. That is, the same processing as described above is performed in the same manner as described above for P_2 as the next password word. In this case, one region corresponding to P_2 is determined from the small regions 1 to m (in this case, K2 is determined), and feature information B_K2 of the determined region corresponds to P_2. The feature information is stored in the feature information storage unit 18 as finger feature information. As described above, in this registration process, fingerprint information (= characteristic information) BK_1 to BK_n of a plurality of fingers is determined by repeating the processes of (S22) to (S26), and these information is used instead of a password. can do. At this time, if there is a relationship of n (number of password elements) ⟨m (number of divisions of finger feature information), authentication is performed with a feature amount smaller than the feature amounts (B_1 to B_m) required for authentication of only the fingerprint. It is possible." |
| 1d2.  map said series into an instruction; and | *See, e.g.:* <br><br> Kensaku at [0017]: <br><br> "[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Kensaku** |
| | authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used. <br><br> Kensaku at [0023]: <br><br> [0023] When the feature information B_1 associated with P_1 is registered in the feature information storage unit 18 in this way, it is determined (S4) whether or not the same process is repeated n (= B_n) times. If it is determined in (S4) that the process has been repeated n (= B_n) times (YES in S4), the series of registration processes is terminated. However, if it is determined in the determination (S4) that the number has not reached n times (NO in S4), i is |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | incremented by +1 (S5), and the process from (S1) is performed again. That is, the same process as described above is performed on P_2, and the feature information of B_2 is extracted and registered according to the feature extraction algorithm determined for P_2. At this time, even if the same fingerprint is used, the feature information extracted in B_2 is different between the extracted feature information B_2 and B_1 because the feature extraction algorithm is determined to be different from that in B_1. In the above example, the case where feature extraction is performed using the same fingerprint has been described. However, the present invention is not limited to this, and a different fingerprint may be used." |
| | Kensaku at [0038]: |
| | [0038] When the feature information of B_K1 is registered as described above, it is determined whether or not the same processing as described above has been repeated n (= B_n) times (S25), and if it has reached n times at this time (S25 YES), a series of registration processing is completed. On the other hand, if it is determined in the above determination (S25) that the number has not reached n times (NO in S25), i is incremented by +1 (S26), and the process from (S22) is performed again. That is, the same processing as described above is performed in the same manner as described above for P_2 as the next password word. In this case, one region corresponding to P_2 is determined from the small regions 1 to m (in this case, K2 is determined), and feature information B_K2 of the determined region corresponds to P_2. The feature information is stored in the feature information storage unit 18 as finger feature information. As described above, in this registration process, fingerprint information (= characteristic information) BK_1 to BK_n of a plurality of fingers is determined by repeating the processes of (S22) to (S26), and these information is used instead of a password. can do. At this time, if there is a relationship of n (number of password elements) ⟨m (number of divisions of finger feature information), |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | authentication is performed with a feature amount smaller than the feature amounts (B_1 to B_m) required for authentication of only the fingerprint. It is possible." |
| 1d3.  populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See, e.g.:*<br><br>Kensaku at [0017]:<br><br>"[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used." |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| :--- | :--- |
| **Claim Element** | **Kensaku** |
| | Kensaku at [0018]:<br><br>"[0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone." |
| | |
| 2. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | *See* Claim 1. |
| 2a. provide a signal for directing input of the series of entries of the biometric signal; | *See, e.g.*:<br><br>Kensaku at [0017]:<br><br>"[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
|  | referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used."<br><br>Kensaku at [0019]:<br>"[0019] (Explanation of First Registration Process) When the user turns on the power of the mobile terminal and performs a predetermined input operation on the operation unit 17, a message indicating that personal security information is registered is displayed on the display unit 16. Displayed (see FIG. 3). In this example, the case where "fingerprint information" is registered as personal security information will be described as an example." |
| 2b.   incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | *See, e.g.*:<br>Kensaku at [0009]:<br><br>"[0009] The personal authentication method using biometric information according to the present invention is a personal authentication method for identifying and authenticating an individual using biometric information, as described in claim 4, wherein the biometric information has a function of collecting the biometric information. An information input unit is provided, a set including the individual confidential information as a component is created in |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | advance, and biometric feature data is extracted from the biometric information collected by the biometric information input unit according to a predetermined feature extraction algorithm The extracted biometric feature data is divided into a plurality of elements, the elements determined from the constituent elements are registered in association with the divided biometric feature data, and the biometric feature data corresponding to the registered elements Is used as collation data to identify and authenticate individuals." |
| 2c.   construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | *See, e.g.*:<br>Kensaku at [0034]:<br><br>"[0034] Furthermore, in the present invention, since the biometric information is repeatedly extracted, it is not always necessary to uniquely identify the user from the feature information of the biometric information used each time. Therefore, the amount of feature information of biometric information extracted each time can be reduced compared to the conventional method of authenticating biometric information once, and the personal authentication device using the fingerprint input sensor 11 having a relatively simple configuration or the like can be used. Realization is possible." |
| | |
| 4.  The system according to claim   1,   wherein   the biometric   sensor   is responsive to one of voice, retinal pattern, iris pattern, face   pattern,   and  palm configuration,   and/or   the database   of   biometric | *See, e.g.:*<br><br>Kensaku at [0012]:<br><br>"[0012] The personal authentication method using biometric information according to the present invention is the personal authentication method |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Kensaku |
|---|---|
| signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | according to claim 7, wherein the biometric information includes at least one of voice, iris, face, retina, blood vessel, palm, and signature. It is characterized by representing one piece of information." |
|  |  |
| 6. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | *See, e.g.:*<br><br>Kensaku at [0001]:<br>"[0001] BACKGROUND OF THE INVENTION 1. Field of the Invention The present invention relates to a personal authentication method, a personal authentication apparatus and a client server type personal authentication system for identifying and authenticating an individual using biometric information as image data."<br><br>Kensaku at [0013]:<br><br>"[0013] In order to solve the above problems, a personal authentication device using biometric information according to the present invention is a personal authentication device that identifies and authenticates an individual using biometric information, as described in claim 8. From the biometric information input means having a function of collecting the biometric information, the secret information creating means for creating a set having the personal secret information as a constituent element in advance, and the biometric information collected by the biometric information input means, Biometric feature data extraction / registration means for extracting and registering biometric feature data according to a feature extraction algorithm associated with an element |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | determined from the elements of the set, and biometric feature data corresponding to the registered element And authentication means for identifying and authenticating an individual using the data as verification data." |
| 6a.  wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | *See, e.g.:*<br><br>Kensaku at [0017]:<br><br>"[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used."<br><br>Kensaku at [0019]: |

- 34 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | "[0019] (Explanation of First Registration Process) When the user turns on the power of the mobile terminal and performs a predetermined input operation on the operation unit 17, a message indicating that personal security information is registered is displayed on the display unit 16. Displayed (see FIG. 3). In this example, the case where "fingerprint information" is registered as personal security information will be described as an example."<br><br>Kensaku at [0001]:<br>"[0001] BACKGROUND OF THE INVENTION 1. Field of the Invention The present invention relates to a personal authentication method, a personal authentication apparatus and a client server type personal authentication system for identifying and authenticating an individual using biometric information as image data."<br><br>Kensaku at [0013]:<br><br>"[0013] In order to solve the above problems, a personal authentication device using biometric information according to the present invention is a personal authentication device that identifies and authenticates an individual using biometric information, as described in claim 8. From the biometric information input means having a function of collecting the biometric information, the secret information creating means for creating a set having the personal secret information as a constituent element in advance, and the biometric information collected by the biometric information input means, Biometric feature data extraction / registration means for extracting and registering biometric feature data according to a feature extraction algorithm associated with an element determined from the elements of the set, and biometric feature data corresponding to the registered element And authentication means for identifying and authenticating an individual using the data as verification data." |

- 35 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 6b. the system further comprising a control panel configured to receive the information and provide the secure access requested. | *See, e.g.:*<br><br>Kensaku at [0017]:<br><br>[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used.<br><br>Kensaku at [0019]:<br><br>**[0019]** (Explanation of First Registration Process) When the user turns on the power of the mobile terminal and performs a predetermined input operation on |

- 36 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Kensaku** |
| | the operation unit 17, a message indicating that personal security information is registered is displayed on the display unit 16. Displayed (see FIG. 3). In this example, the case where "fingerprint information" is registered as personal security information will be described as an example.<br><br>Kensaku at [0021]:<br><br>[0021] The user scrolls the display unit 16 to select one character P_i (in this case, P_i = P_1) (S2) by operating the operation unit 17 to select a character or picture to be used as a password from the set S. The information of the selected P_1 is sent to the control unit 14, and the control unit 14 extracts the feature extraction algorithm corresponding to P_1 from the algorithm storage unit 19 and outputs it to the feature extraction unit 13. The algorithm storage unit 19 stores a plurality of feature extraction algorithms. For example, feature extraction algorithms such as a minutia matching method, a minutia relation method, and a pattern matching method are stored. In this example, the algorithms A, B, and C are assumed in order from the top. |
| | |
| 9. The system according to claim 1, wherein: the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | To the extent this claim is not found indefinite for lack of antecedent basis for the term "the electronic computing device," *see, e.g.*:<br><br>Kensaku at [0017]:<br><br>[0017] (Embodiment 1) FIG. 1 is a diagram showing a schematic configuration of an authentication apparatus (hereinafter referred to as a personal authentication apparatus) according to the present invention. In FIG. 1, this personal authentication device includes a fingerprint input sensor 11 unit for inputting image information of a user's biological body to be verified (in this example, a human finger (= fingerprint) is used as a biological body). An A / D converter 12 (Analog to Digital Converter) that converts analog information of an image read |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | by the input sensor 11 into digital information, and a predetermined feature extraction algorithm for digital image information output from the A / D converter 12 The feature extraction unit 13 that extracts fingerprint feature data (hereinafter referred to as feature information), the control unit 14 that performs overall control (for example, mainly composed of a CPU or the like), characters, And display unit 16 for displaying characters and graphics input by the operation unit, displaying information output from the control unit 14, and feature extraction 13, a feature information storage unit 18 for registering the feature information of the user's fingerprint extracted in step 13 together with character and graphic information input from the operation unit 17, fingerprint feature information newly input for verification, and feature information The collation / determination unit 15 that collates the fingerprint feature information registered in the storage unit 18 and determines the person or other person based on the degree of coincidence between them, and stores the feature extraction algorithm used in the fingerprint feature extraction. The algorithm storage unit 19 is used. |
| | |
| 10.    A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 10a.    a biometric sensor configured to receiving a biometric signal; | *See* Claim Element 1b1. |
| 10b. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output | *See* Claim Element 1b2. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| an accessibility attribute; and | |
| 10c. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 10d. wherein the controller is further configured to: | *See* Claim Element 1b. |
| 10d1. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 10d2. map said series into an instruction; and | *See* Claim Element 1d2. |
| 10d3. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an | *See* Claim Element 1d3. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| electronic computing device. | |
| | |
| 11. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | *See* Claim 1. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 11a.    populating    the database    of    biometric signatures by: | *See* Claim Element 1d3. |
| 11a1.  receiving a series of entries  of  the  biometric signal; | *See* Claim Element 1d1. |
| 11a2.  determining at least one  of  the number of said entries  and  a  duration  of each said entry; | *See* Claim Element 1d1. |
| 11a3.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 11a4.    populating    the database  according  to  the instruction; | *See* Claim Element 1d3. |
| 11b.    receiving    the biometric signal; | *See* Claim Element 1b1. |
| 11c.    matching    the biometric  signal  against members of the database of biometric   signatures   to thereby    output    an accessibility attribute; | *See* Claim Element 1b2. |
| 11d.    emitting  a  secure access  signal  conveying information dependent upon | *See* Claim Element 1b3. |

- 41 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Kensaku** |
| said accessibility attribute; and | |
| 11e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
| | |
| 12. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | *See* Claim Element 1a.<br><br>*See also*:<br>Kensaku at [0018]-[0019]:<br><br>"[0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone.<br><br>[0019] (Explanation of First Registration Process) When the user turns on the power of the mobile terminal and performs a predetermined input operation on the operation unit 17, a message indicating that personal security information is registered is displayed on the display unit 16. Displayed (see FIG. 3). In this example, the case where "fingerprint information" is registered as personal security information will be described as an example." |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | Kensaku at [0025]:<br><br>"[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as $P\_1$, the character "R", $P\_2$ as the character "y", $P\_3$ as the character "H", $P\_4$ as the character "a", and $P\_n$ ($P\_5$) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information $B\_1, B\_2,... B\_n$ is used instead of the password." |
| 12a.  receiving a biometric signal; and | *See* Claim Element 1b1. |
| 12b.  enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | See Claim 1<br><br>*See, e.g.:*<br>Kensaku at [0018]-[0019]:<br><br>"[0018] Next, the operation in the above configuration will be described. First, a first registration process for registering user fingerprint characteristic information will be described with reference to a flowchart shown in FIG. Here, description will be made on the assumption that the above-described personal authentication device is mounted on a mobile terminal such as a mobile phone.<br><br>[0019] (Explanation of First Registration Process) When the user turns on the power of the mobile terminal and performs a predetermined input operation on the operation unit 17, a message indicating that personal security information is registered is displayed on the display unit 16. Displayed (see FIG. 3). In this example, the case where "fingerprint information" is registered as personal security information will be described as an example." |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| | Kensaku at [0025]:<br><br>"[0025] As described above, in the fingerprint registration process according to the first embodiment, a password / character is selected from a set of passwords / pictures, and an algorithm determined according to the selected character / picture is used. Therefore, the extracted feature information is registered. For example, as shown in FIG. 6, as $P\_1$, the character "R", $P\_2$ as the character "y", $P\_3$ as the character "H", $P\_4$ as the character "a", and $P\_n$ ($P\_5$) as the character. When "n" is selected as a password, different features are extracted depending on the selected character. That is, by repeating these, a plurality of fingerprint information $B\_1$, $B\_2$,... $B\_n$ is used instead of the password." |
| | |
| 14. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | *See* Claims 1 and 11. |
| 14a. receive a series of entries of a biometric signal; | *See* Claim Element 1d1. |
| 14b. determine at least one of a number of said entries and a duration of each of said entries; | *See* Claim Element 1d1. |
| 14c. map said series into an instruction; | *See* Claim Element 1d2. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 14d.  populate a database of biometric signatures according to the instruction; | *See* Claim Element 1d3. |
| 14e.  receive the biometric signal; | *See* Claim Element 1b1. |
| 14f.  match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 14g.  emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 14h.  provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1c2 and 1d3. |
| | |
| 15.  A system for providing secure access to a controlled | *See* Claim 1. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| item, the system comprising: | |
| 15a. a memory comprising a database of biometric signatures; | *See* Claim Element 1a. |
| 15b. a transmitter sub-system comprising: | *See* Claim Element 1b. |
| 15b1. a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 15b2. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 15b3. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 15c. a receiver sub-system comprising: | *See* Claim Element 1c. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 15c1.  a receiver sub-system controller capable of: receiving the transmitted secure access signal; and | *See* Claim Element 1c1. |
| 15c2.  providing conditional access to the controlled item dependent upon said information; | *See* Claim Element 1c2. |
| 15d.          wherein     the transmitter     sub-system controller is further capable of: | *See* Claim Element 1b. |
| 15d1.  receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 15d2.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 15d3.  populating the data base according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is  one  of:  a  locking mechanism of a physical access   structure   or   an electronic   lock   on   an | *See* Claim Element 1d3. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| electronic computing device. | |
| | |
| 16. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 16a. a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 16b. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 16c. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 16d. wherein the controller is further capable of: | *See* Claim Element 1b. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 16d1.  receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 16d2.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 16d3.     populating    the database according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is   one   of:   a   locking mechanism of a physical access    structure    or    an electronic    lock    on    an electronic          computing device. | *See* Claim Element 1d3. |
|  | |
| 17.  A method for providing secure access to a controlled item in a system comprising a  database  of  biometric signatures,     a     transmitter sub-system   comprising   a biometric sensor capable of receiving a biometric signal, and a transmitter capable of | *See* Claim 1. |

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | |
| 17a. populating the database of biometric signatures by: | *See* Claim Element 1d3. |
| 17a1. receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |
| 17a2. determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 17a3. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 17a4. populating the database according to the instruction; | *See* Claim Element 1d3. |

- 50 -

Exhibit C-12 (Kensaku)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Kensaku** |
| 17b.    receiving    the biometric signal; | *See* Claim Element 1b1. |
| 17c.    matching    the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 17d.    emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 17e.  providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |

Exhibit C-13 (Pu)

**Exhibit C-13**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**US Patent No. 5,933,515 ("Pu")**

US Patent No. 5,933,515 to Pu ("Pu") anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| 1. A system for providing secure access to a controlled item, the system comprising: | *See, e.g.:*<br><br>Pu at Abstract:<br><br>"An identification system using biometric information of human body parts and a secret sequence code."<br><br>Pu at 4:15-5:3:<br>"FIG. 1 shows a preferred embodiment of the above identification system using fingerprint sequence codes in the present invention. The process illustrated in FIG. 1 is implemented by various systems disclosed herein, examples of which are shown in FIGS. 2, 3, and 4. The system includes a |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | template database with a plurality of different fingerprints from authorized users, a sequence code database with secret sequence codes of all authorized users, and a user stack memory having blank spaces for authorized users to store the corresponding secret sequence code. According to the present invention, different authorized users have different secret sequence codes and one user's secret sequence code is not known by another user.<br><br>The system of the present invention examines whether a user to be identified is in the template database by comparing at least one fingerprint entered by the user with the stored fingerprints of authorized users. The disclosed system further checks whether or not the user's entered sequence code matches the secret sequence code kept in the sequence code database from one authorized user whose fingerprints match the user's. Furthermore, the system is constructed to minimize the processing time and thereby to simulate a "real-time" identification process.<br><br>A user to be identified first enters one fingerprint at the process 100. The entered fingerprint is compared with the fingerprints of the authorized users stored in the template database in fingerprint identification process 102. If there is no match, the user is not recognized. If there is at least one match, the system identifies which authorized user is matched and further registers the entered fingerprint as the first entry of a secret sequence code of the matched authorized user in the user stack memory. This completes step 104.<br><br>Next, the system checks if a sequence code is completed with the first entered fingerprint in step 106. If a sequence code is not completed, the system asks the user to be identified to enter a second fingerprint. The above process repeats until a complete sequence code is constructed with at least one entered fingerprint. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | In step 108, the system compares entries of sequence codes in the user stack memory including unregistered blanks with their corresponding sequence code stored in the sequence code database. This comparison is performed for all authorized users in the database whether or not there is a fingerprint match between the entered fingerprints and the fingerprints in the sequence code. If the entered fingerprint sequence code matches the sequence code of the authorized user in the sequence code database, the system renders a positive identification and the user is considered an authorized user. Therefore, the user to be identified not only has entered correctly matched fingerprint(s) but also has entered the correct sequence code of the matched authorized user. If there is no match in sequence code comparison, the identification is negative and the user either is not in the database or has entered an incorrect sequence code." |
| 1a.  a memory comprising a database of biometric signatures; | *See, e.g.:*<br><br>Pu at 4:15-27 and Fig. 1: |

Exhibit C-13 (Pu)



Figure 1

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Pu** |
| | "FIG. 1 shows a preferred embodiment of the above identification system using fingerprint sequence codes in the present invention. The process illustrated in FIG. 1 is implemented by various systems disclosed herein, examples of which are shown in FIGS. 2, 3, and 4. The system includes a template database with a plurality of different fingerprints from authorized users, a sequence code database with secret sequence codes of all authorized users, and a user stack memory having blank spaces for authorized users to store the corresponding secret sequence code. According to the present invention, different authorized users have different secret sequence codes and one user's secret sequence code is not known by another user."<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Pu** |
| | tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit"<br><br>Figure 2<br><br>Pu at 7:22-30:<br>"FIG. 3 shows one preferred embodiment of such optical correlators suitable for the identification system depicted in FIG. 2. A coherent optical beam generated by a laser source (not shown) is split into reference beam 320 and a signal beam 302, both of which are collimated plane waves. Both beams are needed to record and update the fingerprints of an authorized user in a template database stored in a holographic medium 300. Only the signal beam 302 is needed to perform an identification process." |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| **Claim Element** | **Pu** |
|---|---|
| 1b.    a transmitter sub-system comprising: | *See, e.g.:*<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | <br><br>Figure 2 |
| 1b1. a biometric sensor configured to receive a biometric signal; | *See, e.g.:*<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" <br><br> <br> Figure 2 |
| 1b2.    a transmitter sub-system    controller configured to match the biometric signal against members of the database of | *See, e.g.:* <br><br> Pu at 4:38-5:3: |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| biometric signatures to thereby output an accessibility attribute; and | "A user to be identified first enters one fingerprint at the process 100. The entered fingerprint is compared with the fingerprints of the authorized users stored in the template database in fingerprint identification process 102. If there is no match, the user is not recognized. If there is at least one match, the system identifies which authorized user is matched and further registers the entered fingerprint as the first entry of a secret sequence code of the matched authorized user in the user stack memory. This completes step 104. Next, the system checks if a sequence code is completed with the first entered fingerprint in step 106. If a sequence code is not completed, the system asks the user to be identified to enter a second fingerprint. The above process repeats until a complete sequence code is constructed with at least one entered fingerprint. In step 108, the system compares entries of sequence codes in the user stack memory including unregistered blanks with their corresponding sequence code stored in the sequence code database. This comparison is performed for all authorized users in the database whether or not there is a fingerprint match between the entered fingerprints and the fingerprints in the sequence code. If the entered fingerprint sequence code matches the sequence code of the authorized user in the sequence code database, the system renders a positive identification and the user is considered an authorized user. Therefore, the user to be identified not only has entered correctly matched fingerprint(s) but also has entered the correct sequence code of the matched authorized user. If there is no match in sequence code comparison, the identification is negative and the user either is not in the database or has entered an incorrect sequence code." <br><br> Pu at 6:20-50 and Fig. 2: <br> "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input |

- 10 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Figure 2<br><br>Pu at 9:1-43:<br><br>"To identify a user, the reference beam 320 is turned off and the signal beam 302 is used for identity processing. The user to be identified enters fingerprints which are simultaneously compared with the fingerprints of authorized users in the holographic medium 300 by the optical correlator. The image of an entered fingerprint is Fourier transformed by the lens 306 and multiplied with the Fourier-transformed holograms of the template fingerprints in the holographic medium 300. Next, a inverse Fourier transform of the multiplication thereabove is performed by the Fourier lens 330. Therefore, the correlation pattern of the entered fingerprint and the template fingerprints is formed on the output screen 332 which is located in the Fourier plane of the lens 330. |

- 12 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | A correlation peak appears on the output screen 332 if the entered fingerprint is similar to one template fingerprint in the database and is entered at a similar orientation of that template fingerprint. The brightness of a correlation peak is a function of the degree of similarity between the images and it increases if there is more similarity between the images. The electronic processor 220 identifies the entered fingerprint as a fingerprint belonging to the database if the intensity of the correlation peak is greater than a predetermined threshold value. The orientation of an input fingerprint is important because the optical correlator in FIG. 3 based on Fourier transform is rotation-variant. No correlation peak appears if a right fingerprint is entered at a wrong orientation or a wrong fingerprint is entered. Furthermore, as described thereabove, the location of a bright correlation spot on the output screen 332 indicates whose fingerprint and more specifically which fingerprint of that person is matched.<br><br>As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process for all authorized users in the database to make either a positive or a negative identification of the user."<br><br>*See also*, Pu at 9:66-10:36. |
| 1b3.       a       transmitter configured to emit a secure access signal conveying information dependent upon | *See, e.g.:*<br><br>Pu at 4:38-5:3: |

- 13 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| said accessibility attribute; and | "A user to be identified first enters one fingerprint at the process 100. The entered fingerprint is compared with the fingerprints of the authorized users stored in the template database in fingerprint identification process 102. If there is no match, the user is not recognized. If there is at least one match, the system identifies which authorized user is matched and further registers the entered fingerprint as the first entry of a secret sequence code of the matched authorized user in the user stack memory. This completes step 104. Next, the system checks if a sequence code is completed with the first entered fingerprint in step 106. If a sequence code is not completed, the system asks the user to be identified to enter a second fingerprint. The above process repeats until a complete sequence code is constructed with at least one entered fingerprint. <br><br> In step 108, the system compares entries of sequence codes in the user stack memory including unregistered blanks with their corresponding sequence code stored in the sequence code database. This comparison is performed for all authorized users in the database whether or not there is a fingerprint match between the entered fingerprints and the fingerprints in the sequence code. If the entered fingerprint sequence code matches the sequence code of the authorized user in the sequence code database, the system renders a positive identification and the user is considered an authorized user. Therefore, the user to be identified not only has entered correctly matched fingerprint(s) but also has entered the correct sequence code of the matched authorized user. If there is no match in sequence code comparison, the identification is negative and the user either is not in the database or has entered an incorrect sequence code." <br><br><br> Pu at 6:20-50 and Fig. 2: <br> "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system |

- 14 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

- 15 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| |  Figure 2  Pu at 9:1-43:  "To identify a user, the reference beam 320 is turned off and the signal beam 302 is used for identity processing. The user to be identified enters fingerprints which are simultaneously compared with the fingerprints of authorized users in the holographic medium 300 by the optical correlator. The image of an entered fingerprint is Fourier transformed by the lens 306 and multiplied with the Fourier-transformed holograms of the template fingerprints in the holographic medium 300. Next, a inverse Fourier transform of the multiplication thereabove is performed by the Fourier lens 330. Therefore, the correlation pattern of the entered fingerprint and the template fingerprints is formed on the output screen 332 which is located in the Fourier plane of the lens 330. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| --- | --- |
| **Claim Element** | **Pu** |
| | A correlation peak appears on the output screen 332 if the entered fingerprint is similar to one template fingerprint in the database and is entered at a similar orientation of that template fingerprint. The brightness of a correlation peak is a function of the degree of similarity between the images and it increases if there is more similarity between the images. The electronic processor 220 identifies the entered fingerprint as a fingerprint belonging to the database if the intensity of the correlation peak is greater than a predetermined threshold value. The orientation of an input fingerprint is important because the optical correlator in FIG. 3 based on Fourier transform is rotation-variant. No correlation peak appears if a right fingerprint is entered at a wrong orientation or a wrong fingerprint is entered. Furthermore, as described thereabove, the location of a bright correlation spot on the output screen 332 indicates whose fingerprint and more specifically which fingerprint of that person is matched. <br><br> As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process for all authorized users in the database to make either a positive or a negative identification of the user." |
| 1c.   a receiver sub-system comprising: | *See, e.g.:* <br><br> Pu at 6:20-50 and Fig. 2: <br> "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
|  | based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Figure 2 |
| 1c1.  a receiver sub-system controller configured to: receive the transmitted secure access signal; and | *See, e.g.:*<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is |

- 19 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" <br><br> <br> Figure 2 <br><br> Pu at 9:1-43: <br><br> "To identify a user, the reference beam 320 is turned off and the signal beam 302 is used for identity processing. The user to be identified enters fingerprints which are simultaneously compared with the fingerprints of |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | authorized users in the holographic medium 300 by the optical correlator. The image of an entered fingerprint is Fourier transformed by the lens 306 and multiplied with the Fourier-transformed holograms of the template fingerprints in the holographic medium 300. Next, a inverse Fourier transform of the multiplication thereabove is performed by the Fourier lens 330. Therefore, the correlation pattern of the entered fingerprint and the template fingerprints is formed on the output screen 332 which is located in the Fourier plane of the lens 330. <br><br> A correlation peak appears on the output screen 332 if the entered fingerprint is similar to one template fingerprint in the database and is entered at a similar orientation of that template fingerprint. The brightness of a correlation peak is a function of the degree of similarity between the images and it increases if there is more similarity between the images. The electronic processor 220 identifies the entered fingerprint as a fingerprint belonging to the database if the intensity of the correlation peak is greater than a predetermined threshold value. The orientation of an input fingerprint is important because the optical correlator in FIG. 3 based on Fourier transform is rotation-variant. No correlation peak appears if a right fingerprint is entered at a wrong orientation or a wrong fingerprint is entered. Furthermore, as described thereabove, the location of a bright correlation spot on the output screen 332 indicates whose fingerprint and more specifically which fingerprint of that person is matched. <br><br> As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Pu |
|---|---|
|  | for all authorized users in the database to make either a positive or a negative identification of the user." <br><br> Pu at 4:38-5:3: <br><br> "A user to be identified first enters one fingerprint at the process 100. The entered fingerprint is compared with the fingerprints of the authorized users stored in the template database in fingerprint identification process 102. If there is no match, the user is not recognized. If there is at least one match, the system identifies which authorized user is matched and further registers the entered fingerprint as the first entry of a secret sequence code of the matched authorized user in the user stack memory. This completes step 104. Next, the system checks if a sequence code is completed with the first entered fingerprint in step 106. If a sequence code is not completed, the system asks the user to be identified to enter a second fingerprint. The above process repeats until a complete sequence code is constructed with at least one entered fingerprint. <br> In step 108, the system compares entries of sequence codes in the user stack memory including unregistered blanks with their corresponding sequence code stored in the sequence code database. This comparison is performed for all authorized users in the database whether or not there is a fingerprint match between the entered fingerprints and the fingerprints in the sequence code. If the entered fingerprint sequence code matches the sequence code of the authorized user in the sequence code database, the system renders a positive identification and the user is considered an authorized user. Therefore, the user to be identified not only has entered correctly matched fingerprint(s) but also has entered the correct sequence code of the matched authorized user. If there is no match in sequence code comparison, the identification is negative and the user either is not in the database or has entered an incorrect sequence code." |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Pu** |
| | |
| 1c2. provide conditional access to the controlled item dependent upon said information; | *See, e.g.:*<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

- 23 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Figure 2<br><br>Pu at 9:1-43:<br><br>"To identify a user, the reference beam 320 is turned off and the signal beam 302 is used for identity processing. The user to be identified enters fingerprints which are simultaneously compared with the fingerprints of authorized users in the holographic medium 300 by the optical correlator. The image of an entered fingerprint is Fourier transformed by the lens 306 and multiplied with the Fourier-transformed holograms of the template fingerprints in the holographic medium 300. Next, a inverse Fourier transform of the multiplication thereabove is performed by the Fourier lens 330. Therefore, the correlation pattern of the entered fingerprint and the template fingerprints is formed on the output screen 332 which is located in the Fourier plane of the lens 330.<br><br>A correlation peak appears on the output screen 332 if the entered fingerprint is similar to one template fingerprint in the database and is entered at a similar orientation of that template fingerprint. The brightness of a correlation peak |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Pu** |
| | is a function of the degree of similarity between the images and it increases if there is more similarity between the images. The electronic processor 220 identifies the entered fingerprint as a fingerprint belonging to the database if the intensity of the correlation peak is greater than a predetermined threshold value. The orientation of an input fingerprint is important because the optical correlator in FIG. 3 based on Fourier transform is rotation-variant. No correlation peak appears if a right fingerprint is entered at a wrong orientation or a wrong fingerprint is entered. Furthermore, as described thereabove, the location of a bright correlation spot on the output screen 332 indicates whose fingerprint and more specifically which fingerprint of that person is matched. <br><br> As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process for all authorized users in the database to make either a positive or a negative identification of the user." |
| 1d.  wherein the transmitter sub-system controller is further configured to: | *See* Claim Element 1b. |
| 1d1.  receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of | *See, e.g.:* <br><br> Pu at 6:20-50 and Fig. 2: <br> "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present |

- 25 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Pu** |
| said entries and a duration of each said entry; | invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

- 26 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Figure 2<br><br>Pu at 5:10-57:<br><br>"A secret sequence code for an authorized user is formed by a combination of fingerprints. The number of fingerprints to be entered is dependent on the sequencing method to construct the code. On the other hand, a particular sequencing method also affects the way that a fingerprint is entered. According to the present invention, there are many ways to form a sequence code using at least one fingerprint. The inventors list several embodiments of forming a fingerprint sequence code in the following in order to illustrate the concept of the present invention. It should be understood that the system described in the preferred embodiment could be used for any of these and other variations based on the concept and spirit of the present invention.<br>1. A Multiple-Fingerprint Sequential Code. A combination of a plurality of different fingerprints are used in this method to construct a sequence code. In particular, a sequence code is formed by a sequential order in which a |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | combination is entered. For example, a code uses five fingerprints that is a combination of three different fingerprints.<br><br>One advantage of using a plurality of different fingerprints is redundancy. A fingerprint, like many other physical traits used in biometric identification, is usually uniquely associated to a particular person. The possibility of two people having one identical fingerprint is small. However, there is a possibility of two people have one similar though not identical fingerprint. Specially, the degree of similarity of a fingerprint between two people is dependent on the identification technique and device that are used. Employing multiple different fingerprints for identification further takes the advantage of uniqueness of fingerprints to minimize the possibility of two people having the same identity in the fingerprint identification system disclosed in the present invention. In addition, the present invention uses sequence codes formed with a plurality of different fingerprints to ensure the accuracy of an identification and security of the system.<br><br>2. A Fingerprint Morse Code. A user enters one fingerprint for different time durations on the fingerprint input device. By removing and placing the user's fingerprint on the input device for a plurality of times with different duration, a fingerprint Morse Code is generated and then compared with the stored Morse Code of that particular user for positive identification. One fingerprint is sufficient for this method. An alternative technique uses one fingerprint for "dots" and a different one for "dashes". However, a plurality of different fingerprints are preferred to take advantage of redundancy." |
| 1d2.  map said series into an instruction; and | *See, e.g.:*<br><br>Pu at 7:22-55:<br>"<br><br>FIG. 3 shows one preferred embodiment of such optical correlators suitable for the identification system depicted in FIG. 2. A coherent optical beam generated by a laser source (not shown) is split into reference beam 320 and |

- 28 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | a signal beam 302, both of which are collimated plane waves. Both beams are needed to record and update the fingerprints of an authorized user in a template database stored in a holographic medium 300. Only the signal beam 302 is needed to perform an identification process. |
| | The image of a user's fingerprint is imprinted on the signal beam 302 by a spatial light modulator (SLM) 304. A lens 306 Fourier-transforms the image on the SLM 304 to the Fourier plane. Since the feature information of the input image is in the high spatial frequency components of the Fourier transform, the DC component at the center of the Fourier plane 307 is blocked by a spatial filer 308. Such DC filtering performs an edge enhancement in the input image. According to the present invention, the spacing between the SLM 304 and lens 306 can be an arbitrary distance but is preferably the focal length of lens 306. Lenses 310 and 314 form an imaging relay system to replicate the image in the Fourier plane 307 to the holographic medium 300. A spatial filter 312 is used to remove the components from the edges of the SLM 304. Such edge filtering by filter 312 is desirable to reduce the cross-correlation between different images since the edges of the SLM are common to all the input images. |
| | The reference beam 320 is a collimated plane wave which does not carry image information. Reference beam 320 interferes with the Fourier transform of image-bearing signal beam 302 at the holographic medium 300 to record holograms therein to generate the template database for fingerprint identification." |
| | Pu at 8:37-50: |
| | As described previously, the way that a fingerprint is entered, such as time sequence or spatial position at the input surface, forms the fingerprint sequence code of the present invention. After all the fingerprints of an authorized user are recorded in the holographic medium 300, a template database for that user is completed. In addition, the information of that |

- 29 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Pu** |
| | particular user's fingerprint sequence code is also recorded and stored in a sequence code database in the electronic processor 220. <br><br>The above recording process is repeated to store the data for all authorized users in the holographic medium 300 and the electronic processor 220. Thus a template database and a sequence code database for a plurality of users are established. |
| 1d3.  populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See, e.g.:* <br><br> Pu at 6:20-50 and Fig. 2: <br> "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical |

- 30 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" <br><br><br> Pu at 7:22-55: <br> " <br> FIG. 3 shows one preferred embodiment of such optical correlators suitable for the identification system depicted in FIG. 2. A coherent optical beam generated by a laser source (not shown) is split into reference beam 320 and a signal beam 302, both of which are collimated plane waves.  Both beams are needed to record and update the fingerprints of an authorized user in a template database stored in a holographic medium 300. Only the signal beam 302 is needed to perform an identification process. <br> The image of a user's fingerprint is imprinted on the signal beam 302 by a spatial light modulator (SLM) 304. A lens 306 Fourier-transforms the image on the SLM 304 to the Fourier plane. Since the feature information of the input image is in the high spatial frequency components of the Fourier transform, the DC component at the center of the Fourier plane 307 is blocked by a spatial filer 308. Such DC filtering performs an edge enhancement in the input image. According to the present invention, the spacing between the SLM 304 and lens 306 can be an arbitrary distance but is preferably the focal length of lens 306. Lenses 310 and 314 form an imaging relay system to replicate the image in the Fourier plane 307 to the holographic medium 300. A spatial filter 312 is used to remove the components from the edges of the SLM 304. Such edge filtering by filter 312 is desirable to reduce the cross-correlation between different images since the edges of the SLM are common to all the input images. <br> The reference beam 320 is a collimated plane wave which does not carry image information. Reference beam 320 interferes with the Fourier transform |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | of image-bearing signal beam 302 at the holographic medium 300 to record holograms therein to generate the template database for fingerprint identification." |

Pu at 8:37-50:
As described previously, the way that a fingerprint is entered, such as time sequence or spatial position at the input surface, forms the fingerprint sequence code of the present invention. After all the fingerprints of an authorized user are recorded in the holographic medium 300, a template database for that user is completed. In addition, the information of that particular user's fingerprint sequence code is also recorded and stored in a sequence code database in the electronic processor 220.
The above recording process is repeated to store the data for all authorized users in the holographic medium 300 and the electronic processor 220. Thus a template database and a sequence code database for a plurality of users are established.
Pu at 6:20-50 and Fig. 2:
"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic

- 32 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit"<br><br>Pu at 11:30-35:<br><br>"The present invention can be practiced with any body feature input device(i.e., a thermosensor, a pressure sensor, a IR imaging device), any body feature recognition device (i.e., optical correlators, microcontroller, microprocessors or other digital computers), and any recognition algorithm (i.e., correlation, wavelet transforms, probabilistic match)." |
| | |
| 2. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | *See* Claim 1. |
| 2a. provide a signal for directing input of the series of entries of the biometric signal; | *See, e.g.*<br><br>Pu at 6:20-50 and Fig. 2: |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

- 34 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Figure 2 |
| 2b.    incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | *See, e.g.:*<br><br>Pu at 9:31-43:<br><br>"As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process for all authorized users in the database to make either a positive or a negative identification of the user." |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Pu at 4:38-48:<br><br>"A user to be identified first enters one fingerprint at the process 100. The entered fingerprint is compared with the fingerprints of the authorized users stored in the template database in fingerprint identification process 102. If there is no match, the user is not recognized. If there is at least one match, the system identifies which authorized user is matched and further registers the entered fingerprint as the first entry of a secret sequence code of the matched authorized user in the user stack memory. This completes step 104." |
| 2c.   construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | *See, e.g.:*<br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit"<br><br><br>Figure 2<br><br>Pu at 4:38-5:3:<br><br>"A user to be identified first enters one fingerprint at the process 100. The entered fingerprint is compared with the fingerprints of the authorized users stored in the template database in fingerprint identification process 102. If there is no match, the user is not recognized. If there is at least one match, the system identifies which authorized user is matched and further registers the entered fingerprint as the first entry of a secret sequence code of the matched authorized user in the user stack memory. This completes step 104. |

- 37 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Next, the system checks if a sequence code is completed with the first entered fingerprint in step 106. If a sequence code is not completed, the system asks the user to be identified to enter a second fingerprint. The above process repeats until a complete sequence code is constructed with at least one entered fingerprint.<br><br>In step 108, the system compares entries of sequence codes in the user stack memory including unregistered blanks with their corresponding sequence code stored in the sequence code database. This comparison is performed for all authorized users in the database whether or not there is a fingerprint match between the entered fingerprints and the fingerprints in the sequence code. If the entered fingerprint sequence code matches the sequence code of the authorized user in the sequence code database, the system renders a positive identification and the user is considered an authorized user. Therefore, the user to be identified not only has entered correctly matched fingerprint(s) but also has entered the correct sequence code of the matched authorized user. If there is no match in sequence code comparison, the identification is negative and the user either is not in the database or has entered an incorrect sequence code." |
| | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric | *See, e.g.:*<br><br>Pu at 1:12-18:<br><br>"Biometrics is a study of using a physical trait in a human body part for verifying identity. Various techniques in the art have been suggested including recognition of fingerprints, recognition of retinal scans, palm |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | prints, DNA traces, and others. Each of these human body part identification techniques has its own host of limitations." <br><br> Pu at 4:15-27 and Fig. 1: |

Exhibit C-13 (Pu)



Figure 1

- 40 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | "FIG. 1 shows a preferred embodiment of the above identification system using fingerprint sequence codes in the present invention. The process illustrated in FIG. 1 is implemented by various systems disclosed herein, examples of which are shown in FIGS. 2, 3, and 4. The system includes a template database with a plurality of different fingerprints from authorized users, a sequence code database with secret sequence codes of all authorized users, and a user stack memory having blank spaces for authorized users to store the corresponding secret sequence code. According to the present invention, different authorized users have different secret sequence codes and one user's secret sequence code is not known by another user." <br><br> Pu at 6:20-50 and Fig. 2: <br> "Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple |

- 41 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit"<br><br><br><br>Figure 2<br><br>Pu at 7:22-30:<br>"FIG. 3 shows one preferred embodiment of such optical correlators suitable for the identification system depicted in FIG. 2. A coherent optical beam generated by a laser source (not shown) is split into reference beam 320 and a signal beam 302, both of which are collimated plane waves. Both beams are needed to record and update the fingerprints of an authorized user in a template database stored in a holographic medium 300. Only the signal beam 302 is needed to perform an identification process." |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Pu |
|---|---|
| 6.  The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | *See, e.g.:*<br><br>Pu at 9:31-43:<br><br>"As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process for all authorized users in the database to make either a positive or a negative identification of the user." |
| 6a.  wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | *See, e.g.*<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is |

- 43 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit"<br><br><br><br><br><br>Figure 2<br><br><br>Pu at 9:31-43:<br><br>"As a fingerprint is entered and compared against the authorized fingerprints in the template database, registration of a sequence code is made in the user' |

- 44 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | stack memory by the electronic processor 220. If there is a match, one space in the matched authorized user's stack is registered. Otherwise, no registration is made in the user's stack memory. After the user to be identified finishes entering all fingerprints, the electronic processor 220 compares the entries in the authorized user's stack memory with the corresponding sequence code in the database. The system performs this comparing process for all authorized users in the database to make either a positive or a negative identification of the user." |
| 6b.    the system further comprising a control panel configured to receive the information and provide the secure access requested. | *See, e.g.:*<br><br>Pu at 6:20-50 and Fig. 2:<br>"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple |

- 45 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit"

Figure 2 |
| | |
| 9. The system according to claim 1, wherein: the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | To the extent this claim is not found indefinite for lack of antecedent basis for the term "the electronic computing device," *see, e.g.*:

Pu at 6:20-50 and Fig. 2:
"Various methods of recognizing an input fingerprint and different identification system implementations are contemplated in the present invention. FIG. 2 is one preferred embodiment of an identification system |

- 46 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | based on optical recognition of fingerprints. The system includes an input terminal 200, an optical correlator 210, an electronic processor 220, an output terminal 230 and other devices. The input terminal 200 can be any fingerprint reading device, e.g., a video camera with an imaging optics. The optical correlator 210 has a spatial light modulator (SLM) to capture an image of a fingerprint and imprints the image thereof on the wavefront of an optical signal beam via spatial light modulation. An optical memory unit having the template database with fingerprints of all authorized users is also included in the optical correlator 210. The input fingerprint carried on the signal beam is simultaneously compared with the template fingerprints of authorized users in the optical memory unit by optical interaction therewith. The electronic processor 220 stores the secret sequence codes of all authorized users that are associated with the fingerprints stored in the optical memory unit. The user's stack memory and the secret sequence code database are included in the electronic processor 220. The electronic processor 220 performs multiple tasks including registration of the entered fingerprint in the user's stack memory, sequence code identification based on the results from optical correlator 210, overall system monitoring, coordination and controlling. The output terminal 230 informs the user on instructions, processing status and results by a video display and/or an audio device. The input terminal 200 and the output terminal 230 can be integrated as one user interface unit" |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | Figure 2 |
| | |
| 10.    A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 10a.    a biometric sensor configured to receiving a biometric signal; | *See* Claim Element 1b1. |
| 10b. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output | *See* Claim Element 1b2. |

- 48 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| an accessibility attribute; and | |
| 10c.  a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 10d.  wherein the controller is further configured to: | *See* Claim Element 1b. |
| 10d1.  receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 10d2.  map said series into an instruction; and | *See* Claim Element 1d2. |
| 10d3.  populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an | *See* Claim Element 1d3. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| electronic computing device. | |
| | |
| 11. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | *See* Claim 1. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| :---: | :---: |
| **Claim Element** | **Pu** |
| 11a.    populating    the database    of    biometric signatures by: | *See* Claim Element 1d3. |
| 11a1.  receiving a series of entries  of  the  biometric signal; | *See* Claim Element 1d1. |
| 11a2.  determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 11a3.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 11a4.    populating    the database according to the instruction; | *See* Claim Element 1d3. |
| 11b.    receiving    the biometric signal; | *See* Claim Element 1b1. |
| 11c.    matching    the biometric    signal    against members of the database of biometric    signatures    to thereby    output    an accessibility attribute; | *See* Claim Element 1b2. |
| 11d.    emitting  a  secure access   signal   conveying information dependent upon | *See* Claim Element 1b3. |

- 51 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| said accessibility attribute; and | |
| 11e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
| | |
| 12. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | *See* Claim 10.<br><br>*See, e.g.:*<br><br>Pu at 8:37-50:<br><br>"As described previously, the way that a fingerprint is entered, such as time sequence or spatial position at the input surface, forms the fingerprint sequence code of the present invention. After all the fingerprints of an authorized user are recorded in the holographic medium 300, a template database for that user is completed. In addition, the information of that particular user's fingerprint sequence code is also recorded and stored in a sequence code database in the electronic processor 220.<br><br>The above recording process is repeated to store the data for all authorized users in the holographic medium 300 and the electronic processor 220. Thus |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| | a template database and a sequence code database for a plurality of users are established." |
| 12a. receiving a biometric signal; and | *See* Claim Element 1b1. |
| 12b. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | *See, e.g.:*<br><br>Pu at 8:37-50:<br><br>"As described previously, the way that a fingerprint is entered, such as time sequence or spatial position at the input surface, forms the fingerprint sequence code of the present invention. After all the fingerprints of an authorized user are recorded in the holographic medium 300, a template database for that user is completed. In addition, the information of that particular user's fingerprint sequence code is also recorded and stored in a sequence code database in the electronic processor 220.<br>The above recording process is repeated to store the data for all authorized users in the holographic medium 300 and the electronic processor 220. Thus a template database and a sequence code database for a plurality of users are established." |
| | |
| 14. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when | *See* Claims 1, 11. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| executed by processors causes the processors to: | |
| 14a. receive a series of entries of a biometric signal; | *See* Claim Element 1d1. |
| 14b. determine at least one of a number of said entries and a duration of each of said entries; | *See* Claim Element 1d1. |
| 14c. map said series into an instruction; | *See* Claim Element 1d2. |
| 14d. populate a database of biometric signatures according to the instruction; | *See* Claim Element 1d3. |
| 14e. receive the biometric signal; | *See* Claim Element 1b1. |
| 14f. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 14g. emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| 14h.    provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1c2 and 1d3. |
| | |
| 15.  A system for providing secure access to a controlled item, the system comprising: | *See* Claim 1. |
| 15a.  a memory comprising a database of biometric signatures; | *See* Claim Element 1a. |
| 15b.    a transmitter sub-system comprising: | *See* Claim Element 1b. |
| 15b1.    a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 15b2.    a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output | *See* Claim Element 1b2. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Pu |
|---|---|
| an accessibility attribute; and | |
| 15b3. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 15c. a receiver sub-system comprising: | *See* Claim Element 1c. |
| 15c1. a receiver sub-system controller capable of: receiving the transmitted secure access signal; and | *See* Claim Element 1c1. |
| 15c2. providing conditional access to the controlled item dependent upon said information; | *See* Claim Element 1c2. |
| 15d. wherein the transmitter sub-system controller is further capable of: | *See* Claim Element 1b. |
| 15d1. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of | *See* Claim Element 1d1. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Pu |
| --- | --- |
| said entries and a duration of each said entry; | |
| 15d2.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 15d3.  populating the data base according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |
| | |
| 16.  A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 16a.  a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 16b. a controller capable of matching the biometric signal against members of a database of biometric | *See* Claim Element 1b2. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| signatures to thereby output an accessibility attribute; and | |
| 16c. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 16d. wherein the controller is further capable of: | *See* Claim Element 1b. |
| 16d1. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 16d2. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 16d3. populating the database according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an | *See* Claim Element 1d3. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| electronic computing device. | |
| | |
| 17. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | *See* Claim 1. |
| 17a. populating the database of biometric signatures by: | *See* Claim Element 1d3. |

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Pu** |
| 17a1.  receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |
| 17a2.  determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 17a3.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 17a4.  populating the database according to the instruction; | *See* Claim Element 1d3. |
| 17b.  receiving the biometric signal; | *See* Claim Element 1b1. |
| 17c.  matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 17d.  emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |

- 60 -

Exhibit C-13 (Pu)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Pu** |
| 17e.  providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |

Exhibit C-14 (Li)

**Exhibit C-14**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**US Patent No. 6,219,793 ("Li")**

US Patent No. 6,219,793 to Li ("Li") anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 1. A system for providing secure access to a controlled item, the system comprising: | *See, e.g.*:<br><br>Li at 1:22-27: "The present invention relates to security measures for wireless telephones or cellular mobile phones. More particularly, the invention relates to authentication methods employing biometric information (e.g., fingerprints) to guarantee non-fraudulent use of wireless telephones or cellular mobile phones."<br><br>Li at 4:6-20: "Authentication methods implemented on a source such as a wireless telephone (as opposed to the central authentication center as described above) may be characterized as including the following steps: (a) transmitting a dialed number to a switching center on the communication |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | network; (b) receiving a user's fingerprint (possibly after a prompt); (c) generating source fingerprint data from the user's fingerprint; and (d) if the source fingerprint data matches stored fingerprint data associated with user, completing the call. The source may itself determine whether the source fingerprint data matches the stored fingerprint data prior to completing the call. In the case of a wireless telephone, the method may also include traditional calling steps such as transmitting at least one of an MIN and an ESN to the switching center." |
| | Li at 6:14-24: "The communications allowed over the communication system will sometimes be referred to herein as "calls." Examples of communications (calls) within the context of this invention include (a) analog transmissions such as telephone calls transmitting analog voice data over a wire medium or a wireless medium and (b) digital transmissions such as packetized messages over a network (LAN, WAN, Internet, etc.) and digital voice data over a wireless medium. Communications involving packetized transmissions may be connection-based transmissions such as TCP or connectionless transmissions such as UDP." |
| 1a.  a memory comprising a database of biometric signatures; | *See, e.g.:*<br><br>Li at 4:6-20: "Authentication methods implemented on a source such as a wireless telephone (as opposed to the central authentication center as described above) may be characterized as including the following steps: (a) transmitting a dialed number to a switching center on the communication network; (b) receiving a user's fingerprint (possibly after a prompt); (c) generating source fingerprint data from the user's fingerprint; and (d) if the source fingerprint data matches stored fingerprint data associated with user, completing the call. The source may itself determine whether the source fingerprint data matches the stored fingerprint data prior to completing the call. In the case of a wireless telephone, the method may also include |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | traditional calling steps such as transmitting at least one of an MIN and an ESN to the switching center."<br><br>Li at 7:24-37: "In response to the MIN being forwarded by MSC 103, CAS 106 looks up its built-in MIN-Challenge Key Database (MCKD) 107 and retrieves an appropriate Challenge Key (CK 202, FIG. 2) that is associated with that particular MIN. The CK 202 is a token that has been derived from the user's fingerprint when the user first registered the purchase of his/her phone service. The CK 202 is then used to encrypt a "challenge" that is generated by the CAS 106. The challenge that is formulated by the CAS 106 is different each time when it is accessed by the same or different users. The CK 202 and the encrypted challenge are then jointly sent to wireless telephone 102 through any available forward voice channel (FVC) or forward control channel (FCC) for example."<br><br>Li at 14:40-60: "FIG. 6 is a diagram of CAS 106 in accordance with one embodiment of this invention. The design is superficially similar to the FCPD 101 (and the design presented in U.S. Pat. No. 5,420,908). Connected to CAS 106 are PSTN 105 and MCKD 107. CAS 106 must be able to handle, simultaneously, many calls from many wireless carriers. It includes a memory 605 including a persistently stored program 606 and various temporarily stored items including a challenge 607, a response token 608, and a decrypted message 609. Program 606 contains the instructions for generating a challenge, encrypting the challenge with a fingerprint based token, validating a decrypted challenge (e.g., by comparison with the generated challenge), fingerprint matching based on tokens, and, in some embodiments, comparing a response token with one or more stored tokens and further assuring that tokens are not identical as that would imply illegal use. Response token 608 is a memory entity containing the token sent back from the FCPD 101 in the wireless telephone 102 before token matching is |

- 3 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | conducted. When a new token is provided from FCPD, stored token is updated." |
| 1b.    a transmitter sub-system comprising: | *See, e.g.:*<br><br>Li at 6:52-7:4: "FIG. 1 shows an apparatus that may be used to process a wireless call in accordance with the principles of the current invention. A fingerprint capturing device ("FCPD") 101 (such as that described in U.S. Provisional Application No. 60/025,949, previously incorporated by reference) with an on-board CPU for processing and comparison of the captured fingerprint image (see FIG. 4) is connected to the wireless telephone 102. This connection may be by any method, i.e. via a telephone modem or a data port specifically built-in to the wireless telephone 102, an acoustic coupler, or the direct incorporation of the fingerprint module 101 into the wireless telephone 102. Preferably, the module 101 can be incorporated within telephone 102 such that a standard mobile telephone casing may house all electronics for operation of the telephone and fingerprint processing. In an especially preferred embodiment, the electronics for processing both the fingerprints and the telephone calls are provided on a single integrated circuit chip. This makes it especially difficult to tamper with the system by, for example, intercepting signals between fingerprint capturing module 101 and telephone 102." |
| 1b1.    a biometric sensor configured to receive a biometric signal; | *See, e.g.:*<br><br>Li at 4:6-20: "Authentication methods implemented on a source such as a wireless telephone (as opposed to the central authentication center as described above) may be characterized as including the following steps: (a) transmitting a dialed number to a switching center on the communication network; (b) receiving a user's fingerprint (possibly after a prompt); (c) generating source fingerprint data from the user's fingerprint; and (d) if the |

- 4 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Li** |
|  | source fingerprint data matches stored fingerprint data associated with user, completing the call. The source may itself determine whether the source fingerprint data matches the stored fingerprint data prior to completing the call. In the case of a wireless telephone, the method may also include traditional calling steps such as transmitting at least one of an MIN and an ESN to the switching center."<br><br>Li at 4:33-43: "A personal wireless communication device (e.g., a wireless telephone) suitable for use with the authentication methods of this invention may be characterized as including the following features: (a) a wireless communications interface for sending and receiving wireless communications; (b) a device for capturing the user's fingerprint; and (c) a processing device (e.g., a CPU) capable of converting the user's fingerprint to source fingerprint data which can be transmitted. Preferably, the wireless device includes a casing and provided within that casing are both the device for capturing the user's fingerprint and the processing device."<br><br>Li at 4:50-65: "In one embodiment, the device for capturing the user's fingerprint includes: (i) a fingerprint capture surface on which the user can place his or her finger to produce an optical image of his or her fingerprint; (ii) an imager capable of generating an electronic image of the user's fingerprint (e.g., a CCD array or CMOS photodiode/photogate array); and (iii) optics for directing the optical image of the user's fingerprint from the finger print capture surface to the imager. In a preferred embodiment, the imager is a CMOS photodiode/photogate array which is provided on an integrated circuit together with the processing device. In an alternative embodiment, the device for capturing the user's fingerprint includes an imager which does not require optics. Examples of such "optics-free" imagers include capacitor arrays or ultrasonic mechanisms formed on semiconductor substrates." |

- 5 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
|  | Li at 6:26-51: "Fingerprint technology including hardware image capture, software image processing, software/hardware for fingerprint data storage and software for fingerprint analysis/comparison is a relatively mature technology with over 20 years of development (see, for example, U.S. Pat. Nos. 2,952,181, 4,151,512, 4,322,163, 4,537,484, 4,747,147, 5,467,403, each of which is incorporated herein by reference for all purposes). It is well-known that no two individuals possess the same identical fingerprint and that accurate matching techniques in conjunction with well-captured images can positively identify an individual. The term "fingerprint" as used herein refers to handprints, palmprints, and other unique skin patterns in addition to traditional fingerprints. <br><br> The present invention may employ sophisticated hardware and software to allow rapid fingerprint based identification as described in U.S. Provisional Application No. 60/025,949, filed on Sep. 11, 1996, naming R. Rao, S. Subbiah, Y. Li & D. Chu as inventors, and previously incorporated by reference. That application describes an extremely small, low-cost fingerprint capture hardware module that lends itself to ready insertion into many devices. The referenced Provisional Application was incorporated herein by reference for all purposes and is illustrative of the maturity of the fingerprint capture and comparison technology." <br><br> Li at Claim 15: <br> "15. A method for authenticating a call to be made over a communication system, the method comprising: <br> (a) sending a dialed number on said communication network; <br> (b) receiving a challenge encrypted with stored fingerprint minutiae data and the stored fingerprint minutiae data itself from the communications system; <br> (c) receiving a user's fingerprint; <br> (d) generating source fingerprint minutiae data from said user's fingerprint; |

- 6 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Li |
|---|---|
|  | (e) comparing the stored fingerprint minutiae data with the source fingerprint minutiae data; and<br>(f) if the stored and the source fingerprint minutiae data match, sending the source fingerprint minutiae data to the communications system."<br><br>Li at Claim 17:<br>"17. The method of claim 16, wherein (a) through (f) are performed by a mobile cellular telephone." |
| 1b2.  a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See, e.g.:*<br><br>Li at 4:6-20: "Authentication methods implemented on a source such as a wireless telephone (as opposed to the central authentication center as described above) may be characterized as including the following steps: (a) transmitting a dialed number to a switching center on the communication network; (b) receiving a user's fingerprint (possibly after a prompt); (c) generating source fingerprint data from the user's fingerprint; and (d) if the source fingerprint data matches stored fingerprint data associated with user, completing the call. The source may itself determine whether the source fingerprint data matches the stored fingerprint data prior to completing the call. In the case of a wireless telephone, the method may also include traditional calling steps such as transmitting at least one of an MIN and an ESN to the switching center."<br><br>Li at 4:33-43: "A personal wireless communication device (e.g., a wireless telephone) suitable for use with the authentication methods of this invention may be characterized as including the following features: (a) a wireless communications interface for sending and receiving wireless communications; (b) a device for capturing the user's fingerprint; and (c) a processing device (e.g., a CPU) capable of converting the user's fingerprint to source fingerprint data which can be transmitted. Preferably, the wireless |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | device includes a casing and provided within that casing are both the device for capturing the user's fingerprint and the processing device." <br><br> Li at 4:66-5:4: "The processing device should contain the logic and resources necessary for comparing the source fingerprint data with stored fingerprint data received from a remote location. Preferably, the processing device should also be capable of decrypting a challenge received from the remote location." <br><br> Li at 5:12-25: "Another aspect of the invention provides a central authentication system or node connected to a communications network and capable of rendering wireless communications secure by processing biometric information from a user. Such central authentication systems may be characterized as including (a) a communications interface for sending and receiving data communications over the communications network; (b) a database interface for accessing a database containing stored fingerprint data associated with users of wireless communications devices; and (c) a processor capable of determining whether a wireless communication from a wireless communications device should be permitted based upon a match between a fingerprint taken from the wireless communications device and stored fingerprint data associated the wireless communications device." <br><br> Li at 7:38-62: "After reception of the challenge from CAS 106 by wireless telephone 102, the challenge is forwarded to FCPD 101 as detailed in FIG. 4. The user's fingerprint information could have been requested by FCPD 101 either before this point and after the user entered the number of the called party, or at this time point itself. A token, which in one embodiment could simply be an encoded collection of a set of unique minutiae/features found in the fingerprint, is then generated based on the fingerprint information captured locally by FCPD 101. As well-known in the art of fingerprint matching, a fingerprint from any individual is unique to that |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | individual and therefore the variety of slightly different tokens (tokens can differ by a feature or two without any loss in uniqueness) that can be generated can only come from that individual. This is then compared with fingerprint-based token CK 202 that was received from CAS 106. If there is a match of the tokens, the encrypted message is decrypted by using token CK 202 received from CAS 106. In other embodiments, either or both tokens could be used to decrypt the challenge. A response (the decrypted challenge) is then sent back to MSC 103 through any of the available reverse voice channels (RVCs) or reverse control channels (RCCs). This is then forwarded via PSTN or Internet 105 (for additional security one may limit use of the common air interface as much as possible) back to CAS 106." <br><br> Li at Claim 15: <br> "15. A method for authenticating a call to be made over a communication system, the method comprising: <br> (a) sending a dialed number on said communication network; <br> (b) receiving a challenge encrypted with stored fingerprint minutiae data and the stored fingerprint minutiae data itself from the communications system; <br> (c) receiving a user's fingerprint; <br> (d) generating source fingerprint minutiae data from said user's fingerprint; <br> (e) comparing the stored fingerprint minutiae data with the source fingerprint minutiae data; and <br> (f) if the stored and the source fingerprint minutiae data match, sending the source fingerprint minutiae data to the communications system." <br><br> Li at Claim 17: <br> "17. The method of claim 16, wherein (a) through (f) are performed by a mobile cellular telephone." |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 1b3. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See, e.g.:*<br><br>Li at 7:38-62: "After reception of the challenge from CAS 106 by wireless telephone 102, the challenge is forwarded to FCPD 101 as detailed in FIG. 4. The user's fingerprint information could have been requested by FCPD 101 either before this point and after the user entered the number of the called party, or at this time point itself. A token, which in one embodiment could simply be an encoded collection of a set of unique minutiae/features found in the fingerprint, is then generated based on the fingerprint information captured locally by FCPD 101. As well-known in the art of fingerprint matching, a fingerprint from any individual is unique to that individual and therefore the variety of slightly different tokens (tokens can differ by a feature or two without any loss in uniqueness) that can be generated can only come from that individual. This is then compared with fingerprint-based token CK 202 that was received from CAS 106. If there is a match of the tokens, the encrypted message is decrypted by using token CK 202 received from CAS 106. In other embodiments, either or both tokens could be used to decrypt the challenge. A response (the decrypted challenge) is then sent back to MSC 103 through any of the available reverse voice channels (RVCs) or reverse control channels (RCCs). This is then forwarded via PSTN or Internet 105 (for additional security one may limit use of the common air interface as much as possible) back to CAS 106."<br><br>Li at Claim 15:<br>"15. A method for authenticating a call to be made over a communication system, the method comprising:<br>(a) sending a dialed number on said communication network;<br>(b) receiving a challenge encrypted with stored fingerprint minutiae data and the stored fingerprint minutiae data itself from the communications system;<br>(c) receiving a user's fingerprint;<br>(d) generating source fingerprint minutiae data from said user's fingerprint; |

- 10 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | (e) comparing the stored fingerprint minutiae data with the source fingerprint minutiae data; and <br> (f) if the stored and the source fingerprint minutiae data match, sending the source fingerprint minutiae data to the communications system." <br><br> Li at Claim 17: <br> "17. The method of claim 16, wherein (a) through (f) are performed by a mobile cellular telephone." |
| 1c.  a receiver sub-system comprising: | *See, e.g.:* <br><br> Li at 7:63-8:6: "The response from FCPD 101 to CAS 106 contains both the decrypted message and a token that is generated from the fingerprint image the user supplied. If (1) the received decrypted message matches the expected response (i.e., the original unencrypted challenge that had been temporarily stored in CAS 106, as detailed in FIG. 6) and (2) the token received from the FCPD 101 matches the CK 202 in the MCKD 107, the call is authorized and connected. This double matching method will reduce false positives. It will also prevent any illegal attempt that relies only on a decryption of just the encoded challenge." |
| 1c1.  a receiver sub-system controller configured to: receive the transmitted secure access signal; and | *See, e.g.:* <br><br> Li at 7:63-8:6: "The response from FCPD 101 to CAS 106 contains both the decrypted message and a token that is generated from the fingerprint image the user supplied. If (1) the received decrypted message matches the expected response (i.e., the original unencrypted challenge that had been temporarily stored in CAS 106, as detailed in FIG. 6) and (2) the token received from the FCPD 101 matches the CK 202 in the MCKD 107, the call is authorized and connected. This double matching method will reduce false positives. It will also prevent any illegal attempt that relies only on a decryption of just the encoded challenge." |

- 11 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | |
| 1c2. provide conditional access to the controlled item dependent upon said information; | *See, e.g.:*<br><br>Li at 7:63-8:6: "The response from FCPD 101 to CAS 106 contains both the decrypted message and a token that is generated from the fingerprint image the user supplied. If (1) the received decrypted message matches the expected response (i.e., the original unencrypted challenge that had been temporarily stored in CAS 106, as detailed in FIG. 6) and (2) the token received from the FCPD 101 matches the CK 202 in the MCKD 107, the call is authorized and connected. This double matching method will reduce false positives. It will also prevent any illegal attempt that relies only on a decryption of just the encoded challenge." |
| 1d. wherein the transmitter sub-system controller is further configured to: | |
| 1d1. receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; | *See, e.g.:* claim element 1b1.<br><br>*See also, e.g.*, Li at 15:31-39: "In a further embodiment of the present invention, the phone owner could use more than one fingerprint as a means to authenticate his/her identity. The MCKD 107 can be arranged to contain information regarding more than one fingerprint of the owner. In fact, if additional password-like security beyond fingerprint security is desired, the owner can provide multiple fingerprints from different fingers in a particular secret order. This can serve as a "password" known only to the owner." |
| 1d2. map said series into an instruction; and | *See, e.g.:* |

- 12 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | Li at 15:31-39: "In a further embodiment of the present invention, the phone owner could use more than one fingerprint as a means to authenticate his/her identity. The MCKD 107 can be arranged to contain information regarding more than one fingerprint of the owner. In fact, if additional password-like security beyond fingerprint security is desired, the owner can provide multiple fingerprints from different fingers in a particular secret order. This can serve as a "password" known only to the owner." |
| 1d3. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See, e.g.:*<br><br>Li at 15:31-39: "In a further embodiment of the present invention, the phone owner could use more than one fingerprint as a means to authenticate his/her identity. The MCKD 107 can be arranged to contain information regarding more than one fingerprint of the owner. In fact, if additional password-like security beyond fingerprint security is desired, the owner can provide multiple fingerprints from different fingers in a particular secret order. This can serve as a "password" known only to the owner."<br><br>Li at 16:34-49: "As mentioned, the technology described herein may be employed in contexts other than cellular telephone systems. For example, the invention may be employed to ensure secure access to a vehicle with a wireless security system. Many automobiles now employ wireless systems to allow remote control of door locking, automotive alarm systems, lighting, etc. within the automobile. When the owner approaches his or her car, he or she can unlock the car doors or activate/inactivate other car systems before actually reaching the car. This is accomplished with the click of a button on a wireless control module. Unfortunately, if such a module falls into the hands of a thief (or if the wireless signal is illegally captured through the air and decoded), he may be able to circumvent the car's security mechanism(s) and obtain control of the car. The present invention provides a mechanism to protect against this possibility." |

- 13 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| | |
| | |
| 2. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | *See* Claim 1. |
| 2a.   provide a signal for directing input of the series of entries of the biometric signal; | *See, e.g.:*<br><br>Li at 4:6-20: "Authentication methods implemented on a source such as a wireless telephone (as opposed to the central authentication center as described above) may be characterized as including the following steps: (a) transmitting a dialed number to a switching center on the communication network; (b) receiving a user's fingerprint (possibly after a prompt); (c) generating source fingerprint data from the user's fingerprint; and (d) if the source fingerprint data matches stored fingerprint data associated with user, completing the call. The source may itself determine whether the source fingerprint data matches the stored fingerprint data prior to completing the call. In the case of a wireless telephone, the method may also include traditional calling steps such as transmitting at least one of an MIN and an ESN to the switching center."<br><br>Li at Claim 19:<br>"19. The method of claim 15, further comprising:<br>prompting the user to provide a fingerprint." |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 2b. incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | *See, e.g.:* <br><br>Li at 16:4-15: "In another use of the current invention, the identity of the user can be authenticated for the purpose of identifying the caller's personal identity rather than merely the phone number from the caller initiated the call—i.e. the source terminal-ID. In one embodiment of the present invention, at step 319 (FIG. 3), the caller's personal identity as determined by the CAS 106 can be made available to the call control entity or the recipient of the call. Based on the prior knowledge of who the caller is (and not just merely what phone number the caller is calling from) the call recipient may elect to block the call even after it has been authenticated as being non-fraudulent at step 314." <br><br>Li at Claim 15: <br>"15. A method for authenticating a call to be made over a communication system, the method comprising: <br>(a) sending a dialed number on said communication network; <br>(b) receiving a challenge encrypted with stored fingerprint minutiae data and the stored fingerprint minutiae data itself from the communications system; <br>(c) receiving a user's fingerprint; <br>(d) generating source fingerprint minutiae data from said user's fingerprint; <br>(e) comparing the stored fingerprint minutiae data with the source fingerprint minutiae data; and <br>(f) if the stored and the source fingerprint minutiae data match, sending the source fingerprint minutiae data to the communications system." <br><br>Li at Claim 17: <br>"17. The method of claim 16, wherein (a) through (f) are performed by a mobile cellular telephone." |

- 15 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Li** |
| 2c.   construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | *See, e.g.:*<br><br>Li at 8:6-35: "It is important to note that tokens generated from the same finger vary every time the fingerprint is captured. In a preferred embodiment, if the token sent from FCPD 101 (via wireless telephone 102) is identical to that in the database (CK 202) the call will not be authorized, since it is extremely unlikely that the exact same token will be generated in subsequent image capture of the same finger. Presumably, such exact token matching will only happen if the token had been illegally captured and is being used for illegal access into the phone network. In this embodiment, the database may store up to a pre-specified number of tokens sent by user from wireless telephone 102. If the most current token sent from the user is identical to any token from this list, the call is also blocked, since this may indicate the interception of a particular token sent from user to CAS 106 and used illegally. This is a major advantage of the current invention since the token CK 202 used for encryption (in other words the secret key that is central to all 'challenge-response' authentication methods) can itself be broadcast over the common air interface or even made public. Thus the secret aspect of system described in the above-referenced Hodges and Rubenstein patent may be avoided in one embodiment. To reiterate, by blocking exact matches between a newly generated token and a stored token (one embodiment of this invention), the illegal capture of the token CK 202 does not enable third-parties to fraudulently initiate calls. This is a clear and substantial advantage over the prior art, and derives from the fact that personal biometric information is being used to generate secret keys." |
| | |
| 4.  The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, | *See, e.g.:*<br><br>Li at 6:36-39: "The term "fingerprint" as used herein refers to handprints, palmprints, and other unique skin patterns in addition to traditional fingerprints." |

- 16 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Li |
|---|---|
| face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | Li at 14:40-60: "FIG. 6 is a diagram of CAS 106 in accordance with one embodiment of this invention. The design is superficially similar to the FCPD 101 (and the design presented in U.S. Pat. No. 5,420,908). Connected to CAS 106 are PSTN 105 and MCKD 107. CAS 106 must be able to handle, simultaneously, many calls from many wireless carriers. It includes a memory 605 including a persistently stored program 606 and various temporarily stored items including a challenge 607, a response token 608, and a decrypted message 609. Program 606 contains the instructions for generating a challenge, encrypting the challenge with a fingerprint based token, validating a decrypted challenge (e.g., by comparison with the generated challenge), fingerprint matching based on tokens, and, in some embodiments, comparing a response token with one or more stored tokens and further assuring that tokens are not identical as that would imply illegal use. Response token 608 is a memory entity containing the token sent back from the FCPD 101 in the wireless telephone 102 before token matching is conducted. When a new token is provided from FCPD, stored token is updated." |
| | |
| 6. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | *See, e.g.:*<br><br>Li at 15:31-39: "In a further embodiment of the present invention, the phone owner could use more than one fingerprint as a means to authenticate his/her identity. The MCKD 107 can be arranged to contain information regarding more than one fingerprint of the owner. In fact, if additional password-like security beyond fingerprint security is desired, the owner can provide multiple fingerprints from different fingers in a particular secret order. This can serve as a "password" known only to the owner." |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 6a. wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | *See, e.g.:*<br><br>Li at 4:33-43: "A personal wireless communication device (e.g., a wireless telephone) suitable for use with the authentication methods of this invention may be characterized as including the following features: (a) a wireless communications interface for sending and receiving wireless communications; (b) a device for capturing the user's fingerprint; and (c) a processing device (e.g., a CPU) capable of converting the user's fingerprint to source fingerprint data which can be transmitted. Preferably, the wireless device includes a casing and provided within that casing are both the device for capturing the user's fingerprint and the processing device."<br><br>Li at 7:38-43: "After reception of the challenge from CAS 106 by wireless telephone 102, the challenge is forwarded to FCPD 101 as detailed in FIG. 4. The user's fingerprint information could have been requested by FCPD 101 either before this point and after the user entered the number of the called party, or at this time point itself.<br><br>Li at 7:63-8:6: "The response from FCPD 101 to CAS 106 contains both the decrypted message and a token that is generated from the fingerprint image the user supplied. If (1) the received decrypted message matches the expected response (i.e., the original unencrypted challenge that had been temporarily stored in CAS 106, as detailed in FIG. 6) and (2) the token received from the FCPD 101 matches the CK 202 in the MCKD 107, the call is authorized and connected. This double matching method will reduce false positives. It will also prevent any illegal attempt that relies only on a decryption of just the encoded challenge." |
| 6b. the system further comprising a control panel configured to receive the | *See, e.g.:* |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| information and provide the secure access requested. | Li at 4:6-20: "Authentication methods implemented on a source such as a wireless telephone (as opposed to the central authentication center as described above) may be characterized as including the following steps: (a) transmitting a dialed number to a switching center on the communication network; (b) receiving a user's fingerprint (possibly after a prompt); (c) generating source fingerprint data from the user's fingerprint; and (d) if the source fingerprint data matches stored fingerprint data associated with user, completing the call. The source may itself determine whether the source fingerprint data matches the stored fingerprint data prior to completing the call. In the case of a wireless telephone, the method may also include traditional calling steps such as transmitting at least one of an MIN and an ESN to the switching center." |
|  |  |
| 9. The system according to claim 1, wherein: the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | To the extent this claim is not found indefinite for lack of antecedent basis for the term "the electronic computing device," *see, e.g.*:<br><br>Li at 14:31-39: "Central authentication system (CAS) 106 is preferably, though not necessarily, provided as a server or other node connected to one or more MSCs over a public switched telephone network. CAS 106 may also have wireless connection to an MSC or may even form a part of the MSC. Generally, CAS 106 must be able to generate and compare challenges, access a database of fingerprint based tokens, and communicate with a plurality of wireless sources (e.g., mobile cellular telephones) via the one or more MSCs." |
|  |  |
| 10. A transmitter sub-system for operating in a system for providing secure access to a controlled item, | *See* Claim Element 1b. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| wherein the transmitter sub-system comprises: | |
| 10a.    a biometric sensor configured to receiving a biometric signal; | *See* Claim Element 1b1. |
| 10b. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 10c.        a    transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 10d.  wherein the controller is further configured to: | *See* Claim Element 1b. |
| 10d1.   receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Li** |
| 10d2. map said series into an instruction; and | *See* Claim Element 1d2. |
| 10d3. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |
|  ||
| 11. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the | *See* Claim 1. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | |
| 11a. populating the database of biometric signatures by: | *See* Claim Element 1d3. |
| 11a1. receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |
| 11a2. determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 11a3. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 11a4. populating the database according to the instruction; | *See* Claim Element 1d3. |
| 11b. receiving the biometric signal; | *See* Claim Element 1b1. |
| 11c. matching the biometric signal against members of the database of | *See* Claim Element 1b2. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| biometric signatures to thereby output an accessibility attribute; | |
| 11d. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 11e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
| | |
| 12. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | *See* Claim Element 1a. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| :---: | :---: |
| **Claim Element** | **Li** |
| 12a.  receiving a biometric signal; and | *See* Claim Element 1b1. |
| 12b.  enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | *See, e.g.:*<br><br>Li at 7:24-37: "In response to the MIN being forwarded by MSC 103, CAS 106 looks up its built-in MIN-Challenge Key Database (MCKD) 107 and retrieves an appropriate Challenge Key (CK 202, FIG. 2) that is associated with that particular MIN. The CK 202 is a token that has been derived from the user's fingerprint when the user first registered the purchase of his/her phone service. The CK 202 is then used to encrypt a "challenge" that is generated by the CAS 106. The challenge that is formulated by the CAS 106 is different each time when it is accessed by the same or different users. The CK 202 and the encrypted challenge are then jointly sent to wireless telephone 102 through any available forward voice channel (FVC) or forward control channel (FCC) for example."<br><br>Li at 15:15-30: "In yet another embodiment of the present invention, multiple users can be permitted to use the same wireless phone. All that is required is that the MCKD 107 at the CAS 106 be allowed to contain multiple CKs 202, one generated from each user of the same phone. Such authorization can in principle be activated/initiated by the phone owner serving as a master user who can at any time recruit additional users to be able to use their phone. By activating appropriate buttons on the phone, the master user can in principle activate the phone and the CAS 106 to receive a newly recruited user's fingerprint for association with the master user's entry in the MCKD 107. The master user can remotely authorize this action by simply validating it with his/her fingerprint. Again by engaging a pre-defined sequence of buttons on the phone the master user could also in principle remove previously authorized co-users." |

- 24 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Li |
| --- | --- |
| 14. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | *See* Claims 1, 11. |
| 14a. receive a series of entries of a biometric signal; | *See* Claim Element 1d1. |
| 14b. determine at least one of a number of said entries and a duration of each of said entries; | *See* Claim Element 1d1. |
| 14c. map said series into an instruction; | *See* Claim Element 1d2. |
| 14d. populate a database of biometric signatures according to the instruction; | *See* Claim Element 1d3. |
| 14e. receive the biometric signal; | *See* Claim Element 1b1. |
| 14f. match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Li** |
| 14g.  emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 14h.  provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
|  ||
| 15.  A system for providing secure access to a controlled item, the system comprising: | *See* Claim 1. |
| 15a.  a memory comprising a database of biometric signatures; | *See* Claim Element 1a. |
| 15b.  a transmitter sub-system comprising: | *See* Claim Element 1b. |
| 15b1.  a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |

- 26 -

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 15b2. a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 15b3. a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 15c. a receiver sub-system comprising: | *See* Claim Element 1c. |
| 15c1. a receiver sub-system controller capable of: receiving the transmitted secure access signal; and | *See* Claim Element 1c1. |
| 15c2. providing conditional access to the controlled item dependent upon said information; | *See* Claim Element 1c2. |
| 15d. wherein the transmitter sub-system controller is further capable of: | *See* Claim Element 1b. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 15d1. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 15d2. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 15d3. populating the data base according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |
| | |
| 16. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 16a. a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 16b.  a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 16c.  a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 16d.  wherein the controller is further capable of: | *See* Claim Element 1b. |
| 16d1.  receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 16d2.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 16d3.  populating the database according to the instruction, | *See* Claim Element 1d3. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |
| | |
| 17. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | *See* Claim 1. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| 17a.    populating    the database    of    biometric signatures by: | *See* Claim Element 1d3. |
| 17a1.  receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |
| 17a2.  determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 17a3.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 17a4.    populating    the database according to the instruction; | *See* Claim Element 1d3. |
| 17b.    receiving    the biometric signal; | *See* Claim Element 1b1. |
| 17c.    matching    the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 17d.    emitting a secure access signal conveying information dependent upon | *See* Claim Element 1b3. |

Exhibit C-14 (Li)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Li** |
| said accessibility attribute; and | |
| 17e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |

Exhibit C-15 (Poo)

**Exhibit C-15**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 20030005336A1 ("Poo")**

U.S. PATENT APP. PUB. 20030005336A1 to Poo ("Poo") anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15, 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| 1. A system for providing secure access to a controlled item, the system comprising: | *See, e.g.:* <br><br> Teng Pin Poo at [0006] <br><br> "[0006] Accordingly, the present invention provides a method and system which delivers a highly reliable and user-friendly authentication mechanism for preventing unauthorized access to information stored on a portable or designated storage media. Furthermore, embodiments of the present invention also provide a highly secure access control mechanism for protection against unauthorized access to stored data and computer resources as well as guarding against unauthorized entry to premises. Aspects of the present invention, which |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | utilizes a unique biometrics marker as a basis for identity authentication and as an "access key" for each individual user, are described in detail herein." <br><br> Teng Pin Poo at Claim 1: <br> "A portable device comprising: <br> a microprocessor; and <br> a biometrics-based authentication module coupled to and controlled by the microprocessor, wherein access to a restricted resource, the restricted resource having a communication port communicatively coupled to the portable device, is granted to a user provided that the biometrics-based authentication module authenticates the user's identity and wherein access to the restricted resource is denied to the user otherwise." |
| 1a.  a memory comprising a database of biometric signatures; | *See, e.g.:* <br><br> Teng Pin Poo at [0023]: <br><br> "Referring still to FIG. 1A, portable device 70 further includes an integrated circuit 10, a flash memory 20, a volatile memory 30 and a fingerprint module 50. Integrated circuit 10 can be conveniently implemented as an application-specific integrated circuit (ASIC). In a currently preferred embodiment, flash memory 20 can have a storage capacity between 8 MB and 512 MB, a portion of which can be used to store one or more templates generated in accordance with the present invention as described below. Moreover, in a preferred embodiment, the template(s) are stored in a reserved area of flash memory 20 which is specifically designated for this purpose and which is not otherwise accessible to the user. Additionally, as described in detail further below, a template is encrypted before it is stored in flash memory 20 in a currently preferred embodiment, thereby providing added security against hacking. In one embodiment, volatile memory 30 is external to integrated circuit 10 and |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | can comprise either a dynamic random access memory (DRAM) or a static random access memory (SRAM). Among other uses, volatile memory 30 can serve as an initial storage and staging area for a fingerprint image captured in accordance with the present invention." <br><br> Teng Pin Poo at [0033] <br><br> "Referring still to FIG. 1B, fingerprint module 150 comprises a sensor 152, a converter 154 and an optional controller 156. In this embodiment, sensor 152 is used to capture the fingerprint image of a finger being placed thereon, converter 154 serves to convert a captured fingerprint image into electrical signals representing the image, and optional controller 156 is used to check the quality of fingerprint images captured by sensor 152 to determine whether a given image is acceptable or not. It should be appreciated that such image processing capabilities can be implemented using software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention." <br><br> Teng Pin Poo at [0043]-[0045] <br><br> "[0043] Referring next to FIG. 10, a flow diagram 200 illustrating steps of a user registration/authentication process using the portable device with an integrated fingerprint module in accordance with one embodiment of the present invention is shown. In the following description, various modules and components referred to have been described above with reference to FIG. 1A using the same reference numerals. In step 210, upon being coupled to a host platform, portable device 70 undergoes an initialization procedure. In a currently preferred embodiment, the initialization procedure involves establishing communication with the host platform and ensuring the host platform is aware that portable device 70 has been coupled thereto. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| | [0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform.<br><br>[0045] In one embodiment, portable device 70 supports more than one user. In another embodiment, the same user may register multiple fingerprints as separate templates. In yet another embodiment, the same user fingerprint may be registered multiple times as different templates. Thus, portable device 70 can facilitate the registration of additional user(s) and/or additional template(s) either by periodically (e.g., upon startup) inquiring whether a new user/template needs to be added or upon the user's request in step 220. If an additional user/template is to be registered, the registration process will be invoked. If it is determined that no new registration is necessary, process 200 proceeds with an authentication process (steps 230, 240 and 260 as described below)."<br><br>Teng Pin Poo at [0047]-[0051]<br><br>"[0047] Referring still to FIG. 10, the registration process is now described. In step 225, the registration process is initiated. In one embodiment, this involves informing the user that a registration process will commence and prompting the user to place his/her finger on sensor 52. |

- 4 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | [0048] In step 235, sensor 52 is read to capture an image of the fingerprint of the user's finger that has been placed thereon. In a currently preferred embodiment, step 235 also includes verifying that the captured image is of sufficient quality for further processing (e.g., template generation). This is preferably performed by control unit 56 as directed by microprocessor 11. In one embodiment, step 235 will be repeated if the quality of the captured fingerprint image is unacceptable. Under such circumstances, the user will be prompted to place his/her finger on sensor 52 again so that a new image can be captured. Preferably, the number of retry is user-configurable. <br><br> [0049] Once an acceptable fingerprint image has been captured in step 235, process 200 proceeds to step 245, wherein a template is generated based on the captured fingerprint image. As described above, in a preferred embodiment, the captured image is converted into 64 KB of data, which is then used as input to template generator 12 a for generating a 512-byte template. <br><br> [0050] In step 248, the template generated in step 245 is encrypted. In one embodiment, the encryption is performed by firmware (e.g., encryption firmware 117 d of FIG. 1B), thereby providing an added level of security against hacking. <br><br> [0051] In step 255, the encrypted template is stored into flash memory 20. In one embodiment, upon successful generation and encryption of a template, flash controller 14 is prompted by template generator 12 a to store the newly generated and encrypted template into flash memory 20 for use in subsequent user authentication. Moreover, as described above, in a preferred embodiment, the template is stored in a reserved area of flash memory 20 which is specifically designated for storing template(s) and which is not otherwise accessible to the user." |

- 5 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| 1b.    a transmitter sub-system comprising: | *See, e.g.:*<br><br>Teng Pin Poo at [0023]-[0026]<br><br>[0023] Referring still to FIG. 1A, portable device 70 further includes an integrated circuit 10, a flash memory 20, a volatile memory 30 and a fingerprint module 50. Integrated circuit 10 can be conveniently implemented as an application-specific integrated circuit (ASIC). In a currently preferred embodiment, flash memory 20 can have a storage capacity between 8 MB and 512 MB, a portion of which can be used to store one or more templates generated in accordance with the present invention as described below. Moreover, in a preferred embodiment, the template(s) are stored in a reserved area of flash memory 20 which is specifically designated for this purpose and which is not otherwise accessible to the user. Additionally, as described in detail further below, a template is encrypted before it is stored in flash memory 20 in a currently preferred embodiment, thereby providing added security against hacking. In one embodiment, volatile memory 30 is external to integrated circuit 10 and can comprise either a dynamic random access memory (DRAM) or a static random access memory (SRAM). Among other uses, volatile memory 30 can serve as an initial storage and staging area for a fingerprint image captured in accordance with the present invention.<br><br>[0024] Integrated circuit 10 comprises a microprocessor 11 which, in one embodiment, is a RISC processor. In a currently preferred embodiment, an authentication engine 12 is included in integrated circuit 10. Authentication engine 12 in turns comprises a template generator 12 a and a verification module 12 b. Template generator 12 a is used to generate an encoded version of an image of a fingerprint. Within the scope of the present invention, such an encoded fingerprint image is referred to as a template. It should be appreciated that according to current biometrics technology, a fingerprint can be uniquely identified using between 8 and 13 distinct points in the raw image of the |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | fingerprint. Fingerprint information can thus be conveniently stored in a condensed fashion as data pertaining to the 8 to 13 relevant data points. A preferred embodiment of the present invention advantageously stores a fingerprint in a compact format as a template referred to above. In this embodiment, a template has a size of 512 bytes. Other embodiments can use templates of different sizes. The other component of authentication engine 12, verification module 12 b, is used to compare a newly generated template against a stored template to validate the authenticity of a fingerprint provided by someone purporting to be an authorized user. Thus, authentication engine 12 works in conjunction with fingerprint module 50, described in greater detail below, to implement user authentication in accordance with the present invention. <br><br> [0025] It should be appreciated that authentication engine 12 is well-adapted to numerous implementations within the scope of the present invention. In one embodiment, authentication engine 12 is implemented as firmware stored in a non-volatile memory within portable device 70. In another embodiment, authentication engine 12 is implemented as part of microprocessor 11. In still another embodiment, authentication engine 12 is implemented as a processor separate from microprocessor 11. In yet another embodiment, authentication engine 12 includes the same components and serves the same functions as described herein, but is located in host platform 90 rather than in portable device 70. In other words, within the scope of the present invention, authentication engine 12 is not required to reside in portable device 70. Instead, where authentication engine 12 is to be placed is a design choice, thus affording design flexibility to suit different applications in which the present invention can be utilized. <br><br> [0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory 30. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein." <br><br> Teng Pin Poo at [0030]-[0034] <br><br> "[0030] Portable device 170 further comprises an integrated circuit 110, a flash memory 120 and a volatile memory 130. Integrated circuit 110 can be conveniently implemented as an ASIC. In a preferred embodiment, a reserved area 122 of flash memory 120 is used to store one or more templates generated in accordance with the present invention. Furthermore, in this embodiment, reserved flash memory area 122 includes a status flag 121 which indicates whether or not portable device 170 has been previously registered in accordance with the present invention. Status flag 121 thus enables portable device 170 to automatically invoke a registration process upon its initial use, as described in detail further below. In one embodiment, volatile memory 130 comprises either a DRAM or a SRAM, which serves as an initial storage area for a fingerprint image captured in accordance with the present invention. <br><br> [0031] Referring still to FIG. 1B, integrated circuit 110 comprises a microprocessor 111 which preferably is a RISC processor. Integrated circuit 110 further includes a flash controller 114 for controlling access to flash memory 120 and a memory controller 133 for controlling access to volatile |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | memory 130. Integrated circuit 110 also includes a volatile memory 116 and a non-volatile memory 117. Preferably, volatile memory 116 comprises a RAM for use as a working memory for microprocessor 111 during its operation, while non-volatile memory 117 comprises a ROM for storing firmware that perform various functions of portable device 170. Specifically, in one embodiment, ROM 117 stores the following firmware code: firmware 117 a for reading fingerprint sensor 152, firmware 117 b for processing fingerprint images, firmware 117 c for generating templates, firmware 117 d for encrypting fingerprint images and/or templates, and firmware 117 e for verifying fingerprint authenticity. Nevertheless, it should be appreciated that in an alternative embodiment of the present invention, such firmware can be stored in a non-volatile memory within the host platform rather than in portable device 170.<br><br>[0032] Additionally, integrated circuit 110 includes an optional error checking (ECC) engine 119 for performing various error checking tasks during the operation of portable device 170. It should be appreciated that ECC engine 119 can be implemented as software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention.<br><br>[0033] Referring still to FIG. 1B, fingerprint module 150 comprises a sensor 152, a converter 154 and an optional controller 156. In this embodiment, sensor 152 is used to capture the fingerprint image of a finger being placed thereon, converter 154 serves to convert a captured fingerprint image into electrical signals representing the image, and optional controller 156 is used to check the quality of fingerprint images captured by sensor 152 to determine whether a given image is acceptable or not. It should be appreciated that such image processing capabilities can be implemented using software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | [0034] In a currently preferred embodiment as illustrated in FIG. 1B, microprocessor 111 controls various components of portable device 170, including flash controller 114, USB device controller 115, RAM 116, ROM 117 (and execution of firmware code stored therein), ECC engine 119, memory controller 133, and controller 156 of fingerprint module 150. In this embodiment, portable device 170 also includes a write-protection switch 140 which, when activated, triggers microprocessor 111 to disable write-access to flash memory 120." <br><br> Teng Pin Poo at [0043]: <br><br> "[0043] Referring next to FIG. 10, a flow diagram 200 illustrating steps of a user registration/authentication process using the portable device with an integrated fingerprint module in accordance with one embodiment of the present invention is shown. In the following description, various modules and components referred to have been described above with reference to FIG. 1A using the same reference numerals. In step 210, upon being coupled to a host platform, portable device 70 undergoes an initialization procedure. In a currently preferred embodiment, the initialization procedure involves establishing communication with the host platform and ensuring the host platform is aware that portable device 70 has been coupled thereto." <br><br> Teng Pin Poo at [0065]: <br><br> "[0065] Moreover, while preferred embodiments of the present invention have been described herein as using flash memory as a storage media, it should be appreciated that other types of non-volatile memory, such as ferroelectric random access memory (FRAM) or magnetic random access memory (MRAM), can also be used within the scope of the present invention. In addition, while such preferred embodiments have been described herein as being compatible with the USB standard, the portable device of the present |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | invention is not intended to be restricted thereto. Rather, the present invention is intended to encompass portable devices that support other communication protocols and/or bus standards, such as the IEEE 1394 ("Firewire") standard."<br><br>Teng Pin Poo at Fig. 1A<br><br><br><br>Teng Pin Poo at Fig. 1B |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Teng Pin Poo** |
| | <br><br>Teng Pin Poo at Claim 3:<br><br>"3. The portable device as recited in claim 1 which is communicatively coupled to the communication port of the restricted resource via a universal serial bus (USB)." |
| 1b1. a biometric sensor configured to receive a biometric signal; | *See, e.g.:*<br><br>Teng Pin Poo at [0028]<br><br>"Referring again to FIG. 1A, fingerprint module 50 comprises a sensor 52 which is used to capture the fingerprint image of a finger being placed thereon. Fingerprint module 50 also comprises a converter 54, which serves to convert a captured fingerprint image into electrical signals representing the image. In a currently preferred embodiment, a fingerprint print image is converted into 64 KB of data by converter 54 and sent to volatile memory 30 of portable device 70 for temporary storage. In other embodiments, converter 54 can produce image data of different sizes. Fingerprint module 50 further includes an |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | optional control unit 56 which, in a currently preferred embodiment, is controlled via microprocessor 11 in portable device 70 and is used for checking the quality of fingerprint images captured by sensor 52 to determine whether a given image is acceptable or not. As described in more detail below, if it is determined that the quality of a captured image is unacceptable, the user will be prompted to place his/her finger on sensor 52 again so that a new image can be captured."<br><br>Teng Pin Poo at [0033]<br><br>"Referring still to FIG. 1B, fingerprint module 150 comprises a sensor 152, a converter 154 and an optional controller 156. In this embodiment, sensor 152 is used to capture the fingerprint image of a finger being placed thereon, converter 154 serves to convert a captured fingerprint image into electrical signals representing the image, and optional controller 156 is used to check the quality of fingerprint images captured by sensor 152 to determine whether a given image is acceptable or not. It should be appreciated that such image processing capabilities can be implemented using software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention."<br><br>Teng Pin Poo at Claim 4:<br><br>"The portable device as recited in claim 1 wherein the biometrics-based authentication module comprises a biometrics sensor fitted on one surface of the portable device." |
| 1b2.    a transmitter sub-system            controller configured to match the biometric signal against | *See, e.g.:*<br><br>Teng Pin Poo at [0024]-[0025] |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| members of the database of biometric signatures to thereby output an accessibility attribute; and | "[0024] Integrated circuit 10 comprises a microprocessor 11 which, in one embodiment, is a RISC processor. In a currently preferred embodiment, an authentication engine 12 is included in integrated circuit 10. Authentication engine 12 in turns comprises a template generator 12 a and a verification module 12 b. Template generator 12 a is used to generate an encoded version of an image of a fingerprint. Within the scope of the present invention, such an encoded fingerprint image is referred to as a template. It should be appreciated that according to current biometrics technology, a fingerprint can be uniquely identified using between 8 and 13 distinct points in the raw image of the fingerprint. Fingerprint information can thus be conveniently stored in a condensed fashion as data pertaining to the 8 to 13 relevant data points. A preferred embodiment of the present invention advantageously stores a fingerprint in a compact format as a template referred to above. In this embodiment, a template has a size of 512 bytes. Other embodiments can use templates of different sizes. The other component of authentication engine 12, verification module 12 b, is used to compare a newly generated template against a stored template to validate the authenticity of a fingerprint provided by someone purporting to be an authorized user. Thus, authentication engine 12 works in conjunction with fingerprint module 50, described in greater detail below, to implement user authentication in accordance with the present invention. <br><br>[0025] It should be appreciated that authentication engine 12 is well-adapted to numerous implementations within the scope of the present invention. In one embodiment, authentication engine 12 is implemented as firmware stored in a non-volatile memory within portable device 70. In another embodiment, authentication engine 12 is implemented as part of microprocessor 11. In still another embodiment, authentication engine 12 is implemented as a processor separate from microprocessor 11. In yet another embodiment, authentication engine 12 includes the same components and serves the same functions as described herein, but is located in host platform 90 rather than in portable |

- 14 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | device 70. In other words, within the scope of the present invention, authentication engine 12 is not required to reside in portable device 70. Instead, where authentication engine 12 is to be placed is a design choice, thus affording design flexibility to suit different applications in which the present invention can be utilized."<br><br>Teng Pin Poo at [0028]<br><br>"Referring again to FIG. 1A, fingerprint module 50 comprises a sensor 52 which is used to capture the fingerprint image of a finger being placed thereon. Fingerprint module 50 also comprises a converter 54, which serves to convert a captured fingerprint image into electrical signals representing the image. In a currently preferred embodiment, a fingerprint print image is converted into 64 KB of data by converter 54 and sent to volatile memory 30 of portable device 70 for temporary storage. In other embodiments, converter 54 can produce image data of different sizes. Fingerprint module 50 further includes an optional control unit 56 which, in a currently preferred embodiment, is controlled via microprocessor 11 in portable device 70 and is used for checking the quality of fingerprint images captured by sensor 52 to determine whether a given image is acceptable or not. As described in more detail below, if it is determined that the quality of a captured image is unacceptable, the user will be prompted to place his/her finger on sensor 52 again so that a new image can be captured."<br><br>Teng Pin Poo at [0033]<br><br>"Referring still to FIG. 1B, fingerprint module 150 comprises a sensor 152, a converter 154 and an optional controller 156. In this embodiment, sensor 152 is used to capture the fingerprint image of a finger being placed thereon, converter 154 serves to convert a captured fingerprint image into electrical signals representing the image, and optional controller 156 is used to check the |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | quality of fingerprint images captured by sensor 152 to determine whether a given image is acceptable or not. It should be appreciated that such image processing capabilities can be implemented using software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention."<br><br>Teng Pin Poo at [0043]-[0045]<br><br>"[0043] Referring next to FIG. 10, a flow diagram 200 illustrating steps of a user registration/authentication process using the portable device with an integrated fingerprint module in accordance with one embodiment of the present invention is shown. In the following description, various modules and components referred to have been described above with reference to FIG. 1A using the same reference numerals. In step 210, upon being coupled to a host platform, portable device 70 undergoes an initialization procedure. In a currently preferred embodiment, the initialization procedure involves establishing communication with the host platform and ensuring the host platform is aware that portable device 70 has been coupled thereto.<br><br>[0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | [0045] In one embodiment, portable device 70 supports more than one user. In another embodiment, the same user may register multiple fingerprints as separate templates. In yet another embodiment, the same user fingerprint may be registered multiple times as different templates. Thus, portable device 70 can facilitate the registration of additional user(s) and/or additional template(s) either by periodically (e.g., upon startup) inquiring whether a new user/template needs to be added or upon the user's request in step 220. If an additional user/template is to be registered, the registration process will be invoked. If it is determined that no new registration is necessary, process 200 proceeds with an authentication process (steps 230, 240 and 260 as described below)."<br><br>Teng Pin Poo at [0053]-[0056]:<br><br>"[0053] With reference still to FIG. 10, the authentication process is now described. In step 230, sensor 52 is read to capture an image of the fingerprint of the user's finger that has been placed thereon. In a currently preferred embodiment, step 230 also includes a quality check of the captured image by control unit 56, so that the image capture will be repeated if the quality of the captured fingerprint image is unacceptable for template generation. If a repeat capture is needed, the user will be so prompted. Preferably, the number of retry is user-configurable. In a currently preferred embodiment, step 230 also includes generating a template based on the captured fingerprint image and storing the resulting template into volatile memory 16.<br><br>[0054] In step 240, the stored template(s) are read from flash memory 20 for use as the basis of authenticating the identity of the user whose fingerprint image has been captured in step 230. In a currently preferred embodiment, microprocessor 11 directs flash controller 14 to retrieve the registered template(s) from flash memory 20. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | [0055] In step 250, the registered template(s) read from flash memory 20, which are stored in encrypted form in a preferred embodiment, are decrypted. The decrypted template(s) are loaded into volatile memory 16 in one embodiment.<br><br>[0056] In step 260, it is determined whether the user's fingerprint can be authenticated against the registered fingerprint template on record. In a currently preferred embodiment, verification module 12 b compares the template pending verification against the registered template(s). If a match is detected, the user is authenticated; otherwise, authentication fails. In one embodiment, the user is allowed to reattempt the authentication process if an initial attempt fails (e.g., steps 230, 240 and 250 are repeated). Preferably, the number of repeated attempts is user-configurable and can be set once an authorized user has been authenticated and granted access." |
| 1b3.    a    transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See, e.g.:*<br><br>Teng Pin Poo at [0026]<br><br>"[0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory 30. Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| | host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein." <br><br> Teng Pin Poo at [0056] <br><br> "[0056] In step 260, it is determined whether the user's fingerprint can be authenticated against the registered fingerprint template on record. In a currently preferred embodiment, verification module 12 b compares the template pending verification against the registered template(s). If a match is detected, the user is authenticated; otherwise, authentication fails. In one embodiment, the user is allowed to reattempt the authentication process if an initial attempt fails (e.g., steps 230, 240 and 250 are repeated). Preferably, the number of repeated attempts is user-configurable and can be set once an authorized user has been authenticated and granted access." <br><br> Teng Pin Poo at [0059]-[0060] <br><br> "[0059] In step 280, a signal or message indicating the successful authentication is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90. <br><br> [0060] It should be appreciated that in an embodiment where authentication engine 12 is located in host platform 90, appropriate modifications to the authentication process described above are needed. In particular, once a satisfactory fingerprint image has been obtained in step 230, the image data is first encrypted and then transmitted to host platform 90, wherein the steps to be performed by authentication engine 12 will be carried out. Thus, depending |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | on the particular implementation or application, the information being transmitted from portable device 70 to host platform 90 can either be a simple notification of success upon successful authentication, or image data representing a user fingerprint that is pending authentication."

Teng Pin Poo at [0062]

"[0062] Significantly, it should be appreciated that the present invention not only contemplates using portable device 70 as a secure data storage device but also as an access control device. In particular, within the scope of the present invention, portable device 70 can act as an "access key" to host platform 90 to which portable device 70 is coupled. More specifically, in one embodiment, in order to access any resource on host platform 90 (e.g., data, files, application programs, peripherals) and/or any resource attached thereto (e.g., network access, network printers and storage devices, electronic mail) a user is required to first successfully authenticate his/her identity as an authorized user using portable device 70 with integrated fingerprint module 50. In accordance with this embodiment, such fingerprint authentication is used preferably in lieu of (or alternatively in addition to) conventional password-based authentication. Thus, the user inconvenience and less stringent security that is inherent in the prior art password-based authentication approach is advantageously eliminated in accordance with the present invention."

Teng Pin Poo at [0065]:

"[0065] Moreover, while preferred embodiments of the present invention have been described herein as using flash memory as a storage media, it should be appreciated that other types of non-volatile memory, such as ferroelectric random access memory (FRAM) or magnetic random access memory (MRAM), can also be used within the scope of the present invention. In addition, while such preferred embodiments have been described herein as |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | being compatible with the USB standard, the portable device of the present invention is not intended to be restricted thereto. Rather, the present invention is intended to encompass portable devices that support other communication protocols and/or bus standards, such as the IEEE 1394 ("Firewire") standard." |
| 1c.  a receiver sub-system comprising: | *See, e.g.:*<br><br>Teng Pin Poo at [0022]:<br><br>"[0022] FIG. 1A is a block diagram illustrating functional blocks of one embodiment of the portable device of the present invention and an illustrative operational configuration thereof FIG. 1A shows a portable device 70 coupled to a host platform 90. In this embodiment, host platform 90 is coupled to a power supply circuit 80 located in portable device 70. Power supply circuit 80 draws power from host platform 90 and serves as a power source for various components of portable device 70.<br><br>Teng Pin Poo at [0026]:<br><br>"[0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory 30. Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein." <br><br> Teng Pin Poo at [0029]: <br><br> "[0029] Reference is now made to FIG. 1B, which is a block diagram illustrating functional blocks of another embodiment of the portable device of the present invention. In this embodiment, portable device 170 is compatible with the USB standard and includes a USB plug 118 which, as FIG. 1B shows, is coupled to a USB host controller 193 of a host platform. Optionally, portable device 170 further includes an additional USB port 162 that is coupled to USB plug 118. USB port 162 is provided as a convenient feature that can be used to couple other USB-compatible device(s) to the USB via portable device 170. In this embodiment, portable device 170 also includes a USB device controller 115 for controlling the communication between portable device 170 and the host platform via USB host controller 193. In one embodiment, a driver software 177 and an application programming interface (API) 197, which in turn includes monitoring software 199, reside in the host platform and communicate with USB host controller 193 to facilitate the operation of portable device 170." <br><br> Teng Pin Poo at [0062]-[0063]: <br><br> "[0062] Significantly, it should be appreciated that the present invention not only contemplates using portable device 70 as a secure data storage device but also as an access control device. In particular, within the scope of the present invention, portable device 70 can act as an "access key" to host platform 90 to which portable device 70 is coupled. More specifically, in one embodiment, in order to access any resource on host platform 90 (e.g., data, files, application programs, peripherals) and/or any resource attached thereto (e.g., network access, network printers and storage devices, electronic mail) a user is required |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | to first successfully authenticate his/her identity as an authorized user using portable device 70 with integrated fingerprint module 50. In accordance with this embodiment, such fingerprint authentication is used preferably in lieu of (or alternatively in addition to) conventional password-based authentication. Thus, the user inconvenience and less stringent security that is inherent in the prior art password-based authentication approach is advantageously eliminated in accordance with the present invention.<br><br>[0063] Beyond access control to various computer resources, the present invention can also be advantageously utilized in numerous other applications that require security clearance, such as entry into private homes, offices, hotel rooms, bank vaults and security deposit boxes, and so on. The present invention can also be beneficially applied to restrict the operation of machinery, such as factory machines and vehicles, to those who have been properly trained. In one embodiment, access control device 70 can be used as a house key to a private home or room key to a hotel room in place of conventional keys. In the first example, the home owner first registers his/her fingerprint when the biometrics-based lock is installed at the house. In the latter example, a hotel guest first registers his/her fingerprint upon check-in at a hotel. Thereafter, access to the house or hotel room is securely restricted to the respective key holder (home owner or hotel guest). These and other wide-ranging applications of the biometrics-based access device technology disclosed herein are all intended to be within the scope and spirit of the present invention."<br><br>Teng Pin Poo at [0065]:<br><br>"[0065] Moreover, while preferred embodiments of the present invention have been described herein as using flash memory as a storage media, it should be appreciated that other types of non-volatile memory, such as ferroelectric random access memory (FRAM) or magnetic random access memory (MRAM), can also be used within the scope of the present invention. In |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | addition, while such preferred embodiments have been described herein as being compatible with the USB standard, the portable device of the present invention is not intended to be restricted thereto. Rather, the present invention is intended to encompass portable devices that support other communication protocols and/or bus standards, such as the IEEE 1394 ("Firewire") standard."<br><br>Teng Pin Poo at Fig. 1A<br><br><br><br>Teng Pin Poo at Fig. 1B |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | <br><br>FIG. IB |
| 1c1.  a receiver sub-system controller configured to: receive the transmitted secure access signal; and | *See, e.g.:*<br><br>Teng Pin Poo at [0022]:<br><br>"[0022] FIG. 1A is a block diagram illustrating functional blocks of one embodiment of the portable device of the present invention and an illustrative operational configuration thereof FIG. 1A shows a portable device 70 coupled to a host platform 90. In this embodiment, host platform 90 is coupled to a power supply circuit 80 located in portable device 70. Power supply circuit 80 draws power from host platform 90 and serves as a power source for various components of portable device 70.<br><br>Teng Pin Poo at [0026]:<br><br>"[0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | 30. Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein." <br><br> Teng Pin Poo at [0029]: <br><br> "[0029] Reference is now made to FIG. 1B, which is a block diagram illustrating functional blocks of another embodiment of the portable device of the present invention. In this embodiment, portable device 170 is compatible with the USB standard and includes a USB plug 118 which, as FIG. 1B shows, is coupled to a USB host controller 193 of a host platform. Optionally, portable device 170 further includes an additional USB port 162 that is coupled to USB plug 118. USB port 162 is provided as a convenient feature that can be used to couple other USB-compatible device(s) to the USB via portable device 170. In this embodiment, portable device 170 also includes a USB device controller 115 for controlling the communication between portable device 170 and the host platform via USB host controller 193. In one embodiment, a driver software 177 and an application programming interface (API) 197, which in turn includes monitoring software 199, reside in the host platform and communicate with USB host controller 193 to facilitate the operation of portable device 170." <br><br> Teng Pin Poo at [0057]: |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
|  | "[0057] In one embodiment, when a user has failed to authenticated his/her identity as an authorized user, access to flash memory 20 will be blocked (e.g., in an embodiment where a software driver resides in host platform 90, the software driver can forbid such access). In another embodiment, microprocessor 11 in portable device 70 will shut down or otherwise disable flash controller 14 upon such authentication failure. These actions serve as added security measures against potential hacking and other forms of unauthorized access to the data stored in flash memory 20 and are triggered by repeated failed authentication attempts.<br><br>Teng Pin Poo at [0059]-[0060]<br><br>"[0059] In step 280, a signal or message indicating the successful authentication is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90.<br><br>[0060] It should be appreciated that in an embodiment where authentication engine 12 is located in host platform 90, appropriate modifications to the authentication process described above are needed. In particular, once a satisfactory fingerprint image has been obtained in step 230, the image data is first encrypted and then transmitted to host platform 90, wherein the steps to be performed by authentication engine 12 will be carried out. Thus, depending on the particular implementation or application, the information being transmitted from portable device 70 to host platform 90 can either be a simple notification of success upon successful authentication, or image data representing a user fingerprint that is pending authentication." |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | Teng Pin Poo at [0062]-[0063]:<br><br>"[0062] Significantly, it should be appreciated that the present invention not only contemplates using portable device 70 as a secure data storage device but also as an access control device. In particular, within the scope of the present invention, portable device 70 can act as an "access key" to host platform 90 to which portable device 70 is coupled. More specifically, in one embodiment, in order to access any resource on host platform 90 (e.g., data, files, application programs, peripherals) and/or any resource attached thereto (e.g., network access, network printers and storage devices, electronic mail) a user is required to first successfully authenticate his/her identity as an authorized user using portable device 70 with integrated fingerprint module 50. In accordance with this embodiment, such fingerprint authentication is used preferably in lieu of (or alternatively in addition to) conventional password-based authentication. Thus, the user inconvenience and less stringent security that is inherent in the prior art password-based authentication approach is advantageously eliminated in accordance with the present invention.<br><br>[0063] Beyond access control to various computer resources, the present invention can also be advantageously utilized in numerous other applications that require security clearance, such as entry into private homes, offices, hotel rooms, bank vaults and security deposit boxes, and so on. The present invention can also be beneficially applied to restrict the operation of machinery, such as factory machines and vehicles, to those who have been properly trained. In one embodiment, access control device 70 can be used as a house key to a private home or room key to a hotel room in place of conventional keys. In the first example, the home owner first registers his/her fingerprint when the biometrics-based lock is installed at the house. In the latter example, a hotel guest first registers his/her fingerprint upon check-in at a hotel. Thereafter, access to the house or hotel room is securely restricted to the respective key holder (home owner or hotel guest). These and other wide-ranging applications |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | of the biometrics-based access device technology disclosed herein are all intended to be within the scope and spirit of the present invention." <br><br> Teng Pin Poo at [0065]: <br><br> "[0065] Moreover, while preferred embodiments of the present invention have been described herein as using flash memory as a storage media, it should be appreciated that other types of non-volatile memory, such as ferroelectric random access memory (FRAM) or magnetic random access memory (MRAM), can also be used within the scope of the present invention. In addition, while such preferred embodiments have been described herein as being compatible with the USB standard, the portable device of the present invention is not intended to be restricted thereto. Rather, the present invention is intended to encompass portable devices that support other communication protocols and/or bus standards, such as the IEEE 1394 ("Firewire") standard." <br><br> Teng Pin Poo at Fig. 1A <br><br> <br><br> Teng Pin Poo at Fig. 1B |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | FIG. 1B<br><br>Teng Pin Poo at Claim 3:<br><br>"3. The portable device as recited in claim 1 which is communicatively coupled to the communication port of the restricted resource via a universal serial bus (USB)." |
| 1c2. provide conditional access to the controlled item dependent upon said information; | *See, e.g.:*<br><br>Teng Pin Poo at [0029]:<br><br>"[0029] Reference is now made to FIG. 1B, which is a block diagram illustrating functional blocks of another embodiment of the portable device of the present invention. In this embodiment, portable device 170 is compatible with the USB standard and includes a USB plug 118 which, as FIG. 1B shows, is coupled to a USB host controller 193 of a host platform. Optionally, portable device 170 further includes an additional USB port 162 that is coupled to USB plug 118. USB port 162 is provided as a convenient feature that can be used to |

- 30 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | couple other USB-compatible device(s) to the USB via portable device 170. In this embodiment, portable device 170 also includes a USB device controller 115 for controlling the communication between portable device 170 and the host platform via USB host controller 193. In one embodiment, a driver software 177 and an application programming interface (API) 197, which in turn includes monitoring software 199, reside in the host platform and communicate with USB host controller 193 to facilitate the operation of portable device 170."<br><br>Teng Pin Poo at [0057]:<br><br>"[0057] In one embodiment, when a user has failed to authenticated his/her identity as an authorized user, access to flash memory 20 will be blocked (e.g., in an embodiment where a software driver resides in host platform 90, the software driver can forbid such access). In another embodiment, microprocessor 11 in portable device 70 will shut down or otherwise disable flash controller 14 upon such authentication failure. These actions serve as added security measures against potential hacking and other forms of unauthorized access to the data stored in flash memory 20 and are triggered by repeated failed authentication attempts.<br><br><br>Teng Pin Poo at [0059]-[0060]<br><br>"[0059] In step 280, a signal or message indicating the successful authentication is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| | [0060] It should be appreciated that in an embodiment where authentication engine 12 is located in host platform 90, appropriate modifications to the authentication process described above are needed. In particular, once a satisfactory fingerprint image has been obtained in step 230, the image data is first encrypted and then transmitted to host platform 90, wherein the steps to be performed by authentication engine 12 will be carried out. Thus, depending on the particular implementation or application, the information being transmitted from portable device 70 to host platform 90 can either be a simple notification of success upon successful authentication, or image data representing a user fingerprint that is pending authentication."<br><br>Teng Pin Poo at [0062]-[0063]:<br><br>"[0062] Significantly, it should be appreciated that the present invention not only contemplates using portable device 70 as a secure data storage device but also as an access control device. In particular, within the scope of the present invention, portable device 70 can act as an "access key" to host platform 90 to which portable device 70 is coupled. More specifically, in one embodiment, in order to access any resource on host platform 90 (e.g., data, files, application programs, peripherals) and/or any resource attached thereto (e.g., network access, network printers and storage devices, electronic mail) a user is required to first successfully authenticate his/her identity as an authorized user using portable device 70 with integrated fingerprint module 50. In accordance with this embodiment, such fingerprint authentication is used preferably in lieu of (or alternatively in addition to) conventional password-based authentication. Thus, the user inconvenience and less stringent security that is inherent in the prior art password-based authentication approach is advantageously eliminated in accordance with the present invention.<br><br>[0063] Beyond access control to various computer resources, the present invention can also be advantageously utilized in numerous other applications |

- 32 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | that require security clearance, such as entry into private homes, offices, hotel rooms, bank vaults and security deposit boxes, and so on. The present invention can also be beneficially applied to restrict the operation of machinery, such as factory machines and vehicles, to those who have been properly trained. In one embodiment, access control device 70 can be used as a house key to a private home or room key to a hotel room in place of conventional keys. In the first example, the home owner first registers his/her fingerprint when the biometrics-based lock is installed at the house. In the latter example, a hotel guest first registers his/her fingerprint upon check-in at a hotel. Thereafter, access to the house or hotel room is securely restricted to the respective key holder (home owner or hotel guest). These and other wide-ranging applications of the biometrics-based access device technology disclosed herein are all intended to be within the scope and spirit of the present invention." |
| 1d. wherein the transmitter sub-system controller is further configured to: | |
| 1d1. receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; | *See, e.g.:*<br><br>Teng Pin Poo at [0028]<br><br>"[0028] Referring again to FIG. 1A, fingerprint module 50 comprises a sensor 52 which is used to capture the fingerprint image of a finger being placed thereon. Fingerprint module 50 also comprises a converter 54, which serves to convert a captured fingerprint image into electrical signals representing the image. In a currently preferred embodiment, a fingerprint print image is converted into 64 KB of data by converter 54 and sent to volatile memory 30 of portable device 70 for temporary storage. In other embodiments, converter 54 can produce image data of different sizes. Fingerprint module 50 further includes an optional control unit 56 which, in a currently preferred embodiment, is controlled via microprocessor 11 in portable device 70 and is |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | used for checking the quality of fingerprint images captured by sensor 52 to determine whether a given image is acceptable or not. As described in more detail below, if it is determined that the quality of a captured image is unacceptable, the user will be prompted to place his/her finger on sensor 52 again so that a new image can be captured.<br><br>Teng Pin Poo at [0033]<br><br>"[0033] Referring still to FIG. 1B, fingerprint module 150 comprises a sensor 152, a converter 154 and an optional controller 156. In this embodiment, sensor 152 is used to capture the fingerprint image of a finger being placed thereon, converter 154 serves to convert a captured fingerprint image into electrical signals representing the image, and optional controller 156 is used to check the quality of fingerprint images captured by sensor 152 to determine whether a given image is acceptable or not. It should be appreciated that such image processing capabilities can be implemented using software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention."<br><br>Teng Pin Poo at [0043]-[0045]<br><br>"[0043] Referring next to FIG. 10, a flow diagram 200 illustrating steps of a user registration/authentication process using the portable device with an integrated fingerprint module in accordance with one embodiment of the present invention is shown. In the following description, various modules and components referred to have been described above with reference to FIG. 1A using the same reference numerals. In step 210, upon being coupled to a host platform, portable device 70 undergoes an initialization procedure. In a currently preferred embodiment, the initialization procedure involves establishing communication with the host platform and ensuring the host platform is aware that portable device 70 has been coupled thereto. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| | [0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform.<br><br>[0045] In one embodiment, portable device 70 supports more than one user. In another embodiment, the same user may register multiple fingerprints as separate templates. In yet another embodiment, the same user fingerprint may be registered multiple times as different templates. Thus, portable device 70 can facilitate the registration of additional user(s) and/or additional template(s) either by periodically (e.g., upon startup) inquiring whether a new user/template needs to be added or upon the user's request in step 220. If an additional user/template is to be registered, the registration process will be invoked. If it is determined that no new registration is necessary, process 200 proceeds with an authentication process (steps 230, 240 and 260 as described below)."<br><br>Teng Pin Poo at [0056]<br><br>"[0056] In step 260, it is determined whether the user's fingerprint can be authenticated against the registered fingerprint template on record. In a currently preferred embodiment, verification module 12 b compares the template pending verification against the registered template(s). If a match is |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | detected, the user is authenticated; otherwise, authentication fails. In one embodiment, the user is allowed to reattempt the authentication process if an initial attempt fails (e.g., steps 230, 240 and 250 are repeated). Preferably, the number of repeated attempts is user-configurable and can be set once an authorized user has been authenticated and granted access." |
| 1d2.  map said series into an instruction; and | *See, e.g.:*<br><br>Teng Pin Poo at [0033]<br><br>"Referring still to FIG. 1B, fingerprint module 150 comprises a sensor 152, a converter 154 and an optional controller 156. In this embodiment, sensor 152 is used to capture the fingerprint image of a finger being placed thereon, converter 154 serves to convert a captured fingerprint image into electrical signals representing the image, and optional controller 156 is used to check the quality of fingerprint images captured by sensor 152 to determine whether a given image is acceptable or not. It should be appreciated that such image processing capabilities can be implemented using software (e.g., firmware) or hardware (e.g., processor/processor module) within the scope of the present invention."<br><br>Teng Pin Poo at [0043]-[0045]<br><br>"[0043] Referring next to FIG. 10, a flow diagram 200 illustrating steps of a user registration/authentication process using the portable device with an integrated fingerprint module in accordance with one embodiment of the present invention is shown. In the following description, various modules and components referred to have been described above with reference to FIG. 1A using the same reference numerals. In step 210, upon being coupled to a host platform, portable device 70 undergoes an initialization procedure. In a currently preferred embodiment, the initialization procedure involves |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | establishing communication with the host platform and ensuring the host platform is aware that portable device 70 has been coupled thereto.<br><br>[0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform.<br><br>[0045] In one embodiment, portable device 70 supports more than one user. In another embodiment, the same user may register multiple fingerprints as separate templates. In yet another embodiment, the same user fingerprint may be registered multiple times as different templates. Thus, portable device 70 can facilitate the registration of additional user(s) and/or additional template(s) either by periodically (e.g., upon startup) inquiring whether a new user/template needs to be added or upon the user's request in step 220. If an additional user/template is to be registered, the registration process will be invoked. If it is determined that no new registration is necessary, process 200 proceeds with an authentication process (steps 230, 240 and 260 as described below)."<br><br>Teng Pin Poo at [0047]-[0051]<br><br>"[0047] Referring still to FIG. 10, the registration process is now described. In step 225, the registration process is initiated. In one embodiment, this involves |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | informing the user that a registration process will commence and prompting the user to place his/her finger on sensor 52.<br><br>[0048] In step 235, sensor 52 is read to capture an image of the fingerprint of the user's finger that has been placed thereon. In a currently preferred embodiment, step 235 also includes verifying that the captured image is of sufficient quality for further processing (e.g., template generation). This is preferably performed by control unit 56 as directed by microprocessor 11. In one embodiment, step 235 will be repeated if the quality of the captured fingerprint image is unacceptable. Under such circumstances, the user will be prompted to place his/her finger on sensor 52 again so that a new image can be captured. Preferably, the number of retry is user-configurable.<br><br>[0049] Once an acceptable fingerprint image has been captured in step 235, process 200 proceeds to step 245, wherein a template is generated based on the captured fingerprint image. As described above, in a preferred embodiment, the captured image is converted into 64 KB of data, which is then used as input to template generator 12 a for generating a 512-byte template.<br><br>[0050] In step 248, the template generated in step 245 is encrypted. In one embodiment, the encryption is performed by firmware (e.g., encryption firmware 117 d of FIG. 1B), thereby providing an added level of security against hacking.<br><br>[0051] In step 255, the encrypted template is stored into flash memory 20. In one embodiment, upon successful generation and encryption of a template, flash controller 14 is prompted by template generator 12 a to store the newly generated and encrypted template into flash memory 20 for use in subsequent user authentication. Moreover, as described above, in a preferred embodiment, the template is stored in a reserved area of flash memory 20 which is |

- 38 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | specifically designated for storing template(s) and which is not otherwise accessible to the user." |
| 1d3. populate the data base according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See, e.g.:*<br><br>Teng Pin Poo at [0023]-[0026]:<br><br>"[0023] Referring still to FIG. 1A, portable device 70 further includes an integrated circuit 10, a flash memory 20, a volatile memory 30 and a fingerprint module 50. Integrated circuit 10 can be conveniently implemented as an application-specific integrated circuit (ASIC). In a currently preferred embodiment, flash memory 20 can have a storage capacity between 8 MB and 512 MB, a portion of which can be used to store one or more templates generated in accordance with the present invention as described below. Moreover, in a preferred embodiment, the template(s) are stored in a reserved area of flash memory 20 which is specifically designated for this purpose and which is not otherwise accessible to the user. Additionally, as described in detail further below, a template is encrypted before it is stored in flash memory 20 in a currently preferred embodiment, thereby providing added security against hacking. In one embodiment, volatile memory 30 is external to integrated circuit 10 and can comprise either a dynamic random access memory (DRAM) or a static random access memory (SRAM). Among other uses, volatile memory 30 can serve as an initial storage and staging area for a fingerprint image captured in accordance with the present invention."<br><br>[0024] Integrated circuit 10 comprises a microprocessor 11 which, in one embodiment, is a RISC processor. In a currently preferred embodiment, an authentication engine 12 is included in integrated circuit 10. Authentication engine 12 in turns comprises a template generator 12 a and a verification |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | module 12 b. Template generator 12 a is used to generate an encoded version of an image of a fingerprint. Within the scope of the present invention, such an encoded fingerprint image is referred to as a template. It should be appreciated that according to current biometrics technology, a fingerprint can be uniquely identified using between 8 and 13 distinct points in the raw image of the fingerprint. Fingerprint information can thus be conveniently stored in a condensed fashion as data pertaining to the 8 to 13 relevant data points. A preferred embodiment of the present invention advantageously stores a fingerprint in a compact format as a template referred to above. In this embodiment, a template has a size of 512 bytes. Other embodiments can use templates of different sizes. The other component of authentication engine 12, verification module 12 b, is used to compare a newly generated template against a stored template to validate the authenticity of a fingerprint provided by someone purporting to be an authorized user. Thus, authentication engine 12 works in conjunction with fingerprint module 50, described in greater detail below, to implement user authentication in accordance with the present invention.<br><br>[0025] It should be appreciated that authentication engine 12 is well-adapted to numerous implementations within the scope of the present invention. In one embodiment, authentication engine 12 is implemented as firmware stored in a non-volatile memory within portable device 70. In another embodiment, authentication engine 12 is implemented as part of microprocessor 11. In still another embodiment, authentication engine 12 is implemented as a processor separate from microprocessor 11. In yet another embodiment, authentication engine 12 includes the same components and serves the same functions as described herein, but is located in host platform 90 rather than in portable device 70. In other words, within the scope of the present invention, authentication engine 12 is not required to reside in portable device 70. Instead, where authentication engine 12 is to be placed is a design choice, thus affording |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | design flexibility to suit different applications in which the present invention can be utilized.<br><br>[0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory 30. Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein."<br><br>Teng Pin Poo at [0029]:<br><br>"[0029] Reference is now made to FIG. 1B, which is a block diagram illustrating functional blocks of another embodiment of the portable device of the present invention. In this embodiment, portable device 170 is compatible with the USB standard and includes a USB plug 118 which, as FIG. 1B shows, is coupled to a USB host controller 193 of a host platform. Optionally, portable device 170 further includes an additional USB port 162 that is coupled to USB plug 118. USB port 162 is provided as a convenient feature that can be used to couple other USB-compatible device(s) to the USB via portable device 170. In this embodiment, portable device 170 also includes a USB device controller 115 for controlling the communication between portable device 170 and the host platform via USB host controller 193. In one embodiment, a driver |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | software 177 and an application programming interface (API) 197, which in turn includes monitoring software 199, reside in the host platform and communicate with USB host controller 193 to facilitate the operation of portable device 170."

Teng Pin Poo at [0051]

"[0051] In step 255, the encrypted template is stored into flash memory 20. In one embodiment, upon successful generation and encryption of a template, flash controller 14 is prompted by template generator 12 a to store the newly generated and encrypted template into flash memory 20 for use in subsequent user authentication. Moreover, as described above, in a preferred embodiment, the template is stored in a reserved area of flash memory 20 which is specifically designated for storing template(s) and which is not otherwise accessible to the user.""

Teng Pin Poo at [0059]-[0060]

"[0059] In step 280, a signal or message indicating the successful authentication is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90.

[0060] It should be appreciated that in an embodiment where authentication engine 12 is located in host platform 90, appropriate modifications to the authentication process described above are needed. In particular, once a satisfactory fingerprint image has been obtained in step 230, the image data is first encrypted and then transmitted to host platform 90, wherein the steps to be performed by authentication engine 12 will be carried out. Thus, depending |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | on the particular implementation or application, the information being transmitted from portable device 70 to host platform 90 can either be a simple notification of success upon successful authentication, or image data representing a user fingerprint that is pending authentication."

Teng Pin Poo at [0062]-[0063]:

"[0062] Significantly, it should be appreciated that the present invention not only contemplates using portable device 70 as a secure data storage device but also as an access control device. In particular, within the scope of the present invention, portable device 70 can act as an "access key" to host platform 90 to which portable device 70 is coupled. More specifically, in one embodiment, in order to access any resource on host platform 90 (e.g., data, files, application programs, peripherals) and/or any resource attached thereto (e.g., network access, network printers and storage devices, electronic mail) a user is required to first successfully authenticate his/her identity as an authorized user using portable device 70 with integrated fingerprint module 50. In accordance with this embodiment, such fingerprint authentication is used preferably in lieu of (or alternatively in addition to) conventional password-based authentication. Thus, the user inconvenience and less stringent security that is inherent in the prior art password-based authentication approach is advantageously eliminated in accordance with the present invention.

[0063] Beyond access control to various computer resources, the present invention can also be advantageously utilized in numerous other applications that require security clearance, such as entry into private homes, offices, hotel rooms, bank vaults and security deposit boxes, and so on. The present invention can also be beneficially applied to restrict the operation of machinery, such as factory machines and vehicles, to those who have been properly trained. In one embodiment, access control device 70 can be used as a house key to a private home or room key to a hotel room in place of conventional keys. In the first |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | example, the home owner first registers his/her fingerprint when the biometrics-based lock is installed at the house. In the latter example, a hotel guest first registers his/her fingerprint upon check-in at a hotel. Thereafter, access to the house or hotel room is securely restricted to the respective key holder (home owner or hotel guest). These and other wide-ranging applications of the biometrics-based access device technology disclosed herein are all intended to be within the scope and spirit of the present invention." |
| | |
| 2. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | *See* Claim 1. |
| 2a.  provide a signal for directing input of the series of entries of the biometric signal; | *See, e.g.* Teng Pin Poo at [0044]<br><br>"[0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform."<br><br>*See, e.g.* Teng Pin Poo at [0046] |

- 44 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| | "[0046] It should be appreciated that within the scope of the present invention, software (e.g., a software driver) may need to be installed on the host platform prior to the first use of portable device 70 to enable its utilization of the host platform's user interface to communicate with the user. It should also be appreciated that if the operating system of the host platform has built-in support for such functionality, no additional software needs to be installed thereon." |
| 2b.    incorporate into the secure access signal an identification            field identifying the biometric signal if the signal matches a member of the database; and | *See, e.g.:*<br><br>Teng Pin Poo at [0026]<br><br>"[0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory 30. Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein."<br><br>Teng Pin Poo at [0044]:<br><br>"[0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time |

- 45 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform."<br><br>Teng Pin Poo at [0052]:<br><br>"In step 280, a signal or message indicating the successful completion of the registration process is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90."<br><br>Teng Pin Poo at [0059]-[0060]<br><br>"[0059] In step 280, a signal or message indicating the successful authentication is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90.<br><br>[0060] It should be appreciated that in an embodiment where authentication engine 12 is located in host platform 90, appropriate modifications to the authentication process described above are needed. In particular, once a |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | satisfactory fingerprint image has been obtained in step 230, the image data is first encrypted and then transmitted to host platform 90, wherein the steps to be performed by authentication engine 12 will be carried out. Thus, depending on the particular implementation or application, the information being transmitted from portable device 70 to host platform 90 can either be a simple notification of success upon successful authentication, or image data representing a user fingerprint that is pending authentication."<br><br>Teng Pin Poo at [0062]<br><br>"[0062] Significantly, it should be appreciated that the present invention not only contemplates using portable device 70 as a secure data storage device but also as an access control device. In particular, within the scope of the present invention, portable device 70 can act as an "access key" to host platform 90 to which portable device 70 is coupled. More specifically, in one embodiment, in order to access any resource on host platform 90 (e.g., data, files, application programs, peripherals) and/or any resource attached thereto (e.g., network access, network printers and storage devices, electronic mail) a user is required to first successfully authenticate his/her identity as an authorized user using portable device 70 with integrated fingerprint module 50. In accordance with this embodiment, such fingerprint authentication is used preferably in lieu of (or alternatively in addition to) conventional password-based authentication. Thus, the user inconvenience and less stringent security that is inherent in the prior art password-based authentication approach is advantageously eliminated in accordance with the present invention." |
| 2c.   construct an audit trail of biometric signals provided to the biometric | *See, e.g.:*<br><br>Teng Pin Poo at [0053] |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Teng Pin Poo** |
| sensor in order to access the controlled item. | "[0053] With reference still to FIG. 10, the authentication process is now described. In step 230, sensor 52 is read to capture an image of the fingerprint of the user's finger that has been placed thereon. In a currently preferred embodiment, step 230 also includes a quality check of the captured image by control unit 56, so that the image capture will be repeated if the quality of the captured fingerprint image is unacceptable for template generation. If a repeat capture is needed, the user will be so prompted. Preferably, the number of retry is user-configurable. In a currently preferred embodiment, step 230 also includes generating a template based on the captured fingerprint image and storing the resulting template into volatile memory 16." <br><br> Teng Pin Poo at [0057] <br><br> "[0057] In one embodiment, when a user has failed to authenticated his/her identity as an authorized user, access to flash memory 20 will be blocked (e.g., in an embodiment where a software driver resides in host platform 90, the software driver can forbid such access). In another embodiment, microprocessor 11 in portable device 70 will shut down or otherwise disable flash controller 14 upon such authentication failure. These actions serve as added security measures against potential hacking and other forms of unauthorized access to the data stored in flash memory 20 and are triggered by repeated failed authentication attempts." <br><br> Teng pin Poo at [0060] <br><br> "[0060] It should be appreciated that in an embodiment where authentication engine 12 is located in host platform 90, appropriate modifications to the authentication process described above are needed. In particular, once a satisfactory fingerprint image has been obtained in step 230, the image data is first encrypted and then transmitted to host platform 90, wherein the steps to be performed by authentication engine 12 will be carried out. Thus, depending |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | on the particular implementation or application, the information being transmitted from portable device 70 to host platform 90 can either be a simple notification of success upon successful authentication, or image data representing a user fingerprint that is pending authentication." |
| | |
| 4. The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | *See, e.g.:*<br><br>Teng Pin Poo at [0064]<br><br>"[0064] Although embodiments of the present invention have been described herein as using fingerprint authentication technology to implement access control, it should be appreciated that the present invention is not limited thereto but rather encompasses the use of other biometrics-based authentication techniques. One such technique is iris scan technology. While such other biometrics-based techniques are not expressly described herein, their applicability to access control implementations using a portable device is within the scope and spirit of the present invention disclosed."<br><br>Teng Pin Poo at [0023]:<br><br>"Referring still to FIG. 1A, portable device 70 further includes an integrated circuit 10, a flash memory 20, a volatile memory 30 and a fingerprint module 50. Integrated circuit 10 can be conveniently implemented as an application-specific integrated circuit (ASIC). In a currently preferred embodiment, flash memory 20 can have a storage capacity between 8 MB and 512 MB, a portion of which can be used to store one or more templates generated in accordance with the present invention as described below. Moreover, in a preferred embodiment, the template(s) are stored in a reserved area of flash memory 20 which is specifically designated for this purpose and which is not otherwise |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | accessible to the user. Additionally, as described in detail further below, a template is encrypted before it is stored in flash memory 20 in a currently preferred embodiment, thereby providing added security against hacking. In one embodiment, volatile memory 30 is external to integrated circuit 10 and can comprise either a dynamic random access memory (DRAM) or a static random access memory (SRAM). Among other uses, volatile memory 30 can serve as an initial storage and staging area for a fingerprint image captured in accordance with the present invention." |
| | |
| 6. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | *See, e.g.:*<br><br>Teng Pin Poo at [0006]:<br><br>"[0006] Accordingly, the present invention provides a method and system which delivers a highly reliable and user-friendly authentication mechanism for preventing unauthorized access to information stored on a portable or designated storage media. Furthermore, embodiments of the present invention also provide a highly secure access control mechanism for protection against unauthorized access to stored data and computer resources as well as guarding against unauthorized entry to premises. Aspects of the present invention, which utilizes a unique biometrics marker as a basis for identity authentication and as an "access key" for each individual user, are described in detail herein."<br><br>Teng Pin Poo at [0053]-[0054]:<br><br>"[0053] With reference still to FIG. 10, the authentication process is now described. In step 230, sensor 52 is read to capture an image of the fingerprint of the user's finger that has been placed thereon. In a currently preferred embodiment, step 230 also includes a quality check of the captured image by |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | control unit 56, so that the image capture will be repeated if the quality of the captured fingerprint image is unacceptable for template generation. If a repeat capture is needed, the user will be so prompted. Preferably, the number of retry is user-configurable. In a currently preferred embodiment, step 230 also includes generating a template based on the captured fingerprint image and storing the resulting template into volatile memory 16.<br><br>[0054] In step 240, the stored template(s) are read from flash memory 20 for use as the basis of authenticating the identity of the user whose fingerprint image has been captured in step 230. In a currently preferred embodiment, microprocessor 11 directs flash controller 14 to retrieve the registered template(s) from flash memory 20." |
| 6a.  wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | *See, e.g.:*<br><br>Teng Pin Poo at [0053]-[0056]:<br><br>"[0053] With reference still to FIG. 10, the authentication process is now described. In step 230, sensor 52 is read to capture an image of the fingerprint of the user's finger that has been placed thereon. In a currently preferred embodiment, step 230 also includes a quality check of the captured image by control unit 56, so that the image capture will be repeated if the quality of the captured fingerprint image is unacceptable for template generation. If a repeat capture is needed, the user will be so prompted. Preferably, the number of retry is user-configurable. In a currently preferred embodiment, step 230 also includes generating a template based on the captured fingerprint image and storing the resulting template into volatile memory 16.<br><br>[0054] In step 240, the stored template(s) are read from flash memory 20 for use as the basis of authenticating the identity of the user whose fingerprint image has been captured in step 230. In a currently preferred embodiment, |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | microprocessor 11 directs flash controller 14 to retrieve the registered template(s) from flash memory 20.<br><br>[0055] In step 250, the registered template(s) read from flash memory 20, which are stored in encrypted form in a preferred embodiment, are decrypted. The decrypted template(s) are loaded into volatile memory 16 in one embodiment.<br><br>[0056] In step 260, it is determined whether the user's fingerprint can be authenticated against the registered fingerprint template on record. In a currently preferred embodiment, verification module 12 b compares the template pending verification against the registered template(s). If a match is detected, the user is authenticated; otherwise, authentication fails. In one embodiment, the user is allowed to reattempt the authentication process if an initial attempt fails (e.g., steps 230, 240 and 250 are repeated). Preferably, the number of repeated attempts is user-configurable and can be set once an authorized user has been authenticated and granted access."<br><br>Teng Pin Poo at [0059]<br><br>"[0059] In step 280, a signal or message indicating the successful authentication is generated. In an embodiment where portable device 70 is used as a secure storage device, step 280 can also entail enabling portable device, i.e., granting the newly registered user access (e.g., read data therefrom and write data thereto) to portable device 70 and mapping portable device 70 to a valid drive letter on host platform 90."<br><br>Teng Pin Poo at [0065]: |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | "[0065] Moreover, while preferred embodiments of the present invention have been described herein as using flash memory as a storage media, it should be appreciated that other types of non-volatile memory, such as ferroelectric random access memory (FRAM) or magnetic random access memory (MRAM), can also be used within the scope of the present invention. In addition, while such preferred embodiments have been described herein as being compatible with the USB standard, the portable device of the present invention is not intended to be restricted thereto. Rather, the present invention is intended to encompass portable devices that support other communication protocols and/or bus standards, such as the IEEE 1394 ("Firewire") standard." |
| 6b.    the system further comprising a control panel configured to receive the information and provide the secure access requested. | *See, e.g.:*<br><br>Teng Pin Poo at [0046]:<br><br>"[0046] It should be appreciated that within the scope of the present invention, software (e.g., a software driver) may need to be installed on the host platform prior to the first use of portable device 70 to enable its utilization of the host platform's user interface to communicate with the user. It should also be appreciated that if the operating system of the host platform has built-in support for such functionality, no additional software needs to be installed thereon." |
| | |
| 9.  The system according to claim 1, wherein:    the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | To the extent this claim is not found indefinite for lack of antecedent basis for the term "the electronic computing device," *see, e.g.:*<br><br>Teng Pin Poo at [0023]:<br><br>"[0023] Referring still to FIG. 1A, portable device 70 further includes an integrated circuit 10, a flash memory 20, a volatile memory 30 and a fingerprint module 50. Integrated circuit 10 can be conveniently implemented as an |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | application-specific integrated circuit (ASIC). In a currently preferred embodiment, flash memory 20 can have a storage capacity between 8 MB and 512 MB, a portion of which can be used to store one or more templates generated in accordance with the present invention as described below. Moreover, in a preferred embodiment, the template(s) are stored in a reserved area of flash memory 20 which is specifically designated for this purpose and which is not otherwise accessible to the user. Additionally, as described in detail further below, a template is encrypted before it is stored in flash memory 20 in a currently preferred embodiment, thereby providing added security against hacking. In one embodiment, volatile memory 30 is external to integrated circuit 10 and can comprise either a dynamic random access memory (DRAM) or a static random access memory (SRAM). Among other uses, volatile memory 30 can serve as an initial storage and staging area for a fingerprint image captured in accordance with the present invention.<br><br>Teng Pin Poo at [0026]<br><br>[0026] Referring still to FIG. 1A, in a preferred embodiment, integrated circuit 10 also comprises a bus interface 13 which facilitates communication between integrated circuit 10 and other components, such as volatile memory 30. Integrated circuit 10 further includes a flash controller 14 for controlling access to flash memory 20. In one embodiment, upon the successful generation of a template during user registration, flash controller 14 communicates with template generator 12 a to store the newly generated template into flash memory 20 for use in subsequent user authentication. Moreover, in a currently preferred embodiment, portable device 70 is compatible with the universal serial bus (USB) standard and includes a USB connector (not shown). In this embodiment, integrated circuit 10 also includes a USB device controller 15, which serves to control the communication between portable device 70 and host platform 90, such as a USB-compatible personal computer (PC) having a USB host controller 93 therein." |

- 54 -

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Teng Pin Poo** |
|  | Teng Pin Poo at [0057]:<br><br>"[0057] In one embodiment, when a user has failed to authenticated his/her identity as an authorized user, access to flash memory 20 will be blocked (e.g., in an embodiment where a software driver resides in host platform 90, the software driver can forbid such access). In another embodiment, microprocessor 11 in portable device 70 will shut down or otherwise disable flash controller 14 upon such authentication failure. These actions serve as added security measures against potential hacking and other forms of unauthorized access to the data stored in flash memory 20 and are triggered by repeated failed authentication attempts. |
|  ||
| 10.    A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 10a.    a biometric sensor configured to receiving a biometric signal; | *See* Claim Element 1b1. |
| 10b. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| 10c. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 10d. wherein the controller is further configured to: | *See* Claim Element 1b. |
| 10d1. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 10d2. map said series into an instruction; and | *See* Claim Element 1d2. |
| 10d3. populate the database according to the instruction, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| 11. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | *See* Claim 1. |
| 11a. populating the database of biometric signatures by: | *See* Claim Element 1d3. |
| 11a1. receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| 11a2. determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 11a3. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 11a4. populating the database according to the instruction; | *See* Claim Element 1d3. |
| 11b. receiving the biometric signal; | *See* Claim Element 1b1. |
| 11c. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 11d. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 11e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a | *See* Claim Elements 1c2 and 1d3. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| physical access structure or an electronic lock on an electronic computing device. | |
| | |
| 12. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | *See* Claim Element 1a. |
| 12a. receiving a biometric signal; and | *See* Claim Element 1b1. |
| 12b. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | *See, e.g.*:<br><br>Teng Pin Poo at [0044]<br><br>"[0044] In step 220, portable device 70 determines whether a user registration is necessary. For example, if portable device 70 is being used for the first time and no template has yet been stored in flash memory 20, portable device 70 will guide the user to complete a registration process (steps 225, 235, 245 and 255 as described below) via a user interface (e.g., pop-up message windows) through the host platform. Thus, upon the first use of portable device 70 (e.g., immediately after purchase), a preferred embodiment automatically initiate the registration process to generate the first ("master") template. This is preferably |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| | accomplished by checking a status flag (e.g., flag 121 in flash memory 120 of FIG. 1B). Subsequent registration(s), as described below, can be activated by individual users via software on the host platform. |
| | |
| 14.    A    non-transitory computer readable storage medium storing a computer program    comprising instructions,    which    when executed    by    processors causes the processors to: | *See* Claims 1, 11. |
| 14a.    receive    a    series    of entries of a biometric signal; | *See* Claim Element 1d1. |
| 14b.    determine at least one of a number of said entries and  a  duration  of  each  of said entries; | *See* Claim Element 1d1. |
| 14c.  map said series into an instruction; | *See* Claim Element 1d2. |
| 14d.  populate a database of biometric    signatures according to the instruction; | *See* Claim Element 1d3. |
| 14e.    receive  the  biometric signal; | *See* Claim Element 1b1. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| 14f.   match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 14g.   emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 14h.   provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
|  | |
| 15.  A system for providing secure access to a controlled item, the system comprising: | *See* Claim 1. |
| 15a.  a memory comprising a database of biometric signatures; | *See* Claim Element 1a. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Teng Pin Poo** |
| 15b.    a transmitter sub-system comprising: | *See* Claim Element 1b. |
| 15b1.    a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 15b2.    a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 15b3.  a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 15c.  a receiver sub-system comprising: | *See* Claim Element 1c. |
| 15c1. a receiver sub-system controller capable of: receiving the transmitted secure access signal; and | *See* Claim Element 1c1. |
| 15c2. providing conditional access to the controlled item | *See* Claim Element 1c2. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| dependent upon said information; | |
| 15d. wherein the transmitter sub-system controller is further capable of: | *See* Claim Element 1b. |
| 15d1. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 15d2. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 15d3. populating the data base according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Teng Pin Poo |
|---|---|
| 16. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 16a. a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 16b. a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 16c. a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 16d. wherein the controller is further capable of: | *See* Claim Element 1b. |
| 16d1. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of | *See* Claim Element 1d1. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| said entries and a duration of each said entry; | |
| 16d2.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 16d3.    populating    the database according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |
| | |
| 17.  A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub- | *See* Claim 1. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | |
| 17a. populating the database of biometric signatures by: | *See* Claim Element 1d3. |
| 17a1. receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |
| 17a2. determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 17a3. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 17a4. populating the database according to the instruction; | *See* Claim Element 1d3. |
| 17b. receiving the biometric signal; | *See* Claim Element 1b1. |

Exhibit C-15 (Poo)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Teng Pin Poo** |
| 17c. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 17d. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 17e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |

Exhibit C-16 (Krueger)

**Exhibit C-16**

**INVALIDITY OF U.S. PATENT NO. 9,665,705 (THE "'705 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 20030051173 ("Krueger")**

U.S. PATENT APP. PUB. 20030051173 to Krueger ("Krueger") anticipates and/or renders obvious claims 1, 2, 4, 6, 9-12, 14, 15, 16 and 17 of U.S. Patent No. 9,665,705 (the "'705 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 1. A system for providing secure access to a controlled item, the system comprising: | *See, e.g.:*<br><br>Krueger at [0006]<br><br>"[0006] A computer access system according to the present invention includes an authentication gateway that validates the identity of a user who accesses the computer through the authentication gateway. The user's identification is preferably validated by the authentication gateway using a biometric sample. The computer therefore utilizes the increased security associated with biometric validation but doesn't have to have the built-in capacity to implement biometric validation." |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | |
| 1a.  a memory comprising a database of biometric signatures; | *See, e.g.:*<br><br>Krueger at [0019]:<br><br>"[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code." |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
|  |  |
| 1b.    a transmitter sub-system comprising: | *See, e.g.:*<br><br>Krueger at [0018]:<br><br>"[0018] A block diagram of one embodiment of a computer access system 10 in accordance with the present invention is shown in FIG. 1. Using the system 10, a user accesses a remotely located computer 12 from a computer system 14, personal digital assistant (PDA) 16, networked cellular telephone 18, or other device for accessing a computer network. Communications between the user and the remotely located computer system 12 pass through an authentication gateway 20 that confirms the identity of the users who access the remotely-located computer 12."<br><br>Krueger at Fig. 1: |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| |  Fig.1. |
| 1b1.    a biometric sensor configured to receive a biometric signal; | *See, e.g.:* <br><br> Krueger at [0019]: <br><br> "[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code." |
| 1b2. a transmitter sub-system controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See, e.g.:*<br><br>Krueger at [0012]<br><br>"[0021] Although the present embodiment of the invention utilizes a bank as the identification validation source 32, it will be appreciated that other agencies or individuals, such as a notary public, governmental agency, or other identification validation service could be used to establish a person's |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | identity to the satisfaction of the authentication gateway. Once the individual or agency has confirmed the identity of the user, the authentication gateway associates a biometric sample, log-in name, and password with the particular individual. The next time the user accesses the authentication gateway, he or she provides the log-in name, password, and another biometric sample that is compared to the data stored on the database 30. If the data matches or correlates, then the user can access the remotely located computer 12 via the authentication gateway. To limit access to the computer 12, the computer 12 may be programmed so that it only accepts entries or log-ins that access the computer through the authentication gateway 20." |
| 1b3. a transmitter configured to emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See, e.g.:*<br><br>Krueger at [0024]-[0029]:<br><br>"[0024] If the computer system 12 utilizes cookie technology, the computer system 12 asks the authentication gateway 20 for a cookie that contains the access code(s), such as the log-in name and password, for the user. If available, the log-in and password are provided. If not, an indication that the information is not available is returned to the computer system 12 at which time the computer system 12 can generate a Web page with a request that such information be provided by the operator.<br><br>[0025] When accessed via the authentication gateway 20, the remote computer system 12 and the authentication gateway 20 preferably agree on a protocol for identifying users whose identification has been established. For example, the log-in identification may contain a unique identifier that indicates the user has accessed the computer system 12 through the authentication gateway 20. For example, all users that access the computer |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| Claim Element | Krueger |
| --- | --- |
| | system 12 through the authentication gateway 20 may have a log-in name comprising a specific numeric code coupled with an alphanumeric identifier. A log-in name for a user John Doe may comprise the log-in identification 123456DOEJ, etc. If the computer 12 detects the specific identifier, then the computer 12 knows that the user is accessing via the authentication gateway 20 and that the authentication gateway has confirmed the identity of the user." <br><br> [0026] Once the user has accessed the authentication gateway 20, communications between the user and the computer system 12 pass through the authentication gateway 20 until the user logs off the authentication gateway. <br><br> [0027] As will be appreciated, one advantage of the present invention is that the computer 12 can still use its log-in/password security method, but has a greater degree of confidence in the identity of a user who accesses the computer 12 via the authentication gateway because the authentication gateway has either confirmed the identity of the user using the identification validation source 32 and/or confirmed the biometric sample that is provided by the user. Thus, the access code(s) provided to the computer 12 can be said to be biometrically validated without requiring the computer 12 to have the equipment/hardware and software to validate biometric samples." <br><br> [0028] In another embodiment of the invention, the user may wish to access a security service that stores combinations or key codes to perform some function such as unlocking doors to a car 40, gaining entrances to buildings, etc. If such codes were stored directly on an electronic device, such as a PDA 16 or cellular phone 18, then such codes could be used by unauthorized users if the PDA 16 or cellular phone 18 were stolen. As shown in FIG. 2, to protect the security/key codes, the codes are stored on a remote computer system 12 that is accessed through the authentication gateway 20. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | [0029] The user accesses the authentication gateway 20 by providing a log-in identification, password, and a biometric sample. This information is compared to previously validated information that is stored on the authentication gateway's database 30. Once the user has logged on to the authentication gateway 20, they can access the remote computer 12 to request a security/key code. Upon the request of a code, the computer system 12 asks the authentication gateway 20 for a log-in name and password for the user that are preferably stored as a cookie file. Again, the specific log-in name and password associated with a particular user are unknown to the user such that the user cannot access the remote computer system 12 except through the authentication gateway 20. In this manner, the computer system 12 has a high degree of confidence that the user's identity is legitimate. Upon successful log-in to the remote computer 12, the security/key code is returned to the user's access device (cell phone, PDA, etc.) such that the user can direct the received security/key code at the car 40 or electronic doorway, etc., in order to perform the desired task of opening the car/office door, etc." |
| 1c. a receiver sub-system comprising: | *See, e.g.:*<br><br>Krueger at [0018]:<br><br>"[0018] A block diagram of one embodiment of a computer access system 10 in accordance with the present invention is shown in FIG. 1. Using the system 10, a user accesses a remotely located computer 12 from a computer system 14, personal digital assistant (PDA) 16, networked cellular telephone 18, or other device for accessing a computer network. Communications between the user and the remotely located computer system 12 pass through an authentication gateway 20 that confirms the identity of the users who access the remotely-located computer 12." |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | Krueger at Fig. 1:<br><br><br><br>*Fig.1.* |
| 1c1. a receiver sub-system controller configured to: receive the transmitted secure access signal; and | *See, e.g.:*<br><br>Krueger at [0024]-[0029]: |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | "[0024] If the computer system 12 utilizes cookie technology, the computer system 12 asks the authentication gateway 20 for a cookie that contains the access code(s), such as the log-in name and password, for the user. If available, the log-in and password are provided. If not, an indication that the information is not available is returned to the computer system 12 at which time the computer system 12 can generate a Web page with a request that such information be provided by the operator.<br><br>[0025] When accessed via the authentication gateway 20, the remote computer system 12 and the authentication gateway 20 preferably agree on a protocol for identifying users whose identification has been established. For example, the log-in identification may contain a unique identifier that indicates the user has accessed the computer system 12 through the authentication gateway 20. For example, all users that access the computer system 12 through the authentication gateway 20 may have a log-in name comprising a specific numeric code coupled with an alphanumeric identifier. A log-in name for a user John Doe may comprise the log-in identification 123456DOEJ, etc. If the computer 12 detects the specific identifier, then the computer 12 knows that the user is accessing via the authentication gateway 20 and that the authentication gateway has confirmed the identity of the user."<br><br>[0026] Once the user has accessed the authentication gateway 20, communications between the user and the computer system 12 pass through the authentication gateway 20 until the user logs off the authentication gateway.<br><br>[0027] As will be appreciated, one advantage of the present invention is that the computer 12 can still use its log-in/password security method, but has a greater degree of confidence in the identity of a user who accesses the computer 12 via the authentication gateway because the authentication |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | gateway has either confirmed the identity of the user using the identification validation source 32 and/or confirmed the biometric sample that is provided by the user. Thus, the access code(s) provided to the computer 12 can be said to be biometrically validated without requiring the computer 12 to have the equipment/hardware and software to validate biometric samples."<br><br>[0028] In another embodiment of the invention, the user may wish to access a security service that stores combinations or key codes to perform some function such as unlocking doors to a car 40, gaining entrances to buildings, etc. If such codes were stored directly on an electronic device, such as a PDA 16 or cellular phone 18, then such codes could be used by unauthorized users if the PDA 16 or cellular phone 18 were stolen. As shown in FIG. 2, to protect the security/key codes, the codes are stored on a remote computer system 12 that is accessed through the authentication gateway 20.<br><br>[0029] The user accesses the authentication gateway 20 by providing a log-in identification, password, and a biometric sample. This information is compared to previously validated information that is stored on the authentication gateway's database 30. Once the user has logged on to the authentication gateway 20, they can access the remote computer 12 to request a security/key code. Upon the request of a code, the computer system 12 asks the authentication gateway 20 for a log-in name and password for the user that are preferably stored as a cookie file. Again, the specific log-in name and password associated with a particular user are unknown to the user such that the user cannot access the remote computer system 12 except through the authentication gateway 20. In this manner, the computer system 12 has a high degree of confidence that the user's identity is legitimate. Upon successful log-in to the remote computer 12, the security/key code is returned to the user's access device (cell phone, PDA, etc.) such that the user can direct the received security/key code at the car 40 or electronic doorway, etc., in order to perform the desired task of opening the car/office door, etc." |

- 11 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
|  |  |
| 1c2.    provide conditional access to the controlled item dependent upon said information; | *See, e.g.:*<br><br>Krueger at [0027]-[0029]:<br><br>"[0027] As will be appreciated, one advantage of the present invention is that the computer 12 can still use its log-in/password security method, but has a greater degree of confidence in the identity of a user who accesses the computer 12 via the authentication gateway because the authentication gateway has either confirmed the identity of the user using the identification validation source 32 and/or confirmed the biometric sample that is provided by the user. Thus, the access code(s) provided to the computer 12 can be said to be biometrically validated without requiring the computer 12 to have the equipment/hardware and software to validate biometric samples."<br><br>[0028] In another embodiment of the invention, the user may wish to access a security service that stores combinations or key codes to perform some function such as unlocking doors to a car 40, gaining entrances to buildings, etc. If such codes were stored directly on an electronic device, such as a PDA 16 or cellular phone 18, then such codes could be used by unauthorized users if the PDA 16 or cellular phone 18 were stolen. As shown in FIG. 2, to protect the security/key codes, the codes are stored on a remote computer system 12 that is accessed through the authentication gateway 20.<br><br>[0029] The user accesses the authentication gateway 20 by providing a log-in identification, password, and a biometric sample. This information is compared to previously validated information that is stored on the authentication gateway's database 30. Once the user has logged on to the authentication gateway 20, they can access the remote computer 12 to |

- 12 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Krueger** |
|  | request a security/key code. Upon the request of a code, the computer system 12 asks the authentication gateway 20 for a log-in name and password for the user that are preferably stored as a cookie file. Again, the specific log-in name and password associated with a particular user are unknown to the user such that the user cannot access the remote computer system 12 except through the authentication gateway 20. In this manner, the computer system 12 has a high degree of confidence that the user's identity is legitimate. Upon successful log-in to the remote computer 12, the security/key code is returned to the user's access device (cell phone, PDA, etc.) such that the user can direct the received security/key code at the car 40 or electronic doorway, etc., in order to perform the desired task of opening the car/office door, etc." |
| 1d.  wherein the transmitter sub-system controller is further configured to: |  |
| 1d1.  receive a series of entries of the biometric signal, said series being characterized according to at least one of the number of said entries and a duration of each said entry; | *See, e.g.:*<br><br>Krueger at [0019]:<br><br>"[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code." |
| 1d2.  map said series into an instruction; and | *See, e.g.:*<br><br>Krueger at [0019]:<br><br>"[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric |

- 14 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code."<br><br>Krueger at [0025]:<br><br>"[0025] When accessed via the authentication gateway 20, the remote computer system 12 and the authentication gateway 20 preferably agree on a protocol for identifying users whose identification has been established. For example, the log-in identification may contain a unique identifier that indicates the user has accessed the computer system 12 through the authentication gateway 20. For example, all users that access the computer system 12 through the authentication gateway 20 may have a log-in name comprising a specific numeric code coupled with an alphanumeric identifier. A log-in name for a user John Doe may comprise the log-in identification 123456DOEJ, etc. If the computer 12 detects the specific identifier, then the computer 12 knows that the user is accessing via the authentication gateway 20 and that the authentication gateway has confirmed the identity of the user." |
| 1d3.  populate the data base according to the instruction, wherein the controlled item | See, *e.g.*:<br><br>Krueger at [0019]-[0020]: |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | "[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code.

[0020] To associate a biometric sample with a particular individual, the authentication gateway utilizes the identification-checking services of an identification validation source 32. In one embodiment of the invention, the identification validation source 32 is a bank. The user is asked by the authentication gateway to enter a bank account number. The authentication gateway 20 receives the account number and makes a small variable or |

- 16 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | random deposit (e.g., between 0.01 and 0.99 dollars) into the user's account. The user is then asked to report back to the authentication gateway how much money was deposited. If the user gets the amount correct, then the authentication gateway assumes that the user's identity has been confirmed because banks often require the presentation of a birth certificate or similarly reliable identification in order to set up an account. If the user does not have an account, they are asked to establish one and to provide authentication gateway with the account number when the account is established. Therefore, by relying on the identity verification procedures utilized by the bank, the authentication gateway confirms the identity of a user with a greater degree of confidence."<br><br>Krueger at [0027]-[0029]:<br><br>"[0027] As will be appreciated, one advantage of the present invention is that the computer 12 can still use its log-in/password security method, but has a greater degree of confidence in the identity of a user who accesses the computer 12 via the authentication gateway because the authentication gateway has either confirmed the identity of the user using the identification validation source 32 and/or confirmed the biometric sample that is provided by the user. Thus, the access code(s) provided to the computer 12 can be said to be biometrically validated without requiring the computer 12 to have the equipment/hardware and software to validate biometric samples."<br><br>[0028] In another embodiment of the invention, the user may wish to access a security service that stores combinations or key codes to perform some function such as unlocking doors to a car 40, gaining entrances to buildings, etc. If such codes were stored directly on an electronic device, such as a PDA 16 or cellular phone 18, then such codes could be used by unauthorized users if the PDA 16 or cellular phone 18 were stolen. As shown in FIG. 2, |

- 17 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | to protect the security/key codes, the codes are stored on a remote computer system 12 that is accessed through the authentication gateway 20.<br><br>[0029] The user accesses the authentication gateway 20 by providing a log-in identification, password, and a biometric sample. This information is compared to previously validated information that is stored on the authentication gateway's database 30. Once the user has logged on to the authentication gateway 20, they can access the remote computer 12 to request a security/key code. Upon the request of a code, the computer system 12 asks the authentication gateway 20 for a log-in name and password for the user that are preferably stored as a cookie file. Again, the specific log-in name and password associated with a particular user are unknown to the user such that the user cannot access the remote computer system 12 except through the authentication gateway 20. In this manner, the computer system 12 has a high degree of confidence that the user's identity is legitimate. Upon successful log-in to the remote computer 12, the security/key code is returned to the user's access device (cell phone, PDA, etc.) such that the user can direct the received security/key code at the car 40 or electronic doorway, etc., in order to perform the desired task of opening the car/office door, etc." |
| | |
| 2. The system according to claim 1, wherein the transmitter sub-system controller is further configured to: | *See* Claim 1. |
| 2a. provide a signal for directing input of the series of entries of the biometric signal; | *See, e.g.:*<br><br>Krueger at [0019]: |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | "[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code."<br><br>Krueger at Claim 2:<br><br>2. A system for providing one or more access codes that validate the identity of a user to a computer system, comprising: |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| :--- | :--- |
| **Claim Element** | **Krueger** |
| | an authentication gateway through which the user accesses the computer system, the authentication gateway being programmed to:<br><br>(a) receive a biometric sample from the user; . . ." |
| 2b.   incorporate into the secure access signal an identification field identifying the biometric signal if the signal matches a member of the database; and | *See, e.g.:*<br><br>Krueger at [0025]:<br><br>"[0025] When accessed via the authentication gateway 20, the remote computer system 12 and the authentication gateway 20 preferably agree on a protocol for identifying users whose identification has been established. For example, the log-in identification may contain a unique identifier that indicates the user has accessed the computer system 12 through the authentication gateway 20. For example, all users that access the computer system 12 through the authentication gateway 20 may have a log-in name comprising a specific numeric code coupled with an alphanumeric identifier. A log-in name for a user John Doe may comprise the log-in identification 123456DOEJ, etc. If the computer 12 detects the specific identifier, then the computer 12 knows that the user is accessing via the authentication gateway 20 and that the authentication gateway has confirmed the identity of the user." |
| 2c.   construct an audit trail of biometric signals provided to the biometric sensor in order to access the controlled item. | *See, e.g.:*<br><br>Krueger at [0032]:<br><br>" [0032] Before the program or the stored digital content can be used or accessed, the user must successfully log on to the authentication gateway 20 with the user's one or more access codes, such as a log-in name, password, and biometric sample. Upon successful access to the authentication gateway |

- 20 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| :---: | :---: |
| **Claim Element** | **Krueger** |
| | 20, the registered program or digital content makes a request for the unlocking key to be returned to the computer system 50. If the key is available, it is transferred to the computer 50 or network access device to unlock the program or digital content for the user to view/use. The next time the user wants to use the program/digital content, the program/digital content will make another request for the key from the authentication gateway 20. This embodiment of the invention has the advantage that the vendor or registrar of the program or content does not have to administer the keeping of security keys but can rely on the authentication gateway to ensure that all users of the program/digital content are legitimate." |
| | |
| 4.  The system according to claim 1, wherein the biometric sensor is responsive to one of voice, retinal pattern, iris pattern, face pattern, and palm configuration, and/or the database of biometric signatures is located in at least one of the transmitter sub-system and the receiver sub-system. | *See, e.g.:*<br><br>Krueger at [0019]:<br><br>"[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code." |
| | |
| 6. The system as claimed in claim 1, wherein the biometric sensor is further configured to authenticate the identity of a user; | *See, e.g.:*<br><br>Krueger at [0019]-[0021]:<br><br>"[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code.<br><br>[0020] To associate a biometric sample with a particular individual, the authentication gateway utilizes the identification-checking services of an identification validation source 32. In one embodiment of the invention, the identification validation source 32 is a bank. The user is asked by the authentication gateway to enter a bank account number. The authentication gateway 20 receives the account number and makes a small variable or random deposit (e.g., between 0.01 and 0.99 dollars) into the user's account. The user is then asked to report back to the authentication gateway how much money was deposited. If the user gets the amount correct, then the authentication gateway assumes that the user's identity has been confirmed because banks often require the presentation of a birth certificate or similarly reliable identification in order to set up an account. If the user does not have an account, they are asked to establish one and to provide authentication gateway with the account number when the account is established. Therefore, by relying on the identity verification procedures utilized by the bank, the authentication gateway confirms the identity of a user with a greater degree of confidence.<br><br>[0021] Although the present embodiment of the invention utilizes a bank as the identification validation source 32, it will be appreciated that other agencies or individuals, such as a notary public, governmental agency, or other identification validation service could be used to establish a person's identity to the satisfaction of the authentication gateway. Once the individual or agency has confirmed the identity of the user, the |

- 23 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | authentication gateway associates a biometric sample, log-in name, and password with the particular individual. The next time the user accesses the authentication gateway, he or she provides the log-in name, password, and another biometric sample that is compared to the data stored on the database 30. If the data matches or correlates, then the user can access the remotely located computer 12 via the authentication gateway. To limit access to the computer 12, the computer 12 may be programmed so that it only accepts entries or log-ins that access the computer through the authentication gateway 20." <br><br> Krueger at Claim 1: <br><br> "A system for limiting access to a computer, comprising: <br><br> an authentication gateway through which a user accesses the computer, the authentication gateway receiving one or more access codes from the user and a biometric sample to authenticate the identity of the user, <br><br> the authentication gateway providing one or more authenticated access codes to the computer such that the user can access the computer." |
| 6a.  wherein the transmitter is further configured to transmit information capable of granting access to the controlled item using a secure wireless signal dependent upon a request from the user and the authentication of the user identity; and | *See, e.g.:* <br><br> Krueger at [0019]: <br><br> "[0019] To confirm the identity of a user, the user accesses the authentication gateway 20 with one or more access codes, such as a log-in name and a password, and by providing a biometric sample. The biometric sample provided could be a voice sample, a photograph, fingerprint, retinal scan, or any other sample that uniquely identifies the user. To provide the sample, the user's access device includes one or more sensors such as a |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | microphone 22 for recording voice samples, a fingerprint scanner 24 for recording fingerprints, a digital camera 26 for recording images, or other sensor for detecting a biometric sample that can be converted to a digital form and transmitted via a wired or wireless link to the authentication gateway 20. The one or more access codes, such as the log-in name, password, and biometric sample, are compared with previously stored code data, as well as a stored biometric sample, that forms a standard against which the new biometric sample is compared. The standard biometric sample, log-in name, and password for each user are preferably stored in a database 30 or computer retrievable media that is associated with the authentication gateway 20. If the user accesses the authentication gateway 20 with a PDA 16 or cellular telephone 18, these devices must be similarly equipped with appropriate biometric sensors, i.e., cameras, microphones, etc., to record the sample. In some embodiments, the authentication gateway 20 may be accessed by a user by only providing a biometric sample. For example, the user could speak his or her name into a microphone and the recorded name would save as both the biometric sample and an access code." |
| 6b.    the system further comprising a control panel configured to receive the information and provide the secure access requested. | *See, e.g.:*<br><br>Krueger at [0024]:<br><br>"[0024] If the computer system 12 utilizes cookie technology, the computer system 12 asks the authentication gateway 20 for a cookie that contains the access code(s), such as the log-in name and password, for the user. If available, the log-in and password are provided. If not, an indication that the information is not available is returned to the computer system 12 at which time the computer system 12 can generate a Web page with a request that such information be provided by the operator." |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| | |
| 9. The system according to claim 1, wherein: the transmitter sub-system and the receiver sub-system are collocated in the electronic computing device. | To the extent this claim is not found indefinite for lack of antecedent basis for the term "the electronic computing device," *see, e.g.*:<br><br>Krueger at [0037]:<br><br>"[0037] Furthermore, the present invention is not limited to the use of log-in names and passwords. For example, in closed systems, a token or random string of letters/characters/numbers could be used as a means for gaining access or privileges. An automated enrollment form may be returned to the user in the form of a cookie and a single security code, rather than a cookie file containing the user's log-in name and password to be used to gain entry or privileges. Furthermore, the present invention is not limited to cookie technology. For example, it is possible for the authentication gateway to deliver the user's blind log-in information directly to the Web site and bypass cookie technology. Finally, the present invention is not limited to computer systems that are accessible as Web sites. Any computerized secured resource using some form of security code as a means for gaining access could be modified to benefit from the present invention." |
| | |
| 10. A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 10a. a biometric sensor configured to receiving a biometric signal; | *See* Claim Element 1b1. |

- 26 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 10b. a controller configured to match the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 10c. a transmitter configured to emit a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 10d. wherein the controller is further configured to: | *See* Claim Element 1b. |
| 10d1. receive a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 10d2. map said series into an instruction; and | *See* Claim Element 1d2. |
| 10d3. populate the database according to the instruction, wherein the controlled item is one of: a locking | *See* Claim Element 1d3. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| mechanism of a physical access structure or an electronic lock on an electronic computing device. | |
| | |
| 11. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor configured to receive a biometric signal, and a transmitter configured to emit a secure access signal capable of granting access to the controlled item, and a receiver sub-system comprising a receiver sub-system controller configured to receive the transmitted secure access signal, and provide conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | *See* Claim 1. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 11a.    populating    the database    of    biometric signatures by: | *See* Claim Element 1d3. |
| 11a1.  receiving a series of entries  of  the  biometric signal; | *See* Claim Element 1d1. |
| 11a2.  determining at least one of the number of said entries  and  a  duration  of each said entry; | *See* Claim Element 1d1. |
| 11a3.  mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 11a4.    populating    the database  according  to  the instruction; | *See* Claim Element 1d3. |
| 11b.    receiving    the biometric signal; | *See* Claim Element 1b1. |
| 11c.    matching    the biometric  signal  against members of the database of biometric    signatures    to thereby    output    an accessibility attribute; | *See* Claim Element 1b2. |
| 11d.    emitting  a  secure access   signal   conveying information dependent upon | *See* Claim Element 1b3. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| said accessibility attribute; and | |
| 11e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
| | |
| 12. The method according to claim 11, wherein populating the database of biometric signatures further comprises enrolling a biometric signature into the database of biometric signatures, and wherein enrolling the biometric signature into the database comprises: | *See* Claim Element 1a. |
| 12a. receiving a biometric signal; and | *See* Claim Element 1b1. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
|---|---|
| **Claim Element** | **Krueger** |
| 12b. enrolling the biometric signal as an administrator signature in response to the database of biometric signatures being empty. | *See* Claim Element 1a. |
| | |
| 14. A non-transitory computer readable storage medium storing a computer program comprising instructions, which when executed by processors causes the processors to: | *See* Claims 1, 11. |
| 14a. receive a series of entries of a biometric signal; | *See* Claim Element 1d1. |
| 14b. determine at least one of a number of said entries and a duration of each of said entries; | *See* Claim Element 1d1. |
| 14c. map said series into an instruction; | *See* Claim Element 1d2. |
| 14d. populate a database of biometric signatures according to the instruction; | *See* Claim Element 1d3. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 14e.  receive the biometric signal; | *See* Claim Element 1b1. |
| 14f.  match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 14g.  emit a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 14h.  provide conditional access to a controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |
| | |
| 15.  A system for providing secure access to a controlled item, the system comprising: | *See* Claim 1. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 15a.  a memory comprising a database of biometric signatures; | *See* Claim Element 1a. |
| 15b.    a transmitter sub-system comprising: | *See* Claim Element 1b. |
| 15b1.    a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 15b2.    a transmitter sub-system controller capable of matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 15b3.  a transmitter capable of emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 15c.  a receiver sub-system comprising: | *See* Claim Element 1c. |
| 15c1.  a receiver sub-system controller capable of: receiving the transmitted secure access signal; and | *See* Claim Element 1c1. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
| --- | --- |
| **Claim Element** | **Krueger** |
| 15c2. providing conditional access to the controlled item dependent upon said information; | *See* Claim Element 1c2. |
| 15d. wherein the transmitter sub-system controller is further capable of: | *See* Claim Element 1b. |
| 15d1. receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 15d2. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 15d3. populating the data base according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |

- 34 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 16.  A transmitter sub-system for operating in a system for providing secure access to a controlled item, wherein the transmitter sub-system comprises: | *See* Claim Element 1b. |
| 16a.  a biometric sensor capable of receiving a biometric signal; | *See* Claim Element 1b1. |
| 16b.  a controller capable of matching the biometric signal against members of a database of biometric signatures to thereby output an accessibility attribute; and | *See* Claim Element 1b2. |
| 16c.  a transmitter capable of emitting a secure access signal conveying said information dependent upon said accessibility attribute; | *See* Claim Element 1b3. |
| 16d.  wherein the controller is further capable of: | *See* Claim Element 1b. |
| 16d1.  receiving a series of entries of the biometric signal, said series being characterised according to at least one of the number of | *See* Claim Element 1d1. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| said entries and a duration of each said entry; | |
| 16d2. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 16d3. populating the database according to the instruction, | *See* Claim Element 1d3. |
| wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Element 1d3. |
| | |
| 17. A method for providing secure access to a controlled item in a system comprising a database of biometric signatures, a transmitter sub-system comprising a biometric sensor capable of receiving a biometric signal, and a transmitter capable of emitting a secure access signal capable of granting access to the controlled item, and a receiver sub- | *See* Claim 1. |

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 ||
| **Claim Element** | **Krueger** |
| system comprising a receiver sub-system controller capable of receiving the transmitted secure access signal, and providing conditional access to the controlled item dependent upon information in said secure access signal, the method comprising: | |
| 17a. populating the database of biometric signatures by: | *See* Claim Element 1d3. |
| 17a1. receiving a series of entries of the biometric signal; | *See* Claim Element 1d1. |
| 17a2. determining at least one of the number of said entries and a duration of each said entry; | *See* Claim Element 1d1. |
| 17a3. mapping said series into an instruction; and | *See* Claim Element 1d2. |
| 17a4. populating the database according to the instruction; | *See* Claim Element 1d3. |
| 17b. receiving the biometric signal; | *See* Claim Element 1b1. |

- 37 -

Exhibit C-16 (Krueger)

| Initial Invalidity Claim Chart - U.S. Pat. No. 9,665,705 | |
|---|---|
| **Claim Element** | **Krueger** |
| 17c. matching the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute; | *See* Claim Element 1b2. |
| 17d. emitting a secure access signal conveying information dependent upon said accessibility attribute; and | *See* Claim Element 1b3. |
| 17e. providing conditional access to the controlled item dependent upon said information, wherein the controlled item is one of: a locking mechanism of a physical access structure or an electronic lock on an electronic computing device. | *See* Claim Elements 1c2 and 1d3. |