# EXHIBIT D

Exhibit A-1 (Tello)

## Exhibit A-1

### INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")

### BY

### U.S. PATENT NO. 6,463,537 ("Tello")

U.S. Patent No. 6,463,537 to Tello entitled "Modified Computer Motherboard Security and Identification System" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Tello |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Tello discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A 'personalized' computer with a unique encrypted digital signature which will not boot up or recognize any data storage or communication peripheral devices without a matching 'personalized' smart card containing a complementary |

1

Exhibit A-1 (Tello)

| | |
|---|---|
| | encrypted digital signature. A modified BIOS (Basic Input Output System) replaces the standard BIOS of a motherboard and allows a security engine microprocessor to take over preboot control of the computer from the motherboard CPU (Central Processing Unit), configures and operates the encryption-based security system, and enables or disables selected data storage devices and other user selectable peripherals upon start up and shut down of the computer. This use of a modified BIOS also allows this invention to work with any operating system or computer microprocessor chipset. The enabling or disabling of peripheral devices involves the use of special enabling/disabling circuits and a procedure for checking the security engine for the presence of an encrypted list of allowed peripheral devices before any particular device driver will be operational. A modified DDL (Device Driver Layer), loaded in the hard drive of the computer as part of the resident O/S (Operating System) of the computer, and memory buffer circuits allows a real time encryption system to be in place for any communication or data storage device. A data encryption engine in the security engine microprocessor allows encryption and decryption of all data stored in data storage devices, including the smart card, and moved through communication devices such as a modem. Upon power up, reset or interrupt of the computer, the microprocessor looks for, and if present, reads from the smart card in the smart card reader which is logically connected to the security engine microprocessor. A software program compares a unique digital signature placed in the smart card to a digital signature assigned to the computer. If these two digital signatures are complementary, the boot up procedure is allowed to continue and access to the computer allowed up to a predetermined level depending on the level of access configured on the smart card. This invention can also be used to allow identification and authentication of the computer and its user in networks." Tello at Abstract <br><br> "Upon power up or interrupt of the computer, the modified BIOS takes control and allows the security engine microprocessor to look for, and if present, read from a smart card in the smart card reader which is logically connected to the security engine microprocessor. If the smart card and the computer have not been previously 'personalized' a security setup procedure is initiated and a unique hash |

2

Exhibit A-1 (Tello)

|  | number (digital signature) placed in the smart card during the initial set up of the security system and a complementary hash number similarly assigned to the security engine memory. The hash number calculations are based on a set of personal information provided by the holder of a particular smart card and thus each computer and smart card is uniquely 'personalized' for that user. During start up or interrupt of the computer, a software program in the flash memory of the security engine compares the hash numbers in the smart card and the computer. If these two hash numbers are complements, the boot up procedure is allowed to continue and access to the computer allowed up to a predetermined level depending on the level of access configured in the security engine. The level of access allowed is determined by the presence or absence of encrypted keys in the memory of the security engine which are required before any device driver can load and initialize and recognize its respective peripheral communication or data storage device. This enable and disable capability is achieved through the placement of enable/disable circuits between the peripheral device connector and its respective Bus. If the proper smart card is not present in the card reader, no device drivers will be loaded and the computer will not be operable. Provisions are made within this invention to accommodate a hierarchy of users within a computer network and to allow identification and authentication procedures over a network of computers containing the present invention." <br> Tello at 5:15-48 <br><br> "Other identification and authentication devices are provided for in this invention through an SPI interface that is connected to the security engine microprocessor. This allows for the addition of devices such as a biometric reader to provide a higher level of security to the system." <br> Tello at 7:52-56 <br><br> "When the registers are read from the smart card to determine the type of card is inserted, an encrypted code number is read from the register of the inserted smart card and decrypted by the security engine microprocessor using the public encryption key 475. This code is then compared to a table of smart card code numbers that are stored in flash memory in the security engine 477. From this |
|---|---|

3

Exhibit A-1 (Tello)

| | comparison, the type of smart card can be ascertained. By default, all smart cards, with the exception of vendor smart cards, have the code for a 'new' card in the appropriate register location until changed through the set up procedure."<br>Tello at 24:46-56<br><br>"Following this, another command is sent to the BIOS to display the user identification set up screen 527. This screen displays a unique serial number assigned each security motherboard during its manufacture and allows the user to input personal information to be used to 'personalize' each computer and smart card 529. The personal information can include such items as the user's name, address, phone number, a credit card number, a one-time password and other information. At this point control is passed back to the BIOS which instructs the security engine microprocessor to read the information inputted by the user and write this data to a CMOS (Complementary Metallic Oxide Semiconductor) table in the scratch memory of the security engine 531. If the entry of the personal identification information is completed 533, the information inputted by the user is also written to a look up table in the Identification area in the internal memory of the inserted smart card 535. Some of this personal data may be changed at any time although this requires the insertion of an authorized smart card and a further check of the identity of the individual requesting the change such as by the entering of certain key information known only to the authorized individual user such as a password or some personal identification number."<br>Tello at 25:62-27:17 |
| --- | --- |
| 1[a]. receiving card information; | Tello discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A 'personalized' computer with a unique encrypted digital signature which will not boot up or recognize any data storage or communication peripheral devices |

4

Exhibit A-1 (Tello)

| | |
|---|---|
| | without a matching 'personalized' smart card containing a complementary encrypted digital signature. A modified BIOS (Basic Input Output System) replaces the standard BIOS of a motherboard and allows a security engine microprocessor to take over preboot control of the computer from the motherboard CPU (Central Processing Unit), configures and operates the encryption-based security system, and enables or disables selected data storage devices and other user selectable peripherals upon start up and shut down of the computer. This use of a modified BIOS also allows this invention to work with any operating system or computer microprocessor chipset. The enabling or disabling of peripheral devices involves the use of special enabling/disabling circuits and a procedure for checking the security engine for the presence of an encrypted list of allowed peripheral devices before any particular device driver will be operational. A modified DDL (Device Driver Layer), loaded in the hard drive of the computer as part of the resident O/S (Operating System) of the computer, and memory buffer circuits allows a real time encryption system to be in place for any communication or data storage device. A data encryption engine in the security engine microprocessor allows encryption and decryption of all data stored in data storage devices, including the smart card, and moved through communication devices such as a modem. Upon power up, reset or interrupt of the computer, the microprocessor looks for, and if present, reads from the smart card in the smart card reader which is logically connected to the security engine microprocessor. A software program compares a unique digital signature placed in the smart card to a digital signature assigned to the computer. If these two digital signatures are complementary, the boot up procedure is allowed to continue and access to the computer allowed up to a predetermined level depending on the level of access configured on the smart card. This invention can also be used to allow identification and authentication of the computer and its user in networks." Tello at Abstract

"Upon power up or interrupt of the computer, the modified BIOS takes control and allows the security engine microprocessor to look for, and if present, read from a smart card in the smart card reader which is logically connected to the security engine microprocessor. If the smart card and the computer have not been |

Exhibit A-1 (Tello)

|  | previously 'personalized' a security setup procedure is initiated and a unique hash number (digital signature) placed in the smart card during the initial set up of the security system and a complementary hash number similarly assigned to the security engine memory. The hash number calculations are based on a set of personal information provided by the holder of a particular smart card and thus each computer and smart card is uniquely 'personalized' for that user. During start up or interrupt of the computer, a software program in the flash memory of the security engine compares the hash numbers in the smart card and the computer. If these two hash numbers are complements, the boot up procedure is allowed to continue and access to the computer allowed up to a predetermined level depending on the level of access configured in the security engine. The level of access allowed is determined by the presence or absence of encrypted keys in the memory of the security engine which are required before any device driver can load and initialize and recognize its respective peripheral communication or data storage device. This enable and disable capability is achieved through the placement of enable/disable circuits between the peripheral device connector and its respective Bus. If the proper smart card is not present in the card reader, no device drivers will be loaded and the computer will not be operable. Provisions are made within this invention to accommodate a hierarchy of users within a computer network and to allow identification and authentication procedures over a network of computers containing the present invention."<br>Tello at 5:15-48<br><br>"A smart card reader 133 is logically connected to the smart card reader interface 135 which in turn is connected to the programming circuit 129 and the microprocessor 125 of the security engine. In the preferred embodiment of the invention, encrypted integrated circuit cards (smart cards) are used for the identification and verification of authorized users and which control the level of access to a computer system by its containing cryptographic keys which are required before any particular peripheral device will be enabled. By limiting the number of keys present in a smart card, access to specific peripherals can be restricted on a device by device basis. The smart card is read through a smart card reader connected to the security engine. The smart card suitable for this invention |

6

Exhibit A-1 (Tello)

<table>
<tr>
<td></td>
<td>

typically contains a microprocessor and more than one internal memory. In the preferred embodiment, this plurality of internal memory comprises internal RAM, on-board ROM and EEPROM. The preferred card is one which is compatible with ISO 7816 standards although one skilled in the art would readily recognize that other smart cards may be substituted without materially modifying the scope or spirit of this invention."
Tello at 14:47-67

"Once this process is completed, a check is made of the security engine memory to see if the security system had previously been set up by a vendor 467. The presence of vendor identification data and encryption key length information in the flash memory of the security engine indicates this. If it had not previously been set up, a check is made to determine if a vendor type smart card is currently inserted in the smart card reader 133. If one is not, a command is sent to the BIOS to display the message "Insert Vendor Card" 469.
Upon insertion of any smart card into the reader, the security engine microprocessor begins procedures to synchronize communications with the smart card 471. The synchronization process involves the reading of a block of data from the smart card by the security engine. Included in this block of data are: the allowed key length for all encryption procedures, the smart card register code for the smart card which identifies the type of card it is, the number of communication keys stored in the EEPROM of the smart card, the number of commands which are stored in the look up table of the smart card ROM, and a CRC (Cyclic Redundancy Check) check sum."
Tello at 23:43-64

"Following this, another command is sent to the BIOS to display the user identification set up screen 527. This screen displays a unique serial number assigned each security motherboard during its manufacture and allows the user to input personal information to be used to 'personalize' each computer and smart card 529. The personal information can include such items as the user's name, address, phone number, a credit card number, a one-time password and other information. At this point control is passed back to the BIOS which instructs the

</td>
</tr>
</table>

7

Exhibit A-1 (Tello)

| | security engine microprocessor to read the information inputted by the user and write this data to a CMOS (Complementary Metallic Oxide Semiconductor) table in the scratch memory of the security engine 531. If the entry of the personal identification information is completed 533, the information inputted by the user is also written to a look up table in the Identification area in the internal memory of the inserted smart card 535. Some of this personal data may be changed at any time although this requires the insertion of an authorized smart card and a further check of the identity of the individual requesting the change such as by the entering of certain key information known only to the authorized individual user such as a password or some personal identification number." Tello at 25:62-26:17 |
|---|---|

Exhibit A-1 (Tello)



Tello at Fig. 1

9

Exhibit A-1 (Tello)

| 1[b]. receiving the biometric signature; | Tello discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Another method for securing a computer system, specifically the data stored inside, is the use of identification and authentication systems by which a user provides a claimed identity to the system and establishes the validity of this claim before access is granted. The three main methods by which a user's claimed identity is verified are through the use of: 1.) something the individual knows such as a password or PIN (Personal Identification Number); 2.) something the individual possesses, such as a token—a magnetic stripe card or smart card for example; and/or 3.) something unique to the individual, such as a biometric characteristic—retina pattern or fingerprint for example. This method may be effective to a certain degree to deter theft or sabotage of data but is relatively ineffective as a deterrent to actual theft of the computer. In addition all these identification and authentication systems may be by-passed by such techniques as removing the hard drive from the secured machine and placing it in another unsecured machine thereby gaining access to the data stored inside or microscopically reading data stored in ROM (Read Only Memory)." Tello at 1:64-2:17<br><br>"Other identification and authentication devices are provided for in this invention through an SPI interface that is connected to the security engine microprocessor. This allows for the addition of devices such as a biometric reader to provide a higher level of security to the system." Tello at 7:52-56<br><br>"In this invention, three different lengths of communication are supported between the security engine microprocessor and the smart card reader. They are 1 byte, 6 bytes and 8 bytes. This allows the invention to be compatible with several |

Exhibit A-1 (Tello)

| | different types of smart cards and to also support other identification and authentication devices such as button memory and biometric readers. Status commands involving communication set-up, synchronization, and prompts are encrypted and are eight bits in length. All commands are 48 bits long and data flows are 64 bits long and are also encrypted. Due to the amount of information which must move between the security engine and the smart card, the speed required, and the necessity to support different lengths of communication protocols, this invention involves a check for errors using a CRC (Cyclic Redundancy Check) algorithm. In this invention the algorithm used is the Hamming Code although one skilled in the art would readily recognize that other algorithms which are compatible with the Hamming Code may be substituted without materially affecting this invention."<br>Tello at 16:10-29 |
|---|---|
| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Tello discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>To the extent that Plaintiff contends Tello does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Bradford at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Tello discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit A-1 (Tello)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The second internal memory or EEPROM memory of the smart card is used for user authentication and is divided into three major parts—Identification, Key Management, and Application."<br>Tello at 15:33-36<br><br>"The Application area is divided into two sections, an index and a data storage section. The index operates similar to a small File Allocation Table (FAT) which records the location and the amount of space occupied by each application. The index is also responsible for allocating extra space to an application if required. Each application in this area is uniquely identified by a two byte code which identifies the communication key for each application. The use of this two byte code supports the inclusion of up to 65,536 different applications."<br>Tello at 15:47-56<br><br>"If it is a new user smart card, a check is made by the security engine to determine if any personal identification data or security configuration parameters are stored in their respective areas of the flash memory 523. If there is, the start procedure is terminated 524. If there is neither, this indicates that the system has not yet been 'personalized' and this procedure is initiated."<br>Tello at 25:48-54 |

Exhibit A-1 (Tello)



FIG. 13D

Tello at Fig 13D

13

Exhibit A-1 (Tello)

| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Tello discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"This area also contains hash numbers that are created from the personal information stored in the Identification area and are unique to each computer system implementing this invention. Also stored in the Key Management area of the smart card ROM are unique, encrypted identification codes that are used to create different types or classes of smart cards with different capabilities."<br>Tello at 16:30-36<br><br>"When the registers are read from the smart card to determine the type of card is inserted, an encrypted code number is read from the register of the inserted smart card and decrypted by the security engine microprocessor using the public encryption key 475. This code is then compared to a table of smart card code numbers that are stored in flash memory in the security engine 477. From this comparison, the type of smart card can be ascertained. By default, all smart cards, with the exception of vendor smart cards, have the code for a 'new' card in the appropriate register location until changed through the set up procedure."<br>Tello at 24:46-56<br><br>"If a new smart card (one with no data in the Identification area and indicated by a code in the smart card register) is inserted into the card reader, the security engine writes the security parameters and vendor information to the Key Management area of the EEPROM of the user smart card 493. The security parameters and vendor data are then erased from the security engine RAM 495. The security engine then waits for instruction 497. Any command received is compared to those listed in the command table stored in the ROM memory of the smart card 499. More commands may be added in the future if desired. If the command |

Exhibit A-1 (Tello)

| | received is a match it is executed by the smart card microprocessor 501 and it goes in to a wait state once again. At this point, the encryption functions are totally disabled and all non-security related functions are enabled. The smart card and the computer system can be fully prepared and tested by the vendor for delivery to a customer and to be 'personalized' by that customer."<br>Tello at 25:9-26<br><br>"Following this, another command is sent to the BIOS to display the user identification set up screen 527. This screen displays a unique serial number assigned each security motherboard during its manufacture and allows the user to input personal information to be used to 'personalize' each computer and smart card 529. The personal information can include such items as the user's name, address, phone number, a credit card number, a one-time password and other information. At this point control is passed back to the BIOS which instructs the security engine microprocessor to read the information inputted by the user and write this data to a CMOS (Complementary Metallic Oxide Semiconductor) table in the scratch memory of the security engine 531. If the entry of the personal identification information is completed 533, the information inputted by the user is also written to a look up table in the Identification area in the internal memory of the inserted smart card 535. Some of this personal data may be changed at any time although this requires the insertion of an authorized smart card and a further check of the identity of the individual requesting the change such as by the entering of certain key information known only to the authorized individual user such as a password or some personal identification number."<br>Tello at 25:62-26:17<br><br>"After the user has inputted all the data required by the identification set up screen and the information has been stored in both the smart card and security engine memories, a command is then sent to the BIOS to display the security configuration set up screen 537. Through this screen, the user can set the level and type of security for the system. This includes such parameters as the specific peripheral devices to be enabled in the system as well as the designation of the system as a Stand Alone Master, Master/Slave or Slave. As with the identification |

Exhibit A-1 (Tello)

| | |
|---|---|
| | set up screen, the security configuration information inputted by the user 539 is written to the CMOS table in the security engine scratch memory buffer and also to the Identification area of the internal memory of the inserted smart card 541. This security configuration data can also be changed if the proper authorization is given.<br>Once all the user inputted data has been written to the scratch memory 543, the security engine microprocessor writes a boot load subroutine 545, which is stored in the flash memory, to the internal RAM of the microprocessor. The boot load subroutine contains software of all the procedures necessary to burn the data stored in the scratch memory to the flash memory. Every time the programming circuit is required to bum data from the scratch memory to the security engine flash memory, this boot load program is created."<br>Tello at 26:18-43 |

16

Exhibit A-1 (Tello)



Tello at Fig 13B

17

Exhibit A-1 (Tello)



FIG. 13C

18

Exhibit A-1 (Tello)

Tello at Fig 13C



FIG. 13E

Exhibit A-1 (Tello)

|  | Tello at Fig 13E |
|---|---|
| **Claim 13** | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Tello discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Tello discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Tello discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Tello discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or |

20

Exhibit A-1 (Tello)

| | as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 13[d]. means for determining if the defined memory location is unoccupied; and | Tello discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Tello discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Tello discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit A-1 (Tello)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Tello discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Tello discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Tello discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

22

Exhibit A-1 (Tello)

|  |  |
|---|---|
| 19[d]. code for determining if the defined memory location is unoccupied; and | Tello discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Tello discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit A-2 (Lyon)

**Exhibit A-2**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 2006/0212407 ("Lyon")**

U.S. Patent App. Pub. No. 2006/0212407 to Lyon entitled "User Authentication and Secure Transaction System" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Lyon |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Lyon discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A system, method, and apparatus to minimize fraud at the user, merchant, and/or financial institution level. A control computer provides authentication and/or transaction processing. The control computer has access to databases comprising |

1

Exhibit A-2 (Lyon)

| | |
|---|---|
| | user, merchant, enrollment, transaction, duplicate, and fraudulent activity data. Parties may enroll in the system via an enrollment computer and conduct transactions through the system via a merchant computer. Users are issued hardware identification keys containing an encrypted user code. Access keys can be required in addition to an authorized user key to conduct certain actions. Keys are copy protected and can comprise a computer operating system. The hardware profile of client devices can be recorded. Parties may specify minimum and/or maximum security levels and restrict transactions. Transactions with parties can be authenticated without sending user personal data to the parties. Users can control transfer of information from their personal communication device to other devices."<br>Lyon at Abstract<br><br>"FIG. 1 is an embodiment of a user authentication and secure transaction system comprised of enrollment computer 50, control computer 60 in electronic communication with enrollment computer 50, merchant computer 70 in electronic communication with control computer 60, and user key 502. Some embodiments of system 40 may also include merchant access key 1110. It is to be understood that the system illustrated in FIG. 1 and described in the description of FIG. 1 can have a single occurrence of each component or person or a plurality of one or more components or persons as required by the needs of the system applications."<br>Lyon at [0053]<br><br>"Enrollment computer 50 may further comprise card scanner 57 in direct or indirect electronic communication with CPU 51. Card scanner 57 may be suitable for scanning the magnetic stripe of a card, the integrated circuit or other electronic processor of a smart card, or equivalents thereof. For example, card scanner 57 may comprise a three-track card reader capable of reading magnetic stripes on credit cards, or a card scanner used in retail purchase transactions involving smart cards. Examples of cards that may be read by card scanner 57 comprise driver's licenses, credit cards, debit cards, smart cards, military identification cards, other identification cards, or any combination of such cards."<br>Lyon at [0060] |

Exhibit A-2 (Lyon)

| | |
|---|---|
| | "Enrollment computer 50 may be used by user 100 and/or merchant 170 to enroll in system 40. System 40 may further comprise enrollment operator 151 supervising and/or operating enrollment computer 50."<br>Lyon at [0081]<br><br>"FIG. 4 is a diagram of a user key creation process. Data may be entered 401 into a GUI interface. By way of example and not of limitation, data entry points may comprise data such as name 404, physical mailing address 406, email address 408, social security number 410, date of birth 411, IP address 414, hardware identification signature 415, user photo 413, and/or government issued I.D. 402 which could be swiped as a means of input. FIG. 4 also shows optional information that may be entered such as debit card information 403, credit card information 405, bank account information 407, biometric data 409, and/or system based credit limit 412. For example, biometric data may comprise information such as fingerprints, retina scans, voice recognition, and/or facial recognition. After data is entered 401 into the user profile, initial user key is created 400. The data entry depicted in FIG. 4 may also be used to create subsequent user access keys for enrollment agents, financial agents, merchants and users. In some instances, not all of the inputs are used, whereas in some instances, additional inputs may be desired."<br>Lyon at [0111] |

Exhibit A-2 (Lyon)



Lyon at Fig. 1

4

Exhibit A-2 (Lyon)



Lyon at Fig. 4

| | |
|---|---|
| 1[a]. receiving card information; | Lyon discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Enrollment computer 50 may further comprise card scanner 57 in direct or indirect electronic communication with CPU 51. Card scanner 57 may be suitable for scanning the magnetic stripe of a card, the integrated circuit or other electronic |

Exhibit A-2 (Lyon)

| | |
|---|---|
| | processor of a smart card, or equivalents thereof. For example, card scanner 57 may comprise a three-track card reader capable of reading magnetic stripes on credit cards, or a card scanner used in retail purchase transactions involving smart cards. Examples of cards that may be read by card scanner 57 comprise driver's licenses, credit cards, debit cards, smart cards, military identification cards, other identification cards, or any combination of such cards."<br>Lyon at [0060]<br><br>"Merchant computer 70 may further comprise card scanner 77 in direct or indirect electronic communication with CPU 71. Card scanner 77 may be suitable for scanning the magnetic stripe of a card or the integrated circuit or other electronic processor of a smart card, which type of card scanner may be currently known in the art or equivalent thereto. For example, card scanner 77 may comprise a three-track card reader capable of reading magnetic stripes on credit cards or a card reader used in retail purchase transactions involving smart cards. Examples of cards that may be read by card scanner 77 comprise drivers' licenses, credit cards, debit cards, smart cards, military identification cards, other identification cards, or any combination of such cards."<br>Lyon at [0073]<br><br>"A key creation process could begin with having a key creator (i.e. administrator, enrollment agent, or financial agent) enter an access key 501 and user key 502 via an access card. In FIG. 5, inputs are made at client device 503. By way of example and not of limitation, client device 503 may comprise I/O devices such as three track magnetic strip reader 504, biometric capture device 505, keyboard 506, and/or digital camera 507."<br>Lyon at [0113] |

6

Exhibit A-2 (Lyon)



Lyon at Fig. 1

7

Exhibit A-2 (Lyon)



FIG.5

8

Exhibit A-2 (Lyon)

| | Lyon at Fig. 5 |
|---|---|
| 1[b]. receiving the biometric signature; | Lyon discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Enrollment computer 50 may further comprise fingerprint scanner 56 in direct or indirect electronic communication with CPU 51. Fingerprint scanner 56 may be suitable for scanning a person's fingerprints or thumbprints."<br>Lyon at [0059]<br><br>"Enrollment computer 50 may further comprise other input device 58 that may be used to collect and process information, which type of input device 58 may be currently known in the art or equivalent thereto. In these embodiments, other input device 58 may be in direct or indirect electronic communication with CPU 51. An example of other input device 58 may be a retina scanner, which may be suitable for scanning a person's retina (such as for personal identification purposes), which type of retina scanner may be currently known in the art or equivalent thereto."<br>Lyon at [0061]<br><br>"Control computer 60 may further comprise additional input device 68 that may be used to collect and process information, which type of input device 68 is currently known in the art or equivalent thereto. In this embodiment, additional input device 68 may be in direct or indirect electronic communication with CPU 61. An example of additional input device 68 may be a retina or finger print scanner."<br>Lyon at [0066]<br><br>"Merchant computer 70 may further comprise fingerprint scanner 76 in direct or indirect electronic communication with CPU 71. Fingerprint scanner 76 may be |

Exhibit A-2 (Lyon)

| | |
|---|---|
| | suitable for scanning a person's fingerprints or thumbprints (e.g. for law enforcement purposes), which type of fingerprint scanner may be currently known in the art or equivalent thereto."<br>Lyon at [0072]<br><br>"Merchant computer 70 may further comprise other input device 78 that may be used to collect and process information, which type of input device 78 may be currently known in the art or equivalent thereto. In these embodiments, other input device 78 may be in direct or indirect electronic communication with CPU 71. An example of other input device 78 may be a retina scanner, which may be of a type suitable for scanning a person's retina (e.g. for personal identification purposes), which type of retina scanner may be currently known in the art or equivalent thereto. Another example of other input device 78 may be a uniform product code (UPC) scanner, which may be of a type suitable for scanning the UPC symbols on products (e.g. for use in retail point of sale purchase systems), which type of UPC scanner may be currently known in the art or equivalent thereto."<br>Lyon at [0074]<br><br>"If control computer 60 is able to authenticate authorization data 141, control computer 60 may continue to process the transaction. Control computer 60 may determine the type of verification data required to complete the transaction. The type of required verification data may be defined by user's 100 preferences storable in user's 100 profile and/or merchant's 170 preferences storable in merchant's 170 profile. Control computer 60 sends message 133 to merchant computer requesting user 100, merchant 170, and/or merchant operator 171 enter the required verification data. In some embodiments, if the verification data requires verification from merchant operator 171, message 133 may include a portion of user's 100 verification data. For example, if user's 100 verification data requires driver's license information, a photograph, and a left thumbprint, user 100 may swipe user's 100 driver's license through the card scanner and place a left thumb on the fingerprint scanner which are a part of merchant computer 70. To finalize verification, in this example, merchant operator 171 may review whether a photograph of user 100 received in message 133 from control computer 60 |

Exhibit A-2 (Lyon)

| | matches the identity of user 100 and corroborate verification of the photograph by pressing a key of the keyboard/number pad of merchant computer 70. Message 133 requesting verification information may also contain instructions for merchant computer 70 to take certain action(s) (e.g. deny access, keep user key 502)." Lyon at [0102] "A key creation process could begin with having a key creator (i.e. administrator, enrollment agent, or financial agent) enter an access key 501 and user key 502 via an access card. In FIG. 5, inputs are made at client device 503. By way of example and not of limitation, client device 503 may comprise I/O devices such as three track magnetic strip reader 504, biometric capture device 505, keyboard 506, and/or digital camera 507." Lyon at [0113] |
|---|---|

11

Exhibit A-2 (Lyon)



FIG.1

Lyon at Fig. 1

Exhibit A-2 (Lyon)



FIG.5

Exhibit A-2 (Lyon)

|  | Lyon at Fig. 5 |
|---|---|
| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Lyon discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>To the extent that Plaintiff contends Lyon does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Bradford at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Lyon discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"User 100 and/or enrollment operator 151 have the authority to choose the content of user identity data 110 and/or user verification data within system 40 constraints. Merchant 170 and/or enrollment operator 151 have the authority to choose the content of merchant identity data 130 and/or merchant verification data within system 40 constraints. However, any combination of data selection points could be preset for entry. For example, system 40 may permit user 100 to designate only driver's license data, a first left hand index fingerprint, a left eye retina scan, and a voiceprint or any combination thereof, but no other user data, as verification data. In another embodiment, it may be enrollment computer 50, enrollment operator |

14

Exhibit A-2 (Lyon)

| | |
|---|---|
| | 151, and/or control computer 60 which designate all or a portion of the verification data."<br>Lyon at [0087]<br><br>"As illustrated in FIG. 2, control computer 60 may comprise user database 160, duplicate database 161, fraud database 162, user enrollment log 163, merchant database 164, merchant enrollment log 165, and/or transaction log 166."<br>Lyon at [0088]<br><br>"User database 160 houses uploaded user identity data 111, and other data and information related to user 100 that has been entered into enrollment computer 50, or the "user profile" for user 100. During user enrollment, control computer 60 may compare uploaded user identity data 111 to user data stored in database 160. If all or a portion of uploaded user identity data 111 matches data already housed in user database 160, various actions may occur. For example, user enrollment may be denied, uploaded user identity data 111 may be added to duplicate database 161, or enrollment with duplicate user data may be recorded in user's 100 user profile in user database 160."<br>Lyon at [0090]<br><br>"In circumstances where user database 160 already contains user's 100 user profile or a portion of user's 100 uploaded user identity data 111, duplicate database 161 may comprise data and information related to users 100 who have entered user identity data 110 into enrollment computer 50. Additionally, duplicate database 161 may comprise data and information related to merchants 170 who have entered merchant identity data 130 into enrollment computer 50 and where merchant database 164 already contains merchant's 170 merchant profile or a portion of that merchant's 170 uploaded merchant identity data 131."<br>Lyon at [0092] |

15

Exhibit A-2 (Lyon)



Lyon at Fig. 1

16

Exhibit A-2 (Lyon)



Lyon at Fig. 2

17

Exhibit A-2 (Lyon)

| | |
|---|---|
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Lyon discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"User database 160 houses uploaded user identity data 111, and other data and information related to user 100 that has been entered into enrollment computer 50, or the "user profile" for user 100. During user enrollment, control computer 60 may compare uploaded user identity data 111 to user data stored in database 160. If all or a portion of uploaded user identity data 111 matches data already housed in user database 160, various actions may occur. For example, user enrollment may be denied, uploaded user identity data 111 may be added to duplicate database 161, or enrollment with duplicate user data may be recorded in user's 100 user profile in user database 160."<br>Lyon at [0090]<br><br>"In circumstances where user database 160 already contains user's 100 user profile or a portion of user's 100 uploaded user identity data 111, duplicate database 161 may comprise data and information related to users 100 who have entered user identity data 110 into enrollment computer 50. Additionally, duplicate database 161 may comprise data and information related to merchants 170 who have entered merchant identity data 130 into enrollment computer 50 and where merchant database 164 already contains merchant's 170 merchant profile or a portion of that merchant's 170 uploaded merchant identity data 131."<br>Lyon at [0092]<br><br>"Control computer 60 may assign a user identifier to user 100 that is unique to user 100 and/or a merchant identifier to merchant 170 that is unique to merchant 170. The user identifier is storable in the user profile in user database 160 and the |

18

Exhibit A-2 (Lyon)

| | merchant identifier is storable in the merchant profile of merchant database 164. Although the user identifier and/or merchant identifier may be comprised of a hardware identification signature, other types of identifying means could be employed, such as those having serialized encryption means. The user identifier may also be recordable in digital format, along with the user name of user 100, and encrypted on a user key 502 issued to user 100, as described below. The merchant identifier may also be recordable in digital format, along with the merchant name of merchant 170, and encrypted on a merchant access key 1110 issued to merchant 170, as described below. Other data and information may also be recorded on user key 502 and merchant access key 1110. Similarly, this other data and information may also be encrypted" Lyon at [0096] |
|---|---|

Exhibit A-2 (Lyon)



Lyon at Fig. 1

20

Exhibit A-2 (Lyon)



Lyon at Fig. 2

21

Exhibit A-2 (Lyon)

| | |
|---|---|
| **Claim 13** | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Lyon discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Lyon discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Lyon discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Lyon discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

22

Exhibit A-2 (Lyon)

|  | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 13[d]. means for determining if the defined memory location is unoccupied; and | Lyon discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Lyon discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 |  |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Lyon discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

23

Exhibit A-2 (Lyon)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
|---|---|
| 19[a]. code for receiving card information; | Lyon discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Lyon discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Lyon discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

24

Exhibit A-2 (Lyon)

| 19[d]. code for determining if the defined memory location is unoccupied; and | Lyon discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| --- | --- |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Lyon discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit A-3 (Okamura)

**Exhibit A-3**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 2006/0080548 ("Okamura")**

U.S. Patent App. Pub. No. 2006/0080548 to Okamura entitled "User Authentication Apparatus, Electronic Equipment, and a Storage Medium Embodying a User Authentication Program" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Okamura |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Okamura discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A user authentication apparatus includes: means for storing biometric authentication information obtained from a user; means for communicating with a electronic equipment, which authenticates the user with the user's biometric authentication information; means for |

Exhibit A-3 (Okamura)

<table>
<tr>
<td></td>
<td>

sending, in response to a first inquiry from the electronic equipment, store location definition information, which defines store locations of various output information; and output means for outputting, in response to a read request sent from the electronic equipment to designate a store location defined by the store location definition information, the output information along with identification information which indicates the type of the output information. The output means outputs, to an external device, as one of the output information, along with identification information, authentication information store location information, which describes in a given format where authentication information including the biometric authentication information is stored."
Okamura at Abstract

"An object of the present invention is to provide a technology for reading, with efficiency, information from an IC card or other similar user authentication apparatus. The present invention utilizes this reading technology to provide an efficient biometric authentication technology."
Okamura at [0016]

"In order to solve the problems, the present invention employs the following means. That is, the present invention relates to a user authentication apparatus including: a unit storing biometric authentication information; a unit communicating with an electronic equipment which checks the validity of user's biometric authentication information; a unit sending, in response to a first inquiry from the electronic equipment, store location definition information which defines store locations of various output information; and an output unit outputting, in response to a read request from the electronic equipment which designates a store location defined by the store location definition information, the output information along with identification information which indicates the type of the output information, in which the output unit outputs, to the electronic equipment, as one of the output information, authentication information store location information which describes in a given format where authentication information including the biometric authentication information is stored, along with identification information indicating the authentication information store location information."
Okamura at [0017]

</td>
</tr>
</table>

2

Exhibit A-3 (Okamura)

| | |
|---|---|
| | "A customer who wants to receive various services of the bank first sets up a bank account and has the IC card 10 issued to him as a cash card. After the IC card 10 is issued, the customer registers his biometric authentication information at the bank counter. Shown here is an example of employing biometric information based on an image of blood vessels on the customer's palm as biometric authentication information. To register, the customer inserts the IC card 10 in the counter terminal 40 and holds his hand over the image pick-up unit 41 provided in the counter terminal 40. Biometric information of his hand is thus registered in the IC card 10." Okamura at [0035] <br><br> "The biometric authentication AP 14 performs processing of registering biometric authentication information of a customer in the IC card 10, and processing of identifying a customer with the use of the customer's biometric authentication information registered in the IC card 10." Okamura at [0044] |

Exhibit A-3 (Okamura)



Okamura at Fig. 1

4

Exhibit A-3 (Okamura)



Okamura at Fig. 2

| 1[a]. receiving card information; | Okamura discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

"This information system includes an ATM (automated teller machine) 30 installed in a self-service machine corner of a bank and a counter terminal 40 set up at a bank counter. The |

Exhibit A-3 (Okamura)

| | |
|---|---|
| | ATM 30 and the counter terminal 40 each have, inside their card insertion slots which are not shown in the drawing, an input/output interface for an IC card 10. When the IC card 10 is inserted through the not-shown insertion slots, the ATM 30 and the counter terminal 40 communicate with the IC card 10 to obtain various information stored in the IC card 10. Communications between the IC card 10 and the terminals 30 and 40 employ a contact communication protocol regulated by ISO/IEC 7816 or the like, or are non-contact communications utilizing radio waves." Okamura at [0033] |

Exhibit A-3 (Okamura)



Okamura at Fig. 1

7

Exhibit A-3 (Okamura)



Okamura at Fig. 2

| 1[b]. receiving the biometric signature; | Okamura discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |
| --- | --- |

Exhibit A-3 (Okamura)

| | "For IC card authentication, methods utilizing biometric authentication information of the holder of an IC card have been proposed. Biometric authentication information is, for example, the pattern of veins on a palm, fingerprints, voice, or iris patterns. Such biometric authentication information associates an IC card with the owner of the IC card surely and securely."<br>Okamura at [0011]<br><br>"For instance, a terminal is equipped with a biometric authentication information detector to detect biometric authentication information of the holder of an IC card. When the detected biometric authentication information matches biometric authentication information that has been stored in advance in the IC card, the holder is identified as the legitimate owner of the IC card."<br>Okamura at [0012]<br><br>"The ATM 30 and the counter terminal 40 have image pick-up units (corresponding to a unit detecting user's biometric authentication information of the present invention) 31 and 41, respectively. The image pick-up units 31 and 41 pick up, when a hand is held over them, a blood vessel image to create biometric information (corresponding to biometric authentication information of the present invention) from the picked-up data, and give the biometric information to the ATM 30 and the counter terminal 40, respectively. Hereinafter, the ATM 30 and the counter terminal 40 are collectively referred to as terminal (corresponding to an electronic equipment of the present invention)."<br>Okamura at [0034]<br><br>"Once the biometric authentication information is registered in the IC card 10, the customer can receive services including deposit and withdrawal by inserting the IC card in the ATM 30 and identifying himself with his hand held over the image pick-up unit 31, which is provided in the ATM 30. Employable biometric authentication information other than biometric information based on a blood vessel image includes fingerprints, iris patterns, and facial features."<br>Okamura at [0036] |

9

Exhibit A-3 (Okamura)



Okamura at Fig. 1

| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Okamura discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

"The RAM 12 contains a non-volatile memory (corresponding to biometric authentication information storing means of the present invention) to store biometric authentication |

Exhibit A-3 (Okamura)

|  | information of the customer. Alternatively, biometric authentication information of the customer may be stored in a rewritable ROM if the ROM 13 contains the rewritable ROM." Okamura at [0042]

"FIG. 4 shows the data configuration of the authentication information read table (corresponding to authentication information store location information of the present invention). The authentication information read table is similar in configuration to the AFL of FIG. 3, and has a tag 200, a length 201, and a combination of AFL rows. In the authentication information read table, each AFL row defines the store location of information determined in advance." Okamura at [0058]

"In the example of FIG. 4, a first AFL row defines the store location of Data One, for example, authentication information based on a customer's blood vessel image. A second AFL row 203 defines the store location of Data Two, for example, other authentication information. A third AFL row 204 holds the address of Key One, for example, an authentication key. An authentication key is stored in a file by itself, and therefore only a file number is defined in the AFL row 204." Okamura at [0059]

"As has been described, in the case of the authentication information read table, the type of information stored in a store location that is defined in each AFL row is determined in advance. This enables the terminal to, once the authentication information read table is read by the terminal, access desired information in accordance with what is determined by the authentication information read table. In other words, in access with the use of the authentication information read table, the terminal decides in advance which information is necessary, reads an AFL that defines the store location of the necessary information according to a predetermined procedure, and accesses the store location." Okamura at [0061] |
|---|---|

11

Exhibit A-3 (Okamura)



Okamura at Fig. 2

12

Exhibit A-3 (Okamura)



Okamura at Fig. 4

| 1[d]. determining if the defined memory location is unoccupied; and | Okamura discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In addition to the information reading with the use of AFL, the information system of this embodiment utilizes an authentication information read table for reading authentication information. The IC card 10 receives a read command from the terminal and sends, in response, the authentication information read table at a given response timing." Okamura at [0050]<br><br>"The authentication information read table defines store locations of various authentication information in an order that conforms to a given rule. This enables the terminal to read, once |

Exhibit A-3 (Okamura)

| | |
|---|---|
| | the terminal obtains the authentication information read table, authentication information from the IC card 10 by designating the store location of necessary information." Okamura at [0051] |
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Okamura discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Recognizing reception of an authentication information read table, the terminal follows a set format to specify and read information it needs. For instance, in processing of Step S15, the terminal sends a mutual authentication command designating the address of a mutual authentication key (S15). The IC card 10 sends authentication results in response (S16). In another example, the terminal sends a read command designating the address of biometric information (e.g., Data One of FIG. 4) (S17)."<br>Okamura at [0068]<br><br>"The IC card 10 sends, in response, biometric authentication information in the IC card 10 to the terminal. The terminal prompts the customer to, for example, have an image of his left hand's blood vessel pattern picked up. When the customer holds his left hand over the image pick-up unit 31, a blood vessel image is picked up to create biometric authentication information. The terminal compares the created biometric authentication information against the biometric authentication information sent from the IC card 10 to execute biometric authentication."<br>Okamura at [0069] |

Exhibit A-3 (Okamura)



Okamura at Fig. 5

| Claim 13 | |

15

Exhibit A-3 (Okamura)

| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Okamura discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
|---|---|
| 13[a]. a card device reader for receiving card information; | Okamura discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Okamura discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Okamura discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit A-3 (Okamura)

| | |
|---|---|
| 13[d]. means for determining if the defined memory location is unoccupied; and | Okamura discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Okamura discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Okamura discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Okamura discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |

17

Exhibit A-3 (Okamura)

| 19[b]. code for receiving the biometric signature; | Okamura discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
|---|---|
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Okamura discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 19[d]. code for determining if the defined memory location is unoccupied; and | Okamura discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Okamura discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

18

Exhibit A-4 (Russo)

**Exhibit A-4**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 2003/0126448 ("Russo")**

U.S. Patent App. Pub. No. 2003/0126448 to Russo entitled "Method and System for Biometric Image Assembly From Multiple Partial Biometric Frame Scans" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Russo |
|---|---|
| **Claim 1** | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Russo discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Method and system for reconstructing seamless fingerprint image from set of image slices, or frames, from fingerprint swipe sensor. Robust normalized cross-correlation procedures are used for frame evaluation and image matching. |

1

Exhibit A-4 (Russo)

| | |
|---|---|
| | Efficient use of device processing resources including memory by keeping only data frames that indicate moving finger and discards frames where no finger exists at sensor during acquisition or finger has not moved since last frame was acquired. Capability to adjust sensor settings during acquisition process to obtain optimal results. Logic ensures operation across different physical systems and sensor characteristics with varying acquisition speeds. Statistics regarding resulting reconstructed image and finger swiping process are computed and embedded in reconstructed image and are useful to the downstream fingerprint matching system, and by embedding in image, inventive system and method ensure that any fingerprint processing system can use information if when called upon to do so." Russo at Abstract<br><br>"The angle of swipe (or swipe angle) 292 and the speed of the swipe (or swipe speed or swipe velocity) 293 may be useful to other procedures and software modules for different reasons. For example, the speed of the swipe 293 is useful to let a user of the device incorporating the sensor and algorithm know if he or she is swiping too quickly, and to inform him or her to slow down. This information may be in the manner of a message to the user generated by the cell phone 150 or other device. The angle of the swipe 292 is especially useful to the fingerprint matching computer software and procedure. For example, if a user enrolls his or her fingerprint image by swiping at a vertical enrollment angle (e. g. 0 degrees), but he or she tries to verify by swiping at a 45 degree (or some other angle different from the enrollment angle), this may be problematic for the matcher, as many matchers have limits to the acceptable rotation of an enrolled fingerprint image to the verified one. But if the matcher has information about the angle of the swipe 292 for the enrolled and verified image, then the matcher or matching procedure can compensate for the relative rotation of one image (enrollment biometric image) to the other image (biometric image reconstructed during use) and hence either be more efficient and/or have higher accuracy as a result, or both. Alternative embodiments could add additional statistics as would benefit the system and its operation." Russo at [0138] |

Exhibit A-4 (Russo)

| | |
|---|---|
| | "Using the inventive reconstruction software described herein the inventive system and method re-assembles a fingerprint image from the received frames while maximizing contrast and sensitivity across various environmental conditions. This approach dramatically reduces sensor size, lowering cost and reducing power. The sensor's compact size is ideal for integration into multi-function devices such as smart phones, mobile phones, personal digital assistants (PDA's) and PDA-communicators, laptop/notebook computers, smart cards, PC Peripheral's, Universal Serial Bus (USB) devices and tokens, Point-of-Sale (POS) terminals, keyboards, mice, PCMCIA, PC card, compact flash, Sony Memory Stick™, and smart card readers and more as well as other electronic devices, environments, facilities, or in other instances where access control is desired.." Russo at [0032]<br><br>"The next phase of the inventive procedure and algorithm 201 includes iterating by requesting new frames 223 or slices of data from the sensor 150 (Step 204) and correlating the latest frame 223 to the currently (partially) reconstructed or generated image 225 (Step 226) comprising one or more previously captured frame or frames. (The second new frame will be correlated with the first frame which at that time will constitute the reconstructed image, the third frame will be correlated with the then reconstructed partial image having the correlated first and second frames, and so forth, assuming as described below that each of these frames is useful.) At the ith iteration, one frame of data is requested from the sensor device." Russo at [0045] |

3

Exhibit A-4 (Russo)



4

Exhibit A-4 (Russo)

| | Russo at Fig. 3 |
|---|---|
| 1[a]. receiving card information; | Russo discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Using the inventive reconstruction software described herein the inventive system and method re-assembles a fingerprint image from the received frames while maximizing contrast and sensitivity across various environmental conditions. This approach dramatically reduces sensor size, lowering cost and reducing power. The sensor's compact size is ideal for integration into multi-function devices such as smart phones, mobile phones, personal digital assistants (PDA's) and PDA-communicators, laptop/notebook computers, smart cards, PC Peripheral's, Universal Serial Bus (USB) devices and tokens, Point-of-Sale (POS) terminals, keyboards, mice, PCMCIA, PC card, compact flash, Sony Memory Stick™, and smart card readers and more as well as other electronic devices, environments, facilities, or in other instances where access control is desired." Russo at [0032] |
| 1[b]. receiving the biometric signature; | Russo discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Method and system for reconstructing seamless fingerprint image from set of image slices, or frames, from fingerprint swipe sensor. Robust normalized cross-correlation procedures are used for frame evaluation and image matching. Efficient use of device processing resources including memory by keeping only |

5

Exhibit A-4 (Russo)

data frames that indicate moving finger and discards frames where no finger exists at sensor during acquisition or finger has not moved since last frame was acquired. Capability to adjust sensor settings during acquisition process to obtain optimal results. Logic ensures operation across different physical systems and sensor characteristics with varying acquisition speeds. Statistics regarding resulting reconstructed image and finger swiping process are computed and embedded in reconstructed image and are useful to the downstream fingerprint matching system, and by embedding in image, inventive system and method ensure that any fingerprint processing system can use information if when called upon to do so."
Russo at Abstract

"It will be appreciated by workers in the art in light of the description provide here, that although attention is directed to operation of the inventive method, algorithm, and computer program and computer program product, with fingerprint swipe sensor, other embodiments of the invention may utilize other types of sensors, scanners, or image generation or capture devices. It is possible, in alternate embodiments, to use the system and method with little or no modification, with other types of sensors, for example using optical document scanners or various types of push-broom or successive scan line type sensors. The inventive method and procedures may be executed as software in a general purpose computing machine or may be executed in specialized hardware or firmware instead of in software. Parts of the inventive method, procedures, and algorithm may run from a CPU or other processor or controller while other portions could be implemented solely in hardware in what may be referred to as a hybrid environment."
Russo at [0036]

"With further reference to the flowchart diagram of an embodiment of the biometric (fingerprint) image generation or reconstruction procedure 201 in FIG. 3, it will be noted that the fingerprint or other biometric sensor 150 is carried by or connected with some apparatus 152, usually some type of electronic device, such as a personal computer (PC), personal data assistant (PDA), cell phone or other mobile communication device. For simplicity of description this description

6

Exhibit A-4 (Russo)

| | |
|---|---|
| | generally assumes that the apparatus or device 152 carrying or coupled with the sensor is a cell phone 152, as one of the primary commercial applications for the biometric fingerprint sensor is in a mobile cellular telephone; however, it will be understood that reference to the cell phone or simply to the phone is a reference to any device that carries or is coupled with the sensor and adapted to provide the methodological and procedural components described here. In such case, the system would consist of or comprise the cell phone with sensor and the inventive method and procedures embodied as computer program code software and/or firmware or as special purpose processing hardware either with or without associated software and/or firmware." Russo at [0038]<br><br>"The next phase of the inventive procedure and algorithm 201 includes iterating by requesting new frames 223 or slices of data from the sensor 150 (Step 204) and correlating the latest frame 223 to the currently (partially) reconstructed or generated image 225 (Step 226) comprising one or more previously captured frame or frames. (The second new frame will be correlated with the first frame which at that time will constitute the reconstructed image, the third frame will be correlated with the then reconstructed partial image having the correlated first and second frames, and so forth, assuming as described below that each of these frames is useful.) At the ith iteration, one frame of data is requested from the sensor device." Russo at [0045]<br><br>"Once the frame 223 is collected, it is optionally but advantageously analyzed in two ways to determine its usefulness (Step 213) and either kept or thrown away. If a frame is deemed useful, it is kept (Step 217) and saved (Step 205) as a stored frame 224 in local memory 230 for later use; if it is deemed useless, it is simply thrown away or deleted (Step 218). In one embodiment, as a bookkeeping measure so that there is a first frame to correlate with the second frame, the first frame is saved in local memory, whether it is deemed useful or not. Put differently, the first frame is always deemed useful, but other rules or policies may be implemented |

Exhibit A-4 (Russo)

| | relative to the first frame (collected or synthesized) so as to provide an initial frame for correlation with the second frame." <br> Russo at [0046] |
|---|---|

Exhibit A-4 (Russo)



9

Exhibit A-4 (Russo)

| | Russo at Fig. 3 |
|---|---|
| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Russo discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In one aspect the invention provides method, procedures, and algorithm, and computer program and computer program product in the form of computers software and/or firmware, that effectively and efficiently reconstructs a full (or any desired portion of), seamless fingerprint image from a set of image slices, or frames, from a fingerprint swipe sensor. The new invention described herein improves upon the conventional systems, devices, methods, and procedures in significant ways. For example, by way of illustration but not limitation, the invention uses normalized cross-correlation procedures that work better in image processing than conventional routine correlation approaches. Furthermore, the invention makes efficient use of device processing (computer or microprocessor) resources including memory by keeping only those data frames from the device that indicate a moving finger, and throws away or discards those frames where no finger exists at the sensor during frame acquisition or the finger has not moved since the last frame was acquired. In addition, the inventive method and procedures have the capability to adjust sensor settings during the acquisition process to obtain optimal results for a given person's finger. It also has procedural logic to ensure operation works properly across many different physical systems and sensor characteristics with varying acquisition speeds, and includes procedural logic to gracefully handle conditions where the user swipes too quickly. Furthermore, embodiments of the invention keep statistics regarding the resulting reconstructed image and the finger swiping process, which are then embedded in the reconstructed image itself. These statistics, such as the angle of the swipe direction, swipe speed, and other acquisition characteristics and parameter can be |

10

Exhibit A-4 (Russo)

| | useful to the downstream fingerprint matching system, and by embedding them in the image itself, the inventive system and method ensure that any fingerprint processing system can use the information if when called upon to do so. The invention also provides a file or other data structure storing biometric data and biometric acquisition data and other information." <br> Russo at [0009] <br><br> "Once the frame 223 is collected, it is optionally but advantageously analyzed in two ways to determine its usefulness (Step 213) and either kept or thrown away. If a frame is deemed useful, it is kept (Step 217) and saved (Step 205) as a stored frame 224 in local memory 230 for later use; if it is deemed useless, it is simply thrown away or deleted (Step 218). In one embodiment, as a bookkeeping measure so that there is a first frame to correlate with the second frame, the first frame is saved in local memory, whether it is deemed useful or not. Put differently, the first frame is always deemed useful, but other rules or policies may be implemented relative to the first frame (collected or synthesized) so as to provide an initial frame for correlation with the second frame." <br> Russo at [0046] |
|---|---|

Exhibit A-4 (Russo)



Exhibit A-4 (Russo)

| | |
|---|---|
| | Russo at Fig. 3<br><br>To the extent that Plaintiff contends Russo does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Bradford at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Russo discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"If the acquired frame is kept, it is stored as the last useful frame (Step 205) in a memory storage 230 and becomes the stored frame 224. Information from the stored frame 224 may optionally be retrieved to be used in estimating frame properties including for example in determining if a newly acquired frame has any new information as compared to the previous stored useful frame."<br>Russo at [0145] |

Exhibit A-4 (Russo)



14

Exhibit A-4 (Russo)

| | Russo at Fig. 3 |
|---|---|
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Russo discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In another aspect, the invention provides a method for acquiring a plurality of biometric image frames from a sensor and generating a reconstructed composite image from at least some of the plurality of acquired biometric image frames, the method includes: acquiring a frame from the sensor and storing the acquired frame in a memory as a last stored frame; comparing the stored frame to the reconstructed composite image to determine any usefulness and any alignment registration relationship between the acquired frame and the reconstructed composite image that is being generated; updating the generated reconstructed composite image to incorporate at least a portion of the acquired frame to extend the length (height) of the generated reconstructed composite image and storing the updated generated reconstructed composite image in a memory; determining if frame acquisition should be stopped according to a frame acquisition stop criteria; and if it is determined that frame acquisition should be stopped then stopping acquiring frames and identifying the then currently updated generated reconstructed composite image as the final generated reconstructed composite image, and otherwise repeating the procedure of acquiring additional frames through determining if frame acquisition should be stopped until it is determined that frame acquisition should be stopped.."<br>Russo at [0011]<br><br>"Once the frame 223 is collected, it is optionally but advantageously analyzed in two ways to determine its usefulness (Step 213) and either kept or thrown away. If a frame is deemed useful, it is kept (Step 217) and saved (Step 205) as a stored |

Exhibit A-4 (Russo)

|  | frame 224 in local memory 230 for later use; if it is deemed useless, it is simply thrown away or deleted (Step 218). In one embodiment, as a bookkeeping measure so that there is a first frame to correlate with the second frame, the first frame is saved in local memory, whether it is deemed useful or not. Put differently, the first frame is always deemed useful, but other rules or policies may be implemented relative to the first frame (collected or synthesized) so as to provide an initial frame for correlation with the second frame." Russo at [0046] |
|---|---|

Exhibit A-4 (Russo)



17

Exhibit A-4 (Russo)

|  | Russo at Fig. 3 |
|---|---|
| **Claim 13** | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Russo discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Russo discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Russo discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Russo discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, |

Exhibit A-4 (Russo)

| | inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 13[d]. means for determining if the defined memory location is unoccupied; and | Russo discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Russo discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Russo discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit A-4 (Russo)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Russo discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Russo discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Russo discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

20

Exhibit A-4 (Russo)

| 19[d]. code for determining if the defined memory location is unoccupied; and | Russo discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Russo discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

21

Exhibit A-5 (Russo2)

**Exhibit A-5**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 2003/0115490 ("Russo2")**

U.S. Patent App. Pub. No. 2003/0115490 to Russo et al. ("Russo2") entitled "Secure Network and Networked Devices Using Biometrics" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Russo2 |
| --- | --- |
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Russo2 discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A biometric data sample is taken and compared with stored biometric data. If the biometric data sample matches stored data, access to a secure data storage module |

1

Exhibit A-5 (Russo2)

<table>
<tr>
<td></td>
<td>

is enabled. The secure data storage module contains data necessary for successful communication with a server, as detailed further below. Accordingly, a biometric data match enables sensitive data retrieval, and ultimately secure communication with another device. In a preferred embodiment, the Subscriber Identity Module (SIM) in a GSM phone provides stored biometric data and processing capabilities for the matching function within a cellular phone. By storing biometric data on the SIM (a type of smart card) and performing the biometric matching process on the SIM, the need to transmit or store biometric data in a way that leaves it available for retrieval or tampering is minimized."

Russo2 at Abstract

"The present invention further provides methods for accessing sensitive information and securely authenticating a user. FIG. 2 illustrates the initiation of a method according to a preferred embodiment of securely authenticating a device's user. Those skilled in the art will readily appreciate that the method can generally be extending to providing secure communications between devices and providing secured access to sensitive data. The authentication procedure generally begins when access to sensitive information is requested, or when secure communication with another device is initiated. A biometric data sample is obtained in step 203—which may also represent the step of prompting a user to initiate a biometric data sampling activity. Generally, the biometric data sample will be obtained through use of a biometric sensor, described above—including, for example a fingerprint sensor."

Russo2 at [0052]

"FIG. 4 is a schematic outline of a biometric matching process according to an embodiment of the present invention—this process will generally be performed by matching logic 110. In a preferred embodiment, the process outlined in FIG. 3 is performed within smart card 106. In other embodiments, the process activity is shared between smart card 106 and components integral to device 101. A biometric data sample (either raw or a processed template) is submitted in step 301. Matching logic 110 then matches, step 302, the submitted data to a reference template stored in secure data storage component 105—or elsewhere within

</td>
</tr>
</table>

Exhibit A-5 (Russo2)

| | |
|---|---|
| | device 101 or smart card 106. As discussed above, matching procedures are well known for various biometric methods and generally involve determining if the template data of the previously enrolled biometric matches the template data of the recently scanned biometric to within a predetermined tolerance level. If the match is accepted, step 303. then matching logic 110 unlocks secure data storage component 105 in step 304 by issuing an unlocking command, enabling verification processor 104 (or another module of device 101) temporary access to contents of storage component 105 and returns, step 305, an accept result to verification processor 104. Suitable interfaces for communicating with, and unlocking, secure data storage component 105 will vary according to the embodiment of the component and associated processors and are known in the art, for example, JavaCard™ API (Sun Microsystems, Inc; Santa Clara, Calif.). If the match is rejected, step 303, then matching logic 110 does not unlock the secure data storage component 105, but rather returns, step 306, a reject result to verification processor 104."<br><br>Russo2 at [0058] |
| 1[a]. receiving card information; | Russo2 discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Accordingly, devices suitable for use with the present invention include substantially any device suited for electronic communication with a network server (or any other device). Generally, any device for which user authentication is desired may utilize the systems and methods of the present invention, with mobile devices being particularly preferred. FIG. 1 schematically illustrates device 101 according to an embodiment of the present invention. In a preferred embodiment, device 101 comprises a mobile phone. Mobile phones utilizing the global system for mobile communications (GSM) protocol are particularly preferred, such as the Handspring™ Treo™ 270 (Handspring, Inc.; Mountain View, Calif.). In other |

3

Exhibit A-5 (Russo2)

| | |
|---|---|
| | embodiments, other protocols may be used, including code division multiple access (CDMA), time division multiple access (TDMA) protocol, and PCS protocols. Other devices suitable for use with the present invention include personal digital assistants (PDA), laptop computers, personal computers, televisions, telephones, and other terminals such as payment stations, point-of-sale stations, cash registers, Automated Teller Machines (ATMs), and related devices." Russo2 at [0041]<br><br>"Data for which protection and security is desired—'sensitive data', 'sensitive information', or 'secure data' as used herein—is stored in secure storage module 105. Further as used herein, for secure communication between device 101 and network server 102, secure storage module 105 is encoded with data required for communication with network server 102—such as a private key, in one embodiment. Sensitive information in storage module 105 may only be accessed when unlocked after a biometric data match. That is, secure storage module 105 is in electronic communication with verification processor 104, but verification processor 104 may only access sensitive data within module 105 when the secure data module receives an unlocking signal from an object owned by the authentic user—'what you have' authentication, as used herein. In a preferred embodiment, that unlocking object is smart card or SIM 106." Russo2 at [0047]<br><br>"Sensitive information, that is data stored by module 105 generally may include two types of data—(1) data required for communication with network server 102 including encryption keys (for example, private keys used in asymmetric ciphers, other passwords, codes, and the like; and (2) stored biometric data—that is, reference biometric data which will be compared to a biometric data sample. In another embodiment, data required for communication, such as encryption keys are stored by module 105 while reference biometric data is stored in a separate stored biometric data module. Stored, or 'reference' biometric data may include one or more of the following—biometric templates or other stored biometric data including fingerprint data, voice information, facial feature data, retinal scan information, and the like." |

4

Exhibit A-5 (Russo2)

| | Russo2 at [0049]<br><br>"Smart Card or SIM 106 provides the device with a "smart card" computing facility such as that of a SIM card used in GSM phones. In one embodiment, smart card 106 contains matching logic 110, capable of performing biometric matching of fingerprint, voice, facial features, and/or other biometric authentication methods. In another embodiment, matching logic 110 is integral to device 101, and secure data storage module 105 resides on smart card 106. Smart card 106 is in electronic communication with, or capable of being brought into electronic communication with, verification processor 104. Further, smart card 106 is capable of being brought into electronic communication with matching logic 110 in embodiments where logic 110 is not resident within smart card 106.<br>Russo2 at [0051] |
|---|---|

Exhibit A-5 (Russo2)



FIG. 1

Russo2 at Fig. 1

Exhibit A-5 (Russo2)

| 1[b]. receiving the biometric signature; | Russo2 discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Biometric sensor component 107 provides the device with a means of collecting biometric information from the user of the device 101, such as a fingerprint sensor for fingerprint matching, microphone for voiceprint matching, or camera for facial geometry, retina, or iris matching. A wide variety of sensors are known in the art, such as the Veridicom FPS 200 (Veridicom, Inc.; Sunnyvale, Calif.) or Atmel Fingerchip™ fingerprint sensors (Atmel Corporation; San Jose, Calif.), and substantially any sensor capable of recording information about an individual may be employed—those that record blood type, genetic information, and the like. In a preferred embodiment, the biometric sensor is a fingerprint sensor. In a preferred embodiment, biometric sensor 107 is integrated with or adhered to a surface of device 101. In other embodiments, biometric sensor 107 is electronically coupled to device 101. In some embodiments, a plurality of biometric sensors are provided."<br>Russo2 at [0052]<br><br>"The present invention further provides methods for accessing sensitive information and securely authenticating a user. FIG. 2 illustrates the initiation of a method according to a preferred embodiment of securely authenticating a device's user. Those skilled in the art will readily appreciate that the method can generally be extending to providing secure communications between devices and providing secured access to sensitive data. The authentication procedure generally begins when access to sensitive information is requested, or when secure communication with another device is initiated. A biometric data sample is obtained in step 203—which may also represent the step of prompting a user to initiate a biometric data sampling activity. Generally, the biometric data sample will be obtained through |

Exhibit A-5 (Russo2)

| | use of a biometric sensor, described above—including, for example a fingerprint sensor." Russo2 at [0053] |
|---|---|

Exhibit A-5 (Russo2)



Russo2 at Fig. 1

Exhibit A-5 (Russo2)



Russo2 at Fig. 2

Exhibit A-5 (Russo2)

| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Russo2 discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Secure storage module 105 provides device 101 with secure non-volatile data storage. Secure storage module 105 is at least in electronic communication with verification processor 104. In some embodiments, secure storage module 105 is integral to device 101. In other embodiments, secure storage—module 105 is integral to smart card or SIM 106, described further below, and brought into electronic communication with verification processor 104 during operation. In still other embodiments, another form a secure storage, such as a separate memory card, may be used."<br>Russo2 at [0046] |

Exhibit A-5 (Russo2)



FIG. 1

Russo2 at Fig. 1

Exhibit A-5 (Russo2)

| | |
|---|---|
| | To the extent that Plaintiff contends Russo2 does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Bradford at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Russo2 discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In some embodiments, verification processor 104 cannot read or write data to or from secure storage module 105 unless the storage module is unlocked. In other embodiments, verification processor 104 can write data to storage module 105, but cannot read data from storage module 105 without it being unlocked. In still other embodiments, verification processor 104 can read data from storage module 105, but cannot write data to storage module 105 without it being unlocked."<br>Russo2 at [0048] |
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Russo2 discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

13

Exhibit A-5 (Russo2)

| | |
|---|---|
| | "In a first embodiment, the present invention provides a method for secure communication with a server, wherein said secure communication requires encryption information, said method comprising obtaining a biometric data sample, comparing said biometric data sample to stored biometric data, enabling access to said sensitive data if said biometric data sample matches said stored biometric data, and communicating with said server using said sensitive data" Russo2 at [0015]<br><br>"Data for which protection and security is desired—'sensitive data', 'sensitive information', or 'secure data' as used herein—is stored in secure storage module 105. Further as used herein, for secure communication between device 101 and network server 102, secure storage module 105 is encoded with data required for communication with network server 102—such as a private key, in one embodiment. Sensitive information in storage module 105 may only be accessed when unlocked after a biometric data match. That is, secure storage module 105 is in electronic communication with verification processor 104, but verification processor 104 may only access sensitive data within module 105 when the secure data module receives an unlocking signal from an object owned by the authentic user—'what you have' authentication, as used herein. In a preferred embodiment, that unlocking object is smart card or SIM 106" Russo2 at [0047]<br><br>"Sensitive information, that is data stored by module 105 generally may include two types of data—(1) data required for communication with network server 102 including encryption keys (for example, private keys used in asymmetric ciphers, other passwords, codes, and the like; and (2) stored biometric data—that is, reference biometric data which will be compared to a biometric data sample. In another embodiment, data required for communication, such as encryption keys are stored by module 105 while reference biometric data is stored in a separate stored biometric data module. Stored, or 'reference' biometric data may include one or more of the following—biometric templates or other stored biometric data |

Exhibit A-5 (Russo2)

| | |
|---|---|
| | including fingerprint data, voice information, facial feature data, retinal scan information, and the like." Russo2 at [0049] |
| **Claim 13** | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Russo2 discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Russo2 discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well all related disclosures: See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Russo2 discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. For example, see the following passages and/or figures, as well as all related disclosures: See Disclosure at Claim 1[b] |

Exhibit A-5 (Russo2)

| | |
|---|---|
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Russo2 discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 13[d]. means for determining if the defined memory location is unoccupied; and | Russo2 discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Russo2 discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a | To the extent the preamble is limiting, Russo2 discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system |

Exhibit A-5 (Russo2)

| | |
|---|---|
| method of enrolling in a biometric card pointer system, the program comprising: | explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Russo2 discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Russo2 discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Russo2 discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit A-5 (Russo2)

| | See Disclosure at Claim 1[c] |
|---|---|
| 19[d]. code for determining if the defined memory location is unoccupied; and | Russo2 discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Russo2 discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

Exhibit A-6 (Seifert)

**Exhibit A-6**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT NO. 7,310,042 ("Seifert")**

U.S. Patent No. 7,310,042 to Seifert ("Seifert") entitled "System and Method for Biometric-Based Fraud Protection" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Seifert |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Seifert discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "A biometric fingerprint device for preventing fraud based on the device having standalone, self-authentication of the identity of predetermined user(s) and its interactivity with a database that is initiated via a controlled singularity of |

1

Exhibit A-6 (Seifert)

| | registration, i.e. contemporaneous registration of a user's fingerprint(s) into a database and registration, initialization, and authentication of that same fingerprint(s) onto a standalone biometric fingerprint device."<br>Seifert at Abstract<br><br>"The present invention is directed to a biometric fingerprint device for self-authenticating identification of at least one user of the device including internal memory and controller means within a substrate of the device and encoded packet(s) of information output, e.g., a digitized tonal output, for communicating with a remote transaction facilitator, wherein the self-authenticating ID card interacts with a database that is initiated via a controlled singularity of registration."<br>Seifert at 3:13-21<br><br>"Additionally, the present invention is directed to a biometric device for self-authenticating identification of at least one user via a biometric identification input by the user, which may be information relating to at least one fingerprint, voice, etc., including a unique transaction identifier for increased security, particularly with retail transactions made via phone, wireless device, Internet, satellite, or other communication means, after the initial singularity of registration of the user for the card and with the database; as such, transactions do not require communication with the database after the initial contemporaneous registration process is completed."<br>Seifert at 3:27-38<br><br>"According to the present invention, a biometric device is provided for self-authenticating identification of at least one user. Basic functions and configurations of the biometric device are set forth by U.S. Pat. No. 5,623,552 issued Apr. 22, 1997 to Lane for Self-authenticating identification card with fingerprint identification and co-pending U.S. Pat. No. 09/780,637 by Lane filed Feb. 08, 2001 which are both owned by a common assignee and are each incorporated herein by reference in their entirety. Referring now to FIG. 1, a flow diagram illustrating steps within methods according to the present invention is |
|---|---|

Exhibit A-6 (Seifert)

| | |
|---|---|
| | shown. In a method of using an identification system, steps include providing an identification card having a substrate including an internal memory device and an internal control device in electronic communication for providing activation of the card for use by an authorized user; inputting a biometric identifier input corresponding to the user via a biometric input device that communicates with the internal memory device and the internal control device for providing the biometric identifier input (10); transmitting the biometric identifier input to a database stored on a remote computer (11, 12); validating the biometric identifier input and/or the user by confirming the existence of a match to the biometric identifier that corresponds to the user that is stored in the database on the remote computer (13, 14); receiving a validation response from the database by the card, while the card is in communication with the database for the transmission of the biometric identifier input and receipt of the validation response (15, 16); confirming a singular, unique existence of the biometric identifier input and/or the user in the database (17); denying the transaction and/or the authentication where more than a singular unique registration exists in the database for the biometric identification input and/or the user (19, 20); and where the card has never been authenticated and/or activated previously, confirming registration of the biometric identifier and corresponding user in the database (18)." Seifert at 3:65-4:35 <br><br> "The fingerprint sensor is capable of sensing information related to at least one fingerprint and the sensed fingerprint is either used to register a new user, if multiple users are permitted for the particular device, or is used to verify that the information relating to the sensed fingerprint matches the information of the fingerprint of each of the registered users. In the case where more than one user may be registered for a device, each user has corresponding fingerprint identification information that is unique to that user and registered similarly." Seifert at 4:54-63 <br><br> "According to a preferred embodiment of the present invention, the biometric device also includes a database for receiving initial registration information about each of the at least one user of the system, wherein the database and card |

3

Exhibit A-6 (Seifert)

| | registration or initial activation are performed substantially contemporaneously, thereby ensuring that no duplicate identifications are created in the system. Duplicate checking may occur for each new registration to ensure that, for a given user, there is not already a preexisting registration in the system. Preferably, this duplicate checking is performed using fingerprint information from the user, which may include at least one digit fingerprint, a multiplicity of digits fingerprints, or fingerprints from all hand digits of the user. These fingerprints are checked from the fingerprints registered by all users of the system as recorded in the database. This permits the user to be identified as one unique user out of the many users within the system, or even those outside the system, which are not yet registered for the purpose of permitting use of a self-authenticated card for transactions without requiring communication for each transaction with the database." <br> Seifert at 5:25-45 |
|---|---|

4

Exhibit A-6 (Seifert)



Seifert at Fig. 1

| 1[a]. receiving card information; | Seifert discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |
| --- | --- |

5

Exhibit A-6 (Seifert)

| | "Prior art biometric devices commonly employ fingerprint identification and verification as a means for protecting the use of the device for proximity pass, apparatus activation, and access to information. Furthermore, it is known in the prior art to use portable information and transaction processing devices (PITP devices). These devices can be used to perform secure financial transactions, to allow the user access to another apparatus, or to transmit information for various personal reasons. To perform these functions, these devices are able to store data internally and transmit data, including personal user data, over communication lines. PITP devices may also employ biometric verification to ensure the identity of the user. In these devices, biometric verification may include finger, thumb, palm, and voice print, handwriting sample, retinal vascular pattern, and combinations thereof. Additionally, these devices have been constructed to include card readers that read information storage cards. Also, these devices can encrypt information and transmit it via dual-tone multi-frequency, modem, radio frequency, and infrared media. However, none of these devices is a standalone device, in that they require an external central data storage and processing unit to verify the identity of the PITP device user. Additionally, because the data is stored on a central data storage unit, the security of these devices and information relating to their users may be eventually compromised. In such a case, unauthorized use of the PITP device may occur, allowing unauthorized transactions. A single device has overcome this deficiency by incorporating the storage means of the biometric information within the PITP device. Thus, the device is freestanding and will not emit a signal unless the appropriate user is using the device. However, this device does not also emit tonal signals to confirm authentication of the user via biometric identification means. Therefore, there remains a need for a self-authenticating biometric identification device that can be used in connection with an encoded packet output, e.g., a digitized tonal output also having capacity to be used with portable information and transaction processing devices. Particularly where privacy is a significant concern, it is advantageous to provide a biometric device within which the individual fingerprint and other data or information is stored, i.e., there is no requirement for transmitting the fingerprint itself to a remote confirmation bank or source that stores the registered information against which the sensed fingerprint is verified." |
|---|---|

6

Exhibit A-6 (Seifert)

| | |
|---|---|
| | Seifert at 1:23-67<br><br>"Preferably, the present invention provides for an identification system for authenticating a user wherein the system includes an identification card having a substrate including an internal memory device and an internal control device in electronic communication for providing activation of the card for use by an authorized user, wherein the user inputs a biometric identifier input via a biometric input device that communicates with the internal memory device and the internal control device for providing the biometric identifier input, the biometric identifier input is validated and authenticated upon transmission of the biometric identifier input to a database stored on a remote computer and receipt of a validation response from the database, wherein the card is in communication with the database for the transmission of the biometric identifier input and receipt of the validation response, and wherein the database confirms the singular, unique existence of a match to the biometric identifier input that corresponds to the user, wherein the match is stored in the database. Preferably, the biometric identifier input corresponds to at least one fingerprint of the user, which is recorded and authenticated on the card by initially inputting information corresponding to the at least one fingerprint of the user into the substrate, which may be accomplished by an initial scanning, swiping, or otherwise registering it by a sensor, reader, or other device for inputting the information into the card memory. The card then communicates the information corresponding to the at least one fingerprint of the user, which is stored on the card, to the database for validation and confirmation that no duplicate identification exists at that time in the database, i.e., that no match corresponds to the user and/or to the biometric identification input by the user, thereby preventing duplicate registrations within the database for either the user and/or for the biometric identification information input to the card by the user."<br>Seifert at 5:47-6:14<br><br>"In a preferred embodiment of the present invention, the card provides for freestanding identification of the user, i.e., once the user and/or the user's corresponding biometric identifier input is registered in the database, the card will |

7

Exhibit A-6 (Seifert)

| | |
|---|---|
| | activate on its own, without requiring communication with the database, for confirming the identification of the user and the user's biometric identification input, with that biometric identification input initially provided and registered on the card and validated by the database. Advantageously, this system provides for the singular, unique existence of the match in the database for preventing duplicate identifications for the biometric identifier input as well as providing a card that may not be activated by anyone except the user providing his/her unique biometric identification input, which was initially input upon registration of the card with the database. Thus, the singular, unique existence of the match in the database prevents duplicate identifications for the user within the database, while the registration of the biometric identification input for the predetermined, authorized user of the card is stored in the freestanding memory of the card, as well as in the database, such that the card may not be activated without authentication and/or validation of the user and/or the user's biometric identification input properly and confirmed on the card. As such, the system provides for a controlled singularity of registration for the user and/or the biometric identification input corresponding to the user is provided by an essentially simultaneous registration of the card and of the user and/or the biometric identification input into the database through the card as set forth hereinabove." <br> Seifert at 6:23-51 |
| 1[b]. receiving the biometric signature; | Seifert discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> "According to the present invention, a biometric device is provided for self-authenticating identification of at least one user. Basic functions and configurations of the biometric device are set forth by U.S. Pat. No. 5,623,552 issued Apr. 22, 1997 to Lane for Self-authenticating identification card with fingerprint identification and co-pending U.S. Pat. No. 09/780,637 by Lane filed |

Exhibit A-6 (Seifert)

| | |
|---|---|
| | Feb. 08, 2001 which are both owned by a common assignee and are each incorporated herein by reference in their entirety. Referring now to FIG. 1, a flow diagram illustrating steps within methods according to the present invention is shown. In a method of using an identification system, steps include providing an identification card having a substrate including an internal memory device and an internal control device in electronic communication for providing activation of the card for use by an authorized user; inputting a biometric identifier input corresponding to the user via a biometric input device that communicates with the internal memory device and the internal control device for providing the biometric identifier input (10); transmitting the biometric identifier input to a database stored on a remote computer (11, 12); validating the biometric identifier input and/or the user by confirming the existence of a match to the biometric identifier that corresponds to the user that is stored in the database on the remote computer (13, 14); receiving a validation response from the database by the card, while the card is in communication with the database for the transmission of the biometric identifier input and receipt of the validation response (15, 16); confirming a singular, unique existence of the biometric identifier input and/or the user in the database (17); denying the transaction and/or the authentication where more than a singular unique registration exists in the database for the biometric identification input and/or the user (19, 20); and where the card has never been authenticated and/or activated previously, confirming registration of the biometric identifier and corresponding user in the database (18)." <br> Seifert at 3:65-4:35 <br><br> "The device includes a substrate having a fingerprint sensor, internal memory means for storing digitized information related to a fingerprint of the at least one user, activation means for initiating internal storage of the information related to at least one fingerprint corresponding to the at least one user upon activation by the at least one user for a first time thereby creating and recording at least one registered user, an internal controller, verification means for indicating that the information related to the at least one fingerprint corresponding to the at least one registered user has been successfully stored in the internal memory means, and authentication means for comparing information related to a sensed fingerprint |

9

Exhibit A-6 (Seifert)

|  | corresponding to the at least one user that has been sensed with the stored fingerprint information of the registered user and for producing an authentication signal if the sensed fingerprint information matches the stored fingerprint information of the at least one registered user."<br>Seifert at 4:36-53<br><br>"The fingerprint sensor is capable of sensing information related to at least one fingerprint and the sensed fingerprint is either used to register a new user, if multiple users are permitted for the particular device, or is used to verify that the information relating to the sensed fingerprint matches the information of the fingerprint of each of the registered users. In the case where more than one user may be registered for a device, each user has corresponding fingerprint identification information that is unique to that user and registered similarly."<br>Seifert at 4:54-63<br><br>"Preferably, the present invention provides for an identification system for authenticating a user wherein the system includes an identification card having a substrate including an internal memory device and an internal control device in electronic communication for providing activation of the card for use by an authorized user, wherein the user inputs a biometric identifier input via a biometric input device that communicates with the internal memory device and the internal control device for providing the biometric identifier input, the biometric identifier input is validated and authenticated upon transmission of the biometric identifier input to a database stored on a remote computer and receipt of a validation response from the database, wherein the card is in communication with the database for the transmission of the biometric identifier input and receipt of the validation response, and wherein the database confirms the singular, unique existence of a match to the biometric identifier input that corresponds to the user, wherein the match is stored in the database. Preferably, the biometric identifier input corresponds to at least one fingerprint of the user, which is recorded and authenticated on the card by initially inputting information corresponding to the at least one fingerprint of the user into the substrate, which may be accomplished by an initial scanning, swiping, or otherwise registering it by a sensor, reader, or other |

Exhibit A-6 (Seifert)

device for inputting the information into the card memory. The card then communicates the information corresponding to the at least one fingerprint of the user, which is stored on the card, to the database for validation and confirmation that no duplicate identification exists at that time in the database, i.e., that no match corresponds to the user and/or to the biometric identification input by the user, thereby preventing duplicate registrations within the database for either the user and/or for the biometric identification information input to the card by the user."

Seifert at 5:47-6:14



Seifert at Fig. 1

11

Exhibit A-6 (Seifert)

| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Seifert discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The present invention is directed to a biometric fingerprint device for self-authenticating identification of at least one user of the device including internal memory and controller means within a substrate of the device and encoded packet(s) of information output, e.g., a digitized tonal output, for communicating with a remote transaction facilitator, wherein the self-authenticating ID card interacts with a database that is initiated via a controlled singularity of registration."<br>Seifert at 3:13-21<br><br>"According to the present invention, a biometric device is provided for self-authenticating identification of at least one user. Basic functions and configurations of the biometric device are set forth by U.S. Pat. No. 5,623,552 issued Apr. 22, 1997 to Lane for Self-authenticating identification card with fingerprint identification and co-pending U.S. Pat. No. 09/780,637 by Lane filed Feb. 08, 2001 which are both owned by a common assignee and are each incorporated herein by reference in their entirety. Referring now to FIG. 1, a flow diagram illustrating steps within methods according to the present invention is shown. In a method of using an identification system, steps include providing an identification card having a substrate including an internal memory device and an internal control device in electronic communication for providing activation of the card for use by an authorized user; inputting a biometric identifier input corresponding to the user via a biometric input device that communicates with the internal memory device and the internal control device for providing the biometric identifier input (10); transmitting the biometric identifier input to a database stored on a remote computer (11, 12); validating the biometric identifier input and/or the |

Exhibit A-6 (Seifert)

| | |
|---|---|
| | user by confirming the existence of a match to the biometric identifier that corresponds to the user that is stored in the database on the remote computer (13, 14); receiving a validation response from the database by the card, while the card is in communication with the database for the transmission of the biometric identifier input and receipt of the validation response (15, 16); confirming a singular, unique existence of the biometric identifier input and/or the user in the database (17); denying the transaction and/or the authentication where more than a singular unique registration exists in the database for the biometric identification input and/or the user (19, 20); and where the card has never been authenticated and/or activated previously, confirming registration of the biometric identifier and corresponding user in the database (18)." Seifert at 3:65-4:35<br><br>"The internal memory device is in communication with the biometric identification input device. In one embodiment, the internal memory device is electrically connected to a fingerprint sensor, to verification means, to authentication means, and to activation means, which are all configured to be in communication with the internal memory of the card. Also, the internal controller is capable of independently programming the internal memory means with the information related to a fingerprint corresponding to the at least one user by generating an internal control signal to initiate transfer of the information related to the sensed fingerprint corresponding to the at least one user to the internal memory means for storage therein." Seifert at 4:64-5:9 |
| 1[d]. determining if the defined memory location is unoccupied; and | Seifert discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit A-6 (Seifert)

| | "Additionally, the verification means and/or authentication means further includes a transmitter for indicating that the information related to a fingerprint has been successfully stored to create the at least one registered user. This verification and/or authentication signal includes an encoded or encrypted information packet output for verification and/or for authentication that the biometric identification input, which may be information relating to at least one fingerprint of the user, the voice of the user, and the like, matches that of the at least one registered user that is transmitted or communicated via an encoded information packet output transmitter located within the biometric device substrate. The output from the device may be converted into an encoded or encrypted information packet that is output by a transmitter located within the device." Seifert at 5:10-24

"In a preferred embodiment of the present invention, the card provides for freestanding identification of the user, i.e., once the user and/or the user's corresponding biometric identifier input is registered in the database, the card will activate on its own, without requiring communication with the database, for confirming the identification of the user and the user's biometric identification input, with that biometric identification input initially provided and registered on the card and validated by the database. Advantageously, this system provides for the singular, unique existence of the match in the database for preventing duplicate identifications for the biometric identifier input as well as providing a card that may not be activated by anyone except the user providing his/her unique biometric identification input, which was initially input upon registration of the card with the database. Thus, the singular, unique existence of the match in the database prevents duplicate identifications for the user within the database, while the registration of the biometric identification input for the predetermined, authorized user of the card is stored in the freestanding memory of the card, as well as in the database, such that the card may not be activated without authentication and/or validation of the user and/or the user's biometric identification input properly and confirmed on the card. As such, the system provides for a controlled singularity of registration for the user and/or the biometric identification input corresponding to the user is provided by an essentially simultaneous registration of the card and of |

Exhibit A-6 (Seifert)

| | the user and/or the biometric identification input into the database through the card as set forth hereinabove."<br>Seifert at 6:23-51 |
|---|---|
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Seifert discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The internal memory device is in communication with the biometric identification input device. In one embodiment, the internal memory device is electrically connected to a fingerprint sensor, to verification means, to authentication means, and to activation means, which are all configured to be in communication with the internal memory of the card. Also, the internal controller is capable of independently programming the internal memory means with the information related to a fingerprint corresponding to the at least one user by generating an internal control signal to initiate transfer of the information related to the sensed fingerprint corresponding to the at least one user to the internal memory means for storage therein."<br>Seifert at 4:64-5:9<br><br>"The device includes a substrate having a fingerprint sensor, internal memory means for storing digitized information related to a fingerprint of the at least one user, activation means for initiating internal storage of the information related to at least one fingerprint corresponding to the at least one user upon activation by the at least one user for a first time thereby creating and recording at least one registered user, an internal controller, verification means for indicating that the information related to the at least one fingerprint corresponding to the at least one registered user has been successfully stored in the internal memory means, and authentication means for comparing information related to a sensed fingerprint |

Exhibit A-6 (Seifert)

| | |
|---|---|
| | corresponding to the at least one user that has been sensed with the stored fingerprint information of the registered user and for producing an authentication signal if the sensed fingerprint information matches the stored fingerprint information of the at least one registered user."<br>Seifert at 4:36-53<br><br>"In a preferred embodiment of the present invention, the card provides for freestanding identification of the user, i.e., once the user and/or the user's corresponding biometric identifier input is registered in the database, the card will activate on its own, without requiring communication with the database, for confirming the identification of the user and the user's biometric identification input, with that biometric identification input initially provided and registered on the card and validated by the database. Advantageously, this system provides for the singular, unique existence of the match in the database for preventing duplicate identifications for the biometric identifier input as well as providing a card that may not be activated by anyone except the user providing his/her unique biometric identification input, which was initially input upon registration of the card with the database. Thus, the singular, unique existence of the match in the database prevents duplicate identifications for the user within the database, while the registration of the biometric identification input for the predetermined, authorized user of the card is stored in the freestanding memory of the card, as well as in the database, such that the card may not be activated without authentication and/or validation of the user and/or the user's biometric identification input properly and confirmed on the card. As such, the system provides for a controlled singularity of registration for the user and/or the biometric identification input corresponding to the user is provided by an essentially simultaneous registration of the card and of the user and/or the biometric identification input into the database through the card as set forth hereinabove."<br>Seifert at 6:23-51 |
| Claim 13 | |

Exhibit A-6 (Seifert)

| | |
|---|---|
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Seifert discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Seifert discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Seifert discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Seifert discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

17

Exhibit A-6 (Seifert)

|  | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| --- | --- |
| 13[d]. means for determining if the defined memory location is unoccupied; and | Seifert discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Seifert discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 |  |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Seifert discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit A-6 (Seifert)

| | |
|---|---|
| | See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Seifert discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Seifert discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Seifert discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit A-6 (Seifert)

| 19[d]. code for determining if the defined memory location is unoccupied; and | Seifert discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
|---|---|
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Seifert discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

20

Exhibit A7 (Singhal)

**Exhibit A-7**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. US2002/0002533 ("Singhal")**

U.S. Patent App. Pub. No. US20020002533 to Singhal ("Singhal") entitled "Method and Apparatus for a Payment Card System" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Singhal |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Singhal discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"One method used by the customer 20 to establish an account with the payment system 12 is illustrated in FIG. 7. At step 702, the customer selects to connect to the payment system 12. At step 704, the payment system web page 500A is |

1

Exhibit A7 (Singhal)

| | |
|---|---|
| | displayed. At step 706, the customer enters/creates the customer identifier and submits the customer identifier. At step 708, the payment system checks for the existence of the customer identifier in the identifier database 38A and sends validation by displaying data screen 536. At step 710, the customer selects "enter identifying data'. At step 712, the payment system displays identifying data form 524A. At step 714, the customer enters identifying data and selects SEND. At step 716, the payment system does optional address verification from the United States Postal Service database and then saves the identifying data in the identifying-database 38B. At step 718, the customer selects "enter existing card data'. At step 720, the payment system displays existing card data form 524B. At step 722, the customer enters existing card data and selects SEND. At step 724, the payment system checks existing bankcard data and saves the existing bankcard data in database 38C. The checking of existing bankcard data may include checking for correct format and optionally may also include checking for stolen and duplicate data by connecting to the bankcard authorization network 21. At step 726, the customer selects "enter payment card data'. At Step 728, the payment system displays payment card data form 524C. At step 730, the customer enters payment card PIN data 554A for each of the existing cards and alias name 354B and selects SEND. At step 732, the payment system saves PIN data and alias name in database 38D. At step 734, the payment system notifies the customer that the card account has been established and a payment card will be mailed to the customer. This notification can be by e-mail, U.S. mail or a sign off message on the web page 500A. At step 736, the payment system creates a payment card 30 and mails it to the customer 20." <br> Singhal at [0105] <br><br> To the extent that Plaintiff contends Singhal does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: <br><br> See, e.g., Tello at Claim 1[pre] <br> See, e.g., Lyon at Claim 1[pre] |

Exhibit A7 (Singhal)

| | |
|---|---|
| | See, e.g., Okamura at Claim 1[pre]<br>See, e.g., Russo at Claim 1[pre]<br>See, e.g., Russo2 at Claim 1[pre]<br>See, e.g., Seifert at Claim 1[pre]<br>See, e.g., Bradford at Claim 1[pre]<br>See, e.g., Celsius at Claim 1[pre] |
| 1[a]. receiving card information; | Singhal discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>"Payment card 30<br><br>With reference to FIG. 1B, the payment card 30 has front side 30A and back side 30B. The front Side 30A can include the name of the card 32A, and the customer name 32B. The customer name 32B can be a chosen alias 354B of the customer as described later with reference to FIGS. 3D and 5B. The back side 30B can include a machine readable area 33 such as a magnetic strip. The magnetic strip can include data in an encoded form. The data can include a customer identifier 320. One form of the customer identifier 320 is described later with reference to FIG. 4C.<br><br>In some of the embodiments, the information and data contained in the magnetic strip does not contain any of the private data 25 of the customer such as the name, the customer address, the card number(s) of the existing bank cards 31 of the customer 20 and/or the expiration date of the existing bank cards 31 of the customer 20. With this design, if the payment card 30 fell into wrong hands, it does not identify the name of the customer and the existing bank card(s) of the customer 20."<br>Singhal at [0032-34]<br><br>"With reference to FIG. 1D, when the customer 20 is using the payment card 30 at the location of the merchant 22, the payment card 30 can be swiped in a card |

3

Exhibit A7 (Singhal)

<table>
<tr><td></td><td>

reader 34 that is at the location of the merchant 22. The card reader 34 is adapted to read the readable area 33 of the payment card 30. The card reader 34 can include a display window 34A, a card slide slot 34B, function buttons 34C that enables the selection of one of the bank cards, a numeric keypad 34D, an enter button 34E and Yes/No button 34F. Subsequently, the customer 20 uses the buttons 34C to select the type of transaction and enters a PIN number using the numeric keypad 34D. The merchant interface 22A generates a merchant identifier and a total payment amount for the transaction. The merchant identifier can be any combination of characters that identifies the merchant 22. The total payment amount for the transaction will vary according to the transaction. The transaction can be for one or more purchased item(s) and/or services from the merchant." Singhal at [0038]



Singhal at Fig. 1B

</td></tr>
</table>

4

Exhibit A7 (Singhal)



Singhal at Fig. 1D

| 1[b]. receiving the biometric signature; | Singhal discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>To the extent that Plaintiff contends Singhal does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Tello at Claim 1[b]<br>See, e.g., Lyon at Claim 1[b] |

5

Exhibit A7 (Singhal)

| | |
|---|---|
| | See, e.g., Okamura at Claim 1[b]<br>See, e.g., Russo at Claim 1[b]<br>See, e.g., Russo2 at Claim 1[b]<br>See, e.g., Seifert at Claim 1[b]<br>See, e.g., Bradford at Claim 1[b]<br>See, e.g., Celsius at Claim 1[b] |
| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Singhal discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Payment card 30<br><br>With reference to FIG. 1B, the payment card 30 has front side 30A and back side 30B. The front Side 30A can include the name of the card 32A, and the customer name 32B. The customer name 32B can be a chosen alias 354B of the customer as described later with reference to FIGS. 3D and 5B. The back side 30B can include a machine readable area 33 such as a magnetic strip. The magnetic strip can include data in an encoded form. The data can include a customer identifier 320. One form of the customer identifier 320 is described later with reference to FIG. 4C."<br>Singhal at [0032-33]<br><br>"Identifier database 38A<br><br>Referring to FIGS. 2 and 3A, the payment system 12 can store a customer identifier 320 for each of the customers 20 in the identifier database 38A. As provided herein, the customer identifier 320 can be used to anonymously identify and verify the customer 20 for gaining access to and interacting with the payment |

Exhibit A7 (Singhal)

|  | system 12. The customer identifier 320 enables the customer 20 to interact with and use the payment system 12 without revealing private data of the customer. Stated another way, the customer identifier 320 enables the customer 20 to be anonymously identified to the payment system 12.<br><br>The customer identifier 320 can be any number of characters that can be used to identify and verify the customer 20 for gaining access to and interacting with the payment system 12. The customer identifier 320 can be self-created by the customer 20. More specifically, the customer 20 can create the exact characters that make up the customer identifier 320 without the aid or authority of any business, the payment system 12 or government entity. However, as provided herein, the payment system 12 can provide a guideline for the format of the customer identifier 320. The details of the customer identifier 320 are explained in more detail below."<br>Singhal at [0053-55]<br><br>"The payment system 12 can also assign and associate a unique sequence number 330 for each customer identifier 320. The sequence number 330 can include any number of characters. The sequence number 330 is subsequently used as a reference to save and retrieve the private data 25 of the customer 20 in the identifying database 38B, existing bankcard data database 38C and payment card data database 38D. The sequence number 330 can also be stored with the customer identifier 320 in the identifier database 38A."<br>Singhal at [0056]<br><br>"The present invention also discloses a method that may be used in conjunction with and/or separately from any other methods to make the identifying data 322 stored in the identifying database 38B more secure. This method uses separate databases for each piece of the data. As a simplified illustration, referring to FIG. 3B, the name 350A, street address 350B, city/state/Zip address 350C, e-mail address 350D, and telephone number 350E of the customer may be kept in physically separate databases 322A to 322E respectively. The data pieces within the separate sub-databases are referenced to the customer by the sequence number |

Exhibit A7 (Singhal)

330 and are accessible by using the sequence number 330. In this method, the identifying data of the customer is fragmented over many databases and storage devices, such that one database only stores partial information of the customer." Singhal at [0061]



FIGURE 2

Singhal at Fig. 2

8

Exhibit A7 (Singhal)



Singhal at Fig. 3A

9

Exhibit A7 (Singhal)



Singhal at Fig. 3B

| 1[d]. determining if the defined memory location is unoccupied; and | Singhal discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
| --- | --- |
| | To the extent that Plaintiff contends Singhal does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept: |
| | See, e.g., Tello at Claim 1[d]<br>See, e.g., Lyon at Claim 1[d]<br>See, e.g., Russo at Claim 1[d]<br>See, e.g., Russo2 at Claim 1[d]<br>See, e.g., Bradford at Claim 1[d] |

Exhibit A7 (Singhal)

| | See, e.g., Celsius at Claim 1[d] |
|---|---|
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Singhal discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"With reference to FIG. 1D, when the customer 20 is using the payment card 30 at the location of the merchant 22, the payment card 30 can be swiped in a card reader 34 that is at the location of the merchant 22. The card reader 34 is adapted to read the readable area 33 of the payment card 30. The card reader 34 can include a display window 34A, a card slide slot 34B, function buttons 34C that enables the selection of one of the bank cards, a numeric keypad 34D, an enter button 34E and Yes/No button 34F. Subsequently, the customer 20 uses the buttons 34C to select the type of transaction and enters a PIN number using the numeric keypad 34D. The merchant interface 22A generates a merchant identifier and a total payment amount for the transaction. The merchant identifier can be any combination of characters that identifies the merchant 22. The total payment amount for the transaction will vary according to the transaction. The transaction can be for one or more purchased item(s) and/or services from the merchant." Singhal at [0038]<br><br>"Referring to FIGS. 2 and 3A, the payment system 12 can store a customer identifier 320 for each of the customers 20 in the identifier database 38A. As provided herein, the customer identifier 320 can be used to anonymously identify and verify the customer 20 for gaining access to and interacting with the payment system 12. The customer identifier 320 enables the customer 20 to interact with and use the payment system 12 without revealing private data of the customer. Stated another way, the customer identifier 320 enables the customer 20 to be anonymously identified to the payment system 12." |

11

Exhibit A7 (Singhal)

| | Singhal at [0054] |
|---|---|
| | "Referring to FIG. 3B, the payment system 12 can store any identifying data 322 of the customer 20 in the identifying database 38B of the storage device 26. Identifying data 322, as used herein, shall mean any information or data of the customer 20 that if used independently is sufficient to positively identify the customer 20 to a third party. Examples of identifying data 322 can include, a name, an address, a telephone number, a facsimile number, an e-mail address, a social security number, credit card number, and/or a driver license number of the customer 20" <br> Singhal at [0059] <br><br>  <br> Singhal at Fig. 1B |

12

Exhibit A7 (Singhal)



Singhal at Fig. 3A

Exhibit A7 (Singhal)

| | |
|---|---|
| |

Singhal at Fig. 3B |
| **Claim 13** | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Singhal discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:

See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Singhal discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

14

Exhibit A7 (Singhal)

| | For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[a] |
|---|---|
| 13[b]. a biometric reader for receiving the biometric signature; | Singhal discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Singhal discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[c] |
| 13[d]. means for determining if the defined memory location is unoccupied; and | Singhal discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[d] |

Exhibit A7 (Singhal)

| | |
|---|---|
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Singhal discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Singhal discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Singhal discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |

Exhibit A7 (Singhal)

| | |
|---|---|
| 19[b]. code for receiving the biometric signature; | Singhal discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Singhal discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 19[d]. code for determining if the defined memory location is unoccupied; and | Singhal discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Singhal discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

17

Exhibit A7 (Singhal)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
|---|---|

18

Exhibit A8 (Bradford)

**Exhibit A-8**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT NO. 6,612,928 ("Bradford")**

U.S. Patent No. 6,612,928 to Bradford ("Bradford") entitled "Player Identification Using Biometric Data in a Gaming Environment" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Bradford |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Bradford discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Referring now to FIG. 6, a method for the creation of an entry having biometric data in a player ID database is shown. A player currently without an entry in the player ID database would first go to a customer Service counter and ask for an |

1

Exhibit A8 (Bradford)

account, box 600. The process then moves to box 602, where an authorized person enters the initial data from the player into the database, using a privileged data entry Screen into the player authentication database."
Bradford at 14:21-28



Bradford at Fig. 6

"A system and method for using two authenticators to identify a player in a gaming environment is disclosed, where the second authenticator is based on biometric data. The two authenticators allow a two-level authorization process, where the second authenticator, being based on biometric data, allow a player to quickly and easily authenticate documents while remaining at game machines, authenticate electronically based transfers into and out of accounts at game machines, and further allow casinos and other establishments having age

2

Exhibit A8 (Bradford)

| | |
|---|---|
| | requirements and operating in an open environment to confirm that an underage person is not enabling the game play button (making use of the game machine thereby)."<br>Bradford at Abstract<br><br>"The first authenticator may be one of many types, with a typical first authenticator being a player ID card, a Voucher with a unique, encoded, and preferably encrypted numerical ID on it, a unique alphanumeric Sequence, or an RFID tag. Each first authenticator that is not data itself (i.e., a PIN) has the ability to have data read from it (i.e., the data on the magnetic strip of a typical player ID card). "First authenticator data" refers to the data that can be read from a physical first authenticator card, if Such is used. To Simplify word usage in this disclosure, "first authenticator" and "first authenticator data" refer to the same thing, that is, the information or data that is read from a physical item, where that physical item may be used to carry the data, or, in the case of an alpha-numeric Sequence, is the data. Context makes clear if the discussion of a first authenticator is referring to a physical carrier or the data in the physical carrier or both. The second authenticator will be based on a biometric reading. The present invention may use any biometric reading, although those providing reasonably high degrees of uniqueness are clearly preferred. It is expected that at the present time, the predominant biometric used will be based on fingerprints."<br>Bradford at 3:6-27<br><br>"The first level of identification used by a player is called the first authenticator, and is defined as whatever a player first presents to the system to identify themselves. The first authenticator may be one amongst many choices, where the chosen form will depend on the needs and desires of the individual and the System implementation. A non-exhaustive list of first authenticators that are expected to be in use now or in the near future include: Voucher IDs, a first fingerprint; a biometric other than a fingerprint Such as hand geometry, face geometry, iris Scan, or retinal Scan, an alpha-numeric sequence (this includes PINs, but further includes any Sequence of numbers and letters, case Sensitive or not, that may be usable to identify a player); magnetic-strip cards (usually in the form a traditional |

3

Exhibit A8 (Bradford)

| | |
|---|---|
| | player ID card); embedded RFID tags (may be in a key fob, a wallet-sized card, a lapel pin, and numerous other forms which are easy to for a person to carry and use); Smart cards; magnetic diskettes, optical disks and/or mini-disks; or handheld devices with an IR or RF interface (i.e., a PDA such as a Palm Pilot'TM).<br>In addition, a preferred embodiment will allow a player to use one of their preexisting cards or forms of identification. This will include allowing a player to use a credit card, check card, debit card, and the like. In addition, when current driver's licenses are replaced in the near future with those having a common read means throughout the U.S. (expected to be either a form of Smart card or having machine readable symbols on one Surface of the card), those driver's licenses could be used as well. It is important to note that the use of these cards is for data matching only. It will not be used to access or record anything having to do with the meaning of card when used as a first authenticator. Thus, a player who wants to use a debit card they already have as a first authenticator would allow the information on the magnetic Strip of the card to be read and kept as first authenticator data. When the player then goes to a game device, the player presents their card to the reader. The data that is read off of the card is used to find matching first authenticator data in the player ID database. That is the extent of its use. Thus, the actual meaning of the data on the magnetic Stripe is not important; it is simply being used as a unique data Sequence to find a matching data Sequence in the player ID database. Thus, as used in this disclosure "player ID is any authenticator, designated as a first authenticator, that has the property of having data useable as first authenticator data in a player ID database."<br>Bradford at 5:36-6:13<br><br>"The Second level or Second means of identifying oneself to a System is through the use of a Second authenticator. The Second authenticator is a biometrically-based authentication means. A biometric authentication means may include fingerprints, hand geometry Scans, retinal Scans, iris Scans, facial feature Scans, or other biologically-based measurement means which are readily available to be used in a casino environment. In the description of this invention, one embodiment is based on the use of a fingerprint as the Second authenticator. However, the inventive concept is broader than the use of a fingerprint alone, encompassing any |

4

Exhibit A8 (Bradford)

| | Second authenticator that is based on a biometric measurement that can be measured (Scanned, read-in) from a human who is sitting or Standing at or near the gaming device which has just been presented with a first authenticator."<br>Bradford at 6:49-64<br><br>"The player presents their first authenticator to the game device, which is used to get the associated Second authenticator."<br>Bradford at 3:56-58<br><br>"The present invention provides new methods and apparatus having Superior authentication of players than available in the prior art, while further providing for a player's ease of use of the enhanced authentication. It does this by combining at least two authenticators per player in an easy-to-use and manage System. A player first presents. Some form of initial identification to the gaming device, then (not always right away) provides a second means of authentication based on a biometric measure Such as a fingerprint (defined below). The combination of the two identification Steps provides two critical properties in a casino environment. First, because of the combinatorics involved, a Significantly higher degree of assurance is achieved when the two authentication events, using a first and Second authenticator, are used in combination than is possible using a single authenticator. Second, recurring authentication is made significantly easier for both the player and the casino, for example during an extended period of game play, while Still retaining the higher degree of assurance provided by the two-step authorization method."<br>Bradford at 5:16-34<br><br>"1. Field of the Invention<br>This invention pertains generally to gaming systems. More particularly, the present invention relates to a method and apparatus for providing addition assurance that a player is who they claim to be by using biometric identifiers, particularly fingerprints, for player identification at gaming devices."<br>Bradford at 1:20-27 |
|---|---|

5

Exhibit A8 (Bradford)

| | "Referring now to FIG. 6, a method for the creation of an entry having biometric data in a player ID database is shown. A player currently without an entry in the player ID database would first go to a customer Service counter and ask for an account, box 600. The process then moves to box 602, where an authorized perSon enters the initial data from the player into the database, using a privileged data entry Screen into the player authentication database. In a preferred embodiment there will be selected, Small Subset of trusted employees who will make entries into the player ID data base. In order to open the privileged Screens allowing data entry, the authorized casino perSonnel will be required to use their own employee identification cards (badges, RFID tag, of other first authenticator where said first authenticator is not a PIN or other memory-only authenticator), and will further be authenticated by the use of their own biometric measurement. In one preferred embodiment, casino personnel will be required to enter two fingertips worth of fingerprint data in Succession (after they present their first authenticator) to be allowed access to the privileged Screens on the player ID System. The authorized person enters the player's data and information into the player ID database. An important aspect of the present invention is that a casino may decide how much information is required from a player to make use of the enhanced authorization System. In one preferred embodiment the casino will ask the player if they want to have their Social Security number entered into the player information database (in the U.S., generally used as a universal identifier and in particular used by IRS as an individual tax payers identification number). Some players will be comfortable with that, and others won't. Authorized casino personnel will explain to the player the advantages and disadvantages of each choice. In particular, allowing a casino to enter a player's Social Security number into its database, coupled with other player information and data from the game device showing the amount won, will enable fully automated W2G generation. Some players, because of the relative infrequency of Such an event for their type of play, may wish to continue to use manual or Semi-automated W2G generation, So will not provide a Social Security number. Manual W2G generation is the current method in use, where an attendant comes to the game device where the player is located and the player fills out a hardcopy |
|---|---|

6

Exhibit A8 (Bradford)

| | |
|---|---|
| | W2G form. Semi-automated W2G generation is disclosed in co-pending application Ser. No. 09/838,457, titled "Data Entry System And Method For Gaming Devices", the full application explicitly incorporated herein. Disclosed is a method and apparatus for allowing a player, while Staying at the gaming device they are currently using, to use an interactive device (in one preferred embodiment, a touchscreen) to fill out and electronically sign a W2G form. A player may wish to preserve their Social Security number in a manner anonymous to the casino, So can always chose to use a manual or Semi-automated method for filing out W2GS. Players who want to make use of the fully automated W2G generation will need to provide all of the information needed Such that their database entry can Supply the needed data fields to a forms program, generating a completed W2G thereby. Authenticating generated W2GS is discussed more fully below. Continuing now with box 603, the casino attendant may provide the player with the player's first authenticator. In one preferred embodiment the first authenticator will be a tangible card (perhaps using an already existing player ID card) or voucher. If a voucher is given to a player, it is called a "player ID voucher', having encoded thereon (and perhaps further being encrypted) a unique identifier, the data being readable by a voucher reader. AS discussed above, other forms of first authenticators may be used. In another preferred embodiment, the first authenticator comprises finger print data from a fingertip. If the first authenticator comprises fingerprint data, the fingerprint data may be entered later in the process. Box 603 is left and diamond 604 entered. In diamond 604, the attendant asks the player if they need training. If the player has never used the System before (Something that can be partially checked using expired player ID entries, if a casino chooses), a preferred embodiment will tell the attendant to train the perSon by indicating that course of action on the attendant's Screen. This is to prevent confusion when a player Starts to use the two-level authentication System for the first time. If a player is creating a new entry but has experience with the System, either previously at this casino or at another casino using a similar System, the "no training choice may be made by the attendant. |

Exhibit A8 (Bradford)

<table>
<tr>
<td></td>
<td>If the player is to be trained, the "Yes" exit is taken from diamond 604 and box 610 is entered. The attendant goes to a game with the present invention installed on it. There may instead be a special "demo game', Set up at or near the Service counter, where the game is set to invoke Specific winning Sequences to allow a player to see what happens and how to respond. A preferred embodiment allows the attendant to use any game device in the casino having the present invention, where the attendant invokes a special Set of Screens or options on Screens on the biometric device reader by identifying themselves as casino perSonnel. The privileged Screens allow the attendant to do two things: enter a player's biometric measurements for entry into the playerID database, and to show any special Screen or choice Sequences to the user as part of the training (i.e., allow a "fake" transaction So the player Sees the Sequence of actions to take). Box 610 is left and box 612 is entered. In box 612, a preferred embodiment uses fingerprint data as the biometric measurement. The player would use the reader with their chosen finger, with the privileged mode Set by the attendant enabling this data to be made part of the player's ID entry in the player ID database. If, at box 603, the player decided to use two fingertips for authentication, the attendant would have the player enter two Sets of fingerprint data in Sequence, using their chosen fingers. Box 612 is left and box 614 entered.

In box 614, the attendant makes use of the newly created entry to demonstrate to the player the use of the two authenticator authentication process. This may involve the use of a newly created EFA, a W2C event, or simply identifying themselves to the System. The casino will choose which training Scenario they want to present to the newly enrolled players. Box 614 is left and box 616 entered. In box 616, the attendant exits from the privileged screen (s) and training mode. The game device, if it is a regular floor game, is now ready to be used in a normal manner. For added protection, a preferred embodiment will require that while the game is in entry and training mode, the casino attendant's ID card (or other physical device) must be left in the machine; if it is unexpectedly removed the game device immediately reverts to a non-privileged mode and/or Sets itself to a non-play State. In addition, a preferred embodiment requires that the attendant's card be physically attached to the attendant (i.e., by a retractable cord), preventing</td>
</tr>
</table>

8

Exhibit A8 (Bradford)

| | |
|---|---|
| | an attendant from accidentally leaving a card in a machine. Box 616 is left and box 618 is entered.<br>In box 618, the player is now ready to use the system and the System has an entry in the player ID database corresponding to the player, having a first authenticator and a Second authenticator useable by the player. The end State 620 is now reached.<br>If, at diamond 604, the player does not require training the "No" exit is taken and box 606 is entered. The player, still with the attendant at the Service counter (or other location designated for this activity, Such as a Small office or room or designated game device), now enters the player's biometric measurement into the System. In one preferred embodiment this will be fingerprint data, read from a fingerprint reader. If, while at box 603 a player chose to make use of two fingertips, a different fingertip for each authenticator, the attendant will enter a Sequence of two Sets of fingerprint data. The first fingerprint data set will be the first authenticator and the Second fingerprint data Set will be the Second authenticator. Box 606 is left and box 608 entered.<br>In box 608, the system creates the entry in the player ID database corresponding to this player, associating the data corresponding to a first and Second authentic authenticator with this entry, the second of which is always a biometric authenticator and in one preferred embodiment, is a finger print data. Box 608 is left and box 618 is entered. Box 618 corresponds to the System being ready for use by the player, with the process now complete at end point 620."<br>Bradford at 14:21–16:47<br><br>"Continuing with FIG. 7, a method of using two authenticators for the automated issuance of IRS W2G forms is shown."<br>Bradford at 16:48-50<br><br>"Proceeding to FIG. 11, a method of using the present invention for authenticating electronic funds transfers (EFTS) is shown."<br>Bradford at 24:52-54 |

9

Exhibit A8 (Bradford)

"FIG. 3 shows a game device similar to that shown in FIGS. 1 and 2, including game device (including a cabinet) 300, video or reel view area 302, SMIB 312 (optional), at least one electronic connection 314 (optional), first authentication readers 304, voucher/card printer 308, and play or choice buttons 306."
Bradford at 8:51-56



Bradford at Fig. 3

"A player and a casino or establishment uses the present invention in Several Steps. The first is to create an entry in the player identification database, which associates a first authenticator and a Second authenticator."
Bradford at 3:50-54

"Continuing with FIG. 10, the initialization of an electronic funds account (EFA) based on a two-authenticator System is shown. Box 1000 corresponds to a player

10

Exhibit A8 (Bradford)

| | |
|---|---|
| | going to a customer Service counter or other location where an attendant having access to a terminal (or Station) where the attendant can invoke a privileged Screen where they can enable an EFA. The authorized casino attendant will use their ID to invoke a special Screen or Set of Screens that will set up and enable an EFA for player use. Proceeding from box 1000 to box 1002, the player presents any needed ID to the attendant for the type of EFA being created. Note that there may be a range of EFA accounts, from one where the attendant simply checks that the player is of age (18, 19, 20, or 21 depending on the jurisdiction), indicates the type of ID presented (i.e., a driver's license, a passport, etc.), and enables the account by having the player enter their fingerprint data using a fingerprint reader which is then associated with the player's first authenticator and any other information on a player ID database. The relationship between the player ID database and the EFA account System will depend on the casino implementing the System. A preferred embodiment will have a unified, combined system where the EFA data is kept in the Same database as the player ID records, being an extension thereof. However, if the casino has another EFA system already in use, it may chose to implement the two authenticator ID database in a different System and database, and have the authentication of the player take place there. Once authenticated, the associated EFA account will be enabled for use by the player using an agreed upon protocol between the two Systems, and the player will then interact with the EFA system (this coupling will typically be invisible to the player)." Bradford at 22:25-56

"A player identification database is also used, where an entry corresponding to a player comprises at least one record (typically, exactly one record), and the record has fields containing data, information, or pointers. The records have fields corresponding to a first authenticator and a Second authenticator, providing authenticator data therein or pointers to authenticator data. The Second authenticator will always have data that correspond to a biometric measurement." Bradford at 3:28-36 |

11

Exhibit A8 (Bradford)

| | |
|---|---|
| | "The data that is read off of the card is used to find matching first authenticator data in the player ID database."<br>Bradford at 6:4-6 |
| 1[a]. receiving card information; | Bradford discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>"Game device 100 further provides a video or reel display 102, play buttons 106, one or more first authentication readers 104 (typically a voucher reader, player tracking ID slot, or RFID reader), a fingerprint reader 110 (may be a different biometric device), a card/voucher printer 108, and a SMIB 112 which would typically be connected electronically 114 an RGC (remote game controller, not shown). In one embodiment reader 110 would have an interface (port) to SMIB 112, Sending data and receiving data via connection 114."<br>Bradford at 8:22-31<br><br>"FIG. 3 shows a game device similar to that shown in FIGS. 1 and 2, including game device (including a cabinet) 300, video or reel view area 302, SMIB 312 (optional), at least one electronic connection 314 (optional), first authentication readers 304, voucher/card printer 308, and play or choice buttons 306."<br>Bradford at 8:51-56 |

12

Exhibit A8 (Bradford)



Bradford at Fig. 3

"'Presents' is defined in this disclosure to mean any action needed by the user of an authenticator to have the authenticator read by a reader designed to read that authenticator. The exact actions will, of course, vary depending on what type of authenticator a player is using. In the case of a magnetic strip card, the presenting action would be to insert the card into a magnetic strip card reader (like an ATM and a bank card). […] Each type of authenticator and its associated input device would have a corresponding meaning of 'presents', where in each case the net result is that the needed data on or in the authenticator to be read, is read by the reader corresponding to that type of authenticator."
Bradford at 6:13-27

13

Exhibit A8 (Bradford)

| | |
|---|---|
| | "Each first authenticator that is not data itself (i.e., a PIN) has the ability to have data read from it (i.e., the data on the magnetic strip of a typical player ID card). 'First authenticator data' refers to the data that can be read from a physical first authenticator card, if such is used."<br>Bradford at 3:9-15<br><br>"The data that is read off of the card is used to find matching first authenticator data in the player ID database."<br>Bradford at 6:4-6 |
| 1[b]. receiving the biometric signature; | Bradford discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"Game device 100 further provides a video or reel display 102, play buttons 106, one or more first authentication readers 104 (typically a voucher reader, player tracking ID slot, or RFID reader), a fingerprint reader 110 (may be a different biometric device), a card/voucher printer 108, and a SMIB 112 which would typically be connected electronically 114 an RGC (remote game controller, not shown). In one embodiment reader 110 would have an interface (port) to SMIB 112, Sending data and receiving data via connection 114."<br>Bradford at 8:22-31<br><br>"In this case reader 310 includes the hardware and Software needed to do initial processing of the image, Scan, or read of the biometric data that will be the Second authenticator, and will further do the actual database lookup and attempted match for the authorization. In this case, the internals of reader 310 would include a processor, memory, and Software dedicated to reader 310 that are Sufficient to provide the compute resources needed for a database and the Software used to match the reader data and the entries in the database." |

14

Exhibit A8 (Bradford)

| | Bradford at 8:56-65 |
|---|---|
| |  |
| | Bradford at Fig. 3 |
| | "In this case the biometric reader is shown in two possible physical locations relative to game device 400. In one embodiment, the biometric reader and any needed I/O devices are physically outside the game device 400. This would be used in cases where the system will be retro-fitted to an existing game device 400, and where no modifications to the game devices can be made. Reader 410 would be in very close physical proximity to game device 400, prefer ably appearing to a player as a contiguous cabinet with game device 400, or as an extension to the cabinet housing game device 400. |
| | Bradford at 10:30-40 |

15

Exhibit A8 (Bradford)

| | "The Second level or Second means of identifying oneself to a System is through the use of a Second authenticator. The Second authenticator is a biometrically-based authentication means. A biometric authentication means may include fingerprints, hand geometry Scans, retinal Scans, iris Scans, facial feature Scans, or other biologically-based measurement means which are readily available to be used in a casino environment. In the description of this invention, one embodiment is based on the use of a fingerprint as the Second authenticator. However, the inventive concept is broader than the use of a fingerprint alone, encompassing any Second authenticator that is based on a biometric measurement that can be measured (Scanned, read-in) from a human who is sitting or Standing at or near the gaming device which has just been presented with a first authenticator. Bradford at 6:49-64 <br><br> "Fingerprint data is used in a preferred embodiment of the present invention. The word "fingerprint" can be used, in the common Vernacular, to mean both the image left when a fingertip is pressed onto material that will allow Some type of imprint to be left or body oils and skin that leave a distinguishable mark having a unique Set of ridges, etc., as well as meaning the unique pattern on the fingertip itself, even if not transferred to another Surface. To avoid confusion with nuances of the word "fingerprint" when used alone, and add as much clarity as possible, this disclosure will use the term "fingerprint data". "Fingerprint data" is defined to mean at least Some data, where the data is Such that it is Storable and use able by digital logic and/or digital computers, that is derived from a portion of a fingertip, and that is Some way measures, identifies, or characterizes Some portion of the pattern of Swirls, edges, Separation points, etc., found on a portion of the fingertip being used for identification. Thus, it is clear that the term "fingerprint data" does NOT mean a COMPLETE set of data that will always uniquely identify a Single finger from a single human. Rather, it is used to mean there exists a data set (a data set is more than one bit of digital data), usable in digital circuitry, having Some data derived from at least a portion of a fingertip where the fingertip is being used for identification purposes. This definition avoids the problem of having to constantly differentiate between the fingertip, the fingerprint on the fingertip, the fingerprint left after a fingertip is pressed to a Surface, the exact |

Exhibit A8 (Bradford)

| | method used to collect fingerprint information in a fingerprint reader, and the completeness of each reading of a fingerprint. 'Fingerprint reader' means any method and device that may be used to yield 'fingerprint data'."<br>Bradford at 7:3-34 |
|---|---|
| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Bradford discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The first level of identification used by a player is called the first authenticator, and is defined as whatever a player first presents to the system to identify themselves. The first authenticator may be one amongst many choices, where the chosen form will depend on the needs and desires of the individual and the System implementation. A non-exhaustive list of first authenticators that are expected to be in use now or in the near future include: Voucher IDs, a first fingerprint; a biometric other than a fingerprint Such as hand geometry, face geometry, iris Scan, or retinal Scan, an alpha-numeric sequence (this includes PINs, but further includes any Sequence of numbers and letters, case Sensitive or not, that may be usable to identify a player); magnetic-strip cards (usually in the form a traditional player ID card); embedded RFID tags (may be in a key fob, a wallet-sized card, a lapel pin, and numerous other forms which are easy to for a person to carry and use); Smart cards; magnetic diskettes, optical disks and/or mini-disks; or handheld devices with an IR or RF interface (i.e., a PDA such as a Palm Pilot'TM)."<br>Bradford at 5:36-54<br><br>"The data that is read off of the card is used to find matching first authenticator data in the player ID database. That is the extent of its use. Thus, the actual meaning of the data on the magnetic Stripe is not important; it is simply being used as a unique data Sequence to find a matching data Sequence in the player ID |

17

Exhibit A8 (Bradford)

| | database. Thus, as used in this disclosure "player ID" is any authenticator, designated as a first authenticator, that has the property of having data useable as first authenticator data in a player ID database."<br>Bradford at 6:4-13<br><br>"To Simplify word usage in this disclosure, "first authenticator" and "first authenticator data" refer to the same thing, that is, the information or data that is read from a physical item, where that physical item may be used to carry the data, or, in the case of an alpha-numeric Sequence, is the data."<br>Bradford at 3:15-20<br><br>"In the case of a magnetic Strip card, the presenting action would be to insert the card into a magnetic Strip card reader (like an ATM and a bank card)."<br>Bradford at 6:18-20<br><br>"Each first authenticator that is not data itself (i.e., a PIN) has the ability to have data read from it (i.e., the data on the magnetic strip of a typical player ID card)."<br>Bradford at 3:10-13<br><br>"Referring now to FIG. 6, a method for the creation of an entry having biometric data in a player ID database is shown. A player currently without an entry in the player ID database would first go to a customer Service counter and ask for an account, box 600. The process then moves to box 602, where an authorized person enters the initial data from the player into the database, using a privileged data entry Screen into the player authentication database."<br>Bradford at 14:21-28<br><br>"The authorized person enters the player's data and information into the player ID database."<br>Bradford at 14:42-43<br><br>"Continuing now with box 603, the casino attendant may provide the player with the player's first authenticator. In one preferred embodiment the first authenticator |
|---|---|

Exhibit A8 (Bradford)

<table>
<tr>
<td></td>
<td>will be a tangible card (perhaps using an already existing player ID card) or voucher. If a voucher is given to a player, it is called a "player ID voucher', having encoded thereon (and perhaps further being encrypted) a unique identifier, the data being readable by a voucher reader."<br>Bradford at 15:16-23<br><br>"If the player is to be trained, the "Yes" exit is taken from diamond 604 and box 610 is entered. The attendant goes to a game with the present invention installed on it. There may instead be a special "demo game', Set up at or near the Service counter, where the game is set to invoke Specific winning Sequences to allow a player to see what happens and how to respond. A preferred embodiment allows the attendant to use any game device in the casino having the present invention, where the attendant invokes a special Set of Screens or options on Screens on the biometric device reader by identifying themselves as casino perSonnel. The privileged Screens allow the attendant to do two things: enter a player's biometric measurements for entry into the playerID database, and to show any special Screen or choice Sequences to the user as part of the training (i.e., allow a "fake" transaction So the player Sees the Sequence of actions to take). Box 610 is left and box 612 is entered. In box 612, a preferred embodiment uses fingerprint data as the biometric measurement. The player would use the reader with their chosen finger, with the privileged mode Set by the attendant enabling this data to be made part of the player's ID entry in the player ID database. If, at box 603, the player decided to use two fingertips for authentication, the attendant would have the player enter two Sets of fingerprint data in Sequence, using their chosen fingers. Box 612 is left and box 614 entered.<br>In box 614, the attendant makes use of the newly created entry to demonstrate to the player the use of the two authenticator authentication process. This may involve the use of a newly created EFA, a W2C event, or simply identifying themselves to the System. The casino will choose which training Scenario they want to present to the newly enrolled players. Box 614 is left and box 616 entered."<br>Bradford at 15:42–16:7</td>
</tr>
</table>

19

Exhibit A8 (Bradford)

"In box 618, the player is now ready to use the system and the System has an entry in the player ID database corresponding to the player, having a first authenticator and a Second authenticator useable by the player. The end State 620 is now reached."
Bradford at 16:21-26

"In box 608, the system creates the entry in the player ID database corresponding to this player, associating the data corresponding to a first and Second authentic authenticator with this entry, the second of which is always a biometric authenticator and in one preferred embodiment, is a finger print data. Box 608 is left and box 618 is entered. Box 618 corresponds to the System being ready for use by the player, with the process now complete at end point 620."
Bradford at 16:40-47



FIGURE 3

General Gaming Device Having A Fingerprint Reader (Or Other Biometric Reader) And Copy Of A Player Fingerprint (Biometric) Data Base

20

Exhibit A8 (Bradford)

Bradford at Fig. 3



Bradford at Fig. 6

"Thus, the actual meaning of the data on the magnetic Stripe is not important; it is simply being used as a unique data Sequence to find a matching data Sequence in the player ID database."
Bradford at 6:7-10

"(a) having said player present their first authenticator at the Start of game play at Said game device, identifying a unique entry in Said player identification database"
Bradford at 40:46-48

21

Exhibit A8 (Bradford)

<table>
<tr>
<td></td>
<td>"When the player then goes to a game device, the player presents their card to the reader. The data that is read off of the card is used to find matching first authenticator data in the player ID database. That is the extent of its use. Thus, the actual meaning of the data on the magnetic Stripe is not important; it is simply being used as a unique data Sequence to find a matching data Sequence in the player ID database. Thus, as used in this disclosure "player ID is any authenticator, designated as a first authenticator, that has the property of having data useable as first authenticator data in a player ID database. "Presents" is defined in this disclosure to mean any action needed by the user of an authenticator to have the authenticator read by a reader designed to read that authenticator. The exact actions will, of course, vary depending on what type of authenticator a player is using. In the case of a magnetic Strip card, the presenting action would be to insert the card into a magnetic Strip card reader (like an ATM and a bank card). In the case of an RFID tag, the presenting action would be to hold the RFID tag momentarily in front of the reader. Each type of authenticator and its associated input device would have a corresponding meaning of "presents', where in each case the net result is that the needed data on or in the authenticator to be read, is read by the reader corresponding to that type of authenticator. The concept of a database, being well established, is not explained in this disclosure."<br>Bradford at 6:3-30<br><br>"The Second level or Second means of identifying oneself to a System is through the use of a Second authenticator. The Second authenticator is a biometrically-based authentication means. A biometric authentication means may include fingerprints, hand geometry Scans, retinal Scans, iris Scans, facial feature Scans, or other biologically-based measurement means which are readily available to be used in a casino environment. In the description of this invention, one embodiment is based on the use of a fingerprint as the Second authenticator. However, the inventive concept is broader than the use of a fingerprint alone, encompassing any Second authenticator that is based on a biometric measurement that can be measured (Scanned, read-in) from a human who is sitting or Standing at or near the gaming device which has just been presented with a first authenticator."</td>
</tr>
</table>

Exhibit A8 (Bradford)

| | Bradford at 6:49-64 |
|---|---|
| | "The first is to create an entry in the player identification database, which associates a first authenticator and a Second authenticator."<br>Bradford at 3:51-53 |
| | "Returning to diamond 1126, if the second authenticator does not match the Second authenticator associated with the first authenticator using the player ID database, the "No" exit is taken to diamond 1128."<br>Bradford at 26:36-39 |
| | "A player identification database is also used, where an entry corresponding to a player comprises at least one record (typically, exactly one record), and the record has fields containing data, information, or pointers. The records have fields corresponding to a first authenticator and a Second authenticator, providing authenticator data therein or pointers to authenticator data. The Second authenticator will always have data that correspond to a biometric measurement."<br>Bradford at 3:27-36 |
| | "The attendant uses a Special authenticator to enable a privileged Screen that allows the data being read at the biometric reader to be permanently recorded into the field in the player ID datable associated with a second authenticator, in this case fingerprint data."<br>Bradford at 23:36-40 |
| | "Referring again to diamond 706, if the first authenticator is valid and the corresponding player ID entry in the player ID database is enabled (has a Second authenticator) the "Yes' exit is taken to diamond 708."<br>Bradford at 17:47-51 |
| | "Two, the first authenticator can be read but does not correspond to a complete, valid, or enabled entry in the player ID database (for example, the entry has been |

23

Exhibit A8 (Bradford)

| | |
|---|---|
| | expired, revoked, or never had second authenticator data associated with it). Third, the presented authenticator has no corresponding entry in the player ID database." Bradford at 17:18-22<br><br>"In order to provide better (faster) Service to players, a game device configured as shown in FIG. 3, including the network connection, could be implemented with a very limited-capacity embedded System having a Small database. The configuration would allow for the local caching of (for example) the database entries or records corresponding to the last 10 players to use the game device." Bradford at 9:57-63<br><br>"FIG. 3 shows a game device similar to that shown in FIGS. 1 and 2, including game device (including a cabinet) 300, video or reel view area 302, SMIB 312 (optional), at least one electronic connection 314 (optional), first authentication readers 304, voucher/card printer 308, and play or choice buttons 306. In this case reader 310 includes the hardware and Software needed to do initial processing of the image, Scan, or read of the biometric data that will be the Second authenticator, and will further do the actual database lookup and attempted match for the authorization. In this case, the internals of reader 310 would include a processor, memory, and Software dedicated to reader 310 that are Sufficient to provide the compute resources needed for a database and the Software used to match the reader data and the entries in the database. Bradford at 8:51-65<br><br>"The DBIM in the RGC will keep track of a player presenting a first authenticator; if the player has already done so, the BDIM will trigger the reader to prompt the player for their second authenticator, which will be a biometric reading. If the player has not, during this Session, presented a first authenticator the player is prompted for both a first and second authenticator. The BDIM will then take the data Sent from the biometric device and, using the first authenticator, finds an entry in the biometric database by communicating with a backend database machine (shown in FIG. 5 as machine 500)." Bradford at 13:23-33 |

Exhibit A8 (Bradford)

| | |
|---|---|
| | "The player presents their first authenticator to the game device, which is used to get the associated Second authenticator."<br>Bradford at 3:56-58<br><br>"This corresponds to the player inserting a player tracking card, using a Voucher ID, passing an RFID device in front of an RFID reader, or presenting Some other form of first authenticator. The first authenticator is checked to be sure it is valid and enabled for use with a Second authenticator."<br>Bradford at 19:19-24<br><br>"Box 822 corresponds to asking the player to confirm their identity with a biometric measurement, in this case fingerprint data.  The player provides the data (fingerprint) and the data is checked against the entry for the Second authenticator found in the player ID database entry corresponding to the first authenticator."<br>Bradford at 19:63–20:1<br><br>"The player puts the appropriate fingertip on the fingerprint reader, the fingerprint data is checked with the Second authenticator data in the player ID database associated with the first authenticator."<br>Bradford at 20:25-29<br><br>"The process draws to completion in box. 722. The player's biometric data, in this a fingerprint data, is checked against the data in the player ID database for the second authenticator. If a match is made, the W2G is authorized via the fingerprint data, and the actual form is generated in hardcopy for the IRS and for the player (in one embodiment, the player's copy is automatically Sent to the player's address contained in the player ID database)."<br>Bradford at 18:27-34<br><br>"Proceeding to FIG. 11, a method of using the present invention for authenticating electronic funds transfers (EFTS) is shown. A player, having already created an entry in the player ID database, begins game play at a game machine having a |

25

Exhibit A8 (Bradford)

fingerprint reader or other biometric device, box 1100. The player runs out of game credits or wants to transfer some of their winnings to their EFA, moving from box 1100 to box 1102. Box 1102 corresponds to the player initiating an EFT by using Some form of user input button or device, preferably a touchscreen provided either as part of the main game device Video display, or as a separate touchscreen operably connected to the biometric reader (in a preferred embodiment, a fingerprint reader) and Separate from the game device as shown in FIG. 4.

Box 1102 is left and box 1104 is entered. Here, the system then requests the player's first authenticator."

Bradford at 24:52-67



Bradford at Fig. 11

26

Exhibit A8 (Bradford)

| | |
|---|---|
| | "This will typically be a player ID of Some kind, including but not limited to a traditional player ID card, a voucher ID, an RFID tag, or other authenticators used by the casino."<br>Bradford at 24:67–25:3<br><br>"A decision is made based on two criteria: did the player present any first authenticator at all (perhaps they just touched the EFT initiate button to see what would happen, but have not set up an EFA); and, if one is presented, does it correspond to at least one entry in the player ID database?"<br>Bradford at 25:5-10<br><br>"The number of "hits" from the first authenticator will depend of the first authenticator being used, as explained previously. A valid voucher ID will yield one hit; first fingerprint data, a hand geometry read, or certain other biometrics could yield a couple of possible matches, depending on the number of print (or hand or other) criteria that was mapped from the biometric device and the number of people in the player ID database."<br>Bradford at 25:11-18<br><br>"The actions corresponding to box 1118 are to indicate to the player the player's request has been received, and to ask for the players Second authenticator. The player provides the Second authenticator, in one preferred embodiment fingerprint data (illustrated). Continuing onto box 1120, the fingerprint data (or other biometric input) is checked against the Second authenticator data that is associated with the first authenticator (or, in Some embodiments at Some installations, first authenticators; this multiple check need only be done once for each Session a player is at a particular game machine)."<br>Bradford at 25:36-46<br><br>"The configuration would allow for the local caching of (for example) the database entries or records corresponding to the last 10 players to use the game device."<br>Bradford at 9:61-63 |

27

Exhibit A8 (Bradford)

| | |
|---|---|
| | "In this case reader 310 includes the hardware and Software needed to do initial processing of the image, Scan, or read of the biometric data that will be the Second authenticator, and will further do the actual database lookup and attempted match for the authorization."<br>Bradford at 8:56-60<br><br>"FIG. 1 shows a functional block diagram of an example game device. AS used in this disclosure, a "game device' includes any electronic or electromechanical, mechanical, or table (manual) game device usably by a player for any function in a gambling or casino environment. "Game device' further includes the use of a remote computer, typically a home PC, when used for gambling or gaming purposes by being operably coupled through a network to at least one central Server, and where being So coupled over a network allows the home PC to be used for any type of gambling, for placing bets, for the display of game (betting) results, and any similar acts. Included in the definition of game device are also any games of skill (only) or any game that combines skill and chance where a player may win award credits, game credits (changeable to monetary equivalents), or cash prizes. An example of this type of game could be any of the driving skill games currently popular in arcades. In a casino Setting players may play against a clock or other players, winning game credits or making bets on outcomes that are not done in an arcade setting (i.e., same skill games coupled with various types and forms of betting)."<br>Bradford at 7:35-55<br><br>"Game device 100 includes the normal and well known internals needed in order to have a functioning game, Such as at least one central processor, associated memory, input/output interfaces, peripheral interfaces to the Video display, control buttons and lever, monetary input devices, Slot machine interface board (SMIB), together with the firmware and software needed to implement the full functionality of the game (these internals not shown). Game device 100 comprises a conventional game of chance, Such as a Slot machine, Video poker machine, Video lottery device, keno machine, or bingo machine. The gaming device 100 |

28

Exhibit A8 (Bradford)

| | |
|---|---|
| | may alternatively comprise a live table game of chance, Such as a blackjack table or roulette table, where the functions described herein carried out by the gaming device are carried out by a table attendant.<br>Game device 100 further provides a video or reel display 102, play buttons 106, one or more first authentication readers 104 (typically a voucher reader, player tracking ID slot, or RFID reader), a fingerprint reader 110 (may be a different biometric device), a card/voucher printer 108, and a SMIB 112 which would typically be connected electronically 114 an RGC (remote game controller, not shown). In one embodiment reader 110 would have an interface (port) to SMIB 112, Sending data and receiving data via connection 114. Other communications means may be used. As Shown, reader 110 sends the raw biometric data out, unprocessed."<br>Bradford at 8:7-32<br><br>"In this case, the internals of reader 310 would include a processor, memory, and Software dedicated to reader 310 that are Sufficient to provide the compute resources needed for a database and the Software used to match the reader data and the entries in the database."<br>Bradford at 8:60-66<br><br>To the extent that Plaintiff contends Bradford does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Bradford discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

Exhibit A8 (Bradford)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In this case reader 310 includes the hardware and Software needed to do initial processing of the image, Scan, or read of the biometric data that will be the Second authenticator, and will further do the actual database lookup and attempted match for the authorization. In this case, the internals of reader 310 would include a processor, memory, and Software dedicated to reader 310 that are Sufficient to provide the compute resources needed for a database and the Software used to match the reader data and the entries in the database."<br>Bradford at 8:56-66<br><br>"Game device 100 includes the normal and well known internals needed in order to have a functioning game, Such as at least one central processor, associated memory, input/output interfaces, peripheral interfaces to the Video display, control buttons and lever, monetary input devices, Slot machine interface board (SMIB), together with the firmware and software needed to implement the full functionality of the game (these internals not shown)."<br>Bradford at 8:7-14 |
|---|---|

Exhibit A8 (Bradford)



Bradford at Fig. 3

To the extent that Plaintiff contends Bradford does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:

See, e.g., Tello at Claim 1[d]
See, e.g., Lyon at Claim 1[d]
See, e.g., Russo at Claim 1[d]
See, e.g., Russo2 at Claim 1[d]
See, e.g., Celsius at Claim 1[d]

31

Exhibit A8 (Bradford)

| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Bradford discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In this case reader 310 includes the hardware and Software needed to do initial processing of the image, Scan, or read of the biometric data that will be the Second authenticator, and will further do the actual database lookup and attempted match for the authorization. In this case, the internals of reader 310 would include a processor, memory, and Software dedicated to reader 310 that are Sufficient to provide the compute resources needed for a database and the Software used to match the reader data and the entries in the database."<br>Bradford at 8:56-66<br><br>"Game device 100 includes the normal and well known internals needed in order to have a functioning game, Such as at least one central processor, associated memory, input/output interfaces, peripheral interfaces to the Video display, control buttons and lever, monetary input devices, Slot machine interface board (SMIB), together with the firmware and software needed to implement the full functionality of the game (these internals not shown)."<br>Bradford at 8:7-14 |

Exhibit A8 (Bradford)



Bradford at Fig. 3

To the extent that Plaintiff contends Bradford does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:

See, e.g., Tello at Claim 1[e]
See, e.g., Lyon at Claim 1[e]
See, e.g., Okamura at Claim 1[e]
See, e.g., Russo at Claim 1[e]
See, e.g., Russo2 at Claim 1[e]
See, e.g., Seifert at Claim 1[e]

33

Exhibit A8 (Bradford)

| | |
|---|---|
| | See, e.g., Howell at Claim 1[e]<br>See, e.g., Celsius at Claim 1[d] |
| Claim 13 | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Bradford discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Bradford discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Bradford discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |

34

Exhibit A8 (Bradford)

| | |
|---|---|
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Bradford discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 13[d]. means for determining if the defined memory location is unoccupied; and | Bradford discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Bradford discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a | To the extent the preamble is limiting, Bradford discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer |

35

Exhibit A8 (Bradford)

| | |
|---|---|
| method of enrolling in a biometric card pointer system, the program comprising: | system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 19[a]. code for receiving card information; | Bradford discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Bradford discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Bradford discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit A8 (Bradford)

| | See Disclosure at Claim 1[c] |
| --- | --- |
| 19[d]. code for determining if the defined memory location is unoccupied; and | Bradford discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Bradford discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

37

Exhibit A-9 (Howell)

**Exhibit A-9**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**U.S. PATENT APP. PUB. NO. 2005/0169503 ("Howell")**

U.S. Patent App. Pub No. 2005/0169503 to Howell ("Howell") entitled "System For and Method of Finger Initiated Actions" anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

| '039 Patent | Howell |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Howell discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"A device for and method of performing a task associated with fingerprint data is disclosed. The method comprises reading fingerprint data, matching the read fingerprint data to stored fingerprint data, the stored fingerprint data having an |

1

Exhibit A-9 (Howell)

|  | associated task, and performing the task. The associated task is part of a chain of tasks that are automatically executed when the read fingerprint data is matched to the stored fingerprint data. Preferably, at least one task has associated user profile data that is used to perform the task. An electronic device that can be controlled in accordance with the present invention includes, but is not limited to, a telephone, a personal computer, a personal digital assistant, and a remote controlled device."<br>Howell at Abstract<br><br>"In a first aspect of the present invention, a method of performing a task on an electronic device comprises matching read biometric data to stored biometric data having a corresponding task comprising a first chain of tasks and automatically performing the corresponding task on the electronic device. Preferably, the biometric data comprises fingerprint data. The corresponding task is selected from a plurality of tasks that the electronic device is configured to perform. The corresponding task has optional parameters."<br>Howell at [0008]<br><br>"It will be appreciated that a user can access her mailbox or e-mail account in accordance with the present invention in other ways. For example, the control program can call other software, such as Messaging Application Programming Interface (MAPI), which allows a user to seamlessly manipulate e-mail accounts and mailboxes. The control program can invoke a Web browser and post an HTML form to automatically log on to an e-mail server to access her account. The user can manipulate her e-mail account without using a Web browser, by using, for example, a command line such as used in the UNIX environment. It will be appreciated that user name, passwords, and other secured information can be used in other environments in accordance with the present invention, such as with online banking or other online purchasing where credit card and other confidential information can be transmitted."<br>Howell at [0055]<br><br>"FIG. 6 illustrates the steps 600 performed by an Enrollment Program to store fingerprint images and their associated tasks and parameters in the electronic |

2

Exhibit A-9 (Howell)

<table>
<tr>
<td></td>
<td>device 100 (FIG. 1) during a set up process. The Enrollment Program starts in the START step 601. The START step 601 can be entered in a variety of ways, such as by pressing a START button (not shown) on the input device 135 of FIG. 1. Next, in the step 605, the user is prompted to select a task, which in turn can execute a chain of tasks. Tasks can be presented in a number of ways. For example, a user can be presented with a menu of tasks on the display device 130, any number of which can be selected by, for example, entering a selected task on the input device 135. In addition, a user can type in the name of a script (e.g., phone.pls in the array cell 244 of FIG. 2) and its associated parameters (e.g., "10102504085551212" in the array cell 246 in FIG. 2). Next, in the step 610, the Enrollment Program checks whether the selected task has already been associated with a fingerprint image. The Enrollment Program can do this by, for example, parsing the column 204 in FIG. 2 to see whether any of the tasks stored there correspond to the task selected in the step 605. If the selected task corresponds to a fingerprint image in the fingerprint array 200, then the Enrollment Program proceeds to the step 615; otherwise the Enrollment Program proceeds to the step 620."<br/>Howell at [0058]<br/><br/>"As shown in FIG. 8, when the user chooses to enroll a fingerprint image into the fingerprint control system 800, the Enrollment engine 810 is executed. The Enrollment engine 810 processes a fingerprint image captured by the fingerprint scanner 845 and passes the fingerprint image, a pointer to a memory location containing the fingerprint image, or any other fingerprint image identifier to the Task Configuration engine 815. A Task Definition (i.e., associated tasks or programs) are then supplied to the Task Definition engine 820. In one embodiment, the user types tasks using the an input device such as the input device 135 shown in FIG. 1. The Task Configuration engine 815 then stores the fingerprint image identifier (e.g., a fingerprint image, fingerprint minutiae points, pointer to fingerprint minutiae points) into the first column of a row in the Fingerprint Array 835 (e.g. A) and then stores the task chain (e.g., action sequence) and their associated parameters in the remaining elements in the row (e.g., A1, A2, and A3)."</td>
</tr>
</table>

Exhibit A-9 (Howell)

| | Howell at [0065] |
|---|---|

4

Exhibit A-9 (Howell)



Howell at Fig. 6

Exhibit A-9 (Howell)



Howell at Fig. 6

6

Exhibit A-9 (Howell)

| | |
|---|---|
| 1[a]. receiving card information; | Howell discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>To the extent that Plaintiff contends Howell does not disclose or render obvious this<br>claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Tello at Claim 1[a]<br>See, e.g., Lyon at Claim 1[a]<br>See, e.g., Okamura at Claim 1[a]<br>See, e.g., Russo at Claim 1[a]<br>See, e.g., Russo2 at Claim 1[a]<br>See, e.g., Seifert at Claim 1[a]<br>See, e.g., Bradford at Claim 1[a]<br>See, e.g., Singhal at Claim 1[a] |
| 1[b]. receiving the biometric signature; | Howell discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"FIG. 1 is a schematic diagram of a fingerprint control system 100 in accordance with the present invention. The fingerprint control system 100 comprises a central processing unit 110 electronically coupled to a fingerprint sensor 115, a storage unit 120, a display unit 130, and an input unit 135. The storage unit 120 comprises a mapping store 125 containing fingerprint mapping information, such as the task information and associated parameters described in more detail below. It will be appreciated that the fingerprint control system 100 can be a stand-alone system |

7

Exhibit A-9 (Howell)

| | |
|---|---|
| | comprising an electronic device or can be coupled to an external electronic device (not shown) and used to control the external electronic device as described below." Howell at [0032]<br><br>"The fingerprint sensor 115 is used to read the image of a fingerprint placed upon it. The fingerprint sensor 115 can be a placement sensor or a swipe sensor. Placement sensors require a user to place her finger on a reading surface of the fingerprint sensor until a fingerprint image is captured. Placement sensors are designed to actively sense the entire surface of a finger at once. Placement sensors can be based on optical, thermal, pressure, electrical, or other sensing means. In general placement sensors are designed to have a reading surface with an area as large as the pad of a typical human finger, typically 15 mm2. It will be appreciated that the area of the reading surface in accordance with the present invention can be larger or smaller than 15 mm2." Howell at [0033]<br><br>"Alternatively, the fingerprint sensor 115 can be a swipe sensor. In general, swipe sensors are fully sized in one direction (typically in width) but abbreviated in the other (typically in height). Swipe sensors are thus configured to sense only a small rectangular portion of a finger at any one time. To capture a fingerprint image, a user needs to swipe his finger over the sensor. Swipe sensors are especially suitable for portable devices because they are smaller than placement sensors. Methods of and systems for fingerprint sensing are described in detail in the U.S. patent application Ser. No. 10/194,994, filed Jul. 12, 2002, and titled "Method and System for Biometric Image Assembly from Multiple Partial Biometric Frame Scans," and in the U.S. patent application Ser. No. 10/099,558, filed Mar. 13, 2002, and titled "Fingerprint Biometric Capture Device and Method with Integrated On-Chip Data Buffering," both of which are hereby incorporated by reference in their entireties. In the preferred embodiment, the fingerprint sensor is a ATW100 capacitive swipe sensor by Atrua Technologies, Inc., at 1696 Dell Avenue, Campbell, Calif. 95008. It will be appreciated that any sensor technology can be used in accordance with the present invention." |

8

Exhibit A-9 (Howell)

| | Howell at [0034] |
|---|---|
| | "FIG. 3 is a flow chart illustrating the steps 300 taken by a control program in accordance with the present invention and used to perform a task after a fingerprint image is read from the fingerprint sensor 115 of FIG. 1. Referring to FIGS. 1 and 3, in the start step 301, the fingerprint sensor 115 and any data and variables used by the control program are initialized. Next, in the step 305, the user swipes or places her finger on the fingerprint sensor 115. Next, in the step 310, the control program determines whether the image quality of the read (scanned) fingerprint image is acceptable. If it is not, the user is prompted (for example on the display device 130) to again swipe or place her finger on the fingerprint sensor 115. Alternatively, if an optional display is absent the unit can beep or blink on LED to signal the user. The control program then loops back to the step 305. It will be appreciated that the control program can be configured to allow only a pre-determined number of unacceptable images to be scanned. After this limit is reached, the control program can alert the user that the fingerprint sensor 115 is dirty or damaged." <br> Howell at [0048] <br><br> "If it is determined in the step 310 that the quality of the read fingerprint image is acceptable, the control program continues to the step 315, where it compares the read fingerprint image with the stored fingerprint images in the column 201 of the fingerprint array 200 of FIG. 2. Fingerprint images can be compared sequentially or using some weight based on the number of times a particular fingerprint was matched in earlier sessions. A stored fingerprint image (and thus a corresponding task) may match more often (e.g., corresponding to a popular task) and thus will first be compared with other stored fingerprint images. By comparing a read fingerprint image first with an often accessed fingerprint image, the average number of comparisons on a fingerprint control system can be reduced." <br> Howell at [0049] <br><br> "Next, in the step 320, the control program checks whether the read fingerprint image matches the current candidate stored fingerprint image. If a match is not |

Exhibit A-9 (Howell)

<table>
<tr>
<td></td>
<td>found, the control program proceeds to the step 305. If a match was found (e.g., matching the read fingerprint image to the stored fingerprint image 211), the control program continues processing at the step 325. At the step 325, the control program retrieves the corresponding task (e.g., the script email.pls in the field 214) and the corresponding parameters (e.g., the parameter list 216). Next, in the step 330, the control program performs the corresponding task (e.g., calls or launches the script email.pls) using the corresponding parameters (e.g., the user name "John Doe" and the password "password1"). It will be appreciated that executing one task can comprise executing one or more tasks in a task chain. Next, in the step 325, the control program ENDS."<br>Howell at [0050]<br><br>"FIG. 6 illustrates the steps 600 performed by an Enrollment Program to store fingerprint images and their associated tasks and parameters in the electronic device 100 (FIG. 1) during a set up process. The Enrollment Program starts in the START step 601. The START step 601 can be entered in a variety of ways, such as by pressing a START button (not shown) on the input device 135 of FIG. 1. Next, in the step 605, the user is prompted to select a task, which in turn can execute a chain of tasks. Tasks can be presented in a number of ways. For example, a user can be presented with a menu of tasks on the display device 130, any number of which can be selected by, for example, entering a selected task on the input device 135. In addition, a user can type in the name of a script (e.g., phone.pls in the array cell 244 of FIG. 2) and its associated parameters (e.g., "10102504085551212" in the array cell 246 in FIG. 2). Next, in the step 610, the Enrollment Program checks whether the selected task has already been associated with a fingerprint image. The Enrollment Program can do this by, for example, parsing the column 204 in FIG. 2 to see whether any of the tasks stored there correspond to the task selected in the step 605. If the selected task corresponds to a fingerprint image in the fingerprint array 200, then the Enrollment Program proceeds to the step 615; otherwise the Enrollment Program proceeds to the step 620."<br>Howell at [0058]</td>
</tr>
</table>

10

Exhibit A-9 (Howell)

| | |
|---|---|
| | "In the step 615, the Enrollment Program prompts the user whether she would like to change the mapping (association) currently stored in the fingerprint array 200. Preferably, the system of the present invention disallows two fingerprint images from mapping to the same task. It will be appreciated, however, that two fingers can be mapped to the same task. If the user would not like to remap the action already stored in the fingerprint array 200, the Enrollment Program proceeds to the step 605; otherwise, the Enrollment Program proceeds to the step 620. In the step 620, the user is prompted to select a finger that she will later swipe and whose image will be mapped to the selected task. The user can be prompted in a variety of ways. For example, she can be presented with a screen image (similar to column 201 in FIG. 4) of fingers and a means (e.g., mouse click or keypad entry) for selecting one of the fingers presented." <br> Howell at [0059] <br><br> "Next, in the step 630, the user swipes (or places) her finger on the fingerprint sensor 115, and in the step 635 the Enrollment Program checks whether the fingerprint image quality is acceptable. It will be appreciated by those skilled in the art that this can be accomplished in many ways, such as by ensuring an adequate number of dark ridges. If the fingerprint image quality is acceptable, the Enrollment Program proceeds to the step 640; otherwise the Enrollment Program proceeds to the step 630. In the step 640, the Enrollment Program stores in the fingerprint array 200 the fingerprint image, its corresponding task, and the tasks corresponding parameters. Next, in the step 645, the Enrollment Program ENDs." <br> Howell at [0060] |

Exhibit A-9 (Howell)



Howell at Fig. 1

12

Exhibit A-9 (Howell)



Howell at Fig. 3

Exhibit A-9 (Howell)



Howell at Fig. 6

14

Exhibit A-9 (Howell)

| 1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card; | Howell discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"In a second aspect of the present invention, an electronic device comprises (a) a biometric sensor for reading biometric data; (b) a memory storing a plurality of stored biometric data each having a corresponding task identifier used to perform a corresponding task, at least one task comprising a chain of tasks; and (c) a processor coupled to both the biometric sensor and the memory, the processor configured to match read biometric data with stored biometric data and to automatically perform a corresponding task on the electronic device. Preferably, the biometric sensor comprises a fingerprint image sensor, such as a placement sensor or a swipe sensor. In one embodiment, the swipe sensor is configured to detect a direction of a swipe, a first direction having a first task identifier and a second direction having a second task identifier."<br>Howell at [0015]<br><br>"FIG. 1 is a schematic diagram of a fingerprint control system 100 in accordance with the present invention. The fingerprint control system 100 comprises a central processing unit 110 electronically coupled to a fingerprint sensor 115, a storage unit 120, a display unit 130, and an input unit 135. The storage unit 120 comprises a mapping store 125 containing fingerprint mapping information, such as the task information and associated parameters described in more detail below. It will be appreciated that the fingerprint control system 100 can be a stand-alone system comprising an electronic device or can be coupled to an external electronic device (not shown) and used to control the external electronic device as described below."<br>Howell at [0032] |

Exhibit A-9 (Howell)

| | |
|---|---|
| | "The storage unit 120 comprises a fingerprint mapping store 125 used to store fingerprint mapping information. As described in more detail below, the fingerprint mapping information comprises a plurality of fingerprint images, their associated tasks, and the parameters used by the tasks. Thus, when the fingerprint sensor 115 reads a fingerprint image (the read fingerprint image), a control program executed by the CPU 110 compares the read fingerprint image to fingerprint images stored in the fingerprint mapping store 125. These stored fingerprint images are referred to as "enrolled fingerprint images" or "stored fingerprint images." When the control program matches the read fingerprint image to an stored fingerprint image, the CPU 110 will execute the tasks associated with the matched stored fingerprint image, using the associated parameters, if any. In a preferred embodiment, the fingerprint mapping information is stored in a fingerprint array (table) where the index or key is a fingerprint image and the associated task is the value for the array. FIG. 2 shows one embodiment of a fingerprint array, described in more detail below. Using a fingerprint array, the control program can quickly associate a fingerprint image to its corresponding task."<br>Howell at [0037]<br><br>"FIG. 6 illustrates the steps 600 performed by an Enrollment Program to store fingerprint images and their associated tasks and parameters in the electronic device 100 (FIG. 1) during a set up process. The Enrollment Program starts in the START step 601. The START step 601 can be entered in a variety of ways, such as by pressing a START button (not shown) on the input device 135 of FIG. 1. Next, in the step 605, the user is prompted to select a task, which in turn can execute a chain of tasks. Tasks can be presented in a number of ways. For example, a user can be presented with a menu of tasks on the display device 130, any number of which can be selected by, for example, entering a selected task on the input device 135. In addition, a user can type in the name of a script (e.g., phone.pls in the array cell 244 of FIG. 2) and its associated parameters (e.g., "10102504085551212" in the array cell 246 in FIG. 2). Next, in the step 610, the Enrollment Program checks whether the selected task has already been associated with a fingerprint image. The Enrollment Program can do this by, for example, |

Exhibit A-9 (Howell)

| | |
|---|---|
| | parsing the column 204 in FIG. 2 to see whether any of the tasks stored there correspond to the task selected in the step 605. If the selected task corresponds to a fingerprint image in the fingerprint array 200, then the Enrollment Program proceeds to the step 615; otherwise the Enrollment Program proceeds to the step 620."<br>Howell at [0058]<br><br>"Next, in the step 630, the user swipes (or places) her finger on the fingerprint sensor 115, and in the step 635 the Enrollment Program checks whether the fingerprint image quality is acceptable. It will be appreciated by those skilled in the art that this can be accomplished in many ways, such as by ensuring an adequate number of dark ridges. If the fingerprint image quality is acceptable, the Enrollment Program proceeds to the step 640; otherwise the Enrollment Program proceeds to the step 630. In the step 640, the Enrollment Program stores in the fingerprint array 200 the fingerprint image, its corresponding task, and the tasks corresponding parameters. Next, in the step 645, the Enrollment Program ENDs."<br>Howell at [0060]<br><br>"As shown in FIG. 8, when the user chooses to enroll a fingerprint image into the fingerprint control system 800, the Enrollment engine 810 is executed. The Enrollment engine 810 processes a fingerprint image captured by the fingerprint scanner 845 and passes the fingerprint image, a pointer to a memory location containing the fingerprint image, or any other fingerprint image identifier to the Task Configuration engine 815. A Task Definition (i.e., associated tasks or programs) are then supplied to the Task Definition engine 820. In one embodiment, the user types tasks using the an input device such as the input device 135 shown in FIG. 1. The Task Configuration engine 815 then stores the fingerprint image identifier (e.g., a fingerprint image, fingerprint minutiae points, pointer to fingerprint minutiae points) into the first column of a row in the Fingerprint Array 835 (e.g. A) and then stores the task chain (e.g., action sequence) and their associated parameters in the remaining elements in the row (e.g., A1, A2, and A3)."<br>Howell at [0065] |

Exhibit A-9 (Howell)

| | |
|---|---|
| | "In one embodiment, the fingerprint array 835 and the initialization program 825 can both reside in a single memory storage, such as the storage 120 in FIG. 1. It will be appreciated, however, that the fingerprint array 835 and the initialization program 825 can reside on different storage devices at different locations. For example, the initialization program 825 can reside on an electronic device (not shown) and the fingerprint array 835 can be coupled to the electronic device over a network. The initialization program 825 is not required after the set up process. In one embodiment, fingerprint images are stored on a storage device in encrypted form, thus adding an additional level of security." <br> Howell at [0067] <br><br>  <br> Howell at Fig. 1 |

Exhibit A-9 (Howell)



Howell at Fig. 6

19

Exhibit A-9 (Howell)



Howell at Fig. 8

20

Exhibit A-9 (Howell)

| | |
|---|---|
| | To the extent that Plaintiff contends Howell does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:<br><br>See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Bradford at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Howell discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"As shown in FIG. 8, when the user chooses to enroll a fingerprint image into the fingerprint control system 800, the Enrollment engine 810 is executed. The Enrollment engine 810 processes a fingerprint image captured by the fingerprint scanner 845 and passes the fingerprint image, a pointer to a memory location containing the fingerprint image, or any other fingerprint image identifier to the Task Configuration engine 815. A Task Definition (i.e., associated tasks or programs) are then supplied to the Task Definition engine 820. In one embodiment, the user types tasks using the an input device such as the input device 135 shown in FIG. 1. The Task Configuration engine 815 then stores the fingerprint image identifier (e.g., a fingerprint image, fingerprint minutiae points, pointer to fingerprint minutiae points) into the first column of a row in the Fingerprint Array 835 (e.g. A) and then stores the task chain (e.g., action sequence) and their associated parameters in the remaining elements in the row (e.g., A1, A2, and A3)."<br>Howell at [0065] |

Exhibit A-9 (Howell)

| | "In one embodiment, the fingerprint array 835 and the initialization program 825 can both reside in a single memory storage, such as the storage 120 in FIG. 1. It will be appreciated, however, that the fingerprint array 835 and the initialization program 825 can reside on different storage devices at different locations. For example, the initialization program 825 can reside on an electronic device (not shown) and the fingerprint array 835 can be coupled to the electronic device over a network. The initialization program 825 is not required after the set up process. In one embodiment, fingerprint images are stored on a storage device in encrypted form, thus adding an additional level of security." Howell at [0067] |
|---|---|

22

Exhibit A-9 (Howell)



Howell at Fig. 8

Exhibit A-9 (Howell)

| | |
|---|---|
| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Howell discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>"The storage unit 120 comprises a fingerprint mapping store 125 used to store fingerprint mapping information. As described in more detail below, the fingerprint mapping information comprises a plurality of fingerprint images, their associated tasks, and the parameters used by the tasks. Thus, when the fingerprint sensor 115 reads a fingerprint image (the read fingerprint image), a control program executed by the CPU 110 compares the read fingerprint image to fingerprint images stored in the fingerprint mapping store 125. These stored fingerprint images are referred to as "enrolled fingerprint images" or "stored fingerprint images." When the control program matches the read fingerprint image to an stored fingerprint image, the CPU 110 will execute the tasks associated with the matched stored fingerprint image, using the associated parameters, if any. In a preferred embodiment, the fingerprint mapping information is stored in a fingerprint array (table) where the index or key is a fingerprint image and the associated task is the value for the array. FIG. 2 shows one embodiment of a fingerprint array, described in more detail below. Using a fingerprint array, the control program can quickly associate a fingerprint image to its corresponding task."<br>Howell at [0037]<br><br>"Next, in the step 630, the user swipes (or places) her finger on the fingerprint sensor 115, and in the step 635 the Enrollment Program checks whether the fingerprint image quality is acceptable. It will be appreciated by those skilled in the art that this can be accomplished in many ways, such as by ensuring an adequate number of dark ridges. If the fingerprint image quality is acceptable, the Enrollment Program proceeds to the step 640; otherwise the Enrollment Program |

24

Exhibit A-9 (Howell)

| | |
|---|---|
| | proceeds to the step 630. In the step 640, the Enrollment Program stores in the fingerprint array 200 the fingerprint image, its corresponding task, and the tasks corresponding parameters. Next, in the step 645, the Enrollment Program ENDs." Howell at [0060]<br><br>"FIG. 8 illustrates the relationship between the elements of a fingerprint control system 800 comprising a fingerprint reader 845, an initialization program 825, a fingerprint array 835, and a control program 840. The initialization program 825 comprises an Enrollment engine 810, a Task Definition engine 820, and a Task Configuration engine 815. The fingerprint array 835 contains a column of 10 fingerprint images labeled A through J (also referred to as row A through row J, respectively). Each fingerprint image has associated with it a task chain. The task chain corresponds to multiple tasks that are executed by the control program 840 when a fingerprint image read by the fingerprint reader 845 matches a fingerprint image stored in the fingerprint array 835. Preferably, read fingerprint data (e.g., minutiae points) are compared to fingerprint data stored in the fingerprint array 835. The row A has associated with it the chain of tasks (e.g., executable files or a scripts) A1, A2, and A3. Each task A1, A2, and A3 can have one or more parameters associated with it. The result of each task depends on the values of these parameters. It will also be appreciated that while FIG. 8 shows a linear (one-dimensional) task chain A1, A2, and A3, such that task Al is performed, followed by task A2 and then task A3, tasks can also be performed in parallel. Thus, for example, when a read fingerprint image matches the fingerprint image A, a first task Al and a second task All (not shown) can be performed in parallel, thus allowing for the performance of tasks in a two-dimensional manner." Howell at [0062] |

Exhibit A-9 (Howell)



Howell at Fig. 6

26

Exhibit A-9 (Howell)



Howell at Fig. 8

Claim 13

Exhibit A-9 (Howell)

| | |
|---|---|
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Howell discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Howell discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Howell discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Howell discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

28

Exhibit A-9 (Howell)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
|---|---|
| 13[d]. means for determining if the defined memory location is unoccupied; and | Howell discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Howell discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Howell discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

29

Exhibit A-9 (Howell)

|  | See Disclosure at Claim 1[pre] |
|---|---|
| 19[a]. code for receiving card information; | Howell discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Howell discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Howell discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 19[d]. code for determining if the defined memory location is unoccupied; and | Howell discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

30

Exhibit A-9 (Howell)

| | |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Howell discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

31

Exhibit A-10 (Celsius)

**Exhibit A-10**

**INVALIDITY OF U.S. PATENT NO. 8,620,039 (THE "'039 PATENT")**

**BY**

**CELSIUS Mobile A System ("Celsius")**

CELSIUS Mobile A System ("Celsius") anticipates and/or renders obvious claims 1, 13, and 19 of U.S. Patent No. 8,620,039 (the "'039 Patent"), alone and/or in combination with other references and/or the knowledge of one of ordinary skill in the art, as set forth in the chart below and explained in Defendant's Invalidity Contentions. This invalidity claim chart is based on Defendant's present understanding of the asserted claims and CPC Patent Technologies Pty Ltd.'s ("CPC") apparent construction of the claims, as set forth in CPC's Infringement Contentions. Defendant is not adopting CPC's apparent constructions, nor is Defendant agreeing that any of CPC's apparent constructions are correct. Defendant reserves all rights to advance claim construction positions different from CPC's apparent constructions. In addition to being explicitly disclosed in the prior art, each limitation of the asserted claims would have been inherent and/or obvious. By mapping claim language to this reference, Defendant does not imply or admit that the claim language satisfies 35 U.S.C. § 112. To the extent any cell lacks citations to the charted reference, this should not be taken as an admission that the reference does not disclose the corresponding limitation but rather indicates that Defendant does not presently intend to rely on the reference as disclosing the limitation based on Defendant's present understanding of the claim limitation.

System:

- CELSIUS Mobile A Notebook Computer
- CELSIUS EasyGuide (December 2002 edition)

| '039 Patent | Celsius |
|---|---|
| Claim 1 | |
| 1[pre]. A method of enrolling in a biometric card pointer system, the method comprising the steps of: | To the extent the preamble is limiting, Celsius discloses a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

1

Exhibit A-10 (Celsius)

## SmartCard reader

Your notebook also allows operation of a SmartCard via the SmartCard slot. The SmartCard can be used as a particularly secure alternative or as an addition to password protection. SmartCards are just as useful for digital signatures or for encrypting e-mails.

You can also read out other cards with your SmartCard reader (e.g. cell phone cards, health insurance cards, bank cards). For this purpose you also require the software matched to the respective card.

## Fingerprint sensor

Your notebook is equipped with a fingerprint sensor. You can use the fingerprint sensor as an alternative to the BIOS password as system protection. By the way you can use the fingerprint-sensor under any operating system.

## Brief overview of the security functions

| Security function | Type of protection | Preparation |
|---|---|---|
| Kensington Lock | Mechanical | Mount and lock Kensington MicroSaver (accessory) |
| BIOS password protection | Password protection for *BIOS Setup*, operating system and hard disk with Supervisor and User password. The passwords consist of a maximum of eight alphanumeric characters. | Specify at least one Supervisor password in the *BIOS Setup* and activate the password protection for the operating system and hard disk as desired. |
| SmartCard | Protection of the operating system with PIN and SmartCard on which a "Public Key" or a password is stored. | Obtain SmartCard (accessory), install appropriate software, e.g. *Smarty* (accessory). Specify a password when using the *Smarty* software. |
| Fingerprint sensor | Protection of operating system by registered fingerprint. | Activate fingerprint reader in *BIOS Setup* and register fingerprint. |

CELSIUS EasyGuide at 40

2

Exhibit A-10 (Celsius)

## SmartCards

SmartCards are not supplied as standard equipment. You can use all SmartCards that comply with the ISO standard 7816-1, -2 or –3. These SmartCards are available from various manufacturers. Under Windows 2000 or Windows XP we recommend the SICRYPT card, as the drivers for this SmartCard are already preinstalled under Windows 2000 and Windows XP.

With the appropriate software you can use your SmartCard as an alternative to password protection, but also as a digital signature or for encrypting your e-mails.

With the *Smarty* security software (part of the "Mobile Secure IT Suite") you can assign a password to your SmartCard. This enables you to safely log on to the operating system under Windows 2000 and under Windows NT.

We recommend that you always use two SmartCards. Always keep one of the SmartCards in a safe place if you carry the other SmartCard with you.

 The SmartCard can only be used with a PIN so protection is maintained even when the SmartCard is lost. After the incorrect PIN is entered three times, the card is blocked.

The first time you use your SmartCard you must enter the preset PIN provided by the SmartCard manufacturer or your system administrator.

CELSIUS EasyGuide at 44

## Application examples

### SmartCard as device protection

After switching on the notebook and inserting the SmartCard you are asked to enter your PIN. Upon correct entry the SmartCard is checked and the operating system is booted.

The SmartCard remains in the SmartCard holder during the entire work session.

 When the *Smarty* software (accessory) is used, a password is stored on the SmartCard. This password needs only be entered during the initial setup and in the case of password changes. As a result, a long cryptic character sequence can be used as password which offers greater security than a simple password.

In *Smarty* you can specify how the user is to log on to the operating system:

- only with SmartCard and PIN
- either with SmartCard and PIN or with password entry

To install, configure and use *Smarty*, please see the documentation and online help on the CD for the *Smarty* software.

3

Exhibit A-10 (Celsius)

| | CELSIUS EasyGuide at 44 |
|---|---|
| | **SmartCard for creating user profiles**<br><br>With the *Smarty* software you can assign individual rights for different users within a network with the same basic installation under Windows 2000 and Windows NT. You save these individual user profiles on the SmartCards of the individual users with *Smarty*. As a result, each user finds his/her individual configuration at any workstation within the network simply by inserting his/her SmartCard.<br><br>Please see the documentation and the online help on the CD for the *Smarty* software for instructions on how to create the personal user profiles. |
| | CELSIUS EasyGuide at 44 |
| 1[a]. receiving card information; | Celsius discloses receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

4

Exhibit A-10 (Celsius)

<table>
<tr>
<td></td>
<td>

**Inserting the SmartCard**

►     Carefully push the SmartCard into the slot with the chip facing upward and at the front.

CELSIUS EasyGuide at 45</td>
</tr>
<tr>
<td>1[b]. receiving the biometric signature;</td>
<td>Celsius discloses receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:</td>
</tr>
</table>

Exhibit A-10 (Celsius)

<table>
<tr>
<td></td>
<td>

### Configuring and using fingerprint sensor

The fingerprint sensor is not activated by default. You can decide for yourself, whether you log on to the system by entering a password (see "Configuring password protection in BIOS Setup" chapter) or with your fingerprint.

### Activating fingerprint sensor

► Call *BIOS Setup* and select the *Security* menu.

If you have already defined a supervisor and a user password, you have to delete these passwords now. Follow the instructions in "Protecting BIOS Setup (supervisor and user password)" chapter.

► Select the *Supervisor Fingerprint Menu* field and mark the *Enable* entry.

► Then select the *User Fingerprint Menu* field and mark the *Enable* entry.

► Select the *Exit Saving Changes* option in the *Exit* menu.

The notebook reboots and you enter the *SUPERVISOR Fingerprint Security Menu*.

CELSIUS EasyGuide at 47
</td>
</tr>
<tr>
<td>1[c]. defining, dependent upon the received card information, a memory location in a local memory external to the card;</td>
<td>

Celsius discloses defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.

For example, see the following passages and/or figures, as well as all related disclosures:
</td>
</tr>
</table>

Exhibit A-10 (Celsius)

<table>
<tr>
<td></td>
<td>

### Registering fingerprint

**Registering supervisor fingerprint**

▶ Press the [N] key.

▶ Press the fingerprint sensor with one fingertip. The fingertip has to be placed on the sensor several times in a row. Follow the instructions in the BIOS window.

After registering the first fingerprint you will re-enter the menu window.

▶ Press the [N] key to register the next fingerprint.

 It is necessary to register several fingers to make sure you can log on to your system in case a finger is injured. It is best to use fingers of both hands for registration.

▶ Press [Esc] after registration is completed.

If you have not yet enough fingers read, a warning is issued. Otherwise you enter the menu to register the user fingerprint (*USER Fingerprint Security Menu*).

**Registering user fingerprint**

Register several fingers here as well.

▶ Press the [N] key.

▶ Press the fingerprint sensor several times in row with each fingertip. Follow the instructions in the BIOS window.

▶ Press the [Esc] key.

The notebook restarts.

 If you register supervisor fingerprints only, you can also activate the system protection in *BIOS Setup* using the entry *Password on Boot* (see "Password protection of operating system" chapter).

CELSIUS EasyGuide at 47

To the extent that Plaintiff contends Celsius does not disclose or render obvious this claim element, it would have been obvious to combine this reference with other prior art, such as the prior art listed below, or the additional prior art listed in Defendant's Disclosure of Invalidity Contentions that teach this concept:

</td>
</tr>
</table>

7

Exhibit A-10 (Celsius)

| | |
|---|---|
| | See, e.g., Okamura at Claim 1[c]<br>See, e.g., Seifert at Claim 1[c]<br>See, e.g., Bradford at Claim 1[c]<br>See, e.g., Singhal at Claim 1[c] |
| 1[d]. determining if the defined memory location is unoccupied; and | Celsius discloses determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures: |

Exhibit A-10 (Celsius)

<table>
<tr><td></td><td>

### Adding fingerprint

You can add fingerprints to the already registered ones any time, as long as there is enough memory capacity.

**Adding supervisor fingerprint**

► Call *BIOS Setup* and select the *Security* menu.

► Select the *Supervisor Fingerprint Menu* field and mark the *Enable* entry.

► Select the *Exit Saving Changes* option in the *Exit* menu.

When rebooting you enter the *SUPERVISOR Fingerprint Security Menu*.

► Press the [N] key.

► Press the required fingertip on the fingerprint sensor several times in a row. Follow the instructions in the BIOS window.

► Press the [Esc] key.

The notebook restarts.

**Adding user fingerprint**

► Call *BIOS Setup* and select the *Security* menu.

► Select the *Supervisor Fingerprint Menu* field and mark the *Enable* entry.

► Select the *User Fingerprint Menu* field and mark the *Enable* entry.

► Select the *Exit Saving Changes* option in the *Exit* menu.

When rebooting you enter the *SUPERVISOR Fingerprint Security Menu*.

► Press the [Esc] key.

The *USER Fingerprint Security Menu* is called.

► Press the [N] key.

► Press the required fingertip on the fingerprint sensor several times in a row. Follow the instructions in the BIOS window.

► Press the [Esc] key.

The notebook restarts.

CELSIUS EasyGuide at 50

</td></tr>
</table>

9

Exhibit A-10 (Celsius)

| 1[e]. storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Celsius discloses storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |
|---|---|
| | For example, see the following passages and/or figures, as well as all related disclosures: |

**Registering fingerprint**

**Registering supervisor fingerprint**

► Press the [N] key.

► Press the fingerprint sensor with one fingertip. The fingertip has to be placed on the sensor several times in a row. Follow the instructions in the BIOS window.

After registering the first fingerprint you will re-enter the menu window.

► Press the [N] key to register the next fingerprint.

 It is necessary to register several fingers to make sure you can log on to your system in case a finger is injured. It is best to use fingers of both hands for registration.

► Press [Esc] after registration is completed.

If you have not yet enough fingers read, a warning is issued. Otherwise you enter the menu to register the user fingerprint (*USER Fingerprint Security Menu*).

**Registering user fingerprint**

Register several fingers here as well.

► Press the [N] key.

► Press the fingerprint sensor several times in row with each fingertip. Follow the instructions in the BIOS window.

► Press the [Esc] key.

The notebook restarts.

 If you register supervisor fingerprints only, you can also activate the system protection in *BIOS Setup* using the entry *Password on Boot* (see "Password protection of operating system" chapter).

10

Exhibit A-10 (Celsius)

|  | CELSIUS EasyGuide at 47 |
|---|---|
| **Claim 13** | |
| 13[pre]. A biometric card pointer enrolment system comprising: | To the extent the preamble is limiting, Celsius discloses a biometric card pointer enrolment system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[pre] |
| 13[a]. a card device reader for receiving card information; | Celsius discloses a card device reader for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[a] |
| 13[b]. a biometric reader for receiving the biometric signature; | Celsius discloses a biometric reader for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. <br><br> For example, see the following passages and/or figures, as well as all related disclosures: <br><br> See Disclosure at Claim 1[b] |
| 13[c]. means for defining, dependent upon the received card information, a | Celsius discloses means for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a |

Exhibit A-10 (Celsius)

| | |
|---|---|
| memory location in a local memory external to the card; | matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |
| 13[d]. means for determining if the defined memory location is unoccupied; and | Celsius discloses means for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 13[e]. means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Celsius discloses means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |
| Claim 19 | |
| 19[pre]. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising: | To the extent the preamble is limiting, Celsius discloses a non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation. |

12

Exhibit A-10 (Celsius)

| | For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[pre] |
|---|---|
| 19[a]. code for receiving card information; | Celsius discloses code for receiving card information explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[a] |
| 19[b]. code for receiving the biometric signature; | Celsius discloses code for receiving the biometric signature explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[b] |
| 19[c]. code for defining, dependent upon the received card information, a memory location in a local memory external to the card; | Celsius discloses code for defining, dependent upon the received card information, a memory location in a local memory external to the card explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[c] |

Exhibit A-10 (Celsius)

| | |
|---|---|
| 19[d]. code for determining if the defined memory location is unoccupied; and | Celsius discloses code for determining if the defined memory location is unoccupied explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[d] |
| 19[e]. code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location. | Celsius discloses code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location explicitly, inherently, or as a matter of common sense, or it would have been obvious to add missing aspects of the limitation.<br><br>For example, see the following passages and/or figures, as well as all related disclosures:<br><br>See Disclosure at Claim 1[e] |

14